# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Joe Baltas,
      PLAINTIFF,

       :       Civil Action No.

V.

Scott Erfe,
In His Individual and Official Capacities;

Angel Quiros,
In His Individual and Official Capacities;

Henry Falcone,
In His Individual and Official Capacities;

Lalitha Pieri,
In Her Individual and Official Capacities;

_____ Arzt,
In His Individual Capacity;

Nancy Hill,
In Her Individual Capacity;

Scott Semple,
In His Individual and Official Capacities;

E. Tugie,
In Her Individual and Official Capacities;

David Maiga,
In His Individual and Official Capacities;

Monica Rinaldi,
In Her Individual and Official Capacities;

Gregorio Robles,
In His Individual and Official Capacities;

William Mulligan,
In His Individual and Official Capacities;

____ Rizvani,
In His Individual and Official Capacities;

____ Alexander,
In His Individual and Official Capacities;

Mathews,
In Her Individual and Official Capacities;    :

McCormick,
In His Individual and Official Capacities;    :

Chevalier,
In His Individual and Official Capacities;    :

Giuliana Mudano,
In Her Individual and Official Capacities;    :

Leone,
In His Individual and Official Capacities;    :

Betances,
In His Individual and Official Capacities;    :

Rollin Cook,
In His Individual and Official Capacities;    :
        DEFENDANTS.    :

A JURY TRIAL IS HEREBY DEMANDED

# COMPLAINT

## A. INTRODUCTION

1. The Plaintiff herein alleges under 42 U.S.C. §§ 1983 and 1988 that the behavior and actions of the Defendants violated his First, Fourth, Fifth, Eighth and Fourteenth Amendment Rights under the United States Constitution ("U.S. Constitution") and Article First section 20 of the Connecticut State Constitution.

## B. PRELIMINARY STATEMENT

2. The Plaintiff herein, Joe Baltas, is a Prisoner in the custody and control of the Commissioner of the Connecticut Department of Corrections ("DOC") and was at all times relevant to this Complaint held at various Correctional facilities in the State of Connecticut.

3. The Plaintiff alleges that the Defendants acted individually and/or in concert under Color of law and color of their authority as DOC officials to violate the Civil Rights of the Plaintiff and DOC Policies and Administrative Directives ("AD") established to protect the Rights of Prisoners under the Constitution and 42 U.S.C. §§ 1983 and 1988.

4

4. The Plaintiff specifically alleges the Defendants acting alone and/or in Concert did:

    a. treat him differently from similarly situated individuals;

    b. retaliate against him for engaging in protected conduct;

    c. deny him access to and ability to practice his chosen religion;

    d. discriminate against him for the immutable trait of ancestry;

    e. act with deliberate indifference to his medical needs and/or conditions;

    f. use excessive force and subject him to Cruel and unusual punishments;

    g. falsify documents to manufacture a punitive Administrative Segregation Placement;

    h. use an overly broad and Subjective Standard to improperly orchestrate an Administrative Segregation Classification;

    i. deny him Due Process;

    j. Subject him to Atypical and significant Hardships;

    k. Subject him to extremely harsh and cruel conditions of Confinement and isolation Confinement;

    l. deny him association with family, friends and Peers;

    m. intentionally subject him to sexual harassments and sexual abuses;

    n. deny him possession and enjoyment of his Personal Property;

    o. deny him access to information;

    p. fail to protect him;

    q. Violently and unlawfully physically assault him;

    r. act to conceal and cover up misconduct employed against him;

    s. deny him equal protection;

t. fail to supervise subordinate staff;

u. through their actions and/or failures to act did torture and/or
    torment and/or subject the Plaintiff to Cruel and unusual
    Punishments, and/or Conspired to do so.

## C.   JURISDICTION AND VENUE

5. The Court has jurisdiction over the Plaintiff's Claims of clear and
   egregious violations to his federal Constitutional Rights under
   28 U.S.C. §§ 1331, 1343 (a)(3) and 1367(a).

6. The events giving rise to the Causes of Action described herein
   occured in the District of Connecticut, and thus venue is
   appropriate under 28 U.S.C. § 1391 (b)(2).

7. The Court has supplemental jurisdiction over the Plaintiff's Claims of
   clear and egregious violations to his State Constitutional Rights
   and State laws under 28 U.S.C. § 1367.

8. The Plaintiff Seeks Damages pursuant to 42 U.S.C. §§ 1983 and 1988,
   Declaratory Relief pursuant to 28 U.S.C. §§ 2201 and 2202,
   and Injunctive Relief pursuant to 28 U.S.C. §§ 2283 and
   2284 and Rule 65 of the federal Rules of Civil Procedure
   ("fed. R. Civ. P.").

6.

## D. PARTIES

9. The Plaintiff herein, Joe Baltas, inmate number 339650, was at all times relevant to this Complaint a State Prisoner in the custody and control of the Commissioner of the Connecticut DOC and was housed at various State Correctional facilities inclusive of: the Cheshire Correctional Institution ("C.I.") in Cheshire, Connecticut; the Garner C.I. in Newtown, Connecticut; the Northern C.I. in Somers, Connecticut; and the Hartford Correctional Center ("HCC") in Hartford, Connecticut. He is currently held in the Northern C.I.

10. The first named Defendant, Scott Erfe, was at all times relevant to this Complaint the Warden of the Cheshire C.I. and a District Administrator of the DOC. He is sued in his individual and official capacities.

11. The second named Defendant, Angel Quiros, was at all times relevant to this Complaint a District Administrator and a Deputy Commissioner of the DOC. He is sued in his individual and official capacities.

12. The third named Defendant, Henry Falcone, was at all times relevant to this Complaint the Warden of the Garner C.I. He has since retired. He is sued in his individual and official capacities.

7.

13. The fourth named Defendant, Lalitha Pieri, was at all times relevant to this Complaint a Psychiatric Doctor employed at the Garner C.I. She is sued in her individual and official Capacities.

14. The fifth named Defendant, _____ [1] Arze, was at all times relevant to this Complaint a Correctional Lieutenant employeed at the Northern C.I. He has since retired. He is sued in his individual Capacity.

15. The sixth named Defendant, Nancy Hill, was at all times relevant to this Complaint a Registered Nurse employeed at the Northern C.I. She has since retired. She is sued in her individual Capacity.

16. The seventh named Defendant, Scott Semple, was at all times relevant to this Complaint the Commissoner of the DOC. He has since retired. He is sued in his individual and official Capacities.

17. The eighth named Defendant, E. Tugie, was at all times relevant to this Complaint a Correctional Counselor Supervisor employeed at the Division of Offender Classification and Population Management of the DOC with the title of Hearing Officer. She is sued in her individual and official Capacity.

---

[1] The first name of several Defendants are unknown at this time, where that is the case a _____ is used.

8.

18. The ninth named Defendant, David Maiga, was at all times relevant to this Complaint the Director of Offender Classification and Population Management for the DOC. He is sued in his individual and official capacities.

19. The tenth named Defendant, Monica Rinaldi, was at all times relevant to this Complaint a Deputy Commissioner of the DOC. She has since retired. She is sued in her individual and official capacities.

20. The eleventh named Defendant, Gregorio Robles, was at all times relevant to this Complaint a Correctional Captain employed at the Northern C.I. He is sued in his individual and official capacities.

21. The twelfth named Defendant, William Mulligan, was at all times relevant to this Complaint the Warden of Northern C.I. and a District Administrator for the DOC. He is sued in his individual and official capacities.

22. The thirteenth named Defendant, _____ Rizvani, was at all times relevant to this Complaint a Correctional Officer employed at the HCC. He is sued in his individual and official capacities.

23. The fourteenth named Defendant, _____ Alexander, was at all times relevant to this Complaint a Correctional Captain employed at the HCC. He is sued in his individual and official capacities.

9.

24. The fifteenth named Defendant, _____ Mathews, was at all times relevant to this Complaint a Psychiatric Doctor employed at HCC. She is sued in her individual and official Capacities.

25. The sixteenth named Defendant, _____ McCormack, was at all times relevant to this Complaint the Warden of HCC. He is sued in his individual and official Capacities.

26. The Seventeenth named Defendant, _____ Chevalier, Was at all times relevant to this Complaint a Correctional Captain employeed at the Northern C.I. He is sued in his individual and official Capacities.

27. The eighteenth named Defendant, Giuliana Mudano, was at all times relevant to this Complaint the Warden of the Northern C.I. She is sued in her individual and official Capacities.

28. The nineteenth named Defendant, _____ Leone, was at all times relevant to this Complaint a Correctional Officer with the title of Disciplinary Report Investigator employeed at the Northern C.I. He is sued in his individual and official Capacities.

29. The twentieth named Defendant, _____ Betances, was at all times relevant to this Complaint a Correctional Lieutenant with the title of Disciplinary Hearing Officer. He is sued in his individual and official Capacities.

30. The twenty-first named Defendant, Rollin Cook, was at all times relevant to this Complaint the Commissioner of the DOC. He is sued in his individual and official capacities.

31. All named Defendants were employees of the State of Connecticut's Department of Corrections and/or Contracted employees of the State of Connecticut's Department of Corrections. All acted under Color of law and Color of their authority as Officials for the Connecticut Department of Corrections.

E.   CAPACITY of DEFENDANTS

32. Defendants Arze and Hill are sued in their individual capacities only. All other named Defendants are sued in both their individual and official capacities.

F.   PREVIOUS LAWSUITS

33. The Plaintiff herein has not brought any other lawsuits in either State or federal Court dealing with these facts and circumstances.

34. The Plaintiff does have several pending State Habeas Actions dealing with some of these facts.

11.

G.  PREVIOUS DISMISSED ACTIONS OR APPEALS

35.  The Plaintiff has had no civil actions or appeals, in either State or federal Court, which were dismissed as frivolous, malicous or for failure to state a claim on which relief could be granted.

H.  EXHAUSTION of ADMINISTRATIVE REMEDIES

36.  Pursuant to the Prison Litigation Reform Act, codified under 42 U.S.C. § 1997e(a), the Plaintiff has exhausted all of his available Administrative Remedies in accordance with DOC Administrative Directives.

I.  STATEMENT of FACTS

37.  The Plaintiff was housed at the MacDougall C.I. for approx. 15 months under unconstitutional conditions, wherein he organized a mass grievance filing and multi-Plaintiff federal lawsuit not claimed herein. As a result of those actions the Plaintiff was transferred to the Cheshire C.I. Pursuant to a "Warden to Warden Agreement."

38.  On July 11, 2016 the Plaintiff was transferred to Cheshire C.I. Upon arrival he met with the Warden, Scott Erfe ("Erfe"), who

12.

has a known history with the Plaintiff and personal vendetta's against the Plaintiff and his family.

39. Warden Erfe instructed the Plaintiff that based on his High Security ("H/S") status he would be required to wear an alternative uniform than the standard khaki pants and shirt combo the rest of the general population ("gen.pop.") wear. Erfe then provided him an oversized yellow jumpsuit.

40. The Plaintiff instructed Erfe that pursuant to AD 9.4 § 14, which governs the management of H/S, he was to be treated equally with gen.pop. He also stated that pursuant to AD 6.10, jumpsuits are only approved for Restrictive Housing Units ("RHu"), specifically Punitive Segregation, Administrative Detention, and Transfer Detention, none of which applied to him.

41. Erfe stated that "Administrative Directives did not dictate anything at Cheshire I (Erfe) do." He told the Plaintiff if he did not wear the jumpsuit he would be placed in Segregation ("Seg.") until he changed his mind.

42. Erfe also told the Plaintiff he would be forced to wear this jumpsuit at all times outside of his cell, unlike the rest of the gen.pop. who can wear recreation attire to recreation, and that he would be issued a disciplinary report ("DR") for any failures to do so.

43. The Plaintiff was forced to wear this bright yellow oversized jumpsuit which often caused him to trip and fall and sustain minor injuries. He was also forced to endure verbal taunts, abuses and harassment from other prisoners and staff who would mock the Plaintiff based on his uniform, placing him in many situations in this prison enviorement that could lead to altercations.

44. The Plaintiff was forced to engage in physical combat with other prisoners in a cell after verbal confrontations over this uniform, staff were unaware of these incidents.

45. The Plaintiff spoke with Erfe about these issues several times. Erfe took no action to secure the Plaintiffs safety and well being and forced him to continue to wear this violative and unsafe uniform.

46. The Plaintiff filed multiple Grievances regarding this uniform policy created by Warden Erfe. Erfe denied these grievances to his policy.

47. The Plaintiff Appealed to District Administrator Angel Quiros ("Quiros"), who denied the Appeal and upheld the violative Warden Created policy. Quiros manipulated the Grievance process by misquoting non-relevent Administrative Directives, to deny the Plaintiff the equal treatment he is entitled to.

48. Erfe then, in concert with Quiros, arranged to transfer the Plaintiff out of Cheshire C.I. back to MacDougall C.I. a facility that Erfe knew to less hospitable to the Plaintiff. This transfer was orchestrated in retaliation for the grievances the Plaintiff filed challenging Erfe's policies. This transfer was not the result of any incident, served no penological purpose and was not done with the consent of the Commissioner, said transfer was, once again, a "Warden to Warden Agreement."

49. On October 25, 2016 the retaliatory transfer occurred and the Plaintiff was returned to MacDougall C.I. after approx. three months of being housed in Cheshire C.I.

50. On November 23, 2016 the Plaintiff was transferred to the gen.pop. unit of the Garner C.I. after a long hunger strike and involvement in a minor incident at MacDougall C.I.

51. This transfer to Garner C.I. was immediately distressing to the Plaintiff, as Garner C.I. is one of the only facilities that does not permit the Native American Religious practice of sweat lodge, a critical aspect of said Religion, which is the Plaintiff's chosen Religion that he has practiced since 2009.

52. The Plaintiff met with the Garner C.I. Warden, Henry Falcone ("Falcone"), wherein he voiced his concerns and explained his desire for a transfer to

15.

a facility that could meet his religous and spiritual needs or a change in the Garner C.I. policy to allow for sweatlodge. Falcone made clear there would be no change in policy but he would attempt to organize a transfer, he told the Plaintiff he was not happy that he had "got stuck" with the Plaintiff.

53. The following day Falcone instructed the Plaintiff that he had attempted to arrange a transfer but had been "vehemently refused" by Erfe and Quiros.

54. The Plaintiff filed a Grievance regarding the sweatlodge policy.

55. The Plaintiff was subjected to various acts of retaliation for that grievance inclusive of being denied a meal, and being denied access to his religous practice of smudging. When the Plaintiff questioned staff about why he was not being allowed to smudge he was told "because you wrote a grievance about it and we dont like grievances".

56. The Plaintiff reported these incidents to Falcone both in writing and verbally, he took no action and allowed the retaliatory conduct of denying him access to smudging to continue, daily.

57. On December 13, 2016 after the unit's lunch period the Plaintiff requested his religous smudging supplies from the unit officer who refused to

Provide him with his supplies and denied him his ability to smudge. The officer then provided another prisoner, John Ortiz, his supplies, at which time the Plaintiff grabbed his supplies and proceeded to smudge. The officer was irate at the Plaintiffs actions.

58. Later on that day the Plaintiff was involved in another verbal confrontation wherein the Plaintiff and some officer exchanged insults. The Plaintiff secured in his cell to avoid further issue. The officer contacted supervisors to place the Plaintiff in RHU.

59. Supervisors responded and Lt. Andrew Toimie supervised the incident. The Plaintiff refused to secure for movement to RHU to protest his treatment, he made it clear to the Lt. that he would not fight or harm any staff, but they would have to go through the use of force procedures, in order to cause more work and paperwork for the offending staff.

60. The Plaintiff threatened the offending officer stating he would make a shank when he got out of RHU and stab the officer in the neck. This was the only threat the Plaintiff made.

61. The supervisors then began planned use of force procedures. The Plaintiff wrapped a sheet around his face and folded his mattress into the cell door feed trap in order to avoid chemical agent.

62. Chemical agent was used and then an extraction team entered the cell wherein the Plaintiff, took absolutely no action at all, the officers pushed him to the rear of the cell, struck him repeatedly Pushed him to the ground and continued to strike him while an officer grabbed the sheet the Plaintiff had wrapped around his face and used it to choke him. The Plaintiff was placed in restraints and escorted to RHU. Through out the incident the Plaintiff never acted with any aggression or violence in any way. See Exhibit A

63. Once in RHU the Plaintiff was placed in in-cell-restraints, another act of excessive force as the previous use of force had gained his compliance. Once in the restraints the cell was secured and Lt. Tolmie thanked the Plaintiff for not fighting his officers.

64. The Plaintiff's cell was subsequently searched and his property packed. No weapon was found or reported to be found.

65. Corrections staff completed their reports, all staff reported the sole action the Plaintiff took was to "turtle up". All staff reported their was a single verbal threat to the initiating officer. See Exhibit A

66. As a result of that incident the Plaintiff recieved two DR's for "Threats on Staff" and "Interferring with safety or Security" both DR's are class A offenses that are common place in DOC and not considered serious incidents.

18.

67. On December 14, 2016 the Plaintiff had several conversations with Falcone, who agreed the incident was not serious and instructed staff to remove him from in-cell-restraint status, and to issue minimal sanctions on the DR's.

68. The Plaintiff plead "No Contest" to the DR's and recieved sanctions less than the minimum AD requires, evidencing the DOC did not consider the incident serious.

69. The Plaintiff did report the excessive force to Falcone and requested Conn. State Police be contacted and Administrative Review and Action. Falcone refused to take any action regarding the officers actions of excessive force and took no action to secure the Plaintiffs safety.

70. On December 21, 2016 Falcone, in concert with Quiros, did improperly initiate the Administrative Segregation ("A/S") placement process via placement request memo to the Director of Offender of Classification and Population Management ("OCPM"), wherein Falcone falsely listed the reasons for A/S placement as the Plaintiff's "extremely violent behavior and gang influence." See Exhibit B

71. Falcone had been briefed on the incident and reviewed the reports, he was aware that the Plaintiff had not acted with any violence let alone extreme violence.

19.

72. Falcone, Knowing that their is no evidence of any Kind that the Plaintiff
has any gang influence or ever engaged in any Kind of gang activity,
intentionally misrepresented a fragment of a statement made by the
Plaintiff's father to a PSI investigator, to attempt to establish some
Kind of gang influence. Specifically Falcone used the statement
"the club looked out for him." However the Portions Falcone admitted
read that the club had no influence on the Plaintiff and that he was
"not a Diablo" and "not raised to be a Diablo."
                                                    See Exhibit C

73. Falcone went on to use the Plaintiff's relationship to his father,
who had been the governing authority of the Diablos motorcycle club,
to claim the Plaintiff had gang influence because his father did.

74. Falcone Knowingly and intentionally relied soley on the Plaintiff's ancestry
to falsely accuse him of gang influence and place him on DOC's
most restrictive and harsh status.

75. On December 22, 2016 Falcone instructed Dr. Lalitha Pieri ("Pieri") to
Complete the Mental Health Assessment form required by DOC policy
and UCONN E 3.02 policy, prior to A/S placement. Falcone
instructed Dr. Pieri to make sure the Plaintiff was cleared for A/S
Placement.

76. Those policies require a mental health assessment to determine any
contradictions to A/S placement and/or isolation confinement. Those

Contradictions include depressive disorders, Psychological disorders, impulse control disorders and disorders related to behavioral functioning. See Exhibit D

77. The Plaintiff has been diagnosed with Dythimic Disorder (depression), Borderline Personality Disorder (impulse control disorder) and Antisocial Personality Disorder. See Exhibit E

78. DOC and UCONN policy dictate that the Plaintiff's diagnosed mental illnesses require a minimum mental health classification score of a 3 with a GAF (Global Assessment of Functioning) of 51-70 too a Mental health classification score of a 4 with a GAF of 31-55.

79. Dr. Pieri falsefied the requisite assessment forms, HR508, and DOC records to omit the Plaintiff's established mental health diagnosis' and listed his mental health level as a 2 with a GAF of "≥65" (normal). See Exhibit F

80. Dr. Pieri improperly cleared the Plaintiff for A/S placement and deliberately disregarded his established mental illnesses that contradict A/S Placement and isolation confinement. ii

81. The Plaintiff's disorders were documented in the DOC records and the Plaintiff's PSI and known to the DOC and the Defendants. These omitions and falsefications were done intentionally with a complete disregard that said confinements would have on his illnesses and wellsoing.

82. On December 23, 2016 the Plaintiff was transferred to the Northern C.I. On Administrative Detention ("Ad. Det.") status pending A/S placement.

83. Pursuant to AD 9.4, Ad.Det. is not authorized for Northern pending A/S placement.
                                                            See Exhibit G

84. Pursuant to AD 9.4 § 24 (K) only wrist restraints are authorized for Ad.Det. status.

85. While improperly on Ad.Det. status the Plaintiff was improperly forced to endure all movement out of his cell in full restraints, as if he were already classified as A/S. Full restraints consist of cuffs behind the back connected to a tether chain connected to ankle shackles.

86. The Plaintiff was also forced to endure a denial of all rights and privileges inclusive of incoming and outgoing social mail, social phone calls, commissary, possession of property and was only allowed contact with his attorney, he was denied any social visits of any kind.

87. The Plaintiff was forced to wear said restraints to the shower, wherein he was forced to remain shackled in the completely secured shower. Due to the hot water of the showers causing skin to soften, the metal shackles inevitably end up breaking the skin of the ankles causing opened bleeding wounds in the unsanitary community showers.

22.

88. On December 27, 2016 the Plaintiff was provided Notice of Hearing which stated "This hearing will determine possible Placement in A/S". Said Notice was delivered by Correctional Counselor Supervisor ("CCS") Bachan.

See Exhibit H

89. This Notification contained a multitude of false information and described the reasons for the hearing as events that never occured. This false information was inclusive of: threats to stab "several" staff members; indications to do violent acts to manipulate transfers; Continued disruptive behavior after the cell extraction; threats to stab an interviewing Supervisor; barricading the cell door; a second extraction; use of a weapon; extremely violent and dangerous behavior indicated by the use of a weapon; and a term of incarceration of 115 years.

90. The Plaintiff requested Advocate Services from CCT morrison and witness statements from inmate Stephen Curtis and Lt. Andrew Tolmie. He also requested video review of the incident to refute the clearly false allegations against him.

91. The Plaintiff refused to sign the form and CCS Bachan signed the form and listed the time as 9:27 am, she provided a copy of this Notice to the Plaintiff.

92. CCS Bachan subsequently forged a Secondary Notice form

Wherein she omitted the Plaintiff's requested witnesses. She listed the time of her signature as 9:28 Am. This secondary form is what she processed into the Plaintiff's hearing Process.
See Exhibit I

93. On December 21, 2016 the Plaintiff met with his Advocate, he provided a written statement to his Advocate, he pointed out the false information and reiterated his requests for witness statements and video of the incident to refute the false allegations. At which point the Advocate produced the secondary Notice form and expressly refused to make any effort to secure any witness statements or evidence for the Plaintiff's hearing in direct violation of AD 9.4 § 12 which governs A/S hearings.

94. The Plaintiff immediately placed a legal call to his Attorney, frank Cannatelli, and explained the issues stated herein.

95. Attorney Cannatelli faxed a letter to Commissioner Scott Semple ("Semple") notifying Semple of the false allegations, need for video review and video preservation, and the conduct of the Plaintiff's Advocate and his refusal to secure the Plaintiff's evidence, with a request that Semple take corrective actions.

96. Semple subsequently responded to the video preservation portion of Attorney Cannatelli's letter, he ignored all the other issues and took no action to correct the staff's misconduct or secure the Plaintiff's Rights.

97. On December 29, 2016 the Plaintiff was escorted to the unit shower and forced to shower in ankle restraints. The shackles cut into the achilles area of his ankle causing an opened and bleeding wound in the unsanitary housing units community showers. This issue was further confounded by the fact that the wound was caused by community shackles that were previously worn by several other prisoners in the showers, through their bathing cycles without any disinfecting between uses.

98. The Plaintiff was extremely concerned about infections and MRSA, of which their have been several outbreaks at Northern C.I. The Plaintiff also knew from memo's issued by the medical staff, that open wounds in the showers posed a great risk of MRSA infections, and are to be reported and dealt with immediately.

99. The Plaintiff exited the shower and immediately reported his injury to the corrections officers, who proceeded to ignore his wound and forced him to walk down the tier leaking blood onto the tier, and placed him back in his cell, removed the restraints and secured the cell door leaving him standing in his cell untreated and bleeding.

100. Sometime later Lieutenant _____ Arze ("Lt. Arze") conducted his daily tour, at which time the Plaintiff showed the Lt. his still bleeding wound, expressed his concerns over MRSA infections and requested medical attention. Lt. Arze stated he would call medical but had no control over whether or not they responded.

101. Approximately three hours later the Plaintiff had still not been seen by any medical staff or given any treatment. When he questioned the officer, he informed the Plaintiff that the medical staff, Registered Nurse Nancy Hill ("RN Hill") had stated she was "not wasting her time" on the Plaintiff's "whining".

102. The Plaintiff was forced to cover his cell window in order to secure a supervisor response so that he could attempt to force medical treatment to be given to him. It so happened that RN Hill happened to be conducting medication distribution at this time, and stated to the Plaintiff he was not going to recieve any treatment because he was "a whiney little shit."

103. Lt. Arzt responded to the Plaintiff's cell at which time he immediately removed the window covering and requested medical treatment. Lt. Arzt told the Plaintiff that RN Hill had already decided he did not need any treatment.

104. At that point Lt. John Tuttle intervened, he viewed the Plaintiff's injury and stated that the nurse had to do something for it." The Plaintiff was placed in restraints and began to be escorted to the housing units medical screening room, where medical treatment is regularly administered in the housing unit.

105. Prior to even entering the medical room RN Hill stopped the escort and

26.

stated to Lt. Arzt, that she already told him she was not doing anything for the Plaintiff. The Plaintiff stated he just needed the wound disinfected, to which RN Hill replied "then disinfect it yourself with your soap." The Plaintiff responded the soap that Prisoners are provided is "detergeant soap" not "disinfecent soap" to which RN Hill replied "oh well, don't come to Northern then."

106. RN Hill then began to exit the Area and staff began to escort the Plaintiff back to his cell.

107. The Plaintiff then said loudly to RN Hill "Thanks for all the care and treatment, you're a class act cunt!"

108. Lt. Arzt became irate at the Plaintiff's use of the word "cunt" and ordered he be secured to a wall. The Plaintiff looked back and said "So she can call me whatever she wants and refuse to do her job and that's fine but I say a bad word and you have an epilepsy?"

109. Lt. Arzt responded that RN Hill was his friend and could do whatever she wants, he instructed the Plaintiff that if he had "anymore verbal outbursts Chemical agent would be utilized". The hand held camera was then turned on and the Plaintiff was escorted to the cells reserved for in-cell-restraint status.

110. Once in the cell the Plaintiff observed visually and through smell

that their was fecal matter smeared all over the walls of the cell. The Plaintiff stated this to Lt. Arzt who disregarded his statement and stated the cell was not covered in feces.

111. The Plaintiff was improperly placed on in-cell-restraints, which consisted of wrist restraints and a black box, connected to a tether chain, connected to ankle shackles. A photo was taken of his injury on his ankle and a band-aid placed over it. The Plaintiff was then secured in the cell, in in-cell-restraints, forced to endure the horrendous smell of feces, for what the Lt. described as being verbally assaultive to RN Hill.

112. The Plaintiff was issued a Class B infraction for "Insulting Language", the use of in-cell-restraints was an act of excessive force used by Lt. Arzt with the intent to harm and punish the Plaintiff maliciously, for the act of calling his friend a "cunc." further, the application of in-cell-restraints for this minor infraction, in itself violated DOC use of force policy ADG.5.

113. On December 30, 2016 the Plaintiff was removed from in-cell-restraint status in order to attend his A/S Hearing, while being removed RN Ellen Durko commented, on camera, that the cell was covered in feces.

114. The Plaintiff was not permitted to retrieve documents from his cell.

115. The Plaintiff attended his A/S Hearing before CCS E. Tugie, the DOC and division of OCPM's designated A/S Hearing Officer, his Advocate was present.

116. The Plaintiff explained to CCS E. Tugie that the Notice and A/S Request letter contained false information, Tugie stated she was the one who wrote the Notice. The Plaintiff explained what actually occured, he also explained that he wanted witness statements and video review, none of which had been secured or reviewed for his hearing. CCS E. Tugie ordered the Plaintiff's Advocate to secure his witness statements. The Hearing Concluded.

117. On January 10, 2017 CCS E. Tugie made her adjudication and forewarded her "recommendation" to the Director of OCPM, in violation of AD 9.4 §12(E) which requires this to occure within 5 business days from the Hearing. The only evidence she had reviewed was the memo by Falcone and three incident reports, two of which were unrelated to the incident contained in the Notice. See Exhibit J and K

118. CCS E. Tugie, the Designated DOC A/S Hearing officer adjudicated that the Plaintiffs conduct did Not meet the threshold for A/S Placement and, despite the introduction of false Information and complete lack of review of his requested evidence, still ruled in his favor and decided on "No Placement."

29.

119. On January 11, 2017 in less than 24 hours, Director of OCPM David Maiga ("Maiga"), disregarded the decision of his chosen Hearing Officer and placed the Plaintiff in A/S, thus rendering his Hearing meaningless.

120. Director Maiga listed the reason for placement as "Multiple incidents impacting facility operations, safety and security". This was not listed in the Notice provided to the Plaintiff, further this is only a criteria for placement in A/S if the prisoner had already been on Chronic Discipline ("Chronic") status for six months, pursuant to AD 9.2 "Classification" § 12(c). The Plaintiff was not on Chronic, he was a gen.pop. prisoner. This is further confounded by the fact that Maiga knew multiple incidents did not occure. Maiga used false information and violated AD to manufacture this A/S placement, he also conducted no independent review of the incident or the Plaintiffs requested evidence.                See Exhibit K and J

121. The Plaintiff immediately filed a Appeal to Deputy Commissioner of Operations, Monica Rinaldi ("Rinaldi"), wherein he raised the issues of the use of false information, lack of requested evidence, Hearing officers Decision and violations of AD.

122. Rinaldi conducted no review of the Plaintiffs requested evidence and conducted no review of the claims he raised in his Appeal, she upheld his A/S placement and expanded on the reason for his placement as resulting from his DR History in direct violation of AD 9.2 § 12 which governs level increases and dictates they shall only occure based

on new information, which his DR "History" by definition, is not new. Information. She also ignored the fact that AD 9.2 § 12(A) which governs level increases related to disciplinary issues dictates such issues may only result in a maximum level 4 Chronic placement, not a level 5 - A/S placement.

123.   As a result of this A/S placement the Plaintiff was forced to endure the extremely harsh and severe conditions of confinement imposed on A/S prisoners pursuant to AD and facility level practices and Policies inacted and implemented (without proper promulgation) by unit managers and Wardens. These conditions serve no legitemit Ponsiegical Purpose and are designed Soley to punish prisoners and break their mind, will, body and spirit.

124.   A/S is defined as an Administrative Status imposed on prisoners who they deem pose a threat. A/S is an equal level of classification as "Special Needs" which is also a "threat" status, and "Death/ad/Special circumstances" which the DOC has stated in federal Court is the status for those they consider the Greatest threat. All of these classifications are level 5 and are housed together and are similarly situated, however the conditions of A/S confinement are far harsher than either other status.                    See Exhibit G

125.   Specifically, the conditions of confinement imposed on the Plaintiff that he was forced to endure as a result of this A/S Placement

Were inclusive of, but surely not limited too:

  a. Complete isolation confinement;

  b. Cell confinement 24 hours a day with the exception of one hour five days a week for outside recreation only, in a small metal cage that is enclosed by concrete walls;

  c. deprivation of any meaningful activity;

  d. Complete deprivation of any social or recreational activities;

  e. Complete lack of programs;

  f. Complete lack of Job opportunities;

  g. complete lack of school or educational opportunities;

  h. complete lack of religious services or meaningful opportunity to Practice his religion;

  i. deprivation of outside stimuli or visual stimuli;

  j. Complete sensory deprivation imposed by the design of the facility and cells and housing unit which eliminate the ability to see anything, communicate or hear anything besides extremely loud noises, such as screams;

  k. imposition of the constant loud and chaotic environment, which includes screaming and banging by staff and inmates;

  l. deprivation of any meaningful activity or opportunity for exercise, as exercise can not be safely done in the small concrete recreation area and no exercise equipment is provided, further staff do not allow exercise in that area for risk of injury, and exercise can not be reasonably completed in cells as their is not enough room

and the noise from such activity instigates problems amongst the prisoners and poses a risk of future violence and threat to ones safety;

m. extreme temperatures in cells;

n. deprivation of proper ventilation as the facilities air intake system is not operational and air filters are not regularly changed;

o. imposition of a timer penalty on the sink and toilet which limits the use of either to two uses per half hour, which also imposes a denial of access to running water;

p. imposition of faulty plumbing, as the toilets of Northern c.i. regurgitate waste back and forth between cells when flushed, causing waste to regularly enter the unventilated air of the cells, and if using the toilet, causes waste to come into contact with genitals;

q. imposition of unsanitary eating conditions, all meals are served in cells and eaten there, within mere feet of the cell toilet, which often regurgitates waste at meal times, this is further confounded by the toilet timer which would often, not permit flushing at these inopportune times;

r. unsanitary food service conditions, inclusive of filthy carts being used to transport meals;

s. inadequate meals that do not meet minimal nutritional or caloric needs. Items would often be missing from daily meals that would either be substituted for something of lesser nutritional value or

not substituted at all;

t. denial of access to the library and reading materials;

u. denial of access to the unit law library;

v. denial of access to commissary items available to other similarly situated prisoners and a $25.00 spending limit not experienced by other similarly situated prisoners who can spend up to $85.00;

w. deprivation of ability to maintain adequate hygiene by being limited to three showers a week;

x. forced to endure all movement out of cell in full restraints, including being forced to wear restraints in secured showers often causing physical injury and interferring with ability to bathe;

y. forced to walk to and from showers unclothed in nothing but open-fly boxers exposing genitals and body to all present and forcing plaintiff to endure sexual harassment, taunts and advances by staff and inmates;

z. forced to endure extreme weather conditions, including winter conditions, in the outside recreation area without winter attire;

aa. deprivation of ability to communicate or associate, plaintiff was limited to one 15 minute social phone call per week and one 30 minute social visit (non-contact) with immediate family only, however Defendant's refused to approve his immediate family and denied him any and all social visitation;

bb. deprivation of possession and enjoyment of personal property;

cc. denial of access to information, such as news, cultural issues, etc. Said access would only be available through Plaintiff's T.v. which he was unnecessarily, arbitrarily and capriciously denied;

ee. deprivation of sleep;

ff. denial of any mental health care or treatment of any Kind;

gg. deprivation of any opportunity to earn good time and/or risk reduction earned credit, etc.

126. These conditions are not endured by the rest of the population of Connecticut DOC.

127. These conditions are not endured by the similarly situated level 5 prisoners housed in the same unit. For instance, Death row/Special Circumstances and Special Needs are provided all of their property, Showers everyday, Multiple opportunities for Recreation everyday both inside and outside, access to the facility gym, library and law library, equal opportunities for phone and visitation as general population, etc.
See Exhibit G and H

128. These conditions were experienced by the Plaintiff everyday of his A/s confinement and, pursuant to AD 9.4 are to be imposed for a minimum of 300 days to a maximum term defined by the DOC as "indefinite".

129. On January 10, 2017 the Plaintiff was provided a small portion of his personal property which included clothing, some cosmetics, food items, books and magazines (soft cover only)(limited to 7), headphones and his Radio, which is made of hard plastic.

130. The Plaintiff was denied possession, enjoyment and use of his hardcover books (despite being approved by AD), his footwear, his pillow, and his appliances inclusive of his TV, hotpot, video game console, fan, beard trimmers, electric razor, and other miscellaneous items. See Exhibit L

131. This deprivation was imposed without cause or penological interest and is solely designed to make conditions as harsh and punitive as possible.

132. AD 9.5 does not authorize any deprivation of property as a Premarketed sanction, infact no AD or Doc policy authorizes the deprivation of property as a punitive measure.

133. On January 13, 2017 the Plaintiff found his ankle injury to be infected, swollen and inflamed, causing him significant pain. He requested medical aid verbally and in writing and was denied, he was told RN Hill had stated he would "get nothing from them."

134. The Plaintiff filed a medical grievance seeking aid, which went unresponded to.

36.

135. In January of 2017 while the Plaintiff was being escorted to the unit shower in nothing but open fly **boxers** his body and genitals were exposed to male and female staff and all the inmates who were at their cell doors, causing sexual harassing comments by both staff and inmates and verbal sexual advances and comments.

136. The Plaintiff spoke with unit manager, Captain Gregorio Robles ("Robles") regarding this institutional practice of strip searching prisoners and then forcing them to walk around the unit unclothed infront of inmates and female staff. The Plaintiff explained how this caused sexually harassing incident and abuses in violation of PREA.

137. Capt. Robles stated the policy would not change and was in place for staff convenience.

138. The Plaintiff spoke with Capt. Robles about the conditions of A/S and the lack of property. Capt. Robles stated that the conditions were in place to punish prisoners and "learn them their place".

139. The Plaintiff filed a grievance requesting PREA review of the shower policy, which was denied by Northern C.I. Warden William Mulligan ("Mulligan").

140. The Plaintiff spoke with Warden Mulligan regarding the conditions of confinement and lack of property. Mulligan stated "that is

the idea, to make you as uncomfortable as possible." Mulligan made clear nothing would change.

141. The Plaintiff said he would seek civil action, Mulligan responded "We're DOC we own the Judges, and even when we don't the state foots the bill."

142. On or about January 20, 2017 the Plaintiff spoke with Warden Mulligan regarding this issues with his A/S placement and the fact that he did not understand why he was placed in A/S and requested the criteria for A/S placement.

143. Warden Mulligan stated "Criteria for A/S is whatever we want it to be," he further indicated he would do nothing to correct the Plaintiff's improper A/S placement.

144. The Plaintiff filed a grievance requesting compliance with AD 9.2 3 4(f) which requires prisoners understand and be provided criteria for A/S placement, Mulligan denied said grievance.

145. The Plaintiff spoke with Capt. Robles and Warden Mulligan regarding the required reviews of A/S placements pursuant to AD 9.4 which dictates review of placements within 7 days and every 30 days thereafter. They stated that the reviews don't mean anything, you have to do 10 months no matter what."

38

146. AD 9.4 dictates regular reviews of placements must occure, the reviewing committee consist of the unit manager (Robies) and the Warden (Mulligan), however AD 9.4 also dictates a minimum of 300 days in A/s before release will be considered, evidencing that these reviews have no authority or ability to change the A/s status and are merely pro forma. No meaningful opportunity for release from A/s can occure, further the prisoners are not permitted to attend these alleged reviews

147. On or about January 26, 2017 the Plaintiff completed all A/s phase I in cell programming paperwork. Early completion of this paperwork informs prisoners that they may progress to Phase II within 60 days, rather than the Warden mandated 120 days. No one has ever recieved early progression.

148. On or about January 27, 2017 the Plaintiff attended recreation in the mandated outdoors recreation cage. He was not provided any winter attire and wore only his personal sweats and state issued slippers. The Plaintiff was forced to endure extreme colds that caused his body and extremities severe pain.

149. The Plaintiff spoke to Capt. Robies about the lack of winter attire, inclusive of coats, gloves, hats, and footwear. Robies stated only workers would recieve winter clothing, and A/s would never recieve such items, if the Plaintiff "did not like the cold he could just refuse rec."

150. The Plaintiff filed a Grievance requesting winter attire and was denied by Mulligan. The Plaintiff was forced to choose between being confined in the small dim cell constantly or suffer the extreme weather to recieve a medicum of fresh air. He split the difference, suffering the cold half of the time and suffering the confines of the cell and the effects on his mental and emotional health the other half.

151. On January 31, 2017 the Plaintiff's grievance regarding Defendants Aret and Hill was returned to him with instruction to refile, he did so, Warden Mulligan violated Administrative Remedies procedure and falsely used the time frames caused by his return of the grievance to reject said grievance as time bard, despite AD 9.6 - Administrative Remedies dictating that said limitation does not apply to returned grievances.

152. The Plaintiff spoke with Robies and Mulligan regarding the lack of response on his medical grievance and Hills refusal to treat him and interferrence with others treating him. They stated they had "no control over medical."

153. The isolation confinement began having a significant impact on the Plaintiff's mental and emotional health, causing him extreme anxiety, stress, depression, sleep deprivation and boughts with dispair and suicidal Ideacions.

154. The Plaintiff made multiple requests for mental health treatment to no avail.

155. In February of 2017 the Plaintiff spoke with Capt. Robles and Warden Mulligan regarding his mental health issues. The Plaintiff explained he had made multiple requests to be seen by mental health and had not been reviewed by mental health as required by AD 9.4. Defendants Robles and Mulligan responded stating the Plaintiff was "a mental health 2, they don't have to do anything for you." They did nothing to secure treatment for the Plaintiff.

156. The Plaintiff filed multiple medical grievances seeking mental health treatment that went unresponded to.

157. On February 8, 2017 the Plaintiff filed a grievance requesting the 60 day progression to A/S phase II, which was denied.

158. On or about that same date Corrections officers placed inmate Johnathan Blair into one of the adjacent recreation cages in the outside recreation area.

159. Inmate Blair consistently exposes his genitals and masturbates at any time he is around anyone. When he engages in this behavior in front of female staff he is disciplined. When he engages in this behavior in front of other male prisoners he is encouraged by staff and allowed to continue his behavior, rather than being removed from the area like he would be if female staff were present.

160. On or around this date Blair did expose his genitals in the presence of the Plaintiff and masterbated, as Corrections staff observed and laughed.

161. The Plaintiff spoke with Capt. Robles about this incident and requested he instruct unit officers to stop placing Blair in the recreation area around the Plaintiff and other prisoners. Robles stated "Blair goes out with whoever likes to file grievances."

162. Blair was placed in the recreation area around Plaintiff multiple times. When the Plaintiff protested to staff they stated "Sorry man, Captain Robles' orders." Blair continued in his sexual misconduct and even attempted to ejaculate through the metal cages at Plaintiff while Corrections staff looked on laughing.

163. The Plaintiff filed a grievance requesting seperation from Blair and requesting a PREA complaint be filed against offending staff for forcing the Plaintiff to endure said sexual abuse. This grievance was rejected by Warden Mulligan and no Corrective action was taken. The Plaintiff began to refuse all recreation at this point to avoid said abuses.

164. On or around March 9, 2017 the Plaintiff began formal action

42.

seeking changes to Doc Administrative Directive 9.2 and 9.4 to outline clearly defined criteria for A/S placement in order to establish an objective standard for classification and provide the Prison population with Notice of what conduct can result in A/S placement, to change the review policies so that the mandatory reviews are meaningful and provide an opportunity for release from A/S, and to ensure hearings are meaningful.

165.   On or around March 10, 2017 the Plaintiff spoke with Deputy Warden Derell Malden about his Mental health issues and thoughts of self harm, Malden stated he would have the Mental Health Doctor speak with him.

166.   On or around that same date the Plaintiff met with Doctor Mark Frayne and discussed many of his issues and the lack of treatment. Dr. Frayne stated to the Plaintiff "unofficially" orders had been issued from Quiros and Mulligan to ensure their was no Paper trail of the Plaintiff having mental health issues that could see him released from A/S. He went on to state he could offer no real help other than placing him in a suicide cell if the Plaintiff insisted he wanted to harm himself. The Plaintiff denied said feelings to avoid that cell housing. This was the only mental health meeting the Plaintiff

had. He recieved no mental health treatment or reviews throughout his A/s confinement.

167. On or around March 15, 2017 corrections staff touring the outside perimeter of the facility did throw mud at the Plaintiff's exterior cell window and did cover his cell window obstructing the view outside of his cell completely.

168. The following day or thereabout, the Plaintiff did report this issue to Capt. Robles and did visually show Robles the obstructed window. He requested the window be cleaned and Robles stated that "would not happen."

169. On or around March 15, 2017 the Plaintiff wrote to Commissioner Semple regarding all of these issues herein, to which Semple did not respond in writing.

170. On March 17, 2017 the Plaintiff's attorney, Frank Cannatelli, sent two letters to Commissioner Semple via fax regarding the issues with the Plaintiff and issues with the conditions of confinement in Northern CI. See Exhibit M

171. On or around March 21, 2017 the Plaintiff filed a grievance regarding staff's daily failure and refusal to provide the minimum required recreation of one hour five days a week. Staff often deny rec on any given day and never make it up. This happens at least once every two weeks.

172. On March 24, 2017 Warden Mulligan provided the Plaintiff with Notice of placement on "Grievance Restriction" wherein the Plaintiff was not permitted to continue filing grievances. During Mulligans delivery of this Notice he stated Semple had provided him copies of his letter and his attorneys and stated "nothing is going to change."

173. On April 17, 2017 Director Maiga responded to Attorney Cennatelli's complaint regarding the Plaintiff's A/s placement that was filed to Semple, wherein Maiga stated the Plaintiff was placed in A/s for threatening violence and barricading his cell door, thereby providing a third reason for A/s placement.

See Exhibit N

174. The Plaintiff was held in A/s until, approximately late September 2017, wherein he consistently and daily suffered the conditions described herein and recieved no meaningful custody reviews, mental health reviews or treatment and did suffer irreparable harm.

175. All of the Plaintiff's grievances were denied by Warden Mulligan who took no action to correct or cure any of the issues raised herein.

176. All of these grievances were appealed to District Administrator Quiros who upheld all of Mulligans denials and took no action to correct or cure any of the issues raised herein.

177. Commissioner Semple was on notice of all issues raised herein and took no action to correct or cure.

178. The Plaintiff's grievances related to issues raised herein regarding A/S Policies and Directives reached level 3 review by Deputy Commissioner Rinaldi who upheld Mulligan and Quiros' denials, she took no action to cure the structural errors in AD.

179. In october of 2017 the Plaintiff was returned to Cheshire C.I. Wherein he was housed for less then a day before Warden Erfe orchestrated a false incident where Erfe orchestrated a staff seperation profile to manipulate a transfer of the Plaintiff out of Cheshire C.I.

180. The Plaintiff was housed in the Cheshire C.I. RHU, East Block 1, Pending this incident under extremely harsh conditions for approximately three weeks inclusive of isolation, deprivation of property and legal work, cell confinement 24 hours every day, no running warm water, and Black mold through out the ventilation system of this old and filthy unit.

181. The Plaintiff spoke with Erfe about these issues, Erfe stated "It doesn't matter you will be leaving, you will not be in Cheshire as long as I'm warden."

182. The Plaintiff was transferred out of Cheshire C.I. Pursuant to Erfe's request to Quiros, who authorized said action

183. In September of 2018 the Plaintiff was returned to Cheshire c.i. while on a Chronic placement status, despite the alleged staff separation issue.

184. In October of 2018 the Plaintiff was removed from Chronic and returned to the gen. pop.

185. The Plaintiff met with a Counselor Supervisor who informed the Plaintiff that Warden Erfe was arranging for an out of State transfer, Erfe was acting in concert with Several Doc Administrators.

186. In November of 2018 the Plaintiff was transferred to Massachusetts Pursuant to an involuntary interstate compact agreement, wherein Connecticut DOC stated the Plaintiff posed such a threat to Connecticut Corrections that he could not be housed in any Connecticut facility. The main basis for this alleged threat was the Plaintiff being influential due to his deceased fathers influence, though their is no evidence or documentation to suggest the Plaintiff has any kind of "influence" at all.

187. The Plaintiff was periodically returned to Connecticut every several months for pending Court appearances wherein he was housed in Hartford Correctional Center.

188. Housing at HCC Subjected the Plaintiff to Several incidents that are the Subject of a Separate Civil Action docketed at 3:19-cv-01013 (MPS).

189. Due to that litigation many HCC staff were irate with the Plaintiff.

190. On September 10, 2019 the Plaintiff was transferred to HCC for a Court appearance.

191. Upon the Plaintiff's entry into South Block, a RHU, the Plaintiff was immediately confronted by Corrections Officer ___ Rizvani ("Rizvani") who is close friends with the lead Defendant of the aforementioned civil action.

192. Rizvani threatened the Plaintiff with physical violence.

193. Shortly thereafter the Plaintiff met with Administrative Captain ___ Alexander ("Alexander"), he reported the threat and expressed concern for his well being. Alexander being aware of the incidents giving rise to the other civil action stated he would remove Rizvani from his post in the unit. This did not occur.

194. On September 12, 2019 Rizvani was posted as the unit control officer, throughout the shift he made repeated harassing and threatening statements to the Plaintiff.

195. When the Plaintiff was released from his cell for recreation or sometime thereafter Rizvani exited the unit control abandoning his post and

left said Control unattended, and did improperly enter the unit tier with the Plaintiff, as this was an RHU the Plaintiff was not supposed to be on the tier with anyone and the tier was not supposed to be open and unsecured.

196. Rizvani did attempt to insticte a physical confrontation with the Plaintiff calling him a "rat" and "a lawsuit filing rat bitch," he further threatened to "break your skull," speaking to Plaintiff.

197. The Plaintiff walked away from this Confrontation.

198. The harassing and threatening statements of Rizvani continued throughout the shift.

199. On September 12, 2019 Rizvani was again posted in the unit.

200. The Plaintiff was in the unit day room when Rizvani improperly opened the door and handed him crocking. Rizvani stated that he had just rubbed the crocking "on his nuts," the Plaintiff ignored him

201. The Plaintiff decided to return to his cell to avoid further confrontation, at which time he returned to his cell and the door remained open, the doors of MCC are automated and only the control officer has control over the doors.

202. The Plaintiff heard Rizvani tell the control officer to have his door open and entered the tier with the Plaintiff's cell unsecured, pushing the chow cart, Rizvani began to make harassing statements to the Plaintiff while he served food to the inmate in the cell directly across from the Plaintiff's.

203. The Plaintiff approached Rizvani and asked him "what exactly is your problem?" Rizvani replied "you're a lawsuit filing bitch", to which the Plaintiff responded "that's it?" The Plaintiff then patted the arm of Rizvani and told him "it's not that serious" and began to return to his cell.

204. Rizvani then stated aggressively "yeah it is and I'm gonna end up fucking you up."

205. The Plaintiff turned and stepped back towards Rizvani and patted him on the arm again telling him to "calm down."

206. Rizvani then physically attacked the Plaintiff lunging at him and grabbing him by the collar of his shirt with both fists and jamming him back forcefully into the door way of the Plaintiff's cell causing pain and injury to the Plaintiff's back and head, Rizvani was using all of his force, and was screaming he would "Break your Back!"

207. Rizvani then pushed his closed fists into the plaintiff's throat

choking him and collapsing his esophagus.

208. The Plaintiff recovered from the daze caused by his head striking the door and was in a state of absolute terror for his well being and safety, the Plaintiff acting in self defense lashed out with his right arm aimed at Rizvani's shoulder and collar bone area to force him back and cease the choking he was subjecting the Plaintiff to.

209. Rizvani then forced the Plaintiff back into the cell and struck him several times with his close fisted right hand to the face and body while maintaining hold of the Plaintiff with his left hand.

210. The Plaintiff struggled with Rizvani and pushed him into the wall and the Plaintiff's shirt ripped in Rizvani's hand allowing the Plaintiff to get away.

211. As the Plaintiff was getting away from Rizvani responding staff arrived.

212. The Plaintiff exited the cell and got on his knees with his hands behind his head, as he did this staff were macing him unnecessarily.

213. Staff then slammed the Plaintiff to the ground and dog piled on

him yelling "Stop resisting" and proceeded to use excessive and unnecessary force on him, he remained compliant.

214. The Plaintiff was then escorted to Seg. where he was denied proper decontamination, his head was placed under a shower for seconds, whereas decontamination requires a minimum of a 15 minute shower, and minimum of 15 minute flushing of the eyes. Medical wiped his eyes several times but did not fully decontaminate his eyes

215. The Plaintiff was then improperly placed in in-cell restraints, an act of excessive force given his compliance.

216. These restraints were applied improperly to retaliate and maliciously cause the Plaintiff pain, the restraints were all placed on too tight, the tether chain was manipulated an knotted to shorten it and the ankle restraints were placed on backwards.

217. The Plaintiff is asthmatic and requested medical aid, Medical staff failed to properly assess the Plaintiff and provided no treatment, they also allowed the improper restraint application.

218. The Plaintiff was seared in restraints, contaminated, and in severe pain from the chemical agent, strikes and assault by Rizvani, and the restraints, he could not swallow and speaking caused him severe pain.

53

219. The Plaintiff requested a Captain and Defendant Alexander responded. The Plaintiff requested decontamination and showed Alexander the improper restraint application and requested they be removed due to his compliant behavior or at a minimum fixed.

220. Alexander responded "C'mon man you assaulted staff, this is what we do when that happens." The Plaintiff explained he was assaulted and only defended himself, he also reminded Alexander that he had already reported an issue with the assaulting officer.

221. Alexander laughed at the Plaintiff and stated "Well now you know not to fight back. Now we get to A/S you and send you to court."

222. The Plaintiff again requested decontamination and reported his pains and injuries to Alexander, Alexander stated "The only way you're getting a shower is if you smear shit all over the cell, but hey you're litigious, maybe you can ask the judge for help." Alexander then left and the Plaintiff obliged Alexander's instruction and smeared the cell.

223. The Plaintiff was placed in a shower, upon completion staff surrounded the Plaintiff and instructed him that "CSP had arrived and to keep his mouth shut about Rivani", they then turned on a handheld camera and escorted him to meet with the State Trooper.

54.

224. Doc staff did surround the Plaintiff and record his meeting with the State Trooper (Badge # 838), he told the trooper he wanted to provide a statement outside the presence of DOC staff as he feared for his safety. He was denied and returned to his cell.

225. Doctor _____ Mathews ("Mathews") came to the Plaintiff's cell and asked him if he was "okay"; he stated he was not okay and wanted to speak in private. Mathews disregarded him and walked away.

226. Warden _____ McCormack, in concert with District Administrator Scott Erfe, improperly initiated the A/s placement process via Memo to Director Maiga, who approved the process.

227. McCormack, Erfe and Maiga knew this incident to be classified as a level 2 Assault on Doc Employee, Pursuant to AD 9.2 § 12(A) such incidents "Shall" result in an over all level 4 disciplinary placement (ie. Chronic), a level 5 A/s placement was expressly prohibited by this mandatory language.

228. Dr. Mathews then, without conducting any actual assessment, did falsify the required HR 508 Mental Health Assessment form and did knowingly omit the Plaintiff's established mental illness diagnosis' that contradict A/s placement and did improperly authorize him for said placement.

229. Within mere hours of the incident the Plaintiff was transported to Northern C.I. on Administrative Detention pending A/S placement.

230. The Plaintiff was placed in the 1 West housing unit which houses the Level 5 classifications of A/S, Special Needs and Deathrow/Special Circumstances, he was placed in 207 cell which was appropriately furnished with a new mirror, cosmetic shelves and toilet paper container, lighted and with unobstructed Air Vents, though the facility air intake was not operational.

231. On September 13, 2019 the Plaintiff spoke with Unit Manager, Captain _____ Chevalier ("Chevalier"), Administrative Captain Gregorio Robles, and Warden Giuliana Mudano ("Mudano"), they explained to him that he would be staying in Northern in A/S and that he was already in the Computer as A/S, regardless of a hearing.

232. The Plaintiff asked why he would be housed in Connecticut if he posed such a threat that he had to be sent out of state, they replied that "Maiga and Quiros want their A/S time out of you".

233. Later that day the Plaintiff met with Disciplinary Report Investigator _____ Leone ("Leone") to discuss two DR's, one for Assault on a DOC Employee by Rivera and one for Interfering with Safety or Security. Neither of these DRs had been delivered to the Plaintiff. During this meeting the Plaintiffs property was delivered.

one of the DR's was discovered in the property in the Presence of Leone.

234. The Plaintiff requested multiple witness statements and video evidence to contest the DR's, he also stated he would provide a written statement.

235. The Plaintiff was once again subjected to the conditions of confinement unique to A/S in the Northern C.I. as described in ¶¶ 83-87 and ¶¶ 123-132, with the sole exception of the sink/toilet timer, which is removed.

236. On September 18, 2019 a commissary order for the Plaintiff with a spending limit of $25.00, evidencing that his A/S status was already entered into DOC computer systems, otherwise his spending limit would have been $85.00 See Exhibit ⊙

237. On September 19, 2019 the Plaintiff spoke with Capt. Chevalier and Warden Mudano regarding the conditions being imposed on A/S and specifically referenced the recent federal Court ruling in Reynolds v. Arnaix, et al., that stated many of the conditions being imposed were unconstitutional, he also provided written requests to both Defendants requesting the conditions of A/S, at a minimum mirror the other level 5 status. Chevalier and Mudano made clear that would not occur, Mudano went on to state that "they would be changing nothing irregardless of Reynold," the Plaintiff told her "irregardless" was not a word and she left.

57.

238. On September 20, 2019 the Plaintiff spoke to Robles about the conditions and he reiterated that they would be changing nothing.

239. On September 22, 2019 the Plaintiff wrote to Chevalier, Robles, Maiga, Mulligan, Quiros and the Commissioner, regarding the conditions in Northern CI for A/S and requested their cessation or at a minimum, equal conditions and treatment with the other level 5 status; he also wrote regarding the staff assault against him, the restriction on official discretion related to level 2 incidents, and his mental health issues. He never recieved any written response.

240. On September 24, 2019 the Plaintiff was provided Notice of Hearing for A/S prepared by CCS Tugie, which contained false information inclusive of, but not limited to: officer giving him instruction not to touch him; officer attempting to secure him to an affixed surface; that he repeatedly struck the officer; that after staff responded he continued to be combative; that the officer was treated by an outside hospital; that he is serving a 115 year sentence; that he has conviction for Burglary and Kidnapping; and that the assault was severe.
                                                                See Exhibit P

241. The Plaintiff requested Advisor services from Correctional Counselor Trainee M. Saunders, video evidence of the incident's, and witness statements from the inmates in cells 1 and 3 of Southblock who witnessed the incidents.

242. The Plaintiff reviewed reports related to the incident which clearly indicated it was documented as a non-serious level 2 assault and that the officer only met with MCC medical staff due to swelling on his cheek where he struck the wall during the incident.

243. The Plaintiff's Advisor falsified the Notice form and did not secure his witnesses or evidence, She also indicated he declined advisor services, yet she listed herself as his advisor on his written statement.

242. The Plaintiff's Advisor did not collect his statement until September 26 or 27, 2019.

See Exhibit Q

243. The Plaintiff clearly argued the facts, listed his requested evidence, and listed the false information and argued the procedural issues inclusive of the directives of AD which prohibited A/S placement for this incident (9.2 § 12(A)), and the fact that he had not had a DR Hearing meaning the DOC had no finding of fact regarding this incident.

244. On September 27, 2019 the Plaintiff attended his A/S Hearing before the Designated Hearing Officer CCS. Tugie.

245. The Plaintiff raised all of the aforementioned issues in the Hearing, Tugie responded by saying "none of it matters, you're going to be A/S." The Hearing concluded, as he left Tugie stated "if you don't like it sue."

252.    On October 7, 2019 CCS Tugie made her decision and recommended the Plaintiff be placed in A/S. This recommendation was made outside the 5 business day requirement mandated by AD 9.4 § 12(e), Tugie did not review the Plaintiffs requested evidence or witnesses and did knowingly rely on false information for her decision.
                                                          See Exhibit S

253.    Director Maiga immediately, without any independent review, did authorize A/S placement, stating the reason for placement as a direct/intentional assault on a DOC employee". He also went on to falsely add "Continues to threaten safety, security and/or orderly operation after greater than six months on CD status".
                                                          See Exhibit S

254.    Not only was their No mention of CD status (ie. chronic) in the Notice of Hearing, but Maiga knows this to be completely false, as the Director of ocpm he is fully aware that the Plaintiff was: a) returned to gen pop. from chronic in October of 2018 ; b) DR free for over a year, Chronic is a 90 day program and prisoners are removed from Chronic after 90 days disciplinary free ; and C) housed out of state, wherein he was discharged from Connecticut custody, Pursuant to AD 9.4 § 18(B) had he been on Chronic when sent out of state, he could not be replaced without a new hearing.

255.    Director Maiga knowingly and intentionally introduced false

61

information into the Plaintiff's hearing process.

256. The Plaintiff immediately Appealed this placement and raised these issues to, now, Deputy Commissioner Angel Quiros.

257. On October 9, 2019 the Plaintiff attended a DR Hearing before Disciplinary Hearing Officer Lieutenant ___ Betances ("Betances"), with DR Inv. Leone.

258. The Plaintiff had not been provided Notice of this Hearing, his evidence was not secured, he was not able to prepare, his witnesses were not secured and no statement was taken. The Plaintiff provided written statements wherein he argued that he did not intentionally assault staff, and for the Interfering DR made no argument as to guilt or innocence and only argued the lack of delivery.

259. Lt. Betances refused to review the Plaintiff's requested evidence or secure his witness statements, he refused to conduct an independent review of the video evidence and relied solely on the DR Inv. Leone's interpretation.

260. Lt. Betances found the Plaintiff guilty and went on to falsely add that the Plaintiff admitted guilt. The Plaintiff stated he would pursue civil action, Betances stated "so the State pays that I'm covered."

261.  The Plaintiff Appealed the issues raised herein from ¶¶ 187-260 to District Administrator William Mulligan, who thereby had Notice of said incidents.

262.  On October 11, 2019 the Plaintiff wrote to Commissioner Rollin Cook ("Cook") about the issues raised herein from ¶ 184 on,  Cook did not respond and took no action to correct or cure these issues.

263.  On October 21, 2019 the Plaintiff requested Attorney Comastelli to fax a letter about these issues herein, that remains pending, however the Plaintiff expects the perversity of Doc to continue.

264.  The Plaintiff is now housed in the 1 west housing unit in 107 cell on A/S status and is once again being wrongfully subjected to the extremely harsh and atypical and significant conditions of confinement in A/S and isolation confinement that are not experienced by the similarly situated level 5 classifications housed with him.  He is currently suffering extreme and irreparable harm to his mental and emotional well being and health as well as his Constitutional Rights.

265.  The Plaintiff is a Pro Se litigant entitled to liberal construction and liberal interpretation of his filings.

## J.  CAUSES of ACTION

## FIRST CAUSE

1. Paragraphs 1-205 are hereby restated and made 1-205 of this Cause.

206. Defendants Erfe and Quiros did force the Plaintiff to wear a different uniform from the rest of the Prison population in direct violation of Administrative Directive and the Plaintiff's Right to equal Protection.

207. The named Defendants actions were not related to a legitimate Penological interest and were designed to harass and demean, and did cause the Plaintiff physical and mental harms.

208. The actions and/or failures to act did violate the Plaintiff's first, Eighth and fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

209. The Plaintiff seeks Damages against the named Defendants in their individual Capacities and injunctive relief in their official Capacities ordering the cessation of this ongoing violative practice of forcing high security Prisoners to wear different uniforms from the rest of the general population in Violation of AD 9.4. The Plaintiff also seeks Declaratory Relief.

64.

## SECOND CAUSE

1. Paragraphs 1-269 of the First Cause are hereby restated and made 1-269 of this Cause.

270. Defendants Erfe and Quiros did orchestrate a transfer of the Plaintiff to a facility they believed to be less hospitable to the Plaintiff as an act of retaliation for protected conduct via the filing of grievances related to Erfe's improper adoption and application of unpromulgated policy and practices.

271. The actions of the Defendants did violate the Plaintiff's first and Eighth Amendment Rights under the U.S. Constitution and 42 U.S.C §§ 1983 and 1988.

272. The Plaintiff seeks Declaratory Ruling and Damages.

## THIRD CAUSE

1. Paragraphs 1-272 of the Second Cause are hereby restated and made 1-272 of this Cause.

273. Defendants Falcone and Quiros did deny the Plaintiff access to his Religion and did deny him the ability to practice his Religion by refusing to allow him to participate in Sweat Lodge.

274. Said Defendant's did allow subordinate staff to deny Plaintiff his Religous Practice of smudging, and retaliate.

275. Said actions and/or Inaction and/or failures to act by the named Defendants did violate the Religous Land Use and Incarcerated Persons Act and the Plaintiff's First and Eight Amendment Rights under the U.S. Constitution and 42 u.s.c. §§ 1983 and 1988.

276. The Plaintiff seeks Damages against the Defendants in their individual Capacities and Injunctive Relief in their Official Capacities either ordering the allowance of Native American Sweatlodge at Garner C.I. OR an Order to House the Plaintiff in a facility that allows for his Religious Need of sweatlodge. The Plaintiff also seeks Declaratory Relief.

## FOURTH CAUSE

1. Paragraphs 1-276 of the Third Cause are hereby restated and made 1-276 of this Cause.

277. Defendant's Faucone, Quiros and Maiga did take harmful and or negative action against the Plaintiff and did discriminate against him for the immutable trait of ancestry when they used the Plaintiff's relationship to his father to make an

66.

adverse Classification decision against him.

278. The actions and/or failures to act of the Defendants did cause adverse action against the Plaintiff for the immutable trait of ancestry in violation of the Plaintiffs first, Eighth and fourteenth Amendment Rights under the U.S. Constitution and Article first section 20 of the State of Connecticut Constitution.

279. The Plaintiff seeks Declaratory Relief and Damages.

## FIFTH CAUSE

1. Paragraphs 1-279 of the fourth Cause are hereby restated and made 1-279 of this Cause.

280. Defendants Falcone, Quiros, Pieri, Maiga, Semple, Rinaldi, Robles and Mulligan were deliberately indifferent to the Plaintiff's mental illness and did allow him to be housed in isolation confinement despite his mental illness that contradicts said confinement.

281. Said Defendants through their actions and/or failures to act did Violate the Plaintiff's Eighth and fourteenth Amendment Rights under the U.S Constitution and 42 U.S.C.

§§ 1983 and 1988.

282. The Plaintiff seeks Damages against the named Defendants in their individual Capacities and Injunctive Relief in their Official Capacities Ordering the cessation of imposing Isolation - Administrative Segregation Confinement on the Plaintiff and/or mentally ill prisoners. The Plaintiff also seeks Declaratory Relief.

SIXTH CAUSE

1. Paragraphs 1-282 of the fifth Cause are hereby restated and made 1-282 of this Cause.

283. Defendants Arzt and Hill through there actions and/or failures to act, both individually and in Concert where deliberately indifferent to the injury and medical needs of the Plaintiff and did fail to and/or refused to treat the Plaintiff, subjecting him to undue harm.

284. Said Defendants through their actions and failures to act both individually and/or in Concert did penalize the Plaintiff for Protected conduct and did retaliate against him and take adverse action against him for insulting language in violation of his Right to freedom of speech.

285. The named Defendant's through their actions and/or failures to act both individually and/or in concert did subject the Plaintiff to cruel and unusual punishment by leaving him injured and bleeding, refusing him treatment, placing him on in-cell-restraints in an absolute act of excessive force and over reaction, and by placing him in a cell covered in fecal matter.

286. The acts and/or failures to act both individually and/or in concert did violate the Plaintiff's First and Eighth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

287. The Plaintiff seeks Damages against the Defendants in their individual Capacities.

SEVENTH CAUSE

1. Paragraphs 1-287 of the Sixth Cause are hereby restated and made 1-287 of this Cause.

289. Defendant Mulligan did act and/or failed to act in relation to the sixth Cause and did fail to supervise subordinate staff, and did interfere with Plaintiffs ability to Grieve said Incident and did act to cover up said acts of staff misconduct by Arzt and Hill.

290. The actions and/or failures to act by Defendant Mulligan did violate the Plaintiff's First, Eighth and Fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

291. Plaintiff seeks Damages against the Defendant in his individual Capacity and Injunctive Relief in his Official Capacity ordering the cessation of punishments for "insulting language" as such language is protected conduct under the First Amendment's freedom of Speech Clause.

## EIGHTH CLAUSE

1. Paragraphs 1-291 of the Seventh Cause are hereby restated and made 1-291 of this Cause.

292. Defendants Falcone, Pieri, Quiros, Tugie, Maiga, Rinaldi and Semple through their actions and/or failures to act, both individually and/or in concert did orchestrate, manufacture and/or impose an improper isolation and/or Administrative Segregation placement that subjected the Plaintiff to Atypical and significant hardship and the extremely harsh conditions of said confinement and did deny the Plaintiff the Process due him.

293. The named Defendants through their actions and/or failures to act

70.

did: falsify documents; introduce false information into the Plaintiff's hearing process; fail to give appropriate Notice; fail to secure and/or review evidence or witnesses; fail to provide a meaningful hearing; and denied the Plaintiff the Process Due him with complete disregard for the Plaintiff's Rights, with being or Policy or Directive with malicious intent.

294. The named Defendant's did: fail to provide Notice of Criteria for A/S Placement; use a broad and subjective standard to impose A/S placements arbitrarily and capriciously; abuse official discretion; fail to define criteria for A/S placement and/or create or establish an Objective Classification Standard; and did deprive him of life, liberty and Property.

295. The actions and/or failures to act of the named Defendants both individually and/or in Concert did violate the Plaintiff's first, fourth, fifth, Eighth and fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. § 1983 and 1988, as well as Article First Section 20 of the Connecticut State Constitution which prohibits unlawful Segregation.

296. The Plaintiff seeks Damages against the Defendants in their individual Capacities and Injunctive Relief in their official Capacities ordering amendments to Administrative Directives to define and limit criteria for A/S Placements and ensure meaningful Hearings. The Plaintiff

also seeks Declaratory Relief.

## NINTH CAUSE

1. Paragraphs 1-296 of the Eighth Cause are hereby restated and made 1-296 of this Cause.

297. Defendants Robles, Mulligan, Maiga, Quiros, Rinaldi and Semple did fail to ensure meaningful periodical reviews of A/S placements resulting in prolonged A/S confinement and deprivations to life, liberty and property.

298. The named Defendants through their actions and/or failures to act both individually and/or in concert did violate the Plaintiff's first, fourth, fifth, eighth and fourteenth Amendment Rights under the U.S Constitution and 42 U.S.C. §§ 1983 and 1988.

299. The Plaintiff seeks Damages against the Defendants in their individual Capacities and Injunctive Relief in their official Capacities ordering an Amendment to Administrative Directive to ensure A/S Reviews are meaningful and can allow for release from said Confinement. The Plaintiff also seeks Declaratory Relief.

## TENTH CAUSE

1. Paragraphs 1-299 of the Ninth Cause is hereby restated and made 1-299

72

of this Cause.

300. Defendants Robles, Mulligan, Quiros, Rinaldi and Semple did through their actions and/or failures to act both individually and/or in concert did subject the Plaintiff to the extremely harsh conditions of confinement described herein and did subject him to undue isolation confinement and Cruel and unusual Punishments.

301. The named Defendants through their actions and/or failures to act both individually and/or in concert did impose conditions of confinement far harsher then similarly situated level 5 prisoners housed within the same unit, in violation of the Plaintiff's Right to Equal Protection.

302. The actions and/or failures to act of the named Defendant's both individually and/or in concert did violate the Plaintiff's First, Fourth, Fifth, Eighth and fourteenth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

303. The Plaintiff seeks Damages against the Defendant's in their individual capacity and Injunctive Relief in their official capacity Ordering that Administrative Segregation and/or Plaintiff be managed and/or treated equally with Special Needs and/or special circumstances and provided equal conditions of confinement. The Plaintiff also seeks Declaratory Relief.

73

# ELEVENTH CAUSE

1. Paragraphs 1-303 of the Tenth Cause are hereby restated and made 1-303 of this Cause.

304. Defendants Robles, Mulligan, Quiros and Semple through their actions and/or failures to act did fail to supervise staff and protect the Plaintiff and did allow and facilitate the Plaintiff to suffer acts of sexual harassment and sexual abuses in violation of the Prison Rape Elimination Act.

305. The Defendants through their actions and/or failures to act did violate the PREA and the Plaintiff's first, and Eighth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

306. The Plaintiff seeks Damages against the named Defendants in their individual capacities and Injunctive Relief Ordering the cessation of violative shower practices at Northern CI. and PREA investigation and action against staff using sexual misconduct through third parties to harass prisoners.

# TWELFTH CAUSE

1. Paragraphs 1-306 of the Eleventh Cause are hereby restated and

74.

Made 1-306 of this Cause.

307. Defendant Rizvani did unlawfully attack and physically assault the Plaintiff with malicous intent and did harass and threaten him repeatedly causing fear and anxiety, and did subject him to Cruel and unusual Punishments.

308. The actions of Defendant Rizvani did violate the Plaintiffs Eighth Amendment Rights under the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

309. The Plaintiff seeks Damages against the Defendant in his individual Capacity and Injunctive Relief in his official Capacity Ordering an Amendment to DOC Policy and Directive to allow and/or account for prisoners defense of self from an unlawful staff assault, as no such provision exists. The Plaintiff also seeks Declaratory Ruling.

## THIRTEENTH CAUSE

1. Paragraphs 1-309 of the Twelfth Cause are hereby restated and made 1-309 of this Cause.

310. Defendants Alexander and McCormack did fail to supervise subordinate staff and fail to protect the Plaintiff and did allow and facilitate him being subjected to Cruel and unusual Punishments.

311. The Plaintiff seeks Damages and Declaratory Relief.

FOURTEENTH CAUSE

1. Paragraphs 1-311 of the Thirteenth Cause is hereby restated and made 1-311 of this Cause.

312. Defendants Mathews, McCormack, Erfe, Tugie, Maiga, Quiros and Cook through their actions and/or failures to act both individually and in Concert did manufacture an Administrative Segregation placement of the Plaintiff and have deprived him of Life, Liberty and Property without the Process due him.

313. The named Defendants have, through their actions and/or failures to act both individually and/or in Concert, shown deliberate indifference to the Plaintiff's diagnosed mental illnesses that contradict A/S placement and isolation confinement.

314. The named Defendants have, acting and/or failing to act both individually and/or in Concert: introduced false information into the Plaintiff's hearing process; failed and/or refused to secure and/or review his requested evidence; acted in excess of discretion or authority; failed to supervise and failed to protect the Plaintiff; and denied him the process due him resulting in the atypical and significant hardship and extremely harsh conditions of A/S confinement.

76

315.  The Plaintiff seeks Damages against the Defendants in their individual Capacities and Injunctive Relief in their official Capacities Ordering an Amendment to Administrative Directive to limit and clearly define criteria for A/S placement and an Order to allow Audio Recording of Hearings at the Inmates expense unless indigent and an Order to Release the Plaintiff from A/S. The Plaintiff also seeks Declaratory **Relief.**

316.  The Plaintiff also seeks a Preliminary Injunction and/or Temporary Restraining Order Ordering him Released from A/S and/or relief from his Conditions of confinement inclusive of possession of his Property.

## FIFTEENTH CAUSE

1.  Paragraphs 1-316 of the fourteenth Cause are hereby restated and made 1-316 of this Cause.

317.  Defendants Robies, Chevalier, Mudano, Mulligan, Quiros and Cook through their actions and/or failures to act both individually and/or in Concert are imposing extremely harsh conditions of confinement on the Plaintiff pursuant to A/S **confinement** and isolation confinement and are subjecting him to Cruel and unusual punishment.

318.  Said Defendants are acting with a complete disregard and

77.

deliberate indifference to the Plaintiffs mental illnesses and are Subjecting the mentally ill Plaintiff to isolation confinement and Subjecting him to Cruel and unusual punishments.

319. The Defendants through their actions and/or failure to act both individually and in Concert and through their policies are imposing extremely harsh conditions of confinement not endured by the similarly situated level 5 population within his housing unit in violation of his equal protection Rights.

320. The Plaintiff seeks Damages against the Defendants in their individual Capacities and Injunctive Relief in their official Capacities ordering equal conditions of confinement and treatment for the Plaintiff and/or A/s prisoners with Special Needs and/or Special circumstances. The Plaintiff also seeks Declaratory Relief.

321. The Plaintiff also seeks Preliminary Injunction and/or a Temporary Restraining Order Ordering his release from A/s and/or Relief from these harsh and inequal conditions of confinement by providing him his property equally with Special Needs and/or Special circumstances

## SIXTEENTH CAUSE

1. Paragraphs 1-321 of the fifteenth Cause are hereby restated and made 1-321 of this Cause.

322. Defendants Leone and Betances and Mulligan did, through their actions and/or failures to act both individually and/or in concert, deny the Plaintiff the process he was due and orchestrate a guilty finding with malicious intent.

323. The Defendants did: fail and/or refuse to secure and/or review his evidence and/or witness statements; violate DOC AD's; introduce false information into his hearing process; falsify an admittance of guilt; and mock the Plaintiff's right to seek civil redress.

324. The Plaintiff seeks Punitive Damages against the Defendants in their individual capacities and/injunctive Relief in their official capacities ordering an Amendment to Administrative Directive requiring the use of a legally recognized evidentiary standard instead of the "some evidence" standard currently used by DOC officials to regularly find innocents guilty AND in order to DOC Administrative Directive allowing audio recording of Hearings at inmate expense unless indigent to deter DOC Hearing officers from

79.

falsefying Hearing written records.

305. The Plaintiff also seeks Injunctive Relief ordering a prevision be added to allow and/or account for an inmates defense of self from an unlawful physical attack by corrections officials. The Plaintiff also seeks Declaratory Relief.

## SEVENTEENTH CAUSE

1. Paragraphs 1-305 of the sixteenth cause are hereby restated and made 1-305 of this Cause.

306. Defendants Mudano, Maiga, Mulligan, Quiros and Cook through their actions and/or failures to act both individually and/or in concert did fail to supervise staff and failed to protect this Plaintiff from injury to his persons, health and well being, and Civil Rights.

307. The Plaintiff seeks Damages and Declaratory Relief.

## EIGHTEENTH CAUSE

1. Paragraphs 1-307 are hereby restated and made 1-307 of this Cause.

328. The Plaintiff is a Pro Se litigant entitled to liberal Construction

and liberal interpretations of those filings.

379. The Plaintiff hereby claims any and all arguements and/or Causes of Actions raised herein that he may be unaware of and/or failed to expressley state, granted by the Cares liberal interpretations.

330. The Plaintiff hereby claims any and all relief related to these claims, granted by the Grace of the Court.

K.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff seeks Declaratory Ruling;

WHEREFORE, the Plaintiff seeks Compensatory Damages;

WHEREFORE, the Plaintiff seeks Punitive Damages;

WHEREFORE, the Plaintiff seeks the Costs of Suit;

WHEREFORE, the Plaintiff seeks Reasonable Attorneys fees;

WHEREFORE, the Plaintiff Seeks Permanent Injunctive Reliefs;

WHEREFORE, the Plaintiff seeks A Preliminary Injunction;

WHEREFORE, the Plaintiff Seeks A Temporary Restraining Order;

WHEREFORE, the Plaintiff seeks an Order from the Court not allowing the State to endemnify and/or cover Punitive Damages against the Defendant's in their Individual Capacities as the Pervasity of Corrections Officials will Continue unabated as long as the state and it's Taxpayers Continue to pay for their conduct;

WHEREFORE, the Plaintiff seeks an Order to the States Attorneys Office to Investigate these Allegations for any Criminal Wrongdoing and Cover up by DOC Officials;

WHEREFORE, the Plaintiff Seeks any and all other Relief the Court Deems Just and Equitable.

## A JURY TRIAL IS HEREBY DEMANDED

Respectfully Submitted
THE PLAINTIFF

10.22.19

Date

Joe Baltas, Pro Se
Northern C.I.
P.O. Box 665
81.    Somers, CT  06071

## 1. VERIFICATION

I have read the foregoing Complaint and hereby Verify that the matters alleged therein are True and factual to the Best of my Knowledge and Belief. I certify under penalty of perjury that the foregoing is True and Correct.

Executed at Somers, Connecticut on this date of October 22, 2019.

By The Plaintiff

Joe Bartas, Pro Se
Northern C.I.  # 339050
P.O. Box 665
Somers, CT 06071

82

# CERTIFICATION

I, Joe Baitas, hereby certify that the foregoing Complaint

and Attachments was placed in DOC custody in sealed

Certified Mail Packaging on this date of October 22, 2019

addressed to :

U.S. District Court
915 Lafayette Blvd.
Bridgeport, CT 06604

By the Plaintiff

Joe Belt

Joe Baitas , Pro Se
Northern C.I.
P.O. Box 665
Somers, CT 06071



Pursuant to 28 USCS, §1746:

I,  Joe Baltas        on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas
NCI
P.O. Box 665
Somers, CT 06071



# Incident Report – Supplemental Page
## Connecticut Department of Correction

CN 6601/3
REV 7/20/15

| Report Number: GCI-2016-12-034 | Page 3 of 30 |
|---|---|

| ☒ Facility/Unit: Garner Correctional Institute | ☐ Parole Office/Unit: |
|---|---|

| Date: 12/13/2016 | Time: 3:25 ☐ am ☒ pm | Incident Class: ☐ 1 ☒ 2 ☐ 3   Type: E,M |
|---|---|---|

Incident Location: E-unit cell 123

| Prepared By: Tolmie, | Title: Lieutenant |
|---|---|

**Narrative:**

On 12/13/2016, I Lieutenant        Tolmie was assigned as a shift supervisor on (4 pm-12am) shift. At approximately 4:00 pm I reported to E-unit to relieve the 8 am – 4 pm supervisors who were conducting verbal intervention with Inmate Baltas, Joe #339650.

Once in the unit I Lieutenant Tolmie reported to cell E-123 and tried to engage in verbal intervention with the said inmate. Inmate Baltas was communicating with this writer with his mattress obstructing the food serving trap. After a multiple attempts to have inmate Baltas comply with my direction this writer was informed that a planned use of force was authorized. Inmate Baltas continued to be non-compliant and he continued to refuse all attempts to gain compliance. Deputy Warden Dilworth authorized the use of the cell extraction team, so Lieutenant Hurdle assembled the team while I attempted further verbal intervention and tried to find out if said inmate had a weapon (it should be noted that the said inmate has a history of assaults with weapons) and to have him comply with my direct orders (see Lieutenant Hurdle's supplemental for details pertaining to the C.E.T team assembly). Inmate Baltas stated that he did not have a weapon when asked, but I continued to monitor him while waiting for the team to arrive in case he attempted to retrieve one. Medical staff noted that there was no contraindication to chemical agent exposure. The team then entered the unit and staged in front of cell 123, (Team members #1-    Dorosh, #2-    Swan, #3-    Weglarz, #4-    Blekis, #5-    Sebastian, #6    Badamo). At this time I gave one final verbal command to comply with my direction, inmate Baltas refused to comply and continued to barricade his food serving trap with his mattress. I then directed team member #6 (Badamo) to insert the B.O.T tool into the food serving trap past the mattress so I could position the nozzle in order to administer one burst of MK-9 into the cell. Inmate Baltas was still non-compliant to all verbal direction. I then directed Officer Badamo to insert the B.O.T tool into the food serving trap again at which time Lieutenant    Nelson administered one burst of Z-505 into the cell as I deployed a second burst of MK-9. At this time I directed the cell door be unsecured and the C.E.T team entered the cell. Once team members #1 (Dorosh), #2 (Swan), #3 (Weglarz), #4 (Blekis) were inside the cell inmate Baltas became actively resistant towards the team members and attempted to turtle up, refusing to allow staff to apply restraints. The said inmate was stabilized to the floor where he continued to turtle up against the cell desk and was actively resistant and non-compliant to staff direction to submit to restraints. Team member #2(Swan) attempted to activate the hypoglossal nerve compression while members #3(Weglarz) and #4(Blekis) administered multiple fore-fist strikes to the upper torso in attempts to gain compliance with no success.  The secondary supervisors (Lieutenant    Nelson and    Hurdle) directed team member #5 (Sebastian) to remove the cell chair and mattress from the cell.                                                                                      Team member #1(Dorosh) administered multiple knee strikes in attempts to activate the lateral femoral nerve compression in an attempt to gain compliance to allow staff to apply restraints. At this time I continued to give clear and concise direction to Inmate Baltas to stop resisting staff and submit to restraints. Inmate Baltas finally complied with my direct orders and allowed staff to secure him in restraints. After being secured I directed staff to assisted said inmate to his feet and team members #2 (Swan) and #4 (Blekis) reverse escorted him from cell E-123 to restrictive housing with team member #1 (Dorosh) covering down with the convex safety shield. Once in restrictive housing inmate Baltas was escorted to the unit showers to be decontaminated from chemical agent exposure. Once inmate Baltas was decontaminated he was escorted to cell F-124 for placement. Due to the said inmates refusal to comply with all direction and being acutely disruptive it was determined that he was to be placed on in-cell restraints to deter his behavior from continuing. Once in the cell C.E.T team members #1 (Dorosh), #3 (Weglarz), #4 (Blekis), #5 (Sebastian) conducted a controlled strip search of Inmate Baltas, during the strip search #3 (Weglarz) needed to be relieved so #6 (Badamo) relieved him and systematically placed him into an in-cell restraints setup. Once inmate Baltas was secured in the restraints, myself along with CN    D'Uva conducted a check of the restraints for correct application, the application was acceptable to the standards set forth by the departments' directives. I then utilized the digital camera to get a post restraint application photo of inmate Baltas showing that he was able to stand erect before exiting the cell. I then directed staff one by one to exit the cell and gave inmate Baltas direction to stay lying on the bunk until staff exited the cell and the cell door was secured. Inmate Baltas was secured in the cell without further incident.

Inmate Baltas was issued undergarments, jumpsuit, blanket and mattress as per protocol. Correction Officer    Ragauskas started the video recording and was relieved by officer    Johnson who was assigned as the camera operator on 4-12 shift and continued to videotape the incident until finished. The videos (GCI-V-16-764/765/766) were reviewed, labeled and secured in the safe with proper documentation. (V-16-766 was recorded by correction officer    Legassey, it is the C.E.T operation from the secondary camera).  Correction Officer    Barry packed and inventoried Inmate Baltas's property, and secured it in the property room for storage along with all proper documentation. As per protocol, Inmate Baltas received copies of his class "A" Disciplinary Reports for Interfering with safety or security and Threats  and signed his property matrix form and received a copy for his records. CN    D'Uva provided a Medical Incident report stating the application of in-cell restraints and noting no injuries to inmate Baltas.

| Reporting Employee Signature: | Title: Lieutenant |
|---|---|
| Report Date: 11/17/2016 | Report Time: 11:4_ ☐ am ☒ pm | Type: ☐ Individual ☒ Summary |



Pursuant to 28 USCS, §1746:

I,   Joe Baltas      on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

_Joe Baltas_
NCCI
P.O. Box 665
Somers, CT 06071



DEFENDANT'S
EXHIBIT
A



# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
*GARNER CORRECTIONAL INSTITUTION*
*50 NUNNAWAUK ROAD*
*NEWTOWN, CONNECTICUT 06470*

HENRY FALCONE
WARDEN

TEL: (203) 270-2810
FAX: (203) 270-1826

*Approved for A/S hearing*
*Please fwd to population*
*Management Diablos Inmates fews*
*[signature]*
*12/23/16*

TO:        Angel Quiros, District Administrator
           David Maiga, Director of Offender Classification Population Management

FROM:      Henry Falcone, Warden   *[signature]*

SUBJECT:   Request for Administrative Segregation Hearing/Placement
           Baltas, Joe #339650

DATE:      December 21, 2016

---

I am requesting that inmate Baltas, Joe be considered for Administrative Segregation hearing/placement at Northern CI for safety and security concerns based on his extremely violent behavior and gang influence.

Inmate Baltas has a history of association with the Diablos Motorcycle Gang. The Diablos are a fully established biker gang that has been around for decades that has chapters in cities across the United States who are highly organized and dangerous. In accordance with AD 6.14, Security Risk Group, The Diablos MC is not recognized as a Watch Group, but is listed as a disruptive group by the Intelligence Unit. His father, John Baltas Sr. was incarcerated in CT DOC #2117, was the founder of the East Coast chapter of the Diablos and the one time national president. Inmate Baltas father reported in the presentence investigation report that the club looked out for his son. It was also reported that the father took his son with him to the club so often that it was impossible for him not to have witnessed violence. Although undocumented, the inmate claims to have taken control of the organization since he was 16 years of age.

Inmate Baltas was previously placed on Administrative Segregation status on February 10, 2014 for deliberately and violently assaulting an inmate with a weapon while housed at Cheshire CI on January 7, 2014. He sharpened a large piece of metal as a weapon to stab and cut the inmate during a fight. The victim sustained injuries to his face and arm. As a result of this incident, inmate Baltas received a 20 year consecutive sentence for Assault 2nd and Possession of a Weapon in a Correctional Institution. He was removed from this status on April 28, 2015.

He is currently managed on High Security status due to a notebook found in his possession containing staff names, suspected jurors names and a list of names/alias of what appeared to be Diablo leaders throughout the United States, and a formula of how to make a bomb.

*An Equal Opportunity Employer*

Since his transfer from McDougall CI to Garner CI on November 23, 2016, he has repeatedly told staff, he will do what he has to do to get out of this facility. He is adamant on transferring to Cheshire CI. On November 28, 2016, during a telephone conversation with his mother, he stated, "I got to do what I got to do." On December 4, 2016, he stated, "you know what I mean, they don't want me to start raising hell." Based on information retrieved by the Intelligence Officer, he is eluding that he will do a violent act to get out of this facility to create a staff profile. His threats to disrupt the facility operation presents a serious threat to the safety and security to staff, inmate population and the operation of the facility. A cell extraction team was authorized on December 13, 2016 due to inmate Baltas acutely disruptive behavior. More specifically, he became highly agitated while walking towards his cell, once secured in his cell he threatened to stab Officer Poma in the neck. When interviewed by supervisor; he stated on video camera, "when I get out of seg I'm gonna make a shank and stab you, there's your threat." He then barricaded his cell door trap with his mattress refusing to comply with staff's direction; once staff entered the cell, he became actively resistant and non compliant to submit to wrist restraints. Due to his disruptive behavior, he was placed on in-cell restraints. An officer sustained a knee injury as a result of this incident.

Inmate Baltas is serving a 95-year sentence for Murder, Assault 1st, Burglary 1st, Kidnapping 2nd and a 20 year consecutive with current sentence for Assault 2nd and Possession of a Weapon in a Correctional Institution. He has a total of 55 disciplinary reports.

Inmate Baltas gang influence, history of assaults with weapons, and propensity to violence pose a significant risk to the operation of the institution. In addition, the special management profiles that are listed is a result of violence towards other inmates. To ensure the safety of staff and inmate population, and maintain the normal operations of the facility, it is recommended that inmate Baltas be placed on administrative segregation based on the aforementioned violent behavior and gang influence.



Pursuant to 28 USCS, §1746:

I,  Joe Baltas      on oath state that the copies attached as pages to this exhibit are true genuine copies of the documents they purport to represent. Signed under the pains and penalties of perjury on this date, _10.22.19_ .

Joe Baltas

NCI,

P.O. Box 665

Somers, CT 06071

CONNECTICUT JUDICIAL DEPARTMENT
OFFICE OF ADULT PROBATION
PRESENTENCE INVESTIGATION REPORT LONG FORM

| COURT NAME OF DEFENDANT | CMIS CASE NUMBER(S) | CMIS CLIENT NUMBER |
|---|---|---|
| Baltas, Joe | CA00002626044 | CL01000675852 |

they were both incarcerated at approximately the same time. The offender was approximately eleven years old when both parents were sentenced; however they were incarcerated in 1996 and 1997.

The offender stated that his father was a "good Dad". He qualified this by stating that his father taught him "values" such as having a good education. The offender admittedly broke down and "went silent" when his father was incarcerated. After this, he "bounced around between family and friends." The offender's father explained that the offender idolized him to the point where the offender would "try to get in trouble" in order to land in prison to be closer to his father. Jack Baltas stated that his son Joe was "lost". He stated that "he tried to come to jail to be with me."

The offender's father was questioned about the Diablo gang's influence upon the offender. Jack Baltas stated that it had no influence. He stated rather, "the club looked out for him." He also stated "he was not a Diablo; he was not raised to be a Diablo." It should be noted, however, that the offender's mother stated that Jack took the offender to the club with him so often, that it would impossible for the offender not to have witnessed violence.

With regard to the instant offense, Jack Baltas made a couple of disparaging remarks about Victim #4's negative influence upon his son; and he brought up the question that drugs may have played a role in the offense. The offender indicated that he corresponds regularly with both his mother and his father.

The offender's father had a daughter, Nadiene Balough, age twenty-one, from a relationship simultaneous to the relationship with the offender's mother. The offender indicated that he resided in a multi-family home owned by their father, along with his sister Nadiene, until the instant offense incarceration. As she appeared to be his most recent steady family contact, this writer contacted Nadiene. She confirmed that she and her mother resided in the house owned by her father. Nadiene reported that she is very close to Joe, and they socialized often, being close in age. While explaining that the offender is "very hard-headed" and has anger issues, she also indicated that he never "had a chance to be a kid" and she described the offender as "a little kid trapped in an old man's body."

After spending time with extended family in Connecticut, until approximately age thirteen, the offender moved to North Carolina to reside with his brother, Jeremy Holt. According to Jeremy, he raised the offender from approximately 1998 to 2004 or 2005. Jeremy was only seventeen years of age at the time and had no education. However, he stated he worked full-time in order to provide housing and food for the offender. Jeremy is now still residing in North Carolina, and works as the Assistant Service Manager for a Toyota Dealership. He stated that he plans to marry in June.

There is another sibling of the offender, Shane Baltas, who resides in Connecticut. This writer attempted to communicate with Shane by telephone also, however efforts were fruitless. Although he is said to be settled with a family and residing in Bristol, Shane has a serious criminal history. Records indicate that he was convicted of Manslaughter First Degree and sentenced in the Meriden Superior Court on May 8, 1987 to ten years, execution suspended after eight years, three years Probation. Additionally, Shane spent several years in Federal prison for Conspiracy to Commit Racketeering, Transporting Firearm by Convicted Felon, and it appears, narcotics violations. Records reflect that he is currently serving a term of supervised release with United States Probation in Hartford. His release date is April 19, 2012. Finally, the offender's father candidly stated that he and Shane spent much time in the same Federal correctional facility, together.

With regard to extended family, the offender's father has two sisters, Kathleen Schwartz and Joanne (last name unknown). The offender's father indicated that Joe resided at times with his sister Kathy, who lived in his mother's home. Jack reported that Kathy was "verbally abusive" to the offender. He also indicated that he made his sister Kathleen the executor of his estate, hoping that she would preserve the family assets and home while Jack was incarcerated. Jack stated that he intended for the offender to inherit the home where Jack's mother resided, and for Nadiene to inherit the home where she and the offender resided. The offender's father disclosed that his sister Kathy sold the home intended for the offender, subsequent to the offender's incarceration. Jack Baltas stated of his sister, "she robbed this kid of ninety-five thousand dollars."



Pursuant to 28 USCS, §1746:

I, Joe Baltas      on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas

*NCI*

*P.O. Box C6*

*Somers, CT 06071*

**UCONN HEALTH**
**CORRECTIONAL MANAGED HEALTH CARE**
**POLICY AND PROCEDURES**
**FOR USE WITHIN THE CONNECTICUT DEPARTMENT OF CORRECTION**

| NUMBER:  E 3.02 | Page 1 of 2 |
|---|---|

**TRANSFER/CARE OF INMATES TO NORTHERN CI**
**ADMINISTRATIVE SEGREGATION**

**Effective Date: 05/24/06**

**POLICY:**
Any inmate being considered for Administrative Segregation (AS) transfer to Northern Correctional Institution ("NCI"), or, being reviewed for AS based on a pending criminal charge of Capital Felony Murder, shall be evaluated by a psychologist, psychiatrist, or psychiatric APRN using **Form HR 508 Mental Health Assessment** to determine any clinical contraindications for Northern CI AS placement. The inmate will be placed in appropriate housing by custody staff. **Form HR 523 Northern Correctional Institution Mental Health Clearance Form** is completed by the psychologist, psychiatrist, or psychiatric APRN in order to inform the DOC Director of Psychological Services who will notify population management of the move.

**PROCEDURE:**

1. The evaluation shall include an interview, a review of the health record, and review of custody data including but not limited to RT 50, 60, 67, 74, & 77.

2. A current/updated **Form HR 508 Mental Health Assessment** and **HR 523 Mental Health Clearance Form for Administrative Segregation** (AS), and clinical note documenting interview findings (**HR 401**) shall be completed.

3. Contraindications to placement in Administrative Segregation housing may include serious mental illness, such as the following:

   - A. Psychotic disorders, Bipolar Disorders, Major Depressive Disorder and <u>any diagnosed mental disorder</u> (excluding substance use disorders) <u>currently associated with serious impairment</u> in <u>psychological</u>, cognitive, or <u>behavioral functioning</u> that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health professional.

   - <u>B.</u> Psychological disorders- as relating to the mental and emotional state of an individual.

   - C. Cognitive impairments- as relating to intellectual and cognitive abilities associated with brain function.

   - D. <u>Behavioral disorders</u> – as relating to actions or reactions in response to external or internal stimuli that is observable and measurable.

**TRANSFER/CARE OF INMATES TO NORTHERN CI
ADMINISTRATIVE SEGREGATION**

4. Upon completion, **HR 523, a current HR 508,** and the **HR 401** clinical **note,** shall be **faxed** to CT DOC Director of Psychological Services (or designee). In the absence of extenuating circumstances the psychologist shall contact the CTDOC Director of Psychological Services (or designee) for consultation.

5. Upon the review and approval by the CTDOC Director of Psychological Services (or designee), the HR 523 is forwarded to the Offender Classification and Population Management Unit for action.

6. If HR 508 Mental Health Assessment is not completed by the sending facility the form will be completed by the mental health clinician at Northern CI.

**REFERENCES:** *Administrative Directives* 8.5 Mental Health Services. 2008. Connecticut Department of Correction.
*Standards for Health Services in Prisons (P-E-03).* 2014. National Commission on Correctional Health Care. Chicago, IL.
CMHC Patient Safety System/PSS User Manual (Rev.3/2008).

| | |
|---|---|
| **Approved:  UConn Health - CMHC** | **Date:** |
| Title:  **CMHC Executive Director, Robert Trestman MD PhD** | _____ |
| Title:  **CMHC Dir. MH and Psychiatric Services, Robert Berger MD** | _____ |
| Title:  **CDOC Director of Health Services, Kathleen Maurer MD** | _____ |
| Title:  **CDOC Chief of Psychiatric Services, Craig Burns MD** | _____ |



Part II   Mental Health Need

An individual will be assessed concerning specific needs for mental health treatment within the correctional environment. Behavioral, cognitive, emotional, and/or interpersonal deficits or patterns that potentially influence adjustment within an institutional or community correctional environment are critical factors in determining the mental health score.

Mental Health Need Scores will be determined by mental health professionals. In those facilities with limited mental health resources, MH-1 and MH-2 ratings may be determined by qualified classification staff or by health services staff who do not specialize in mental health. Rating of MH-3 and above may only be scored by **licensed** mental health staff.  Mental health needs scoring must be done on intake and **during the routine 6 month facility classification review or** when a significant change in the individual's condition occurs. Classification staff shall be notified of initial scores and revisions to scores.

All inmate-patients will receive a mental health classification. Depending on their condition, some inmate-patients will receive one or more mental health subcodes. In some cases the subcodes may suggest a need for ADA (Americans with Disability Act) accommodation, in **which case custody ADA coordinators shall be contacted.**

| Class | Definition |
|-------|------------|
| MH5 | Crisis-level mental disorder (acute conditions, temporary classification). Requires 24x7 nursing care |
| MH4 | Mental health disorder severe enough to require specialized housing or ongoing intensive mental health treatment; almost always on psychotropic medications |
| MH3 | Mild or moderate mental health disorder (or severe mental disorder under good control); may or may not be on psychotropic medication |
| MH2 | History of mental health disorder, not currently active or needing treatment, OR current mild mental health symptoms, not requiring treatment by a mental health professional |
| MH1 | No current or former mental health problems |

CMHC, in cooperation with the CDOC Department of Health Services, will publish a detailed guide to classification, intended to assist health services staff to accurately and consistently classify each inmate-patient. This guide will be revised from time to time as necessary, and become a part of the CMHC Policy & Procedure Manual. The current version is appended to this manual as Appendix B.

# Appendix C: Samples of Mental Health Level, by disease category

| MH Level: | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Disease state | | | | | |
| Anxiety disorders | N/A | Mild anxiety symptoms | PTSD w/ ongoing moderate symptoms; other severe anxiety disorders | Severe anxiety disorder; e.g., trichitillomania, agoraphobia, claustrophobia | N/A |
| Mood disorders | N/A | Dysthymic symptoms | Bipolar disease, stable Mood disorders secondary to substance dependence or general medical condition, not on meds Dysthymic disorders, Major depression (current) Bipolar (manic phase), w/o psychosis | Severe mood disorder requiring a higher level of care (should be temporary) Bipolar, manic phase, w/o psychosis | Suicidal or self-harm behavior Suicidal and/or crisis with risk for self-harm Severe depression without sufficient oral intake, or with severe lack of self-care Bipolar, manic, with psychosis |
| Cognitive disorders (includes TBI) | N/A | Borderline or subnormal intellectual function without serious behavioral problems or functional impairment; able to function w/o special supervision or accommodation plan that requires mental health staff | Moderate cognitive/ intellectual deficits with behavioral problems or functional impairment that requires case management and accommodation plan by mental health staff | Moderate to greater cognitive/ intellectual deficits with serious behavioral problems or functional impairment that requires specialized housing and coordinated planning by mental health staff | |

| MH Level: | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Disease state | | | | | |
| Thought disorders | N/A | N/A | Schizophrenia, schizoaffective disorder, delusional disorder --- stable on meds | Psychosis due to substance use or a general medical condition Schizophrenia Schizoaffective disorder Delusional disorder. | Acute psychotic episode due to any cause |
| Life problems | N/A | Adjustment problems Insomnia Grief reaction Other life circumstance problems --- not requiring mental health intervention | Adjustment disorder requiring mental health intervention | | |
| Personality disorders | N/A | Personality disorders | Personality disorders with moderate behavioral problems, Typically borderline, antisocial, or paranoid | Severe personality disorders and impulse control behaviors w/ serious behavioral problems. Typically borderline, sociopathic, or paranoid | Actively suicidal or self-mutilating, or extremely disruptive |
| Usual range of GAF | >65 | >65 | 51-70 | 31-55 | 11-33 |

Note1:  Substance abuse status does not influence mental health classification. Severe intoxication or withdrawal would earn a **temporary** medical level 5 but not a mental health classification. Inmate-patients with dual diagnosis will be classified according to the severity of their psychiatric condition

Note 2:  The clinician assigning a mental health score should consider both the specific illness and the functional score. Global Assessment of Functioning (GAF) scores are presented as a range. The clinician may classify based either on the specific illness or the



Pursuant to 28 USCS, §1746:

I,   Joe Baltas        on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, 10.22.19 .

Joe Baltas

NCI I
P.O. Box 665
Somers, CT 06071

CONNECTICUT JUDICIAL DEPARTMENT
OFFICE OF ADULT PROBATION
PRESENTENCE INVESTIGATION REPORT LONG FORM

| COURT NAME OF DEFENDANT | CMIS CASE NUMBER(S) | CMIS CLIENT NUMBER |
|---|---|---|
| Baltas, Joe | CA00002626044 | CL01000675852 |

With regard to physical health, Baltas reported that he is in good health and participated in athletics when he was young.

When discussing mental health, he disclosed that when he was residing with his cousin (Shannon Impronto Kane), he "went silent" after his father's federal sentencing. As a result, the offender explained, he was placed in an institution for several months. Records indicate that Baltas was initially hospitalized at Midstate Medical Center in Connecticut in the fall of 1999 for an attempt to "smother" his younger cousin. Both the offender's sister and another cousin reported at that time the offender articulated homicidal ideations against his young cousins with whom he resided. These ideations were in writing, and found by the cousins' parents. According to one relative, the offender was a "very angry boy" and he "did some frightening things to my cousin's children." She additionally stated "he scared them enough that they thought he should be institutionalized."

The offender was transferred from Midstate Medical Center after four days to Stony Lodge Hospital in Briarcliff Manor, New York. Information in Stony Lodge records reveals that the offender previously had engagement with supportive outpatient services during his grammar and middle school years in Meriden. He also may have been involved briefly in another counseling program. Stony Lodge reported that during the initial assessment of the offender, it was learned that he has a history of conduct disorder, threatening other children, fist fights, cruelty to animals, and fire setting.

In the discharge summary, it stated that Baltas was admitted from November 19, 1999 to January 9, 2000 for the treatment of Conduct Disorder-Childhood onset and Dysthymic Disorder. The offender was medicated with Seroquel and Serzone. He was involved in "behavioral modification within a therapeutic milieu; group therapy, and individual therapy. . . Passive suicidality and severe aggressivity remained a major issue throughout." The offender was said to become "more oppositional and aggressive, frequently becoming involved in conflicts with peers and being uncooperative with staff" when it was clear that he could not return home." "With both parents incarcerated, extended family unwilling to have him return, and no idea of where he would live, [the offender] was not motivated to leave the hospital or to work in treatment. He did however, become less guarded and more able to take responsibility for his behavior on the unit and in individual sessions."

The discharge summary also reported that the hospital attempted to make an appeal to the Connecticut Department of Children and Families (DCF) "for assistance with obtaining a placement subsequent to discharge." The summary reflected DCF indicated that since the offender was out of state and there were no placement opportunities in Connecticut, "they had closed his case and could not be of any assistance." The discharge summary also stated "[t]he paucity of services in Connecticut resulted in [the offender's] transfer to New York and ultimately in the plan to send him to live in North Carolina." In the end, Stony Lodge noted, "[i]t was felt that the patient would benefit best from residential treatment and did not require continued hospital care an extended basis. However, due to the complexity of his legal status, meaningful application for residential care could not in fact be undertaken." When the offender was discharged, he was diagnosed with Axis I: Conduct Disorder, childhood onset; Dysthymic Disorder; Parent-Child Problem; and Axis II: Borderline Personality Traits.

In speaking with the offender's father, he stated he had the offender removed from Stony Lodge, after hearing that following an explosive outburst by the offender, "they had him strapped down." In fact, records do indicate that there was an episode on January 4, 2000 requiring four-point restraints. In speaking to the offender's sister Nadiene, his cousin Diane, and his mother, all indicated that they believed the hospitalization at Stony Lodge to be very positive and therapeutic. Although the offender's mother also took credit for trying to organize the offender's discharge from Stony Lodge and relocation to North Carolina, she now feels that this was not the right decision.

The offender stated that has not had any formal psychiatric therapy since his release from Stony Lodge, despite that outpatient therapy was recommended. However, his brother Jeremy indicated that the offender was involved with Social Services for approximately two years after his release from Stony Lodge, due to the hospital's recommendations. The offender's brother could not provide additional details about the name of the

CHAPTER 34

# ALITY DISORDERS: *Borderline*
# *nality Disorder*

erline personality disorder includes almost all of the perceptual, cognitive,
tive, and behavioral disturbances present in personality disorders.
ety and maladaptive coping behaviors, particularly manipulation, regression, and
ting are important in this disorder.
nts with this disorder experience major problems with unstable relationships.
goals of collaborative management include:
suring that client does not harm self or others, including self-mutilation
velopment of self-esteem and communication of needs and feelings
tting limits on inappropriate behavior and avoiding power struggles
velopment of problem-solving skills
tment is aimed at reducing the presenting symptoms.
nsive psychotherapy may be necessary to change behavioral, affective, or
nitive function.
**Terms/Concepts:** Manipulation, splitting, regression, self-mutilation, impulsivity,
ection, identification

ividual with a borderline personality disorder exhibits a combination of almost all
perceptual, cognitive, affective, and behavioral disturbances present in other
nality disorders. A diminished tolerance for anxiety and maladaptive coping
iors is exhibited. This disorder is characterized by a pervasive pattern of unstable
ersonal relationships, self-image, and affects, as well as marked impulsivity
ing by early adulthood. These clients are most easily identified by their intensity
ability of affect or behavior.

ity or instability of affect or behavior
ic predisposition
nctional family life

## and Symptoms

- Chronic depression
- Inability to tolerate being alone
- Clinging, distracting, and erratic behaviors
- Splitting
- Manipulation
- Mistrust, blaming
- Difficult interpersonal relationships
- Self-destructive and self-mutilation behaviors
- Impulsivity and exaggerated mood swings
- Rage reactions
- Substance abuse
- Inappropriate sexual behavior
- Frequent hospitalizations
- Common violent outbursts
- Overwhelming fear of abandonment
- Low self-esteem, self-pity, and apathy

## ssment

- History and physical examination: Baseline assessment to rule out any physical abnormalities
- Family assessment: Family patterns of behavior or childhood experiences are assessed for dysfunctional patterns.
- Mental status examination: Provides information about current mental functioning
- Psychological tests: Specified by the psychiatrist after completion of the baseline assessment
- Legal history: May have a legal history of breaking the law, aggression, or violent behavior
- Suicidal ideation and violence toward others

## ng Diagnoses

- Ineffective individual coping
- Social isolation
- Impaired social interaction
- High risk for violence to self or others
- Anxiety
- Fear of abandonment
- Depression

## peutic Nursing Management

- Protect the client from self-mutilation and suicide.
- Setting limits is the most effective method for dealing with manipulation. Manipulation and passive aggression are primary traits displayed by the client with borderline personality disorder. Assist the client in the development of personality by confronting the client's issues and feelings.
- Avoid power struggles with the client by having clearly defined, consistent treatment approaches with clear communication among all caring for the client. The client's divisive actions are used to split staff, particularly over discrepancies in the treatment plan and implementation.
- Help the client identify his/her own use of projection, splitting, manipulation, regression, and inappropriate response to rejection with anger.

**RN Mental Hea**



Hospitalization may be required to keep client safe; however, long hospitalization often leads to further regression for the client with borderline personality disorder.

Staff usually perceives that the client is demanding and judgmental in interpersonal relationships, which can lead to difficult nurse-client rapport.

## ɔmes

ient will:

Experience reduced anxiety and decreased impulsivity

Not harm self or others

Improve communication and interpersonal relationships

Improve problem solving and use of appropriate coping mechanisms

Not report fear of abandonment

## amily Education

Discuss with the client and family the possible environmental or situational causes, contributing factors, and triggers for borderline personality disorder.

Help the client and family to identify the internal and external indicators of borderline personality disorder.

Educate the client and family about the following issues:

- Coping skills
- Anger management
- Stress management
- Problem solving
- Medication adherence



Pursuant to 28 USCS, §1746:

I, Joe Baltas     on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, 16.22.19 .

Joe Baltas
NEI
P.O. box 665
Somers, cT 06071

HR508 REV. 04/12
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

| INMATE NUMBER 339650 | DATE OF BIRTH 12/31/87 |
|---|---|
| INMATE NAME (LAST, FIRST, INITIAL) Baltas, Joe | |

## MENTAL HEALTH ASSESSMENT

| SEX Ⓜ F | RACE/ETHNIC B Ⓦ H O | FACILITY 6 CI |
|---|---|---|

DATE/TIME: 12/22/16   PRIMARY LANGUAGE: English

INTERPRETER NEEDED: ☐ YES ☒ NO  LANGUAGE LINE USED: ☐ YES ☒ NO  INTERPRETER NAME: _____

1. REFERRED BY: ___DOC___   REASON FOR REFERRAL: ___A/S___

---

**2. CURRENT CORRECTIONAL STATUS:** (Check all that apply): ☐ General Population ☐ Protective Custody ☐ Admin. Seg.

☐ SRG ☒ RHU  **CURRENT MENTAL HEALTH STATUS:** ☐ MH Housing ☐ Inpatient Psychiatric ☐ Inpatient Medical

☐ Other: _____  MHU Single Cell ☐ Other Single Cell ☐ ___HHZ___

---

**3. LEGAL HISTORY:**
PRESENT CHARGE OR OFFENSE: ___Murder.___

☐ UNSENTENCED, NEXT COURT DATE: _____

☒ SENTENCED, SENTENCING DATE: 4/23/16 3P  LENGTH: 115 yr.  PROBATION: _____
                                    4/10/10

☐ REGISTRATION REQUIRED
CONVICTION HISTORY:

| LOCATION | OFFENSE | TIME SERVED |
|---|---|---|
| | | |
| | | |
| | | |

---

**4. FAMILY:**
Father: (age, location) ___deceased 2012___                    # Refused to answer
Mother: (age, location) ___alive - North Carolina late 50p.___   based
Brothers and Sisters: (age, location) ___several several___      2014
                                                                 insenput

Marital Status:  Single ☒  Married ☐  Divorced ☐  Separated ☐  ☐ Other: _____

Spouse and/or Spouse equivalents: (age, location) ___∅___

Children: Ages, sex, location, custody, DCF, etc. ___∅___

AVAILABLE SUPPORT SYSTEM (i.e. father, mother, spouse. friends) Name, age, location: ___∅___
RELIGION: ___∅___  Practicing: ☐ Yes ☐ No  ___∅___

**5. RESIDENCE:** ☐ Own ☐ Rent ☐ Family/Friends ☐ Shelter ☐ Homeless
Planned residence after discharge: ___N/A___
Place of Birth: ___CT___   Citizenship: ___USA___

---

**6. PUBLIC ASSISTANCE:** List sources (type, name, location) of public assistance recently received and/or in need of receiving when

discharged: ☐ SAGA ☐ Title 19 ☐ Social Security ☐ SSI ☐ Veterans Benefits ☐ Other: _____

☐ Medicare A & B (Will part B be paid for during incarceration?) ☐ YES ☐ NO   N/A

---

**7. EDUCATION/DEVELOPMENTAL HISTORY:**
HIGHEST GRADE COMPLETED: ___12th___   Year completed: ___?___
List degrees, diplomas, GED, and year obtained: _____
History of Special Education: ☒ NO ☐ YES, If yes, why (learning disabilities, behavior, other) _____
Currently attending school? ☒ NO ☐ YES, Subjects _____
Read English adequately? ☒ YES ☐ NO  Write English: ☐ YES ☐ NO

---

**8. VOCATIONAL HISTORY:**

| JOB TITLE | EMPLOYER | DATES OF EMPLOYMENT (START-END) |
|---|---|---|
| N/A | | |
| | | |

Current institutional job: _____   Hours and Days Working: _____
Employment plan after discharge: _____

| Inmate Name | Baldo   Joe | Inmate Number | 38650 | Date | ~~12/31/87~~ |
|---|---|---|---|---|---|
| | | | | | 12/22/14 |

## 9. MEDICAL INFORMATION AND SIGNIFICANT HISTORY:

Current Significant Medical Problems and Medications (incl. insulin & dialysis treatments and where received in the community):

H/o Asthma

Past Significant Medical Problems (include surgeries, medications, head injuries, loss of consciousness, etc. with dates):

H/A Asthma.

☐ HEAD INJURY, SPECIFY DATE, LOCATION, LOSS OF CONSCIOUSNESS & DETAILS

Hx of fighting

## 10. SUBSTANCE ABUSE HISTORY (List drug of choice, starting with the one most often used):

| Drug type | Age when First Used | Age of Peak Use | Amount at Peak Use | Mode of use (i.e. Smoke, I.V., Snort) | Freq. of Use at Peak Use | Last Used |
|---|---|---|---|---|---|---|
| Cannabis | Per chart. | In | denied | | | |
| Cocaine | | | | | | |
| Alcohol | | | | | | |

Intravenous drug user?   ☐ No   ☐ Yes  If Yes, when? _____   How long? _____

Substance Abuse Treatment History (List prior alcohol/drug treatment programs or detoxification. Start with the most recent.)

| PROGRAM NAME | LOCATION | DATES | LENGTH | DISCHARGE STATUS |
|---|---|---|---|---|
| Denied. | | | | |
| | | | | |

HISTORY OF SUPPORT PROGRAM: ☐ Yes   ☐ No   ☐ AA   ☐ NA   ☐ CA   ☐ 90/90   ☐ SPONSORSHIP
                        ☐ ADDICTION SERVICES:   ☐ Tier I ☐ Tier II ☐ Tier III ☐ Tier IV

When and Where:    Denied.

Have you had periods of recovery?   ☐ NO   ☐ YES   If Yes, when: _____
How long: _____   Why: _____

## 11.    MENTAL HEALTH RECORDS:  (Please check any that apply)

___No prior mental health treatment reported or documented

___Prior community mental health records reviewed

___Prior community and DOC mental health records have been received and reviewed

___Community records have been requested  (date: _____ ) from _____

___Community records have been requested but not yet received

___Prior DOC mental health records not yet available for review

✓Other (please explain):_____CMHC  & DOC records.

## 12.    MENTAL HEALTH HISTORY: (Please start with the most recent treatment.)

| FACILITY | Inpatient | Outpatient | Release of Info. Obtained | DATE | REASON AND TARGET SYMPTOMS |
|---|---|---|---|---|---|
| New York Hospital | ☑ | ☐ | ☐ | 1995 | Age 8 - behavior problems. |
| MH5 12/12/06 | ☑ | ☐ | ☐ | | primarily MH3 & 2. Periods |
| | | ☐ | ☐ | | of MH 4 + 5 for Impulsive. |
| | | ☐ | ☐ | | & self harm behaviors. |

| Inmate Name | Balts, oe | Inmate Number | 33'.50 | Date | 12/22/14 |
|---|---|---|---|---|---|

**13.  PSYCHOACTIVE MEDICATION HISTORY** (Please start with the most recent, including current medications):

| MEDICATION | DATE / DURATION | REASON and RESPONSE |
|---|---|---|
| | | No current meds. |
| Quetiapine | 200 mg | 2006 +2007 — Impulse Control D/o |

**MEDICATION ALLERGIES:** ☑ NO  ☐ YES (LIST MEDICATION/S AND ALLERGIC RESPONSE)

---

**14.  SELF-INJURIOUS / SUICIDAL HISTORY** (Start with the most recent behavior.):

TYPE OF SELF-INJURY/    DATE    REASON & INTENT                                    OUTCOME / HOSPITALIZATION
SUICIDAL BEHAVIOR     Did not answer                                                    REQ.

Per chart BOS several time of on the years - superficially
cut wrist 2010
Recent hunger strike 11/15/16 at MWCI "because I want to
transfer out of here. CCCI is where I do my best

**15.  TRAUMA WITNESSED/EXPERIENCED** (including physical, emotional, & sexual abuse, age of occurrence and duration):  fire +
     Per chart endorsed witnessing trauma - Father, head @ was
                                              murdery at 5 yr" (uncle.- El Drubber.

**16.  FAMILY HISTORY OF MENTAL ILLNESS, SELF-INJURIOUS/SUICIDAL BEHAVIOR, & SUBSTANCE ABUSE:**
     Denied.  Both parents were incarcerated.

---

**17. MENTAL STATUS EXAM** (Check all that apply):                                         Comments:

| Appearance | ☑ kempt, ☐ unkempt, ☐ other _____ |
|---|---|
| Orientation | ☑ time ☑ place ☑ person ☐ purpose |
| Attention | ☑ adequate attention span, ☐ poor attention span, ☐ distractible, ☐ confused |
| Attitude | ☐ cooperative, ☐ suspicious, ☐ guarded, ☑ hostile, ☐ uncooperative |
| Speech | ☑ normal, ☐ slow, ☐ hesitant, ☐ rapid, ☐ slurred |
| Movement | ☑ normal movements, ☐ abnormal movements, ☐ abnormal gait, ☐ motor retardation |
| Mood | ☐ euthymic ☐ dysphoric ☐ elevated ☐ expansive ☑ irritable ☐ angry |
| Affect | ☑ within normal range ☐ blunted ☐ flat ☐ inappropriate ☐ labile ☐ restricted or constricted |
| Thought Content | ☑ normal ☐ preoccupations ☐ delusions ☐ obsessions ☐ |
| Delusions | ☑ Not evident ☐ bizarre ☐ delusional jealousy ☐ erotomanic ☐ grandiose ☐ delusions of being controlled ☐ delusions of reference ☐ persecutory ☐ somatic ☐ thought insertion ☐ thought broadcasting ☐ other _____ |
| Thought Process | ☑ organized ☐ confused ☐ ruminating ☐ circumstantial ☐ flight of ideas |
| Perception | ☑ no perceptual distortions, ☐ auditory hallucinations, ☐ visual hallucinations |
| Intellect | ☑ normal intellectual functioning, ☐ signs of cognitive impairment and/or developmental disability |
| Memory | ☑ no impairment, ☐ memory impairment (specify) ☐ remote, ☐ recent, ☐ immediate |
| Homicidal | ☐ no homicidal ideation, ☑ homicidal ideation ∗ Refused to answer questions regarding current mental health. |
| Judgment | ☐ adequate, ☐ mildly impaired, ☐ severely impaired - Appears adequate. |
| Suicidal | ☑ no suicidal ideation ☐ suicidal ideation ☐ intent ☐ plan -Stated "I'm fine." Appears well nourished |
| Vegetative functioning: eating __/3 meals per day; sleeping __/24 hours  Did not answer. & well rested. |

---

**18.  FORMULATION** (including Symptoms Reported & Observed):  Please see clinical note
                                    date  12/22/14

HR508 Page 3 of 4 REV. 04/12

| Inmate Name | Baltas, Jo | Inmate Number | 339*?50 | Date | 10/22/14 |

---

19. **MENTAL HEALTH CLASSIFICATION SCORES:**

☐ M.H. 1
☑ M.H. 2
☐ M.H. 3
☐ M.H. 4
☐ M.H 5 (list precautions)_____

<u>REQUIRES SUPE PSYCH NOTIFICATION</u>
☐ "B" CODE (TRAUMATIC BRAIN INJURY)
☐ "R" CODE (MENTAL RETARDATION)
☐ "D" CODE (DMHAS TARGET)

20. **PRELIMINARY TREATMENT PLAN (Completed by Jail MH staff, All other staff complete HR514—Initial Treatment Plan)**

☐ TARGET SYMPTOMS   Aggressive + Assaultive

☑ GOALS   Find prosocial needs to get needs /wants met

☐ DISCHARGE NEEDS   N/A

21. **REFERRALS:**

☐ PSYCHIATRIC / APRN EVALUATION
☐ PSYCHOLOGIST EVALUATION
☐ MEDICAL REFERRAL
☐ ADDICTION SERVICES
☐ VOCATIONAL SERVICES _____

☐ DMHAS DISCHARGE PLANNING
☐ PSYCH TESTING _____
☐ HIV/PRETEST COUNSELING (if HIV negative)
☐ EDUCATIONAL SERVICES
☐ P.E.C. CONSIDERATION

☐ PASTORAL SERVICES
☐ COMMUNITY SUPPORT SERVICES

☑ DOC FACILITY TRANSFER
☐ OTHER _____

22. **(If mental health assessment is completed by a Nurse Clinician):**

Nursing Diagnosis(es):   N/A

1. _____
2. _____
3. _____
4. _____

Nurse Clinician (print name)

Mental Health Prescriber or Psychologist (print name)

Nurse Clinician Signature

Mental Health Prescriber or Psychologist (signature)

*Entire form must be reviewed by a psychologist or mental health prescriber who must complete Section 23.*

23. **Diagnostic and Psychosocial Formulation:** *To be completed only by a psychologist, social worker, or mental health prescriber (within 72 hours).*

I/m is a 29 yr old, white male serving a life sentence for murder. He has been a MH 2 (for most part) since 2010. He presents to lightly antisocial & hostile during brief interview. Thoughts are organized & no o/t sx of SMI are noted. ASPD, (prior chart cocaine, cannabis + etoh abuse dx, ICE)

AXIS I _____
AXIS II _____
AXIS III   Asthma
AXIS IV   legal: serving life sentence
AXIS V: Current GAF  65   Highest GAF Past Year (if available) _____

Laletha Pieri, PsyD
(print name / title / date)

Laleth Pieri, Psy.
(signature)

24. **INMATE RE-ENTRY: CLINICIAN REVIEW OF PREVIOUSLY COMPLETED HR508:** (This will take the place of a new HR508 if signed off upon reception and update completed on the Mental Health Screening form HR504. If the previously completed hard copy is not in the current health record and/or it was completed more than 1 year ago, a new HR508 must be completed. If it is currently present and it was completed within the year, any updates or additions must be documented on the HR504.)

Reviewed upon Re-Entry:

_____
Clinician (print name / title)

_____
Date

_____
Clinician Signature

HR508 Page 4 of 4 REV. 04/12



Pursuant to 28 USCS, §1746:

I, Joe Baltas        on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas

*Neal*
*P.o. Box 665*
*Somers, cT 06071*

| State of Connecticut Department of Correction | Directive Number 9.4 | Effective Date 6/16/2016 | Page 1 of 20 |
|---|---|---|---|
| **ADMINISTRATIVE DIRECTIVE** | Supersedes Restrictive Status, dated 1/1/2010 | | |
| Approved By | Title Restrictive Status | | |

1. <u>Policy</u>. The Department of Correction shall provide restrictive conditions as required to preserve the order, safety and security of correctional facilities to comply with the law, and to manage inmate behavior.

2. <u>Authority and Reference</u>.

    A. Connecticut General Statutes, Section 18-81, 18-10b, 53a-54b, 53a-46a.

    B. Administrative Directives 4.1, Inmate Records; 4.2A, Risk Reduction Earned Credits (RREC); 6.1, Tours and Inspections; 6.2, Facility Post Orders and Logs; 6.6, Reporting of Incidents; 6.10, Inmate Property; 6.14, Security Risk Groups; 9.2, Offender Classification; 9.5, Code of Penal Discipline; 9.6, Inmate Administrative Remedies; and 10.3, Inmate Legal Assistance.

    C. American Correctional Association, Standards for Adult Correctional Institutions, Fourth Edition, January 2003, Standards 4-4140, 4-4235, 4-4249 through 4273, and 4-4400.

    D. American Correctional Association, Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June 2004, Standards 4-ALDF-2A-44, 4-ALDF-2A-46 through 4-ALDF-2A-66, and 4-ALDF-5C-04.

3. <u>Definitions and Acronyms</u>. For the purposes stated herein, the following definitions and acronyms apply:

    A. <u>Abbreviated Special Monitoring</u>. A designation for inmates that were classified as Administrative Segregation or Chronic Discipline Status upon discharge and returned to custody after more than 30 days.

    B. <u>Administrative Detention</u>. Placement of an inmate in a restrictive housing unit that results in segregation of the inmate:

        1. Pending the completion of a disciplinary hearing in accordance with Administrative Directive 9.5, Code of Penal Discipline when it is felt that failure to remove the inmate from population would present a danger to staff, the inmate or any other inmate, or cause an immediate threat of disruption to the facility;

        2. For investigation of an allegation or information involving the inmate in the commission of a crime, or of activities jeopardizing the security of the facility or the safety of staff or inmates that could result in placement on punitive or administrative segregation or transfer to high security; or,

        3. For temporary protection of an inmate pending a decision to place the inmate on Protective Custody status or an evaluation by health services staff.

    B. <u>Administrative Segregation Status</u>. Placement of an inmate on a restrictive housing status that results in segregation of the inmate

| Directive Number | Effective Date | Page 2 of 20 |
|---|---|---|
| 9.4 | 6/16/2016 | |
| Title | | |
| Restrictive Status | | |

whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population.

C. <u>Administrative Segregation Hearing Officer</u>. A supervisor appointed by the Director of Offender Classification and Population Management to conduct Administrative Segregation placement hearings.

D. <u>Administrative Segregation Transition Phases</u>. Interim placement on a specialized restrictive housing status program while on Administrative Segregation to prepare an inmate for placement back to general population.

E. <u>Advocate</u>. An employee tasked in assisting the inmate in preparing a defense, and appearing at and assisting in making a presentation at an Administrative Segregation or Special Needs hearings.

F. <u>Behavioral Observation Status</u>. An intervention, determined by a qualified mental health professional, to extinguish maladaptive behaviors while maintaining safety and security of the inmate.

G. <u>CC</u>. Correctional Center.

H. <u>Chronic Discipline</u>. A restrictive housing status that results in management of an inmate whose behavior, while incarcerated, poses a threat to the security and orderly operation of the facility, or a risk to the safety of staff or other inmates due to repetitive disciplinary infractions.

I. <u>CI</u>. Correctional Institution.

J. <u>DOC</u>. Department of Correction.

K. <u>Facility Hearing Officer</u>. A staff member appointed by the Unit Administrator to conduct hearings to consider classification assignments to Chronic Discipline.

L. <u>Facility Intelligence Coordinator</u>. A staff member appointed by the Unit Administrator to assess all information in any given facility relating to Security Risk Group activity.

M. <u>High Security</u>. A designation which provides for increased supervision of inmates who pose a threat to the safety and security of the facility, staff, inmates or the public.

N. <u>Monitored Movement</u>. The following of an inmate's movement using:

1. Personal visual observation;
2. Visual observation with the aid of video equipment; and/or
3. Communication between staff initiated at the starting point of movement, along the inmate's route of travel and commencing at the authorized destination with the verification of the inmate's arrival.

O. <u>Punitive Segregation</u>. Placement of an inmate on a restrictive housing status who is found guilty of violating the Code of Penal Discipline, as sanctioned in accordance with Administrative Directive 9.5, Code of Penal Discipline.

P. <u>Restraint Status I</u>. The securing of an inmate with hand cuffs behind the back and leg irons.

Q. <u>Restraint Status II</u>. The securing of an inmate with hand cuffs in front.

R. <u>Restrictive Housing Status</u>. A designation which provides for closely regulated management and separation of an inmate.

S. <u>Restrictive Housing Unit (RHU)</u>. An inmate housing unit which is physically separated from other inmate housing where inmates on restrictive housing status, Administrative Detention, or Transfer Detention are placed.

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 3 of 20 |
|---|---|---|
| Title | Restrictive Status | |

T.   **Restrictive Status**. Restrictive status shall consist of the following categories: Administrative Detention, Punitive Segregation, Transfer Detention, Administrative Segregation, Special Needs Management, Chronic Discipline, High Security, Security Risk Group Affiliation (Security Risk Group Member) and Special Circumstances.

U.   **Special Monitoring**. A designation which provides for increased supervision and monitoring upon an inmate's completion of a special management program or for reasons of safety and security.

V.   **Special Needs Management**. A placement status for inmates who have demonstrated behavioral qualities either through the serious nature of their crime, behavior, or through reasonable belief that they pose a threat to the safety and security of staff, other inmates, themselves, or the public.

W.   **Special Needs Management Hearing Officer**. A supervisor appointed by the Director of Offender Classification and Population Management to conduct Special Needs Management placement hearings.

X.   **SRG**. Security Risk Group.

Y.   **STARS**. Statistical Tracking Analysis Reporting System.

Z.   **Station Log**. A hardbound book or automated chronological record of day-to-day events in a restrictive housing unit.

AA.   **Transfer Detention**. Placement of an inmate in a restrictive housing unit that results in segregation of the inmate who has been reclassified to a security level higher than the facility at which the inmate is housed and is awaiting transfer, or is awaiting transfer to another facility for the inmate's own protection or the protection of others.

BB.   **YI**. Youth Institution.

CC.   **Special Circumstances Status**.  A placement status for inmates who have been convicted of:

1. The class A felony of murder with special circumstances committed on or after April 25, 2012, under the provisions of section 53a-54b in effect on or after April 25, 2012, and sentenced to a term of life imprisonment without the possibility of release.
2. A capital felony committed prior to April 25, 2012, where the inmate is in the custody of the Commissioner of Correction whose of death has been reduced or commuted to a sentenced of life without the possibility of release.
3. A capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, the inmate is in the custody of the Commissioner of Correction, and a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is reduced to a sentence of life imprisonment without the possibility of release, or commuted to a sentence of life imprisonment without the possibility of release.

4.   **General Conditions for Restrictive Housing Status**. The basic level of conditions described in this section shall apply to an inmate on restrictive housing status. These conditions are for normal unit management. However, individual inmates may require additional restrictions for order and/or control based upon their past history or current behavior. Any such restrictions shall be noted in the housing station log and through the completion of an incident report in accordance with Administrative Directive 6.6, Reporting of Incidents. An inmate on restrictive housing status shall be limited to the specific provisions and

| Directive Number | Effective Date | Page 4 of 20 |
|---|---|---|
| 9.4 | 6/16/2016 | |
| Title | | |
| Restrictive Status | | |

standards outlined in Attachment A, Restrictive Housing Status -
Provisions and Management Standards and Attachment C, Chronic Discipline
Status - Provisions and Management Standards.

    A.    <u>Housing Conditions</u>. Housing areas for inmates on restrictive housing
status shall be well-ventilated, adequately lighted, appropriately
heated and maintained in a sanitary condition at all times. Each
cell shall normally be equipped with beds, which may be securely
fastened to the wall or floor, and furnished in a manner consistent
with cells in general population.

    B.    <u>Clothing</u>. Each inmate shall be provided appropriate clothing in
accordance with Administrative Directive 6.10, Inmate Property.

    C.    <u>Hygiene</u>. Each inmate on restrictive housing status shall be provided
opportunities for personal hygiene and hair care services.

    D.    <u>Food</u>. An inmate on restrictive housing status shall be served the
same quality and quantity of food as that available to inmates in
general population.

    E.    <u>Linen and Laundry</u>. An inmate on restrictive housing status shall
normally be provided the same bedding items and laundry schedule as
provided to inmates in general population.

5.    <u>Sentence Credits</u>. An inmate shall not earn or receive statutory good time,
seven-day work credit, restoration of lost good time, outstanding
meritorious performance awards or Risk Reduction Earned Credit while on
Special Circumstances Status, Administrative Segregation, while a
designated Security Risk Group Member in Phase 1 or 2 of the Security Risk
Group Member Phase Program, or while on Chronic Discipline Status or
Special Needs Management Status.

6.    <u>Access to Programs and Services</u>. An inmate on restrictive housing status
shall not be entitled access to programs or privileges afforded an inmate
in general population. An inmate on restrictive housing status shall be
given access to available programs and services in accordance with
Attachment A, Restrictive Housing Status - Provisions and Management
Standards and Attachment C, Chronic Discipline Status - Provisions and
Management Standards as follows:

    A.    <u>Courts</u>. An inmate shall retain rights of access to the courts.
Access shall include attorney/client visits and access to legal
assistance in accordance with Administrative Directive 10.3, Inmate
Legal Assistance.

    B.    <u>Mail</u>. An inmate shall be provided the same opportunities for writing
and receipt (not retention) of letters available to inmates in
general population.

    C.    <u>Counseling</u>. An inmate shall continue to receive the services of a
counselor when on restrictive housing status.

    D.    <u>Education</u>. An inmate in Administrative Segregation, Administrative
Segregation Transition Phases, Special Needs Management or Chronic
Discipline may have access to educational and library programs
consistent with the security needs of the housing unit and/or
facility. Individual education plans shall be maintained for those
inmates under the age of 21 who are deemed appropriate by the
Education Department. Such inmates shall, at a minimum, receive a
comprehensive educational plan review to determine the scope of
needed services. Recommendations from the Education Department shall
be accommodated by the facility consistent with the security needs
of the housing unit. The programs offered to inmates on
Administrative Segregation, Administrative Segregation Transition

| Directive Number | Effective Date | Page 5 of 20 |
|---|---|---|
| 9.4 | 6/16/2016 | |
| Title | | |
| | Restrictive Status | |

Phases, Special Needs Management or Chronic Discipline shall be approved by the Director of Programs and Treatment (Division).

E.   Health Services. Each inmate shall have access to and be provided required medical, mental health and dental services.

F.   Religion. Facility chaplains shall schedule, at a minimum, weekly visits to inmates on restrictive housing status.

G.   Recreation. Recreation for an inmate on restrictive housing status shall be conducted outside the inmate's cell for a minimum of one (1) hour daily, five (5) days a week including holidays. A supervisor may deny recreation when releasing the inmate for recreation if the inmate presents a threat to the unit's safety and security. The reason for denial shall be noted in the station log and an incident report completed.

7.   Designation of Restrictive Housing Units. Where possible, and as appropriate, the Unit Administrator shall designate specific housing unit(s) that shall be used solely to house any inmate placed on restrictive housing status, Administrative Detention or Transfer Detention. Only staff or inmates with official business to conduct shall be allowed to enter the Restrictive Housing Unit.

8.   Staffing. Specifically screened staff shall be assigned to work a Restrictive Housing Unit in accordance with established facility guidelines. Some factors to be considered shall be: the nature of the inmates in the unit; the ability of the respective candidate to manage such inmates; and, the employee's performance record.

A.   Selection. An employee assigned to work in a Restrictive Housing Unit as specified in Section 7 of this Directive, shall be a permanent status employee who has demonstrated maturity, good judgment and an ability to work in a difficult environment as reflected in acceptable performance rating in each job element of any service rating conducted during the previous 12 month period.

B.   Training and Supervision. Special orientation for each employee shall be provided prior to placement on the unit to include:

1.   the function of the unit;
2.   the requirements of this Directive;
3.   rules governing the unit's operation; and,
4.   the needs and problems typical of inmates in the unit.

9.   Restrictive Housing Status. The initial placement requirements for inmates placed on restrictive housing status, Administrative Detention or Transfer Detention shall be in accordance with Attachment B, Restrictive Housing Status Matrix.

A.   Placement Order. In order to protect the inmate or others, the Unit Administrator or designee may order an inmate's placement on restrictive housing status, Administrative Detention or Transfer Detention by completing CN 9401, Restrictive Housing Unit Status Order, stating the specific reasons for placement. Copies shall be distributed as designated on CN 9401, Restrictive Housing Unit Status Order. The Unit Administrator shall receive the original copy of the order within 24 hours or the following business day after placement. The Unit Administrator shall see that the required reviews are performed and documented on CN 9401, Restrictive Housing Unit Status Order.

| Directive Number<br>9.4 | Effective Date<br>6/16/2016 | Page 6 of 20 |
|---|---|---|
| Title | Restrictive Status | |

    B.    <u>Health Services Consultation</u>. Custody staff shall immediately notify facility health services staff when an inmate is identified for placement into a restrictive housing unit. In the event that any contraindications exist, custody staff shall be notified verbally and in writing utilizing CN 6602, Medical Incident Report. In addition, health services staff shall complete Attachment E, Health Evaluation for Restrictive Housing Unit (RHU) Placement (HR-006) and forward to custody staff for signature indicating receipt. This evaluation and notification shall be documented in the inmate's health record.

    C.    <u>Status Removal</u>. When the inmate is removed from restrictive housing status, Administrative Detention or Transfer Detention the original order shall be placed in the inmate's master file and Section 4 of the order shall be completed. An inmate assigned to the Garner C.I. Youth Development Unit who is removed from restrictive housing status may continue to be managed in the Youth Development Unit until completion of the current school year.

    D.    <u>Inmate Notification</u>. The inmate should normally receive a copy of CN 9401, Restrictive Housing Unit Status Order at the time of placement in the Restrictive Housing Unit, unless there is an emergency situation or major disturbance involving a substantial number of inmates. In such cases, the inmate shall receive a copy not later than 48 hours after placement on restrictive housing status.

10. <u>Chronic Discipline Status</u>. Chronic Discipline programs shall be established and maintained at all level 4 facilities as authorized by the Deputy Commissioner of Operations and Rehabilitative Services. Inmates between the ages of 14 and 17 years of age shall not be placed on Chronic Discipline Status regardless of housing location or behavior. Such inmates will be placed on an individual treatment plan.

Assignment to Chronic Discipline Status shall be dependent upon the seriousness and repetitiveness of disciplinary behavior. Other classification alternatives (e.g., risk level increases) shall be attempted where appropriate, prior to consideration for Chronic Discipline. Automatic consideration for Chronic Discipline shall occur under any of the following conditions:

    A.    two (2) or more incidental assaults of staff (as defined by form CN 6603, Report of Assault on Staff) within the past year of confinement;

    B.    three (3) or more class A disciplinary offenses within 180 days; and,

    C.    three (3) or more class A/B combination of disciplinary offenses within 120 days.

Automatic consideration does not imply an automatic classification increase to Chronic Discipline. If, in the professional judgment of the reviewer, an inmate may continue to benefit from sanctions imposed and inmate management techniques at a given facility, assignment to Chronic Discipline may not occur. Other inmates with a documented chronic history of disciplinary behavior and an inability to remain in level 4 confinement without disciplinary infractions may be considered for classification to Chronic Discipline.

11. <u>Chronic Discipline Review and Hearing</u>. Each review and hearing for Chronic Discipline shall be in accordance with this section. An inmate shall not

| Directive Number | Effective Date | Page 7 of 20 |
|---|---|---|
| 9.4 | 6/16/2016 | |
| Title | | |
| Restrictive Status | | |

be placed in Chronic Discipline without a hearing.

A.  <u>Hearing</u>. The Unit Administrator shall designate a Facility Hearing Officer. The Facility Hearing Officer shall conduct a hearing to consider classification assignment to Chronic Discipline. The Facility Hearing Officer shall examine evidence to support the classification including the inmate's and/or any witness statements.

C.  <u>Hearing Notice</u>. A written notice of the hearing and the reasons for the hearing shall be given to the inmate a minimum of two (2) business days prior to the hearing utilizing CN 9402, Notification of Hearing. The notice shall state, as explicitly as possible, consistent with the protection of any informant, why such classification is being considered. The notice shall contain information that the inmate may be represented by an advocate and that the inmate may request witness statements. The inmate may waive the notice provision in writing by completing CN 9403, Waiver of 48-Hour Hearing Notice and/or Attendance; however, the Facility Hearing Officer may choose not to honor the waiver.

D.  <u>Recommendation</u>. The Facility Hearing Officer shall provide a written recommendation, to the Unit Administrator, utilizing CN 9404, Restrictive Status Report of Hearing for Placement or Removal form, including the information which was relied upon and the reasons for or against placement in Chronic Discipline. Any confidential information shall be maintained in a file which is not accessible to any inmate. The use of confidential information, along with any assessment of its reliability, shall be included with CN 9404, Restrictive Status Report of Hearing for Placement or Removal form, as a separate attachment.

D.  <u>Decision</u>. The Unit Administrator shall review any recommendation for assignment to Chronic Discipline. Any recommendation for assignment and placement, to include the completed CN 9404, Restrictive Status Report of Hearing for Placement or Removal form, and all supporting documentation, shall be forwarded to the Director of Offender Classification and Population Management within five (5) business days. A decision shall be made by the Director of Offender Classification and Population Management, who shall complete and forward CN 9405, Notification of Decision to the Unit Administrator submitting the recommendation, the inmate, and the Unit Administrator responsible for the respective Chronic Discipline Unit.

E.  <u>Placement</u>. No inmate shall be transferred to a Chronic Discipline Unit (Phase I) prior to completion of any Punitive Segregation sanction.

F.  <u>Classification</u>. All classification and status change decisions within the unit, unless otherwise directed by the Administrative Directives, shall be made by the Unit Administrator or designee.

G.  <u>Progression</u>. Progression through Chronic Discipline Phases shall be contingent upon successful completion of specific program components in accordance with unit policies.  Should an inmate be unable to make progress through the Chronic Discipline Phases the Unit Administrator may present an alternative course of action to the District Administrator.  Upon concurrence and approval from the District Administrator, a recommendation for transfer will be forwarded to the Director of Offender Classification and Population Management to facilitate transfer of the inmate.

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 8 of 20 |
|---|---|---|
| Title | Restrictive Status | |

H.   **Removal and Reclassification.** The Unit Administrator shall complete, sign and submit the Restrictive Status Report of Hearing for Placement or Removal, CN 9404, to the Director of Offender Classification and Population Management. A removal from Chronic Discipline shall only be made by the Director of Offender Classification and Population Management or higher authority. A written decision shall be made on the Inmate Classification Form (ICF) and forwarded to the Unit Administrator.

12.   **Administrative Segregation Status.** Administrative Segregation shall be authorized at the Northern, Garner and MacDougall-Walker (Walker Building) Correctional Institutions for adult males, Manson Youth Institution for youth males, and York Correctional Institution for females. Other Administrative Segregation program Phases shall be authorized at level 4 facilities designated by the Commissioner. Inmates on Administrative Segregation status who are attending court, may be housed at Bridgeport CC, New Haven CC, Hartford CC and Corrigan-Radgowski CC with the authorization of the Director of Offender Classification and Population Management. Any facility not authorized to house inmates on Administrative Segregation shall place the inmate on Administrative Detention in accordance with this Directive and notify the Director of Offender Classification and Population Management to transfer the inmate to the appropriate facility and conduct an Administrative Segregation hearing.

A.   **Placement.** Placement of an inmate on Administrative Segregation Status shall be at the discretion of the Director of Offender Classification and Population Management in accordance with this Directive. An inmate shall not be placed in Administrative Segregation Status without notice and a hearing. For adult male inmates being recommended for placement on Administrative Segregation Status at Northern CI, Attachment F, Mental Health Clearance Form (HR-523) shall be completed by the requesting facility's mental health clinician who shall forward it to the DOC Director of Psychological Services. Upon the review and approval by the DOC Director of Psychological Services, the completed form shall be forwarded to the Offender Classification and Population Management Unit for action, as indicated by the DOC Director of Psychological Services.

B.   **Hearing.** The Director of Offender Classification and Population Management shall designate an Administrative Segregation Hearing Officer. The Administrative Segregation Hearing Officer shall conduct a hearing to consider classification assignment to Administrative Segregation Status. The Administrative Segregation Hearing Officer shall examine evidence to support the classification including the inmate's and/or any witness statements. The Administrative Segregation Hearing shall be conducted not later than 30 days after the completion of Administrative Detention pending an investigation or after the completion of Punitive Segregation sanctions.

C.   **Hearing Notice.** A written notice of the hearing and the reasons for the hearing shall be given to the inmate a minimum of two (2) business days prior to the hearing utilizing CN 9402, Notification of Hearing. The notice shall state as explicitly as possible, consistent with the protection of any informant, why Administrative Segregation is being considered. The notice shall contain information that the inmate may be assisted by an advocate and that the inmate may request witness statements. The inmate may waive the notice provision in writing by completing CN 9403, Waiver of 48-Hour Hearing Notice and/or Attendance; however, the Administrative Segregation Hearing Officer may choose not to honor the waiver.

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 9 of 20 |
|---|---|---|
| Title | Restrictive Status | |

D. **Recommendation.** The Administrative Segregation Hearing Officer shall provide a written recommendation utilizing CN 9404, Restrictive Status Report of Hearing for Placement or Removal form, including the information which was relied upon and the reasons for or against placement in Administrative Segregation. Any confidential information shall be maintained in a file, which is not accessible to any inmate. The use of confidential information, along with any assessment of its reliability, shall be included with CN 9404, Restrictive Status Report of Hearing for Placement or Removal form, as a separate attachment.

E. **Decision.** The completed CN 9404, Restrictive Status Report of Hearing for Placement or Removal form, shall be forwarded to the Director of Offender Classification and Population Management within five (5) business days following the hearing. A decision shall be made by the Director of Offender Classification and Population Management, who shall complete and forward CN 9405, Notification of Decision, to the Unit Administrator and the inmate within 15 days.

F. **Automatic Review.** Automatic review of an inmate for placement on Administrative Segregation Status or Special Needs Management Status in accordance with Administrative Directive 9.2, Offender Classification shall require a hearing to be conducted in accordance with the provisions of this section.

G. **Progression.** Progression through the Administrative Segregation program phases shall be contingent upon successful completion of specific program components in accordance with unit policies.

H. **Release.** Release from Administrative Segregation/Special Needs Management shall be in accordance with Attachment B, Restrictive Housing Status Matrix by completing the appropriate section of CN 9404, Restrictive Housing Report of Hearing for Placement or Removal form.

13. **Special Needs Management Status.** Inmates on Special Needs Management Status may be housed at any level 4 or 5 facility when approved by the Deputy Commissioner of Operations and Rehabilitative Services or designee. Any facility not authorized to house inmates on Special Needs Management Status shall place the inmate on Administrative Detention in accordance with this Directive and notify the Director of Offender Classification and Population Management to transfer the inmate to an appropriate facility and conduct a hearing. An inmate may be removed from any restrictive status category as defined in Section 3(T) of this Directive at any time for assignment to Special Needs Management Status, with the exception of Special Circumstances Status. An inmate shall not be placed in Special Needs Management without notice and a hearing. Request for placement hearing shall be made by the Unit Administrator in consultation with the DOC Director of Psychological Services.

A. **Hearing.** The Special Needs Management Hearing Officer shall conduct a hearing to consider classification assignment to Special Needs Management. The Special Needs Management Hearing Officer shall examine evidence to support the classification including the inmate's and/or any witness statements as well as a recommendation from the DOC Director of Psychological Services and the Unit Administrator. The Special Needs Management Hearing shall be conducted:

1. not later than 30 days after the completion of Administrative Detention pending an investigation;

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 10 of 20 |
|---|---|---|
| Title | Restrictive Status | |

   2.   not later than 30 days from the date the Director of Offender
        Classification and Population Management approves the inmate's
        release from Administrative Segregation; or,

   3.   not later than 30 days after the completion of Punitive
        Segregation sanctions.

B.   <u>Hearing Notice</u>. A written notice of the hearing and the reasons for
     the hearing shall be given to the inmate a minimum of two (2)
     business days prior to the hearing utilizing CN 9402, Notification
     of Hearing. The notice shall state as explicitly as possible,
     consistent with the protection of any informant, why Special Needs
     Management is being considered. The notice shall contain information
     that the inmate may be assisted by an advocate and that the inmate
     may request witness statements. The inmate may waive the notice
     provision in writing by completing CN 9403, Waiver of 48-Hour
     Hearing Notice and/or Attendance; however, the Special Needs
     Management Hearing Officer may choose not to honor the waiver.

C.   <u>Recommendation</u>. The Special Needs Management Hearing Officer shall
     provide a written recommendation utilizing CN 9404, Restrictive
     Status Report of Hearing for Placement or Removal form, including
     the information which was relied upon and the reasons for or against
     placement in Special Needs Management. Any confidential information
     shall be maintained in a file, which is not accessible to any
     inmate. The use of confidential information, along with any
     assessment of its reliability, shall be included with CN 9404,
     Restrictive Status Report of Hearing for Placement or Removal form,
     as a separate attachment.

D.   <u>Decision</u>. The completed CN 9404, Restrictive Status Report of
     Hearing for Placement or Removal form shall be forwarded to the
     Director of Offender Classification and Population Management for
     review and decision. Placement on Special Needs Management status or
     participation in the Special Needs Management Behavioral Treatment
     Program shall be determined by the Director of Offender
     Classification and Population Management in consultation with the
     Deputy Commissioner of Operations and Rehabilitative Services or
     designee as outlined in Attachment B, Restrictive Housing Status
     Matrix. Written notification of approval or denial for placement to
     Special Needs Management status shall be forwarded to the
     appropriate Unit Administrator, as well as to the inmate. If
     approved for Special Needs Management, the Director of Offender
     Classification and Population Management shall authorize the
     appropriate management sub code for the inmate.

E.   <u>Management</u>. Inmates placed on Special Needs Management status shall
     be managed in accordance with Attachment A, Restrictive Housing
     Status – Provisions and Management Standards. An individualized
     facility management plan for each inmate on Special Needs Management
     status shall be developed collaboratively by the facility custody
     and mental health staff, and reviewed and approved by the DOC
     Director of Psychological Services in consultation with the Deputy
     Commissioner of Operations and Rehabilitative Services. The
     individualized facility management plan shall include
     recommendations to assist the inmate in achieving removal from
     Special Needs Management status.

F.   <u>Review</u>. A classification hearing for each inmate classified to
     Special Needs Management status shall be held at a minimum of every
     six (6) months. Each inmate classified to Special Needs Management
     status shall be reviewed by a mental health professional after 30

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 11 of 20 |
|---|---|---|
| Title | Restrictive Status | |

days of initial placement and every 90 days thereafter. All such reviews shall be documented in the inmate's health record.

G. <u>Release</u>. The Unit Administrator in consultation with the DOC Director of Psychological Services shall review and make recommendations to the Director of Offender Classification and Population Management regarding an inmate's release from Special Needs Management status by completing the appropriate section of CN 9404, Restrictive Housing Report of Hearing for Placement or Removal form. Release from Special Needs Management status shall be determined by the Director of Offender Classification and Population Management in consultation with the Commissioner or designee as outlined in Attachment B, Restrictive Housing Status Matrix.

14. <u>Placement on High Security Status</u>. An investigation shall be conducted by the Unit Administrator or designee to determine if an inmate may be considered for a High Security Monitoring Hearing, if such inmate meets one of the criteria listed in this section. The Unit Administrator, in consultation with the Director of Offender Classification and Population Management, may consider an inmate as a High Security Inmate if the inmate meets one or more of the criteria listed below. An inmate on High Security Monitoring shall be classified as an overall risk level 4 or above and shall be housed in a level 4 or 5 facility. Placement of an inmate on High Security Monitoring shall not preclude, and may be used in conjunction with, placement on any other restrictive status.

A. <u>Review Procedures</u>. Each facility shall establish procedures to review each inmate, consistent with classification practices, to determine if an inmate shall be considered for a High Security Monitoring Hearing.

B. <u>Criteria for Placement</u>. An inmate may be reviewed for classification as a high security inmate for any of the following reasons:

1. Has a staff threat profile, including but not limited to, hostage taking, intentional/direct assault (as defined by form CN 6603, Report of Assault on Staff), and/or murder of a Department of Correction or other law enforcement staff member.

2. Has a documented history of serious disruptive behavior including but not limited to, history of leading food strikes or work stoppages and/or associated with the design or construction of a correctional facility.

3. Has a level 4 escape profile objective classification score.

4. Has an instant serious escape, attempted serious escape, or a history of serious escape(s).

5. Any information that indicates inmate may attempt to escape, to include, but not limited to:

    a. threats to escape;

    b. information discovered on mail or phone review indicating plans for an escape;

    c. possession of escape related contraband (tools, civilian clothing, maps, etc.);

    d. cell damage that indicates an attempt or probable attempt to escape;

    e. significant change in inmate's legal, institutional, or personal status; or,

| Directive Number | Effective Date | Page 12 of 20 |
|---|---|---|
| 9.4 | 6/16/2016 | |
| Title | Restrictive Status | |

       f.    additional detainers, denial of a release application, or new charges.

    6.    Inmate's experience, special skills and/or knowledge which may present security or safety concerns.

    7.    Other documented criteria to include confidential law enforcement intelligence information.

C.    <u>Documentation</u>. Information relating to Section 14(B) of this Directive, shall be documented on CN 9406, High Security Inmate Form. Copies of the completed form shall be forwarded to the Unit Administrator, Director of Offender Classification and Population Management Unit and the Director of Security.

D.    <u>Notification</u>. The Offender Classification and Population Management Unit shall be notified of any placement of an inmate on High Security Monitoring and shall make appropriate classification/profile changes. The Unit Administrator shall ensure that a green file flag card, designating the inmate as a 'High Security Inmate', is placed as the top page in Section 5 of the inmate's master file in accordance with Administrative Directive 4.1, Inmate Records.

E.    <u>Housing</u>. An inmate placed on High Security Monitoring shall be housed in a secured cell. The inmate shall be moved to a new cell at a minimum of every 90 days.

F.    <u>Staff Awareness</u>. Each unit that houses an inmate on High Security status shall maintain information related to the inmate's High Security status for unit staff review. An inmate who is on High Security status shall be issued a green inmate identification card.

G.    <u>Management of High Security Inmates</u>. A high security inmate shall be managed in accordance with general population standards with the following exceptions:

    1.    escorted or monitored movement only;
    2.    cell searches, at a minimum of two (2) times a week;
    3.    in unit work assignments only;
    4.    in unit or monitored programs;
    5.    non-contact social visits only;
    6.    mail retention, same as general population and automatic mail review; and,
    7.    telephones, same as general population and automatic call review.

H.    <u>Review</u>. The status of each inmate placed on High Security Monitoring shall be reviewed, at a minimum, every six (6) months. The review shall be in conjunction with a classification review. Recommendation for removal shall be made to the Unit Administrator who may endorse the recommendation and forward it to Director of Offender Classification and Population Management.

I.    <u>Removal from High Security Status</u>. The Unit Administrator, in consultation with the Director of Security, shall forward recommendations for removal to the Director of Offender Classification and Population Management, who may consider removal of an inmate from High Security Monitoring, if one (1) or more of the following criteria becomes applicable:

    1.    the inmate's physical condition changes enough to significantly reduce or no longer pose a threat of escape;

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 13 of 20 |
|---|---|---|
| Title | Restrictive Status | |

2. relevant, valid and documented new information that exculpates the inmate or contradicts the initial information used for placement;

3. the belief that an inmate may no longer presents a high-risk due to length of time served or changes in circumstances originally used to classify the inmate as a high security inmate; or,

4. the passage of an extended period of exemplary institutional performance.

15. <u>Special Monitoring Status.</u>

A. <u>Placement</u>. Any inmate upon completion of a special management program (i.e., Administrative Segregation, Chronic Discipline, Security Risk Group or Special Needs Management) or who has been identified as a safety and security concern may be placed on Special Monitoring status as determined by the Unit Administrator. If approved for Special Monitoring status, the Unit Administrator shall authorize the appropriate management subcode for the inmate.

All Special Monitoring designations shall be documented in Section 5 of the inmate's master file using CN 9202, Offender Classification History Form. The Unit Administrator shall ensure that a blue file flag card, designating the inmate as a 'Special Monitoring Inmate', is placed as the top page in Section 5 of the inmate's master file in accordance with Administrative Directive 4.1, Inmate Records.

Should an inmate be placed simultaneously on High Security status and Special Monitoring status, the High Security status shall take precedence (the inmate's RT-77 shall indicate the High Security). Should the inmate be removed from High Security status, the inmate's RT-77 shall reflect the status change from high security to special monitoring.

B. <u>Inmate Notification</u>. The Counselor Supervisor of Classification, the Deputy Warden of Operations, the Unit Manager/Supervisor of the assigned unit (where applicable) and any other staff as determined by the Unit Administrator, shall conduct a meeting with the inmate within the first week of placement in order to notify the inmate of his/her placement on Special Monitoring status. The Counselor Supervisor of Classification shall review the inmate's history and reasons for placement on Special Monitoring status. The inmate shall be advised of the conditions related to Special Monitoring in accordance with CN 9407, Special Monitoring Status – Inmate Notification. The inmate shall sign and be given a copy of CN 9407, Special Monitoring Status – Inmate Notification. The signed CN 9407, Special Monitoring Status – Inmate Notification shall be placed in Section 5 of the inmate's master file.

C. <u>Management of Special Monitoring Inmates</u>. An inmate on Special Monitoring status shall be managed in accordance with general population standards with the following exceptions:

1. in unit work assignments only;

2. random cell searches, at a minimum of once a week;

3. mail and telephone calls shall be reviewed;

4. inmate account activity shall be reviewed;

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 14 of 20 |
|---|---|---|
| Title | Restrictive Status | |

5.  unit staff shall monitor and report who the inmate interacts with during recreation, meal and tier activities;

6.  All disciplinary infractions shall be reported and reviewed; and,

7.  inmate's visits and visiting list shall be reviewed.

D.  Reporting. The requirements of Section 15(C) above shall be documented on CN 9408, Special Monitoring Review Form by the Unit Manager/Supervisor in conjunction with unit staff input. The completed form shall be forwarded to the Deputy Warden of Operations on a monthly basis. CN 9408, Special Monitoring Review Form shall be maintained while the inmate is on Special Monitoring status.

E.  Monthly Review. The Unit Manager/Supervisor shall meet with the inmate on a monthly basis to review the inmate's transition, activities and actions. The meeting shall be documented on CN 9408, Special Monitoring Review Form. The facility shall create and maintain a file for each inmate on Special Monitoring. All monthly reviews shall be placed in this file.

F.  Staff Awareness. Each unit that houses an inmate on Special Monitoring status shall maintain information related to the inmate's Special Monitoring status for unit staff review. An inmate who is on Special Monitoring status shall be issued a light blue inmate identification card.

G.  Transfers. Each inmate on Special Monitoring status who transfers from the designating facility shall be reviewed by the receiving facility in order to determine the continuation of Special Monitoring. If the receiving facility elects to continue the Special Monitoring status, a meeting shall be conducted as outlined in Section 15(B) of this Directive. If the receiving facility elects to discontinue the Special Monitoring status, the appropriate management sub code shall be removed by the receiving facility.

H.  Removal from Special Monitoring Status. After six (6) months, the Unit Manager/Supervisor may recommend the removal of the inmate from Special Monitoring status using CN 9408, Special Monitoring Review Form. All removals from Special Monitoring shall be documented in Section 5 of the inmate's master file using CN 9202, Offender Classification History Form.  The last Special Monitoring Review Form shall be placed in Section 5 of the inmate's master file upon removal from Special Monitoring Status. All other Special Monitoring documents may be destroyed in accordance with AD 4.7, Records Retention.

16.  Placement on Special Circumstances Status.
An inmate placed on Special Circumstances Status shall be housed in Administrative Segregation until a reclassification process is completed. The reclassification process shall include an assessment of the risk the inmate poses to staff and other inmates, and an assessment of whether such risk requires the inmate's placement in Administrative Segregation or Protective Custody. If the inmate is placed on Administrative Segregation pursuant to such assessment, the inmate shall be required to complete the Administrative Segregation program.

A.  Continuation of Special Circumstances Status. An inmate's classification as Special Circumstances Status may be continued if it is determined that such placement is appropriate after completion of the reclassification process.  An inmate whose classification is maintained as Special Circumstances Status shall be housed in a maximum

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 15 of 20 |
|---|---|---|
| Title | Restrictive Status | |

security housing unit and kept separate from inmates who are not on Special Circumstances Status.

B. Conditions of Confinement. Conditions of confinement for inmates remaining on Special Circumstances Status after reclassification assessment shall include, but not be limited to the following:
   1. The inmate's movements shall be escorted or monitored
   2. The inmate shall be moved to a new cell at least every ninety days
   3. The inmate's cell shall be searched at least twice each week
   4. No contact is permitted during the inmate's social visits
   5. The inmate shall only be assigned to work assignments that are within the assigned housing unit
   6. The inmate shall be allowed no more than two hours of recreational activity per day.

C. Review. Each inmate classified to Special Circumstances Status shall be reviewed by a mental health professional after 30 days of initial placement and every 90 days thereafter. All such reviews shall be documented in the inmate's health record.

D. Annual Commissioner's Review. The Commissioner, or designee, shall conduct an annual review of such inmate's conditions of confinement within such housing unit and the Commissioner may, for compelling correctional management or safety reasons modify any condition of confinement, subject to the requirements of section 16, subsection B of this directive.

17. Restrictive Status Review.

   A. Periodic Assessment. Each inmate on restrictive housing status shall be reviewed in accordance with Attachment B, Restrictive Housing Status Matrix.

   B. Unit Administrator Inspection. An inspection of each Restrictive Housing Unit shall be conducted at least twice a week by the Unit Administrator in accordance with Administrative Directive 6.1, Tours and Inspections and recorded in the station log. The Unit Administrator of any facility that houses inmates on Administrative Segregation Status shall tour the unit where such inmates are housed a minimum of twice per week.

   C. Staff Inspections. Each Restrictive Housing Unit shall be visited, at a minimum, by:

      1. Correctional staff at least every 15 minutes on an irregular schedule and on a more frequent basis for problematic inmates. Inmates on Restrictive Status, with the exception of Special Circumstances Status, may be housed in general population housing units, but shall be subject to 15 minutes observation by correctional staff as outlined above. Security Risk Group Members shall be observed by correctional staff in accordance with Administrative Directive 6.14, Security Risk Groups.
      2. a custody supervisor and/or Unit Manager each shift;
      3. a member of the Health Services Unit at least once per shift. For facilities without a 24-hour Health Services Unit, tours shall be conducted when health services personnel are on duty; and,
      4. a counselor at least daily and upon request.

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 16 of 20 |
|---|---|---|
| Title | Restrictive Status | |

All visits shall be recorded in the station log in accordance with
Administrative Directive 6.2, Facility Post Orders and Logs.
Requests to see other staff shall be made in writing by the inmate.

D.   Health Assessment. Each inmate shall be assessed by health services
staff prior to placement in a Restrictive Housing Unit in order to
determine housing suitability. Health services staff shall document
the health assessment by completing CN 6602, Medical Incident
Report. The original report shall be placed in the inmate's health
record and a copy forwarded to the Shift Commander.

Health services staff shall check inmates on Punitive Segregation,
Administrative Detention and Transfer Detention status on a daily
basis and shall check inmates on Administrative Segregation status
three times a week.

When an inmate remains on restrictive housing status beyond 30 days,
a psychologist or psychiatrist shall conduct a personal interview
with the inmate and document the inmate's mental status in the
inmate's health record. If confinement continues for an extended
period of time, the aforementioned psychiatric assessment shall be
made every three (3) months or as clinically necessary. In the event
that continued placement is contraindicated, health services staff
shall promptly notify the Unit Administrator.  For inmates who are
using maladaptive behaviors, such as threatening self harm without
intent or destroying property to avoid compliance with custody
requirements such as housing or disciplinary actions, Behavioral
Observation Status shall be initiated. Behavioral Observation Status
shall be utilized in areas other than an infirmary/hospital Unit but
shall be limited to housing areas in which custody staff routinely
conduct 15 minute tours.

18.   Readmission. Upon readmission, all inmates who were previously on Special
Needs Management, or designated as a Security Risk Group Member shall be
placed on Administrative Detention status pending placement to appropriate
housing. Inmates who were previously on Administrative Segregation Status
or Chronic Discipline Status shall be placed on abbreviated Special
Monitoring Status and managed in accordance with the following procedures:

A.   Administrative Segregation Status.  An inmate who has discharged
while on Administrative Segregation Status (AS) and is readmitted
to the Department of Correction shall be managed according to the
following procedures.
1. An inmate who discharges from AS and is readmitted within 30
days of discharge shall be recommended for reinstatement of AS
by the receiving facility to the District Administrator and
the Director of Offender Classification and Population
Management.  If approved, a hearing shall be required in
accordance with section 12 (A) of this Directive.
2. An inmate who discharges from AS and is readmitted after 30
days from discharge shall have their AS Status suspended.  The
inmate shall be placed on abbreviated Special Monitoring
Status (SM) for a period of 15 days and shall be housed in
general population.  During this period the inmate will not be
transferred to another facility unless medical or mental
health issues warrant such transfer.

Case 3:19-cv-01820-MPS   Document 1   Filed 11/15/19   Page 123 of 188

| Directive Number | Effective Date | Page 17 of 20 |
|---|---|---|
| 9.4 | 6/16/2016 | |
| Title | | |
| Restrictive Status | | |

3. The inmate shall be interviewed during orientation, shall be advised of their placement on abbreviated Special Monitoring Status and shall be provided with a copy of CN9407 Special Monitoring Status-Inmate Notification advising the inmate of the conditions of this status.  The original copy of this form shall be placed in the inmate's master file.

4. Should the inmate receive a Class A or Class B Disciplinary Report during this 15 day period, the inmate shall be reviewed for reinstatement of Administrative Segregation Status.

5. An inmate whose AS Status is suspended shall have their overall score lowered from a 5 to a 4.  The suspension of AS will be documented appropriately in accordance with the classification manual.

6. At the conclusion of the 15 day period of Special Monitoring the inmate may be either; removed from SM; continued on SM, or considered for reinstatement to AS Status.  If the inmate is found guilty of a Class A or B Disciplinary Report soon after removal from Special Monitoring the Unit Administrator may place the inmate on a Custody Management Plan.

   a. Removal from SM: If the inmate is approved for release from SM the Unit Administrator shall send a copy of the SM release form to the Office of Classification and Population Management for removal of the inmate from AS Status. If the inmate meets the criteria for a lower classification level and is suitable, the facility may lower the inmate's classification and submit the inmate for transfer.

   b. Continuation on SM: The Unit Administrator may continue the inmate on SM Status for a specified period of time for further evaluation of the inmate's adjustment to readmission.

   c. The inmate may be considered for reinstatement to AS Status if the inmate's adjustment warrants such action.

B. **Chronic Discipline Status**.  An inmate who has discharged while on Chronic Discipline Status (CD) and is readmitted to the Department of Correction shall be managed according to the following procedures.

   1. An inmate who discharges from CD and is readmitted within 30 days of discharge shall be recommended for reinstatement of CD by the receiving facility to the District Administrator and the Director of Offender Classification and Population Management.  If approved a hearing shall be conducted by the facility and the package shall be forwarded to OCPM for review.

   2. An inmate who discharges from CD and is readmitted after 30 days from discharge shall have their CD Status suspended.  The inmate shall be placed on abbreviated Special Monitoring Status (SM) for a period of 15 days and shall be housed in general population.  During this period the inmate will not be transferred to another facility unless medical or mental health issues warrant such transfer.

   3. The inmate shall be interviewed during orientation, shall be advised of their placement on abbreviated Special Monitoring Status and shall be provided with a copy of CN9407 Special

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 18 of 20 |
|---|---|---|
| Title | Restrictive Status | |

> Monitoring Status – Inmate Notification advising the inmate of the conditions of this status.  The original copy of this form shall be placed in the inmate's master file.
>
> 4. Any new disciplinary sanctions that are incurred during the 15 day period of SM shall be enforced.
> 5. Should the inmate receive a Class A or Class B Disciplinary Report during this 15 day period, the inmate shall be reviewed for reinstatement of Chronic Discipline Status.
> 6. An inmate whose CD Status is suspended shall have their CD sub code removed.  The suspension of CD will be documented appropriately in accordance with the classification manual.
> 7. At the conclusion of the 15 day period of Special Monitoring the inmate may be either; removed from SM; continued on SM, or considered for reinstatement to Chronic Discipline Status.  If the inmate is found guilty of a Class A or B Disciplinary Report soon after removal from Special Monitoring the Unit Administrator may place the inmate on a Custody Management Plan.
>     a. Removal from SM:  If the inmate is approved for release from SM the Unit Administrator shall send a copy of the SM release form to the Office of Classification and Population Management for removal of the inmate from CD Status.  If the inmate meets the criteria for a lower classification level and is suitable, the facility may lower the inmate's classification and submit the inmate for transfer.
>     b. Continuation on SM:  The Unit Administrator may continue the inmate on SM Status for a specified period of time for further evaluation of the inmate's adjustment to readmission.
>     c. The inmate may be considered for reinstatement to CD Status if the inmate's adjustment warrants such action.

C. <u>Special Needs Management Status</u>. The Unit Administrator or designee shall contact the Director of Offender Classification and Population Management, who shall consult with the DOC Director of Psychological Services and the Deputy Commissioner of Operations and Rehabilitative Services regarding the inmate's readmission in order to determine whether or not to return the inmate to Special Needs Management status in accordance with this Directive and the Classification Manual. If it is determined to continue the inmate on Special Needs Management status, the Administrative Segregation/Special Needs Management Hearing Officer shall conduct a hearing within 30 days from the date it is determined to return the inmate to Special Needs Management status. The inmate shall be notified of the pending hearing by utilizing CN 9402, Notification of Hearing. If it is determined not to continue the inmate on Special Needs Management status, a hearing shall not be required. At that time the Director of Offender Classification and Population Management shall the sign the Release Section (page 2) of CN 9404, Restrictive Status Report of Hearing for Placement or Removal.

D. <u>Security Risk Group Member</u>. The Unit Administrator or designee shall notify the Director of Security and the Director of Offender Classification and Population Management of any Security Risk Group Member readmission by the next business day. The inmate's status

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 19 of 20 |
|---|---|---|
| Title | Restrictive Status | |

shall be reviewed by the Facility Intelligence Coordinator/Unit Manager within 90 days of readmission. Prior to meeting with the inmate, the Facility Intelligence Coordinator/Unit Manager shall review the inmate's SRG file and notify the inmate of the pending meeting regarding the inmate's SRG status utilizing CN 61410, Security Risk Group 90-Day Review Notification. The Facility Intelligence Coordinator/Unit Manager shall meet with the inmate and advise the inmate of the results of the review utilizing CN 61408, Security Risk Group Member 90-Day Review. The original CN 61408, Security Risk Group Member 90-Day Review shall be forwarded to the Director of Security or designee and a completed copy of the form shall be forwarded to the inmate upon completion of the review. A recommendation regarding the Security Risk Group status for each readmitted inmate shall be made by the Unit Administrator and reviewed by the Security Division. The final disposition of continued Security Risk Group status shall be made by the Director of Security.

19. <u>Designation and Management of Security Risk Group Members</u>. Designation and management of Security Risk Group shall be in accordance with Administrative Directive 6.14, Security Risk Groups.

20. <u>Extensions of Time</u>. Notwithstanding the time frames established in this Directive, the Unit Administrator and/or the Director of Offender Classification and Population Management may extend such time frames for good cause shown. Any such extensions of time shall be documented together with the reasons for the extension on CN 9409, Notification of Extension of Status. No inmate shall be confined on Administrative Detention status for more than 30 days without notice as to the reasons for such placement and an informal opportunity to be heard, either by a facility counselor, or a designee of the Unit Administrator or Director of Classification and Population Management. Any such informal notice and hearing shall be documented on CN 9409, Notification of Extension of Status.

21. <u>Appeal of a Special Management Decision</u>. An inmate may file an appeal regarding a special management (restrictive status) decision in accordance with Administrative Directive 9.6, Inmate Administrative Remedies.

22. <u>Restrictive Status Reporting</u>. Each Unit Administrator shall include restrictive status information in the monthly STARS report to the appropriate District Administrator.

   A. <u>Restrictive Status Categories</u>. For the purposes of this Directive, the following restrictive status categories shall be included in the monthly STARS report:

      1. Administrative Detention;
      2. Punitive Segregation;
      3. Transfer Detention;
      4. Administrative Segregation;
      5. Chronic Discipline;
      6. (SRG Member); and,
      7. Special Needs Management.
      8. Special Circumstances Status

| Directive Number 9.4 | Effective Date 6/16/2016 | Page 20 of 20 |
|---|---|---|
| Title | Restrictive Status | |

B. <u>Reporting Requirements</u>. The report shall provide the following information for each category as required in accordance with Section 21(A) of this Directive:

    1.   Number of placements during the month;
    2.   Number of removals during the month; and,
    3.   Total number at the end of the month.

23. <u>Log Maintenance</u>. Staff assigned to a Restrictive Housing Unit shall maintain the permanent station log in accordance with Attachment D, Restrictive Housing Unit - Log Entries and Administrative Directive 6.2, Facility Post Orders and Logs.

24. <u>Forms and Attachments</u>. The following forms and attachments are applicable to this Administrative Directive and shall be utilized for the intended function.

    A.   CN 9401, Restrictive Housing Unit Status Order;
    B.   CN 9402, Notification of Hearing;
    C.   CN 9403, Waiver of 48-Hour Hearing Notice and/or Attendance;
    D.   CN 9404, Restrictive Status Report of Hearing for Placement or Removal;
    E.   CN 9405, Notification of Decision;
    F.   CN 9406, High Security Information Report;
    G.   CN 9407, Special Monitoring Status - Inmate Notification;
    H.   CN 9408, Special Monitoring Review Form;
    I.   CN 9409, Notification of Extension of Status;
    J.   CN 9410, Special Circumstances Status - Inmate Notification;
    K.   Attachment A, Restrictive Housing Status - Provisions and Management Standards;
    L.   Attachment B, Restrictive Housing Status Matrix;
    M.   Attachment C, Chronic Discipline Status - Provisions and Management Standards;
    N.   Attachment D, Restrictive Housing Unit - Log Entries; and,
    O.   Attachment E, Health Evaluation for Restrictive Housing Unit (RHU) Placement (HR-006).

25. <u>Exceptions</u>. Any exceptions to the procedures in this Administrative Directive shall require prior written approval from the Commissioner.



# Restrictive Housing Status Matrix
## Connecticut Department of Correction

Attachment B
REV 6/16/16
AD 9.4

| Type of Restrictive Status | Purpose(s) | Approval Authority for Placement | Approval Authority for Release | Authorized Length of Confinement | Review Requirements |
|---|---|---|---|---|---|
| **Administrative Segregation Transition Phases** *Northern and York only* | To prepare inmate for return to general population | Unit Administrator or higher authority | Commissioner or designee | Indefinite | Classification staff every seven (7) days for first two (2) months and every 30 days thereafter and by a mental health professional after 30 days and every three (3) months following. |
| **Administrative Segregation** *Northern and York only* | Classified as a threat to staff, other inmates or facility security. (Requires a hearing prior to placement) | Director of Offender Classification and Population Management or higher authority | Commissioner or designee | Indefinite | Classification staff every seven (7) days for first two (2) months and every 30 days thereafter and by a mental health professional after 30 days and every three (3) months following. |
| **Punitive Segregation** | Discipline (Requires a hearing prior to placement) | Disciplinary Hearing Officer | Unit Administrator or higher authority or inmate serves time | In accordance with A.D. 9.5, Code of Penal Discipline | Local as appropriate |
| **Administrative Detention** | During an investigation or pending a hearing if an inmate may need protection or poses a threat to facility security and safety. | Shift Commander, higher authority or Director of Offender Classification and Population Management | Unit Administrator, higher authority or Director of Offender Classification and Population Management | Up to 14 calendar days. When an Administrative Segregation hearing is pending, up to 30 calendar days. | Every 72 hours by the Unit Administrator or designee and recorded on Restrictive Housing Order. |
| **Transfer Detention** | Pending transfer as appropriate | Shift Commander, higher authority or Director of Offender Classification and Population Management | Shift Commander, higher authority or Director of Offender Classification and Population Management | Up to 72 hours excluding weekends and holidays | Local as appropriate |
| **Chronic Discipline Interval I** | Adjustment of problematic inmate behavior due to multiple disciplinary reports | Director of Offender Classification and Population Management | Approval for release to Interval II shall be by the Unit Administrator | Minimum of 30 days | Classification staff every seven (7) days for one (1) month and every 30 days thereafter. |
| **Chronic Discipline Interval II** | To prepare inmate for return to general population | Unit Administrator | Director of Offender Classification and Population Management | Minimum of 60 days | Classification staff every 30 days. By a mental health professional every 90 days. Inmates remaining in the Close Custody for Chronic Discipline Unit for more than six (6) months shall be reviewed for Administrative Segregation. |
| **Special Needs Management** | For inmates who have demonstrated behavioral qualities either through the serious nature of their crime, behavior or reasonable belief that they continue to pose a threat to the safety and security of staff, other inmates, themselves, or the public. | Director of Offender Classification and Population Management in consultation with the Deputy Commissioner of Operations or designee and the DOC Director of Psychiatric Services. | Director of Offender Classification and Population Management in consultation with the Deputy Commissioner of Operations or designee and the DOC Director of Psychiatric Services. | Indefinite | A classification hearing shall be held at a minimum of every six (6) months. By a mental health professional after 30 days of initial placement and every 90 days thereafter. |
| **Special Circumstances** | In accordance with CGS 18-10b | In accordance with CGS 18-10b | Not applicable in accordance with CGS 18-10b | Indefinite | By a mental health professional after 30 days of initial placement and every 90 days thereafter. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| Function | Punitive Segregation, Administrative Detention, or Transfer Detention | Administrative Segregation (Phase One) | Administrative Segregation Transition (Phase Two) | Administrative Segregation Transition (Phase Three) | Special Needs Management |
|---|---|---|---|---|---|
| **Movement out of cell or out of secured area within housing unit (e.g., on tier or in day space)** | Not more than two (2) inmates out of cell per tier or unit at one time. No restrictive status inmates shall be allowed out of their cells when general population inmates are in the unit. | Not more than six (6) inmates out of cell in the unit at one time. Each inmate, when out of the cell, shall be escorted, at a minimum, on a one (1) staff to one (1) inmate basis and handcuffed behind the back (leg irons and tether chain may be used at Northern CI, York CI, Garner CI and Manson YI when authorized by the Unit Administrator). Janitors shall be under direct supervision. | Not more than 16 inmates including janitors at one time. | Not more than 24 inmates and 2 workers at one time. | Not more than 24 inmates and 2 workers at one time. |
| **Movement out of cell or out of secured area when on restraint status (e.g., on tier or in day space)** | The placement of an inmate on out of cell restraint status shall be approved by the Unit Administrator or designee in accordance with AD 6.5, Use of Force. The Unit Administrator shall be notified within 24 hours of any inmate placed on out of cell restraint status. The type of restraint shall be approved by the Unit Administrator or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. The inmate on restraint status, prior to release from a cell, shall be handcuffed behind the back except when making telephone calls, at which time the inmate shall be handcuffed in the front before leaving the cell.<br><br>Each inmate, out of cell restraint status, shall be escorted on a one (1) staff, one (1) inmate basis. Continued behavior problems shall result in review for Administrative Segregation placement or transfer to higher security. Where there are secured showers, an inmate on restraint status shall normally have handcuffs removed upon entering and reapplied before leaving the shower. Where there are no secure showers, each inmate on restraint status going to the shower shall be handcuffed in front prior to leaving the cell and remain handcuffed while showering. A cell may be opened prior to an inmate being handcuffed if, in the best judgment of a supervisor, a health emergency warrants such. | Inmates shall, prior to release from a cell, at a minimum be handcuffed behind the back (leg irons and tether chain may be used when authorized by the Unit Administrator) except when making phone calls at which time the inmate shall be handcuffed in the front before leaving the cell (when handcuffed in the front, leg irons and tether chain may be used at the discretion of the Unit Administrator).<br><br>Handcuffs may be removed when the inmate is in a secure shower or secure individual recreation area.<br><br>A cell may be opened prior to an inmate being handcuffed if, in the best judgment of a supervisor, a health emergency warrants such. | For the first 30 days, inmates shall, prior to release from a cell, be handcuffed in front. After 30 days restraints not authorized unless for movement outside the unit or while waiting placement back into Administrative Segregation (Phase 1) or Punitive Segregation at which point the standards set forth under Administrative Segregation (Phase 1) shall apply. A cell may be opened prior to an inmate being handcuffed if, in the best judgment of a supervisor, a health emergency warrants such. | Restraints not authorized unless for movement outside the unit or while waiting placement back into Administrative Segregation (Phase 1) or Punitive Segregation at which point the standards set forth under Administrative Segregation (Phase 1) shall apply. | The placement of an inmate on out of cell restraint status shall be approved by the Unit Administrator or designee in accordance with AD 6.5, Use of Force. The Unit Administrator shall be notified within 24 hours of any inmate placed on out of cell restraint status. The type of restraint shall be approved by the Unit Administrator or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| Function | Punitive Segregation, Administrative Detention, or Transfer Detention | Administrative Segregation (Phase One) | Administrative Segregation Transition (Phase Two) | Administrative Segregation Transition (Phase Three) | Special Needs Management |
|---|---|---|---|---|---|
| **Movement out of Unit other than to adjacent Recreation Area** | If not on restraint status, a minimum of one (1) officer per inmate as escort. When outside the unit each inmate shall be handcuffed behind the back and escorted by a minimum of one (1) officer per inmate. An inmate shall, at a minimum, be pat searched upon leaving and returning to the unit. | When outside of unit each inmate, at a minimum, shall be handcuffed behind the back and escorted by a minimum of one (1) officer per inmate. An inmate shall, at a minimum, be pat searched upon leaving and returning to the unit. | Inmates shall be escorted, at a minimum, by one (1) staff member for every three (3) inmates. The inmate shall be handcuffed in the front. At a minimum the inmate shall be pat searched upon leaving and returning to the unit. | Inmates, at a minimum, shall be escorted and supervised by one (1) staff member for every eight (8) inmates. No restraints. | Inmates, at a minimum, shall be escorted and supervised by one (1) staff member for every eight (8) inmates. Restraint status shall be determined by the inmate's mental health treatment plan and appropriate custody protocols (as needed). |
| **In Cell Observation** | Direct observation by a correctional officer, not less frequently than every 15 minutes. Living, breathing flesh shall be observed. | Direct observation by a correctional officer, not less frequently than every 15 minutes. Living, breathing flesh shall be observed. | Direct observation by a correctional officer, not less frequently than every 15 minutes. Living, breathing flesh shall be observed. | Direct observation by a correctional officer, not less frequently than every 15 minutes. Living, breathing flesh shall be observed. | Direct observation by a correctional officer, not less frequently than every 15 minutes. Living, breathing flesh shall be observed. |
| **In Cell Restraint Status** | The placement of an inmate on in-cell restraint status shall be approved by the Shift Commander or Unit Manager. Any time an inmate is placed on in-cell restraint status an Incident Report shall be submitted in accordance with AD 6.6, Reporting of Incidents. The Unit Administrator shall be notified within one (1) hour of any inmate placed on in cell restraint status. The type of restraint shall be approved by the Shift Commander or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. An inmate placed on in-cell restraint status shall be reviewed every 24 hours by the Unit Administrator. An inmate retained on in cell restraint status beyond 72 hours shall be reviewed by the Unit Administrator. The facility Shift Commander or Unit Manager shall observe each inmate on in-cell restraint status at a minimum of once per shift. A health services staff member shall observe each inmate on in-cell restraint status no less frequently than twice during a 24-hour period. | The placement of an inmate on in-cell restraint status shall be approved by the Shift Commander or Unit Manager. Any time an inmate is placed on in-cell restraint status an Incident Report shall be submitted in accordance with AD 6.6, Reporting of Incidents. The Unit Administrator shall be notified within one (1) hour of any inmate placed on in cell restraint status. The type of restraint shall be approved by the Shift Commander or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. An inmate placed on in-cell restraint status shall be reviewed every 24 hours by the Unit Administrator. An inmate retained on in cell restraint status beyond 72 hours shall be reviewed by the Unit Administrator. The facility Shift Commander or Unit Manager shall observe each inmate on in-cell restraint status at a minimum of once per shift. A health services staff member shall observe each inmate on in-cell restraint status no less frequently than twice during a 24-hour period. | The placement of an inmate on in-cell restraint status shall be approved by the Shift Commander or Unit Manager. Any time an inmate is placed on in-cell restraint status an Incident Report shall be submitted in accordance with AD 6.6, Reporting of Incidents. The Unit Administrator shall be notified within one (1) hour of any inmate placed on in cell restraint status. The type of restraint shall be approved by the Shift Commander or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. An inmate placed on in-cell restraint status shall be reviewed every 24 hours by the Unit Administrator. An inmate retained on in cell restraint status beyond 72 hours shall be reviewed by the Unit Administrator. The facility Shift Commander or Unit Manager shall observe each inmate on in-cell restraint status at a minimum of once per shift. A health services staff member shall observe each inmate on in-cell restraint status no less frequently than twice during a 24-hour period. | The placement of an inmate on in-cell restraint status shall be approved by the Shift Commander or Unit Manager. Any time an inmate is placed on in-cell restraint status an Incident Report shall be submitted in accordance with AD 6.6, Reporting of Incidents. The Unit Administrator shall be notified within one (1) hour of any inmate placed on in cell restraint status. The type of restraint shall be approved by the Shift Commander or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. An inmate placed on in-cell restraint status shall be reviewed every 24 hours by the Unit Administrator. An inmate retained on in cell restraint status beyond 72 hours shall be reviewed by the Unit Administrator. The facility Shift Commander or Unit Manager shall observe each inmate on in-cell restraint status at a minimum of once per shift. A health services staff member shall observe each inmate on in-cell restraint status no less frequently than twice during a 24-hour period. | The placement of an inmate on in-cell restraint status shall be approved by the Shift Commander or Unit Manager. Any time an inmate is placed on in-cell restraint status an Incident Report shall be submitted in accordance with AD 6.6, Reporting of Incidents. The Unit Administrator shall be notified within one (1) hour of any inmate placed on in cell restraint status. The type of restraint shall be approved by the Shift Commander or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. An inmate placed on in-cell restraint status shall be reviewed every 24 hours by the Unit Administrator. An inmate retained on in cell restraint status beyond 72 hours shall be reviewed by the Unit Administrator. The facility Shift Commander or Unit Manager shall observe each inmate on in-cell restraint status at a minimum of once per shift. A health services staff member shall observe each inmate on in-cell restraint status no less frequently than twice during a 24-hour period. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| Function | Punitive Segregation, Administrative Detention, or Transfer Detention | Administrative Segregation (Phase One) | Administrative Segregation Transition (Phase Two) | Administrative Segregation Transition (Phase Three) | Special Needs Management |
|---|---|---|---|---|---|
| In Cell Restraint Status (Continued) | A health services professional shall make a mental health assessment within 24 hours of an inmate's placement on in-cell restraints. An inmate's placement on in-cell restraint status shall be directly observed by a correctional officer not less frequently than every 15 minutes. In such cases the standards set forth in AD 6.5, Use of Force shall be followed. | A health services professional shall make a mental health assessment within 24 hours of an inmate's placement on in-cell restraints. An inmate placed on in-cell restraint status shall be directly observed by a correctional officer not less frequently than every 15 minutes. In such cases the standards set forth in AD 6.5, Use of Force shall be followed. | A health services professional shall make a mental health assessment within 24 hours of an inmate's placement on in-cell restraints. An inmate placed on in-cell restraint status shall be directly observed by a correctional officer not less frequently than every 15 minutes. In such cases the standards set forth in AD 6.5, Use of Force shall be followed. | A health services professional shall make a mental health assessment within 24 hours of an inmate's placement on in-cell restraints. An inmate placed on in-cell restraint status shall be directly observed by a correctional officer not less frequently than every 15 minutes. In such cases the standards set forth in AD 6.5, Use of Force shall be followed. | A health services professional shall make a mental health assessment within 24 hours of an inmate's placement on in-cell restraints. An inmate placed on in-cell restraint status shall be directly observed by a correctional officer not less frequently than every 15 minutes. In such cases the standards set forth in AD 6.5, Use of Force shall be followed. |
| Cell Searches | Random, but not less frequently than three (3) times every seven (7) days or when warranted. | Random, but not less frequently than three (3) times every seven (7) days or when warranted. | Not less frequently than twice every seven (7) days. | Not less frequently than once every even (7) days. | Not less frequently than once every even (7) days. |
| Security Checks | Daily on first and second shift. | Daily on first and second shift. | Daily on first and second shift. | Daily on first and second shift. | Daily on first and second shift. |
| Showers | Minimum of three (3) times per week with a 15-minute out of cell limit. | Minimum of three (3) times per week with a 15-minute out of cell limit. | Minimum of three (3) times per week with a 15-minute out of cell limit. | Minimum of three (3) times per week with a 15-minute out of cell limit. | Daily or as otherwise directed by the inmate's mental health treatment plan. |
| Work Assignments | Limited to cleaning and food service in Housing Unit. No seven (7) day jobs. | None | Limited to Unit. No seven (7) day jobs. | As determined by the Unit Administrator. | As determined by the Unit Administrator. |
| Food Service | Regular meal inside cell. | Regular meal inside cell. | Regular meal inside cell. | Regular meal outside of cell but in housing unit. | Regular meal inside cell or as otherwise directed by the inmate's mental health treatment plan. |
| Recreation | One (1) hour per day, five (5) days a week in a controlled area, including holidays. An inmate on restraint status shall not receive recreation with an inmate not on restraint status. | One (1) hour per day, five (5) days a week in a controlled area. Restraints (handcuffs) required unless in a secure individual recreation area. An inmate on restraint status shall not receive recreation with an inmate not on restraint status. | A minimum of one (1) hour per day, five (5) days a week. Restraints for the first 30 days, handcuffed in the front, thereafter, no restraints. | A minimum of one (1) hour per day, five (5) days a week. No restraints. | A minimum of two (2) hours per day, *six (6) days a week* or as otherwise directed by the inmate's mental health treatment plan. Restraint determination shall be in accordance with the inmate's mental health treatment plan. |
| Programs | None. | All program opportunities shall be provided or arranged for in cell. Counseling programs shall be available on a limited basis. | Program opportunities shall be provided out of cell after the first 30 days in restraints, separate from general population in a secured area. All programs shall be approved by the Director of Programs and Treatment. | Program opportunities shall be provided out of cell separate from general population in a secured area. All programs shall be approved by the Director of Programs and Treatment. | Programming in accordance with individualized facility management plan. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| Function | Punitive Segregation, Administrative Detention, or Transfer Detention | Administrative Segregation (Phase One) | Administrative Segregation Transition (Phase Two) | Administrative Segregation Transition (Phase Three) | Special Needs Management |
|---|---|---|---|---|---|
| Education | At a minimum, individual education plans shall be maintained for those inmates under the age of 21 who are deemed appropriate by the Education Department. Recommendations from the Education Department shall be accommodated consistent with the security needs of the housing unit. | At a minimum, individual education plans shall be maintained for those inmates under the age of 21 who are deemed appropriate by the Education Department. Recommendations from the Education Department shall be accommodated consistent with the security needs of the housing unit. | At a minimum, individual education plans shall be maintained for those inmates under the age of 21 who are deemed appropriate by the Education Department. Recommendations from the Education Department shall be accommodated consistent with the security needs of the housing unit. | At a minimum, individual education plans shall be maintained for those inmates under the age of 21 who are deemed appropriate by the Education Department. Recommendations from the Education Department shall be accommodated consistent with the security needs of the housing unit. | At a minimum, individual education plans shall be maintained for those inmates under the age of 21 who are deemed appropriate by the Education Department. Recommendations from the Education Department shall be accommodated consistent with the security needs of the housing unit. |
| Inmate Property | See AD 6.10, Inmate Property | See AD 6.10, Inmate Property | See AD 6.10, Inmate Property | See AD 6.10, Inmate Property | See AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |
| Visits | Visits generally shall not be allowed.\n\nNon-contact visits at Level 4 facilities and above.\n\nLegal visits as needed and approved by the Unit Administrator or designee. | An inmate shall be allowed one (1) 30-minute non-contact visit per week, only with immediate family. No extended family visits.\n\nLegal visits as needed and approved by Unit Administrator or designee. | An inmate shall be allowed only two (2) 30-minute non-contact visits per week, only with immediate family. No extended family visits.\n\nLegal visits as needed and approved by Unit Administrator or designee. | An inmate shall be allowed a minimum of three (3) 30-minute visits per week. No extended family visits.\n\nLegal visits as needed and approved by the Unit Administrator or designee. | An inmate shall be allowed a minimum of three (3) one hour visits per week. No extended family visits.\n\nLegal visits as needed and approved by the Unit Administrator or designee or as otherwise directed by the inmate's mental health treatment plan. |
| Mail Retention | May send and receive mail same as general population but may retain only five (5) letters in cell. | May send and receive mail same as general population but may retain only five (5) letters in cell. | In accordance with storage requirements in AD 6.10, Inmate Property. | In accordance with storage requirements in AD 6.10, Inmate Property. | In accordance with storage requirements in AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |
| Reading Materials | Limited to two (2) books or periodicals at a time. Legal materials shall be provided upon request as required to address a court issue that cannot wait until release from restrictive status. | Shall not exceed the four (4) cubic feet of total allowable property in the cell in accordance with AD 6.10, Inmate Property. Amount may be restricted by the Unit Administrator. | In accordance with storage requirement in AD 6.10, Inmate Property. | In accordance with storage requirement in AD 6.10, Inmate Property. | In accordance with storage requirement in AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| Function | Punitive Segregation, Administrative Detention, or Transfer Detention | Administrative Segregation (Phase One) | Administrative Segregation Transition (Phase Two) | Administrative Segregation Transition (Phase Three) | Special Needs Management |
|---|---|---|---|---|---|
| Telephone Usage | Not allowed unless approved by the Unit Administrator on a case-by-case basis. | One (1) 15-minute call per week, except legal telephone calls as approved by a supervisor/counselor. | Two (2) 15-minute calls per week, except legal telephone calls as approved by a supervisor/counselor. | A minimum of three (3) 15- minute calls per week, except legal telephone calls as approved by a supervisor/counselor. | A minimum of three (3) 15-minute calls per week, except legal telephone calls as approved by a supervisor/counselor or as otherwise directed by the inmate's mental health treatment plan. |
| Television | None | None | None | None | Allowed, in accordance with AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |
| Radio in Cell | None | Allowed, in accordance with AD 6.10, Inmate Property. | Allowed, in accordance with AD 6.10, Inmate Property. | Allowed, in accordance with AD 6.10, Inmate Property. | Allowed, in accordance with AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |
| Commissary | As determined by the Unit Administrator | Weekly Spending Limit = $25 | Weekly Spending Limit = $30 | Weekly Spending Limit = $35 | Weekly Spending Limit = $50 |
| Religious Services | Facility Chaplains shall schedule, at a minimum, weekly visits to inmates on Restrictive Housing Status | Facility Chaplains shall schedule, at a minimum, weekly visits to inmates on Restrictive Housing Status | Facility Chaplains shall schedule, at a minimum, weekly visits to inmates on Restrictive Housing Status | Facility Chaplains shall schedule, at a minimum, weekly visits to inmates on Restrictive Housing Status | Facility Chaplains shall schedule, at a minimum, weekly visits to inmates on Restrictive Housing Status |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| Special Circumstances Status | |
|---|---|
| Movement out of cell or out of secured area within housing unit (e.g., on tier or in day space) | Not more than 24 inmates out at one time.  Staff escort required for all movement. |
| Movement out of cell or out of secured area when on restraint status (e.g., on tier or in day space) | Routine out of cell movement - Handcuffs behind the back, restraints will be removed when the inmate is secured in the area. (showers, recreation, social visits, dayroom usage)<br><br>Professional Visits - Handcuffed behind back and leg irons for escort to visit.  Upon arrival to interview room, leg irons will be secured to D-ring on the floor and handcuffs will be removed.<br><br>In-unit staff interactions - Full restraints in the front (handcuffs, leg irons, tether). Legal calls, Medical/Mental Health visits, all interaction which would require staff being secured in an area with an inmate.<br><br>Subsequent to the discontinuation of the Death Row Restraint Policy<br><br>Restraint status shall be determined by the inmate's mental health treatment plan and appropriate custody protocols (as needed).  Restraint status shall be in accordance with inmate management plan. |
| Movement out of Unit other than to adjacent Recreation Area | All inmate movement shall be escorted, at a minimum, by one (1) staff member for every 8 inmates.<br><br>Full restraints behind the back (handcuffs, leg irons, tether chain) when inmate is on restraint status.<br><br>Subsequent to the discontinuation of the Death Row Restraint Policy<br><br>Restraint status shall be determined by the inmate's mental health treatment plan and appropriate custody protocols (as needed).  Restraint status shall be in accordance with inmate management plan. |
| In Cell Observation | Direct observation by a correctional officer, not less frequently than every 15 minutes.  Living, breathing flesh shall be observed. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| | *Special Circumstances Status* |
|---|---|
| In Cell Restraint Status | The placement of an inmate on in-cell restraint status shall be approved by the Shift Commander or Unit Manager. Any time an inmate is placed on in-cell restraint status an Incident Report shall be submitted in accordance with AD 6.6, Reporting of Incidents. The Unit Administrator shall be notified within one (1) hour of any inmate placed on in cell restraint status. The type of restraint shall be approved by the Shift Commander or designee in accordance with ADs 6.5, Use of Force and 7.2, Armories. An inmate placed on in-cell restraint status shall be reviewed every 24 hours by the Unit Administrator. An inmate retained on in cell restraint status beyond 72 hours shall be reviewed by the Unit Administrator. The facility Shift Commander or Unit Manager shall observe each inmate on in-cell restraint status at a minimum of once per shift.  A health services staff member shall observe each inmate on in-cell restraint status no less frequently than twice during a 24-hour period.<br><br>A health services professional shall make a mental health assessment within 24 hours of an inmate's placement on in-cell restraints. An inmate placed on in-cell restraint status shall be directly observed by a correctional officer not less frequently than every 15 minutes. In such cases the standards set forth in AD 6.5, Use of Force shall be followed |
| Cell Searches | Not less frequently than twice every even (7) days. |
| Security Checks | Daily on first and second shift. |
| Showers | Six days per week, Monday through Saturday. |
| Work Assignments | As determined by the Unit Administrator, must be in assigned housing unit. |
| Food Service | Regular meal outside of cell but in housing unit for lunch and dinner, breakfast is fed in cell. |
| Recreation | 2 hours per day six days per week - one hour outdoor and one hour indoor. |
| Programs | Programming in accordance with individualized facility management plan. |
| Education | At a minimum, individual education plans shall be maintained for those inmates under the age of 21 who are deemed appropriate by the Education Department. Recommendations from the Education Department shall be accommodated consistent with the security needs of the housing unit. |
| Inmate Property | In accordance with storage requirements in AD 6.10, Inmate Property. |



# Restrictive Housing Status - Provisions and Management Standards
## Connecticut Department of Correction

Attachment A/1
REV 6/16/16
AD 9.4

| | Special Circumstances Status |
|---|---|
| Visits | An inmate shall be allowed three (3) one hour non-contact visits per week. No extended family visits.<br><br>Legal visits as needed and approved by the Unit Administrator or designee. |
| Mail Retention | In accordance with storage requirements in AD 6.10, Inmate Property. |
| Reading Materials | In accordance with storage requirement in AD 6.10, Inmate Property. |
| Telephone Usage | Two 15 – minute social calls a day (7 days a week)<br><br>Two professional and privileged calls per month (inmate must make arrangements with unit counselor).  Inmate may contact attorney on Securus (inmate) phones by adding the attorney's number to his PAN list and calls will not be recorded or counted against the two per month. |
| Television | Allowed, in accordance with AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |
| Radio in Cell | Allowed, in accordance with AD 6.10, Inmate Property or as otherwise directed by the inmate's mental health treatment plan. |
| Commissary | Weekly Spending Limit = $75 |
| Religious Services | Facility Chaplains shall schedule, at a minimum, weekly visits to inmates on Restrictive Housing Status |



Pursuant to 28 USCS, §1746:

I,   Joe Baltas        on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_.

_____
Joe Baltas
NCI
P.o. Box 665
Somus, CT 06071



# Notification of Hearing
## Connecticut Department of Correction

CN 9402
REV 1/1/10

| Inmate name: Baltas, Joe | Inmate number: 339650 |
|---|---|

| Facility: Northern CI | Date: 12/23/2016 |
|---|---|

You are being considered for placement to:  ☒ Administrative Segregation  ☐ Chronic Discipline
☐ Special Needs Management

A hearing will take place on ___12/30/2016___ at ___8:00am___ to determine
                                       date                     time

whether your presence in general population presents a threat to the safety and security of the institutional

community due to repetitive disciplinary infractions and/or involvement in a serious incident.

### REASON FOR HEARING

While housed at Garner CI on High Security status you were highly disruptive, threatened to stab several staff members and you were recorded on a phone conversation stating you were going to do what you had to do to get out of this facility (GCI). You also indicated you would do a violent act to get out and were trying to manipulate a transfer to Cheshire CI. On December 13th you were hostile and threatened staff requiring the use of a cell extraction team to safely remove you from the cell and inspect the area for the threatened weapon. You continued your disruptive conduct during the post incident interview. You threatened to make a weapon and stab the interviewing supervisor, and when you entered the cell you barricaded the door preventing observation into the cell requiring the use of a second cell extraction.

Due to your extremely violent and dangerous behavior, indicated by the use of a weapon, your prior placements on Chronic Discipline, High Security and administrative Segregation, accumulation of 55 disciplinary reports (several for threats and fighting) and your term of incarceration of 115 years for murder and Possession of a weapon in a correctional facility; you demonstrate that you pose a serious threat to the safety and security of staff, inmates and the department. As a result of your conduct, Warden Falcone request that you be reviewed for placement within the Administrative Segregation program.

Therefore, a classification hearing will be held to review you for placement on Administrative Segregation, Chronic Discipline or Special Needs Management status. If you desire a staff advocate to act on your behalf, you are to indicate this below, in ranking order, the advocate of your choice. A reasonable number of relevant and non-redundant witnesses' statements may be requested on your behalf. This hearing will determine possible placement into Administrative Segregation, Chronic Discipline or Special Needs Management. If placed into Administrative Segregation, Chronic Discipline or Special Needs Management, you will be managed in accordance with Administrative Directive 9.4, Restrictive Status.

| Advocate Choice(s): | Witness(es) Requested: |
|---|---|
| 1. CCT Morrison | 1. Curtis, inmate No. 363487 |
| 2. CCT Vereen | 2. Lt. Tolmie |
| 3. | 3. |
| ☒ Advocate Declined | ☐ Witness(es) Declined |

| Delivered by Ba Chan, CS | on 12/27/16 | at 9:27 AM |
|---|---|---|
| Staff name and title - print | date | time |

| Inmate signature: Refused to sign | Date: 12/27/16 |
|---|---|
| Staff signature: Bah | Date: 12/27/16 |

Staff witness shall indicate if inmate refuses to sign

distribution:   Director of Offender Classification and Population Management, inmate master file, inmate



Pursuant to 28 USCS, §1746:

I,  Joe Baltas      on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, _10.22.19_ .

_Joe Baltas_
Joe Baltas
NCI
P.O. Box 665
Somers, CT 06071

206 EX.A 8



# Notification of Hearing
## Connecticut Department of Correction

CN 9402
REV 1/1/10

| | |
|---|---|
| Inmate name: Baltas, Joe | Inmate number: 339650 |

| | |
|---|---|
| Facility: Northern CI | Date: 12/23/2016 |

You are being considered for placement to: ☒ Administrative Segregation ☐ Chronic Discipline ☐ Special Needs Management

A hearing will take place on _____12/30/2016_____ at _____8:00am_____ to determine
            date                   time

whether your presence in general population presents a threat to the safety and security of the institutional

community due to repetitive disciplinary infractions and/or involvement in a serious incident.

### REASON FOR HEARING

While housed at Garner CI on High Security status you were highly disruptive, threatened to stab several staff members and you were recorded on a phone conversation stating you were going to do what you had to do to get out of this facility (GCI). You also indicated you would do a violent act to get out and were trying to manipulate a transfer to Cheshire CI. On December 13th you were hostile and threatened staff requiring the use of a cell extraction team to safely remove you from the cell and inspect the area for the threatened weapon. You continued your disruptive conduct during the post incident interview. You threatened to make a weapon and stab the interviewing supervisor, and when you entered the cell you barricaded the door preventing observation into the cell requiring the use of a second cell extraction.

Due to your extremely violent and dangerous behavior, indicated by the use of a weapon, your prior placements on Chronic Discipline, High Security and administrative Segregation, accumulation of 55 disciplinary reports (several for threats and fighting) and your term of incarceration of 115 years for murder and Possession of a weapon in a correctional facility; you demonstrate that you pose a serious threat to the safety and security of staff, inmates and the department. As a result of your conduct, Warden Falcone request that you be reviewed for placement within the Administrative Segregation program.

Therefore, a classification hearing will be held to review you for placement on Administrative Segregation, Chronic Discipline or Special Needs Management status. If you desire a staff advocate to act on your behalf, you are to indicate this below, in ranking order, the advocate of your choice. A reasonable number of relevant and non-redundant witnesses' statements may be requested on your behalf. This hearing will determine possible placement into Administrative Segregation, Chronic Discipline or Special Needs Management. If placed into Administrative Segregation, Chronic Discipline or Special Needs Management, you will be managed in accordance with Administrative Directive 9.4, Restrictive Status.

Advocate Choice(s):

1. CCT Morrison

2. CCT Vereen

3. _____

☐ Advocate Declined

Witness(es) Requested:

1. _____

2. _____

3. _____

☐ Witness(es) Declined

| Delivered by Ba Chan, CS | on 12/27/16 | at 9:28 Am |
|---|---|---|
| Staff name and title - print | date | time |

Inmate signature: ✗ Refused to signed      Date:

Staff signature: Ba...      Date: 12/27/16

Staff witness shall indicate if inmate refuses to sign

distribution: Director of Offender Classification and Population Management, inmate master file, inmate



Pursuant to 28 USCS, §1746:

I, Joe Baltas        on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, <u>10.22.19</u> .

_____
Joe Baltas
NCI
P.O. Box 665
Somers, CT 06071



# Restrictive Status Report of Hearing for Placement or Removal
## Connecticut Department of Correction

CN 9404/2
REV 1/1/10

### SECTION 2 - HEARING DISPOSITION

☐ Recommend placement          ☒ Do not recommend placement

Reason(s) for recommendation:  Recommend A/S placement be deferred 120 days.  Inmate's behavior, although disruptive, does not meet the threshold of Administrative Segregation placement.  Inmate has been managed in general population since 4/28/15.

Information relied upon:  Memo from Warden Falcone to Director Maiga dated December 21, 2016, Incident Report GCI 2016-12-034, Incident Report GCI 2016-12-011, and Incident Report MWCI 2016-11-049.

Signature of Hearing Officer:  *E. Tugie*          Date: 1/10/17

☐ Recommend placement          ☐ Do not recommend placement

Signature of Unit Administrator (close custody only):          Date:

### SECTION 3 – DIRECTOR OF OCPM AUTHORIZATION

☑ Placement authorized          ☐ Placement not authorized

Reason(s):  *A/S placement authorized. Multiple incidents impacting facility operations, safety and security.*

Signature of Director of OCPM:          Date: 01/11/17

### SECTION 4 - RELEASE

*Release rationale:

Signature of Unit Administrator:          Date:

☐ Release approved          ☐ Release not approved

Comments:

Signature of Commissioner/designee:          Date:

*Attach disciplinary and incident reports resulting in original placement on administrative segregation, along with disciplinary record.

cc:  Place in inmate master file on completion.



Pursuant to 28 USCS, §1746:

I, Joe Baltas          on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas

NCI
P.O. Box 665
Somers, CT 06071

| State of Connecticut<br>Department of Correction | Directive Number<br>9.2 | Effective Date<br>7/1/2006 | Page 1 of 14 |
|---|---|---|---|
| **ADMINISTRATIVE<br>DIRECTIVE** | Supersedes<br>Inmate Classification, dated 3/5/2003 | | |
| Approved By | Title<br><br>Offender Classification | | |

1. **Policy.** Each inmate under the custody of the Commissioner of Correction shall be classified to the most appropriate assignment for security and treatment needs to promote effective population management and preparation for release from confinement and supervision. The Department's classification of inmates shall normally utilize a classification instrument based on objective factors. The classification system shall not foster discrimination in status, including housing, programming, job assignment, or on the basis of race, religion, creed, color, or national origin.

2. **Authority and Reference.**

   A. Connecticut General Statutes, Sections 14-227(a), 14-215(c), 18-73,18-81, 18-86, 18-100, 18-100c, 21a-277(d) and 21a-279(e).

   B. American Correctional Association, Standards for Administration of Correctional Agencies, Second Edition, April 1993, Standards 2-CO-4B-01, 2-CO-4B-03 and 2-CO-4B-04.

   C. American Correctional Association, Standards for Adult Correctional Institutions, Fourth Edition, January 2003; Standards 4-4286, 4-4295 through 4-4298 and 4-4300 through 4-4305.

   D. American Correctional Association, Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June 2004, Standards 4-ALDF-2A-30 through 4-ALDF-2A-32.

   E. Administrative Directives, 6.4, Transportation and Community Supervision of Inmates; 6.6, Reporting of Incidents; 6.14, Security Risk Groups; 8.5, Mental Health Services; 9.4, Restrictive Status; 9.5, Code of Penal Discipline; and 9.8, Furloughs.

3. **Definitions.** For the purposes stated herein, the following definitions apply:

   A. **Classification.** The ongoing process of collecting and evaluating information about each inmate to determine the inmate's risk and need level for appropriate confinement location, treatment, programs, and employment assignment whether in a facility or the community.

   B. **Commitment.** The status of an inmate when legal custody is maintained by the Department of Correction. Custody may be in a correctional institution or the community.

   C. **Community Release Program.** A correctional program based in the community for eligible inmates, which includes transitional supervision and residential program placement.

   D. **Newly Admitted Inmate.** An accused, convicted or sentenced inmate who enters the Department of Correction under a new period of commitment. If an inmate has not left the custody of the Department prior to re-admittance, the inmate shall not be treated as newly admitted. For the purposes of this directive, an inmate admitted as a temporary surrender shall not be considered a newly admitted inmate.

| Directive Number | Effective Date | Page 2 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |

| Title | |
|---|---|
| | Offender Classification |

    E.   <u>Override</u>. A documented condition of fact warranting an increase or decrease in the overall risk level of an inmate.

4.   <u>Classification Goals</u>. The goals of the Department's classification system are to:

    A.   ensure the safety and well being of the community, facility, staff and the inmate.

    B.   apply a consistent and reliable classification and assessment system that assigns inmates a level of confinement consistent with the protection of the community, staff, and inmates.

    C.   recommend inmate programs and activities according to specific needs.

    D.   involve the staff and the inmate in developing an incarceration plan and a plan for community release and reintegration, where appropriate.

    E.   develop, record and analyze data necessary for individual decision making and program and facility planning.

    F.   ensure that staff and inmates understand the procedures and criteria used in the classification process.

5.   <u>Classification Management</u>. The Director of Offender Classification and Population Management shall be responsible for the Department of Correction's classification system. The Director of Offender Classification and Population Management shall develop a classification manual containing detailed information concerning offender classification procedures which shall be reviewed annually and updated as necessary. The Unit Administrator shall be responsible for administering the classification procedures under this Directive. However, nothing in this Directive shall preclude the Director of Offender Classification and Population Management, the Director of the Programs and Treatment Division, a Deputy Commissioner or the Commissioner from intervening in any classification decision at any time. The Director of Offender Classification and Population Management shall be responsible for an annual audit to determine compliance with the Department's classification directives and manual.

6.   <u>Classification Levels</u>. Each inmate shall be classified according to risk and needs, and shall be assigned an overall risk score of one (1) to five (5). A risk score level 1 shall represent the lowest security level and 5 the highest. A needs score level 1 shall represent the lowest need level and 5 the highest.

7.   <u>Admissions and Assessment</u>.

    A.   <u>MacDougall-Walker Correctional Institution</u>. Any male inmate 18 years of age or older and sentenced to greater than two (2) years shall normally be admitted to MacDougall-Walker Correctional Institution. Risk and comprehensive needs assessment shall be completed over a period of 10 business days. Upon completion of the classification assessment, the inmate shall be transferred to an appropriate facility.

    B.   <u>Direct Admission Facilities</u>. Any male inmate in pretrial status or sentenced to two (2) years or less shall be admitted to the direct admission facility serving the court of jurisdiction (i.e., Hartford, Bridgeport, New Haven or Corrigan-Radgowski

| Directive Number | Effective Date | Page 3 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |

| Title | |
|---|---|
| | Offender Classification |

Correctional Centers). Risk and needs assessments shall be completed in accordance with Section 8 of this Directive.

C.    York Correctional Institution. Any sentenced and/or pretrial female inmate shall be admitted to York Correctional Institution. Risk and needs assessments shall be completed as required in Section 8 of this Directive.

D.    Manson Youth Institution. Any sentenced and/or pretrial male inmate age 14-17 shall be directly admitted to Manson Youth Institution. Risk and needs assessments shall be completed as required in Section 8 of this Directive.

E.    Juvenile Offenders (ages 14 and 15). Manson Youth Institution shall house all male juvenile offenders and York Correctional Institution shall house all female juvenile offenders. No other facility shall knowingly accept a juvenile offender. Any facility receiving an offender in this category shall immediately report the admission to the Offender Classification and Population Management Unit. The receiving facility shall also make an immediate psychiatric referral to ensure that qualified staff evaluate the offender as soon as possible upon admission in accordance with Administrative Directive 8.5, Mental Health Services. In addition, the receiving facility shall place the juvenile in Administrative Detention and make an immediate request for priority transfer to Manson Youth Institution as appropriate. Whenever possible, prior to transfer, facility classification staff shall complete, at a minimum, an initial risk assessment. Both Manson Youth Institution and York Correctional Institution shall develop Unit Directives that provide for the unique orientation, housing, and program needs of the juvenile offender.

8.    Classification Assessment. Offender classification assessments shall be based upon the individual risk and needs of the inmate.

A.    Risk Assessment. An inmate's risk assessment shall represent the inmate's potential for violence, escape, or disruption of the orderly functioning of a facility or other place of confinement. The level of risk is determined by rating the following factors:

1.    History of escape;
2.    Severity/violence of the current offense;
3.    History of violence;
4.    Length of sentence;
5.    Presence of pending charges, bond amount and/or detainers;
6.    Discipline history; and,
7.    Security Risk Group membership.

B.    Inmate Needs Assessment. An inmate's needs shall be assessed in the following areas:

1.    Medical and health care;
2.    Mental health care;
3.    Education;
4.    Vocational training and work skills;
5.    Substance abuse treatment;
6.    Sex offender treatment; and,
7.    Community resources.

| Directive Number 9.2 | Effective Date 7/1/2006 | Page 4 of 14 |
|---|---|---|
| Title | Offender Classification | |

    Assessment of inmate needs shall be accomplished by classification staff in conjunction with staff responsible for the evaluation and provision of services for the need area.

C.    <u>Overall Risk Score</u>. An overall classification assessment score shall be determined for each inmate. An overall risk score is determined by the highest rating assigned to any of the seven (7) factors outlined in section 8(A) of this Directive, with the exception of the sex offender treatment need score in Section 8(B) of this Directive. No inmate with a sex offender treatment need score of 2 or greater shall be assigned an overall score below level 3 without authorization from the Commissioner or designee. The overall score shall be assigned taking into account the inmate's risk assessments and behavior during confinement.

D.    <u>Overrides</u>. An overall risk score may be increased or decreased through an override. An override of the inmate's overall risk score shall be documented in writing and approved by the Unit Administrator in consultation with the Director of Offender Classification and Population Management or designee. An override shall not be used to decrease an inmate's risk level score more than once during any term of continuous sentenced incarceration. No inmate shall be overridden to level 1.

9.    <u>Initial Classification Review</u>. A preliminary classification risk assessment shall begin within the first two (2) business days of commitment. A preliminary risk classification shall be determined prior to transfer to a level 3 or higher risk level confinement. Full initial classification shall be completed prior to any transfer to any level 2 facility. Within 14 days of commitment to the Department, the initial overall risk score shall be assigned. Within 30 days, the needs assessment and full initial classification shall be completed.

10.    <u>Reclassification Review</u>. After initial classification, the inmate's risk level and needs shall be regularly reviewed or immediately following any change in an inmate's status that may affect the risk score as follows:

A.    <u>Regular Reclassification</u>. An inmate's risk and needs shall be reviewed every six (6) months after the initial classification has been established with the exception of the following:

    1.    annually for level 3 and 4 general population inmates with greater than five (5) years remaining on their sentence; and,

    2.    inmates currently in the custody of the Department being held solely for federal authorities, to include inmates held for the United States Department of Homeland Security (Bureau of Immigration and Customs Enforcement), with no pending Connecticut charges, and no Connecticut sentence to serve, need only to have a regular review conducted annually.

B.    <u>Risk Level Reductions</u>. A reduction of the inmate's risk level shall be reviewed as follows:

    1.    <u>Reduction from Overall Risk Level 5</u>. All inmates assigned to overall risk level 5 will be assigned to Administrative Segregation. Inmates approved for removal from

| Directive Number 9.2 | Effective Date 7/1/2006 | Page 5 of 14 |
|---|---|---|
| Title | Offender Classification | |

Administrative Segregation as per Administrative Directive 9.4, Restrictive Status, shall be reduced to the appropriate overall risk level 4 status. Any inmate assigned to Administrative Segregation shall not have the risk level reduced without the approval of the Commissioner or designee. Any inmate assigned to risk level 5 shall be reviewed at a minimum, annually for regular review or upon completion of the Administrative Segregation Phase Program.

2. <u>Reductions from Risk Level 4 to 3 and Risk Level 3 to 2</u>. Reductions of risk level shall be considered after a sentenced inmate has completed a prescribed amount of time in confinement as noted below. Any inmate serving a life sentence with no possibility of parole or release is not eligible for a risk level decrease without the review and approval of the Director of Offender Classification and Population Management. The percentage of time served for determinate sentences shall be computed on the estimated release date for offenses committed prior to October 1, 1994, and on the maximum release date for offenses committed on or after October 1, 1994. The percentage of time served for indeterminate sentences shall be computed based on the projected discharge date. Parole status shall only be considered when a firm Voted to Parole (VTP) Date has been granted by the Board of Pardons and Paroles, at which time the VTP Date may be considered the release date for percentage of time calculations. Any inmate serving a sentence for a sex related offense or having a history of sex related offenses shall be approved by the Commissioner or designee prior to being classified below risk level 3. If not approved, the reason for a denial of a routine level reduction shall be documented on the Offender Classification Form (OCF). The schedule for risk level reductions and eligibility criteria for these reductions shall be as follows:

a. <u>Level 4 to 3</u>. Inmates must serve 35% of their time since their last risk score change and must be free from Class A disciplinary action for the preceding 120 days and Class B disciplinary action for the preceding 90 days.

b. <u>Level 3 to 2</u>. Inmates must serve 30% of their time since their last risk score change and must be free from Class A disciplinary action for the preceding 120 days and Class B disciplinary action for the preceding 90 days.

Once an inmate meets the eligibility criteria above, a risk level reduction review shall be completed.

An overall level 4 inmate with more than fifteen (15) years left to serve on a sentence shall not be reduced to an overall level 3 without consulting with the Director of Offender Classification and Population Management or designee. An overall level 3 inmate with more than seven (7) years left to serve on a sentence shall not be reduced to an overall level 2 without consulting with the Director of

| Directive Number | Effective Date | Page 6 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |
| Title | | |
| Offender Classification | | |

Offender Classification and Population Management or designee.

    3.    <u>Reduction to Risk Level 1</u>. Reduction to risk level 1 shall be in accordance with Section 11 of this Directive.

    4.    <u>Reduction Based on New Information</u>. Receipt of new information regarding the inmate may also require a classification review and a risk level reduction. A reduction may be prompted for one of the following reasons:

        a.    A reduction of charges against the inmate;
        b.    A removal of a detainer;
        c.    Sentence modification and reduction of sentence;
        d.    Reduction in bond; and/or
        e.    Successful Security Risk Group Renunciation.

    5.    <u>Reduction Exclusion Based on Assignment Refusal</u>. A sentenced inmate who refuses to participate in an available educational or programmatic assignment, consistent with assessed needs in accordance with Section 8(B) of this Directive, may be precluded from a classification reduction until the inmate complies with a mandatory classification program assignment as identified in the Program Index Compendium.

    6.    <u>Disciplinary History Factor Reduction</u>. During an initial assessment, an inmate's discipline history factor shall be reviewed to determine whether or not any change is warranted. If the inmate has not been found guilty of a class A or B disciplinary violation in accordance with Administrative Directive 9.5, Code of Penal Discipline for one (1) year, (six (6) months for inmates under 16 years of age), a reduction of one (1) level may be made to this factor.

11.    <u>Community Release Programs</u>. The community release program shall provide an eligible inmate with the opportunity to reintegrate into the community. Any inmate who refuses to participate in an available educational or program assignment, consistent with the inmate's assessed needs in accordance with Section 8(B) of this Directive, may be excluded from community transfer consideration until the inmate complies with the classification assignment. A member of a Security Risk Group in accordance with Administrative Directive 6.14, Security Risk Groups, shall be excluded from community transfer consideration. Program placement may include Transitional Supervision or Residential Program Placement as follows:

    A.    <u>Transitional Supervision</u>.

        1.    <u>Eligibility Criteria</u>. An inmate incarcerated by the Department of Correction for a definite total effective sentence of two (2) years or less shall, subject to the following criteria, be eligible for consideration for Transitional Supervision. The two (2) years maximum sentence shall include any unpaid fine calculated consecutively at the daily cost of incarceration per day. In addition, the following criteria must be met:

| Directive Number | Effective Date | Page 7 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |
| Title | | |
| Offender Classification | | |

a.   Be classified below level 5;

b.   Served at least 50 percent of the sentence imposed less jail credit on the controlling sentence;

c.   Must not be serving the mandatory portion of Driving While Intoxicated, Section 14-227(a) of the Connecticut General Statutes or a Driving under Suspension offense that originally was related to a Driving while Intoxicated, Section 14-215(c) sentence of the Connecticut General Statutes;

d.   Favorable recommendations for inmates with a sex offense treatment need score greater than 1 shall be forwarded to the Director of Offender Classification and Population Management for review and approval in consultation with appropriate Mental Health staff;

e.   Favorable recommendations for inmates with mental health need scores greater than three (3) shall be forwarded to the Director of Health and Addiction Services for review to further ensure continuity of care;

f.   Remain discipline free of a class A offense during the preceding 120 days;

g.   Remain discipline free of a class B offense during the preceding 60 days;

h.   Remain escape free from any community release program, to include absconding from parole, during the preceding 120 days, may be waived at the discretion of the Unit Administrator;

i.   Have no pending charges or detainers unless bond has been posted, except pending out of state charges below risk level 4 with official verification that the state will not extradite;

j.   Not designated as a Security Risk Group member; and,

k.   Have an approved sponsor and/or have secured housing at an acceptable residence approved by Parole and Community Services.

Class A and B disciplinary reports may be waived at the discretion of the Unit Administrator.

2.   <u>Eligibility Date and Notification</u>. Within two (2) weeks of sentencing, unit classification staff shall determine the date that an eligible inmate may be placed on Transitional Supervision. When an inmate is not recommended for placement on Transitional Supervision at the facility level, the Transitional Supervision package shall be forwarded to the appropriate District Administrator for review. The District Administrator, who may consult with the Director of Offender Classification and Population Management regarding the suitability of placement, shall review the package and either uphold or overturn the decision and establish a placement date. If a placement date is established, the District Administrator shall notify the Unit Administrator of the facility housing the inmate and the Parole and Community Services Unit. The Unit Administrator shall then inform the inmate of the placement date.

| Directive Number 9.2 | Effective Date 7/1/2006 | Page 8 of 14 |
|---|---|---|
| Title | Offender Classification | |

3.   Risk Level. Upon approval for Transitional Supervision an inmate shall be classified to overall risk level 1.

B.   Residential Program Placement.

1.   Eligibility Criteria. An inmate may be eligible for transfer to a residential work or education program when the following criteria are met:

   a.   Be classified level 2 or 3;

   b.   Be within 18 months of estimated discharge date or Voted to Parole date;

   c.   Must not be serving the mandatory portion of Driving While Intoxicated, Section 14-227(a) of the Connecticut General Statutes or a Driving under Suspension offense that originally was related to a Driving while Intoxicated, Section 14-215(c) sentence of the Connecticut General Statutes;

   d.   Remain discipline free of a Class A offense during the preceding 120 days;

   e.   Remain discipline free of a Class B offense during the preceding 60 days;

   f.   Have no return from escape, to include absconding from parole, within the past six (6) months (may be waived at the discretion of the Unit Administrator);

   g.   Remain free of community release program failure during the preceding 120 days;

   h.   Have no pending charges or detainers unless bond has been posted except pending out of state charges below risk level 4 with official verification that the state will not extradite;

   i.   Met the requirements for participation in job opportunities, employment preparation, educational placement or substance abuse training and education;

   j.   Must not be a designated Security Risk Group member;

   k.   Favorable recommendations for inmates with a sex offense treatment need score greater than 1 shall be forwarded to the Director of Offender Classification and Population Management for review and approval in consultation with appropriate Mental Health staff; and,

   l.   Must submit to felony DNA requirements, if applicable.

Class A and B disciplinary reports may be waived at the discretion of the Unit Administrator.

2.   Risk Level. Upon approval for residential program placement an inmate shall be classified to overall risk level 1.

C.   Pretrial Supervision.

1.   Eligibility Criteria. A pretrial offender shall be eligible for pretrial supervision when the following criteria are met:

| Directive Number 9.2 | Effective Date 7/1/2006 | Page 9 of 14 |
|---|---|---|
| Title | Offender Classification | |

a.   Pretrial confinement for no offense other than class D felony or misdemeanor. The following class D felonies are excluded from consideration:

    1.   53a-60a, Assault in the second degree with a firearm;

    2.   53a-60b, Assault on a victim 60 or older, second degree;

    3.   53a-60c, Assault on a victim 60 or older, with a firearm;

    4.   53a-60d, Assault in the second degree, with a motor vehicle;

    5.   53a-72a, Sexual Assault in the third degree;

    6.   53a-73a, Sexual Assault in the fourth degree; and,

    7.   53-181c, Stalking in the first degree;

b.   No community release violation during the preceding 120 days, may be waived at the Unit Administrator's discretion;

c.   Must not have been found guilty of a Class A disciplinary report within 120 days, may be waived at the Unit Administrator's discretion;

d.   Must not have been found guilty of a Class B disciplinary report within 60 days, may be waived at the Unit Administrator's discretion;

e.   No escape or absconder status within the past 6 months; and,

f.   Favorable recommendations for inmates with mental health need scores greater than 3 shall be forwarded to the Director of Health and Addiction Services for approval and to further ensure continuity of care.

Upon approval, an offender shall be classified to overall risk level one (1).

2.   <u>Supervision Level for Pretrial Offenders</u>. Any pretrial offender assigned to overall risk level one (1) shall be supervised by electronic monitoring or any other monitoring technology or services while on pretrial supervision. A pretrial release agreement shall specify that the inmate must:

a.   not change residence without prior approval of the supervising officer;

b.   appear for all court appearances as required;

c.   participate in substance abuse programming if required by the Department; and,

d.   participate in any other conditions imposed by the Department.

12.   <u>Risk Level Increases</u>. Risk level increases shall occur as required upon receipt of new information pertinent to the inmate's risk classification or inmate's disciplinary adjustment.

| Directive Number | Effective Date | Page 10 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |

| Title |
|---|
| Offender Classification |

A.    <u>Disciplinary Increases</u>. Poor disciplinary adjustment may result in an inmate's Overall Risk Factor being increased and a corresponding increase of the Discipline History Factor to the level of the Overall according to the schedule detailed in the Classification Manual.

An inmate who is found guilty of a level 2 assault on a Department of Correction employee as defined in Administrative Directive 6.6, Reporting of Incidents, shall be classified to overall risk level 4 with a corresponding increase in the Discipline Risk Factor.

In the event of multiple disciplinary charges arising from a single disciplinary incident, only the highest chargeable class of offense shall be used.

An inmate assigned to Close Custody for Chronic Discipline shall automatically be classified to Overall and Discipline Risk Factor 4.

Reviews resulting in an overall risk level increase which will require a transfer to another facility shall require the approval of the Director of Offender Classification and Population Management.

B.    <u>Conviction of a Felony</u>. Conviction of a felony committed while incarcerated shall result in a level increase review.

C.    <u>Assignment to Overall Risk Level 5/Administrative Segregation</u>. Assignment to Overall Risk Level 5/Administrative Segregation shall be considered when any totality of facts, information or circumstances which indicates an immediate threat to safety and/or security of the public, staff or other inmates. An inmate shall be automatically placed in Administrative Detention and be reviewed for placement on Overall Risk Level 5/Administrative Segregation, under any of the following conditions:

1.    Level 1 assault on a Department of Correction employee as defined in Administrative Directive 6.6, Reporting of Incidents;
2.    Hostage holding of a Department of Correction Employee;
3.    Riot;
4.    Homicide while confined;
5.    An inmate is sentenced to death;
6.    Escape from the security perimeter of a facility;
7.    Continues to present a threat to safety, security and/or orderly operation after one (1) year in Close Custody for Security Risk Groups;
8.    Continues to present a threat to safety security and/or orderly operation after six (6) months in Close Custody for Chronic Discipline; and,
9.    An inmate is in pretrial or pre-sentence status for a Capital Felony Murder charge.

All increases to Overall Risk Level 5/Administrative Segregation shall be made by the Director of Offender Classification and Population Management.

| Directive Number | Effective Date | Page 11 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |
| Title | | |
| Offender Classification | | |

    D.    <u>Security Risk Group Members</u>. Any inmate designated as a Security Risk Group Member shall not be classified lower than overall risk level 3 and placed in a Close Monitoring unit in accordance with Administrative Directive 6.14, Security Risk Groups. An inmate released from the Department while designated as a Security Risk Group Member shall be readmitted on the same status. The Director of Security shall review the designation in accordance with Administrative Directive 6.14, Security Risk Groups.

    E.    <u>Security Risk Group Safety Threat Members</u>. Any inmate designated as a Security Risk Group Safety Threat Member shall be classified to overall risk level 4 and placed in a Close Custody unit in accordance with Administrative Directive 6.14, Security Risk Groups. An inmate released from the Department while designated as a Security Risk Group Safety Threat Member shall be readmitted on the same status. The Director of Security shall review the designation in accordance with Administrative Directive 6.14, Security Risk Groups.

13.    <u>Risk Level Reclassification from Community Placement</u>. Risk level increases from overall risk level 1 for inmates remanded to custody and whose community transfer has been revoked, requires a risk reclassification hearing. Also, the parole supervisor shall provide the inmate with the following:

    A.    Within 72 hours of the re-incarceration, a statement of reasons for the proposed increase from risk level 1 status except those that may cause a security problem or undue harm to the public;

    B.    A copy of any documents pertaining to such statement of reasons unless the security of the facility and public warrants otherwise.

    C.    A notification of the date, time, and location of a hearing on such proposed revocation. This notice shall state that the inmate may appear at such hearing with a correctional advocate as a representative and present documents at such hearing on the inmate's behalf.

    Any inmate in community placement status and returned to a level 2 or higher security facility shall have a classification hearing within 14 days of return to the facility. This time limit may be extended for cause. A disciplinary hearing shall not substitute for a classification hearing. A classification hearing shall not consider disciplinary matters unless the inmate has been found guilty of an offense under Administrative Directive 9.5, Code of Penal Discipline. A classification hearing may consider reclassification for a non-chargeable matter and return the inmate to a higher security facility prior to a disciplinary hearing on a chargeable offense. Classification shall not be used to avoid a disciplinary hearing for an inmate. Records of the disciplinary hearing, including information provided by the inmate, shall be forwarded to the counselor supervisor or higher authority as appropriate. If the inmate's assignment to risk level 1 is revoked, the counselor supervisor or higher authority shall state the reasons in writing and change the risk level. The risk score will be increased to overall risk level 2, except in the case where new information would result in a level increase due to a change in one of the risk factors.

| Directive Number | Effective Date | Page 12 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |
| Title | | |
| Offender Classification | | |

D.   Not withstanding the above provisions, this criterion shall not interfere with the use of discretion invoking incremental sanctions by a parole officer or higher authority for technical, non-criminal violations to include, but not be limited to intervention, increased programming, detoxification and electronic monitoring through the Community Release Intervention Program as enumerated below:

1.   When necessary, inmates shall be temporarily remanded to custody by the Parole and Community Services Unit. All remands to custody shall be documented on CN 9202, Offender Classification History Form and placed in the inmate's master file;

2.   No classification transaction shall be required, unless it has been determined that the inmate will not be placed back into the community;

3.   Classification staff shall notify Addiction Services when an inmate is returned for a positive urinalysis so as to provide necessary intervention;

4.   The Parole and Community Services Unit shall review and track each case and make necessary modifications to the inmate's conditions of release for reinstatement into the community; and,

5.   If it is determined by the Unit Administrator, in consultation with the Director of Parole and Community Services, that the inmate is not appropriate for re-release, the inmate shall then be scheduled for a reclassification hearing and reviewed for an overall level increase as appropriate and considered for a transfer to a sentenced facility if the inmate has greater than 15 days to discharge.

14.   <u>Risk Level Reclassification Resulting from New Information</u>. Whenever new information is received that is relevant to an inmate's risk or needs classification, a reclassification review shall occur.

15.   <u>Inmate Involvement</u>. An inmate should be involved in program decisions to the extent feasible. The inmate shall be seen by classification staff for every objective classification action except Percentage-of-Time Reviews unless the inmate is denied. The inmate may appear before the classification staff as required by this Directive, as long as the appearance does not jeopardize the safety and security of the facility, staff, or other inmates. If an appearance of the inmate is required, the inmate shall receive notice 48 hours prior to classification review. An inmate may waive, in writing, the notice requirement or any appearance. Within five (5) days of a classification decision, the decision, including the overall risk score and need ratings assigned the inmate as well as any changes of these ratings shall be shared with the inmate in writing. A classification decision may be appealed to the Unit Administrator or designee within 15 days of the decision.

16.   <u>Level of Review Required for Classification Reviews</u>. The Unit Administrator shall designate staff within the unit responsible for classification reviews and assignments. With the exception of classification assignments made by the Director of Offender Classification and Population Management, classification decisions may

| Directive Number | Effective Date | Page 13 of 14 |
|---|---|---|
| 9.2 | 7/1/2006 | |
| Title | | |
| Offender Classification | | |

be appealed to the Unit Administrator. The Unit Administrator shall respond in writing within 15 business days of receipt of the appeal.

17. <u>Inmate Supervision Requirements</u>. Supervision requirements during transport shall be in accordance with Administrative Directive 6.4, Transportation and Community Supervision of Inmates. All other inmate supervision outside the facility's perimeter with the exception of Administrative Directive 9.8, Furloughs, shall be governed by an inmate's risk level in accordance with the following:

   A. An inmate classified as level 3, 4 or 5 shall be excluded from a job or program assignment that is outside the facility's security perimeter. Any security classification level 3, 4 or 5 inmate, who is to be moved beyond the facility's security perimeter, shall be managed in accordance with Administrative Directive 6.4, Transportation and Community Supervision of Inmates.

   B. Any inmate who is placed on facility-based outside clearance, shall be intermittently observed by a Department of Correction employee at a minimum of once every hour or continuous if deemed appropriate by the Unit Administrator or designee.

   C. An inmate placed on a community service work detail shall be intermittently observed by an approved trained agent of the municipality or other state agency at a minimum of every 15 minutes, or continuously if deemed appropriate by the Unit Administrator or designee. Additional stipulations and supervision requirements shall be pursuant to the provisions of Administrative Directive 10.5, Public Service Work, and enumerated in a Memorandum of Understanding between the Department of Correction and the requesting town, municipality or state agency.

18. <u>Other Classification Actions</u>.

   A. <u>Outside Work Assignments</u>. The Unit Administrator shall be the approving authority for any inmate placed on facility-based outside clearance, community service work detail, or work or education release. Prior to authorization to participate in the above listed programs, a review of the inmate's special management information and any discretionary release denial or return within the past 30 days (if any), shall be conducted to determine the inmate's suitability for such programming. Authorization to participate shall be based on the following minimum eligibility criteria utilizing CN 9201, Outside Work Assignment Application:

      1. Risk level 1 or 2;
      2. No sex offender treatment score greater than a 1;
      3. No level 4 convictions, past or current offense;
      4. Mental Health and Medical need scores less than 3 unless cleared by Health Services;
      5. Within 36 months of end of sentence or voted to parole date;
      6. No return from escape within 1 year;
      7. No Class A disciplinary reports within 120 days and no Class B disciplinary reports within 60 days;
      8. No detainer score greater than a 1; and,
      9. No history of classification as an overall risk level 5.

| Directive Number 9.2 | Effective Date 7/1/2006 | Page 14 of 14 |
|---|---|---|
| Title | Offender Classification | |

Any inmate already approved or being considered for outside clearance who has been denied or has returned from any discretionary release program such as community release or parole within the last 30 days, shall be evaluated by the Unit Administrator to assess the appropriateness of an outside work assignment.

Any inmate already approved for outside clearance that has received a disciplinary report or has been involved in any incident shall also be evaluated by the Unit Administrator for continued placement on outside clearance.

B.    Indeterminate Sentences. The Commissioner may release any inmate sentenced to an indeterminate sentence pursuant to Sections 21a-277(d) or 21a-279(e) of the Connecticut General Statutes, at any point during that sentence. The Unit Administrator may recommend release at any time during the sentence. Only favorable recommendations shall be forwarded to the Commissioner's Office via the Director of Offender Classification and Population Management. The initial review shall be made after the completion of initial classification and a 30-day period of confinement. If denied, the Unit Administrator shall set another review date not more than six (6) months from the decision date. Each review and disposition shall be documented on CN 9202, Offender Classification History Form in Section 5 of the inmate's master file.

19.   Forms and Attachments. The following forms are applicable to this Administrative Directive and shall be utilized for the intended function.

A.    CN 9201, Outside Work Assignment Application; and,
B.    CN 9202, Offender Classification History Form.

20.   Exceptions. Any exceptions to the procedures in this Administrative Directive shall require prior written approval from the Commissioner.



EXHIBIT

L

Pursuant to 28 USCS, §1746:

I, Joe Baltas      on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, *10.22.19* .

_____
Joe Baltas
Northern c.i.
P.o. Box 665
Somers, CT 06071

# NORTHERN CI MALE PROPERTY MATRIX UD 6.10.1 Attach-K/1

| CLOTHING ITEMS | ADMINISTRATIVE SEGREGATION | | | | | |
|---|---|---|---|---|---|---|
| | PHASE 1 | | PHASE 2 | | PHASE 3 | |
| | 1 MAX | 2 MIN | 1 MAX | 2 MIN | 1 MAX | 2 MIN |
| ATHLETIC SUPPORTER | n/a | n/a | n/a | n/a | n/a | n/a |
| BASEBALL CAP | n/a | n/a | n/a | n/a | n/a | n/a |
| BATHROBE (white w/no belt) | n/a | n/a | n/a | n/a | n/a | n/a |
| COAT | n/a | n/a | n/a | n/a | n/a | n/a |
| DOO RAG | n/a | n/a | n/a | n/a | n/a | n/a |
| GLOVES (pair) | n/a | n/a | n/a | n/a | n/a | n/a |
| GYM SHORTS | 1ABC | 1ABC | 1ABC | 1ABC | 1ABC | 1ABC |
| JUMPSUIT  (* State Issued) | 1F | 1F | 1F | 1F | 1F | 1F |
| PAJAMAS | n/a | n/a | n/a | n/a | n/a | n/a |
| PANTS | n/a | n/a | n/a | n/a | n/a | n/a |
| RAINWEAR | n/a | n/a | n/a | n/a | n/a | n/a |
| SHIRT | n/a | n/a | n/a | n/a | n/a | n/a |
| SHOES/SNEAKERS  (*slip-on--State Issued) | 1F | 1F | 1F | 1F | 1F | 1F |
| SHOWER TONGS | 1AB | 1AB | 1AB | 1AB | 1AB | 1AB |
| SLIPPERS | n/a | n/a | n/a | n/a | n/a | n/a |
| SOCKS | 9B | 3BF | 9B | 3BF | 9B | 3BF |
| SWEATPANTS (solid gray only-NO pockets) | 1AB | n/a | 1AB | n/a | 1AB | n/a |
| SWEATSHIRTS (solid gray only) | 1AB | 1ABF | 1AB | 1ABF | 1AB | 1ABF |
| THERMAL UNDERWEAR     (top and bottom) | 2AB | 2AB | 2AB | 2AB | 2AB | 2AB |
| T-SHIRTS (white only) | 9B | 3BF | 9B | 3BF | 9B | 3BF |
| UNDERPANTS (boxers or briefs) | 9B | 3BF | 9B | 3BF | 9B | 3BF |
| | | | | | | |
| | | | | | | |

1 = Maximum amount allowed            2 = Minimum number required that must be issued by the facility and the minimum is reached

A - Commissary purchase only

B - Must be individually inventoried as part of the running inventory

C - Only if specifically approved by facility

D - Items which shall be permanently marked

E - Access only; not in inmate's possession

F -  State Issue only

G - Inmate may retain item upon admission as long as the item meets the requirements of Attachment B, Female Property Matrix or Attachment C, Male Property Matrix.      After admission, item shall be commissary purchase only.

N/A = Not allowed or applicable to status

NO MIRRORS, hair brush, hair grease, board games, dental floss sticks, colored pencils or markers or Nail clippers.

Updated 5/28/2010

| NORTHERN CI MALE PROPERTY MATRIX  UD 6.10.1 Attach-K/2 | | | | | | |
|---|---|---|---|---|---|---|
| MISCELLANEOUS ITEMS | ADMINISTRATIVE SEGREGATION | | | | | |
| | PHASE 1 | | PHASE 2 | | PHASE 3 | |
| | 1 | 2 | 1 | 2 | 1 | 2 |
| | MAX | MIN | MAX | MIN | MAX | MIN |
| ADAPTER JACK | n/a | n/a | n/a | n/a | n/a | n/a |
| ADDRESS BOOK  (Commissary Purchase) | 1A | n/a | 1A | n/a | 1A | n/a |
| BATTERIES | 4AC | n/a | 4AC | n/a | 4AC | n/a |
| CASSETTE PLAYER (headset required-Commissary Purchase) | 1ABCD | n/a | 1ABCD | n/a | 1ABCD | n/a |
| CASSETTE TAPES | n/a | n/a | n/a | n/a | n/a | n/a |
| CLIP-ON BOOK LAMP | n/a | n/a | n/a | n/a | n/a | n/a |
| CLOCK (battery operated) | n/a | n/a | n/a | n/a | n/a | n/a |
| COMBINATION LOCK | n/a | n/a | n/a | n/a | n/a | n/a |
| COMPACT DISCS | n/a | n/a | n/a | n/a | n/a | n/a |
| COMPACT DISC PLAYER (Commissary) | n/a | n/a | n/a | n/a | n/a | n/a |
| DIGITAL CONVERTER BOX | n/a | n/a | n/a | n/a | n/a | n/a |
| DRINKING CUP | 2A | n/a | 2A | n/a | 2A | n/a |
| ELECTRIC BEARD TRIMMER | n/a | n/a | n/a | n/a | n/a | n/a |
| ELECTRIC RAZOR | n/a | n/a | n/a | n/a | n/a | n/a |
| EXTENSION CORD | n/a | n/a | n/a | n/a | n/a | n/a |
| EYE GLASSES/CONTACT LENS (prescription) | 2B | n/a | 2B | n/a | 2B | n/a |
| GAMEBOY CONSOLE | n/a | n/a | n/a | n/a | n/a | n/a |
| GAMEBOY GAME CARTRIDGES | n/a | n/a | n/a | n/a | n/a | n/a |
| HANDKERCHIEFS (white only) | n/a | n/a | n/a | n/a | n/a | n/a |
| HEADPHONE EXTENDER | n/a | n/a | n/a | n/a | n/a | n/a |
| HEADPHONES | 1ABCD | n/a | 1ABCD | n/a | 1ABCD | n/a |
| PAPER MATERIALS** | 7 | n/a | 7 | n/a | 7 | n/a |
| PHOTO ALBUM (non-metal-not to exceed 2") | 1ABC | n/a | 1ABC | n/a | 1ABC | n/a |
| POCKET CALCULATOR | n/a | n/a | n/a | n/a | n/a | n/a |
| RADIO (headset required) | 1ABCD | n/a | 1ABCD | n/a | 1ABCD | n/a |
| TELEVISION (headset required) | n/a | n/a | n/a | n/a | n/a | n/a |
| TOWEL | 2ABC | 1F | 2ABC | 1F | 2ABC | 1F |
| WASH CLOTH | 2ABC | n/a | 2ABC | n/a | 2ABC | n/a |
| WATCH (Commissary only) | 1ABC | n/a | 1ABC | n/a | 1ABC | n/a |
| WEDDING RING (Value less than $200) | 1BC | n/a | 1BC | n/a | 1BC | n/a |
| | | | | | | |
| 1 = Maximum amount allowed | 2 = Minimum number required that must be issued by the facility and the minimum is reached | | | | | |
| | | | | | | |
| Cassette Player OR CD Player OR Radio | | | | | | |
| **Paper Materials: including but not limited to religious publications, program materials, books, periodicals and correspondence. | | | | | | Updated 5/28/2010 |

| NORTHERN CI MALE PROPERTY MATRIX UD 6.10.1 Attach-K/3 | | | | | | |
|---|---|---|---|---|---|---|
| RELIGIOUS ITEMS | ADMINISTRATIVE SEGREGATION | | | | | |
| | PHASE 1 | | PHASE 2 | | PHASE 3 | |
| | 1 | 2 | 1 | 2 | 1 | 2 |
| | MAX | MIN | MAX | MIN | MAX | MIN |
| ABALONE SHELL | 1AB | | 1AB | | 1AB | |
| CHAIN, RELIGIOUS (ball bar) | 1ABG | | 1ABG | | 1ABG | |
| CRESCENT AND STAR | 1ABG | | 1ABG | | 1ABG | |
| CROSS (wooden) | 1ABG | | 1ABG | | 1ABG | |
| CRUCIFIX | 1ABG | | 1ABG | | 1ABG | |
| FEATHER | 1AB | | 1AB | | 1AB | |
| FOUR-WAY MEDAL | 1ABG | | 1ABG | | 1ABG | |
| HEADBAND (solid brown only) | 2ABG | | 2ABG | | 2ABG | |
| ISLAMIC MEDAL | 1ABG | | 1ABG | | 1ABG | |
| KUFFI (solid white only) | 2ABG | | 2ABG | | 2ABG | |
| KURTA SHIRT | 2AB | | 2AB | | 2AB | |
| MALA BEADS | 1BG | | 1BG | | 1BG | |
| MEDICINE BAG | 1ABG | | 1ABG | | 1ABG | |
| PRAYER RUG | 1ABD | | 1ABD | | 1ABD | |
| PRAYER SHAWL | 1AB | | 1AB | | 1AB | |
| ROSARY BEADS w/case | 1ABG | | 1ABG | | 1ABG | |
| STAR OF DAVID | 1ABG | | 1ABG | | 1ABG | |
| TAMS (sold brown only) | 2BG | | 2BG | | 2BG | |
| TZITTIT SHIRT | 2B | | 2B | | 2B | |
| YARMULKE (solid white only) | 2ABG | | 2ABG | | 2ABG | |
| ZIKAR BEADS | 1ABG | | 1ABG | | 1ABG | |
| | | | | | | |
| | | | | | | |
| 1 = Maximum amount allowed          2 = Minimum number required that must be issued by the facility and the minimum is reached | | | | | | |
| | | | | | | Updated 5/28/2010 |

| NORTHERN CI MALE PROPERTY MATRIX UD 6.4.1 Attach-J/3 | | | | | | |
|---|---|---|---|---|---|---|
| | DEATH ROW AND SPECIAL NEEDS MANAGEMENT | | | | | |
| RELIGIOUS ITEMS | DEATH ROW | | SPECIAL NEEDS MANAGEMENT | | | |
| | 1 | 2 | 1 | 2 | | |
| | MAX | MIN | MAX | MIN | | |
| ABALONE SHELL | 1AB | n/a | 1AB | n/a | | |
| CHAIN, RELIGIOUS (ball bar) | 1ABG | n/a | 1ABG | n/a | | |
| CRESCENT AND STAR | 1ABG | n/a | 1ABG | n/a | | |
| CROSS (wooden) | 1ABG | n/a | 1ABG | n/a | | |
| CRUCIFIX | 1ABG | n/a | 1ABG | n/a | | |
| FEATHER | 1AB | n/a | 1AB | n/a | | |
| FOUR-WAY MEDAL | 1ABG | n/a | 1ABG | n/a | | |
| HEADBAND (solid brown only) | 2ABG | n/a | 2ABG | n/a | | |
| ISLAMIC MEDAL | 1ABG | n/a | 1ABG | n/a | | |
| KUFFI (solid white only) | 2ABG | n/a | 2ABG | n/a | | |
| KURTA SHIRT | 2AB | n/a | 2AB | n/a | | |
| MALA BEADS | 1BG | n/a | 1BG | n/a | | |
| MEDICINE BAG | 1ABG | n/a | 1ABG | n/a | | |
| ORISHA BEADS (White Only) | 1BCGH | n/a | 1BCGH | n/a | | |
| PRAYER RUG | 1ABD | n/a | 1ABD | n/a | | |
| PRAYER SHAWL | 1AB | n/a | 1AB | n/a | | |
| ROSARY BEADS w/case | 1ABG | n/a | 1ABG | n/a | | |
| STAR OF DAVID | 1ABG | n/a | 1ABG | n/a | | |
| TAMS (sold brown only) | 2BG | n/a | 2BG | n/a | | |
| TZITTIT SHIRT | 2B | n/a | 2B | n/a | | |
| YARMULKE (solid white only) | 2ABG | n/a | 2ABG | n/a | | |
| ZIKAR BEADS | 1ABG | n/a | 1ABG | n/a | | |
| | | | | | | |
| 1 = Maximum amount allowed | | | | | | |
| 2 = Minimum number required that must be issued by the facility and the minimum is reached | | | | | | |
| | | | | Updated 6/7/2013 | | |

## NORTHERN CI MALE PROPERTY MATRIX UD 6.4.1 Attach-J/2

| MISCELLANEOUS ITEMS | DEATH ROW AND SPECIAL NEEDS MANAGEMENT | | | | | | |
|---|---|---|---|---|---|---|---|
| | DEATH ROW | | SPECIAL NEEDS MANAGEMENT | | | | |
| | 1 | 2 | 1 | 2 | | | |
| | MAX | MIN | MAX | MIN | | | |
| ADAPTER JACK | 1ABCD | n/a | 1ABCD | n/a | | | |
| ADDRESS BOOK | 1A | n/a | 1A | n/a | | | |
| BATTERIES | 4AC | n/a | 4AC | n/a | | | |
| CASSETTE PLAYER (headset required) | 1ABCD | n/a | 1ABCD | n/a | | | |
| CASSETTE TAPES | 20BC | 5BC | n/a | n/a | | | |
| CLIP-ON BOOK LAMP | 1ABC | n/a | 1ABC | n/a | | | |
| CLOCK (battery operated) | 1ABCD | n/a | 1ABCD | n/a | | | |
| COMBINATION LOCK | n/a | n/a | n/a | n/a | | | |
| COMPACT DISCS | 20BC | 5BC | n/a | n/a | | | |
| COMPACT DISC PLAYER | 1ABCD | n/a | 1ABCD | n/a | | | |
| DIGITAL CONVERTER BOX | 1ABCD** | n/a | TBD | n/a | | | |
| DRINKING CUP | 2A | n/a | 2A | n/a | | | |
| ELECTRIC BEARD TRIMMER | 1ABCD | n/a | 1ABCD | n/a | | | |
| ELECTRIC RAZOR | 1ABCD | n/a | n/a | n/a | | | |
| EXTENSION CORD | 1A | n/a | 1A | n/a | | | |
| **EYE GLASSES-Plastic frames only/No tints (prescription) | 2B | n/a | 2B | n/a | | | |
| FANS | 1A | | 1A | | | | |
| GAMEBOY CONSOLE | 1ABCD | n/a | 1ABCD | n/a | | | |
| GAMEBOY GAME CARTRIDGES | 20BC | 5BC | 20BC | 5BC | | | |
| HANDKERCHIEFS (white only) | 4AC | n/a | 4AC | n/a | | | |
| HEADPHONE EXTENDER | 1ABC | n/a | 1ABC | n/a | | | |
| HEADPHONES | 1ABCD | n/a | 1ABCD | n/a | | | |
| NINTENDO DS | 1ABCD | n/a | 1ABCD | n/a | | | |
| PAPER MATERIALS ** | 7 | n/a | 7 | n/a | | | |
| PHOTO ALBUM (non-metal-not to exceed 2") | 1ABC | n/a | 1ABC | n/a | | | |
| POCKET CALCULATOR | n/a | n/a | n/a | n/a | | | |
| RADIO (headset required) | 1ABCD | n/a | 1ABCD | n/a | | | |
| ***TELEVISION (headset required) | 1ABCD | n/a | 1ABCD | n/a | | | |
| TELEVISION ANTENNA | 1A | | 1 | | | | |
| TOWEL | 2ABC | 1F | 2ABC | 1F | | | |
| WASH CLOTH | 2ABC | n/a | 2ABC | n/a | | | |
| WATCH | 1AB | n/a | 1AB | n/a | | | |
| WEDDING RING | 1BC | n/a | 1BC | n/a | | | |
| | n/a = Not allowed or applicable to status | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *1 = Maximum amount allowed* | *2 = Minimum number required that must be issued by the facility and the minimum is reached* | | | | | | |
| | | | | | | | |
| *Any combination of tapes/CDs equaling 20 | | | | | | | |
| | | | | | | | |
| Death Row = 1 Mirror; no art pencils or nail clippers allowed | | | | | | | |
| Special Needs = NO Mirror | | | | | | | |
| No hair grease or chess board pieces for Special Needs | | | | | | | |
| **Eyeglasses-Must be approved by Unit Manager | | | | | | | |
| ***Television/Antenna-Refer to Treatment Plan | | | | | | | |
| **Digital Converter Box: May retain-no new purchases | | | | | | | |
| **Paper Materials: including but not limited to religious publications, program materials, books, periodicals and correspondence. | | | | | | | |
| correspondence in accordance with the NCI Inmate Handbook (7 books, 7 periodicals and 7 magazines). | | | Updated 6/7/2013 | | | | |

| NORTHERN CI MALE PROPERTY MATRIX UD 6.4.1 Attach-J/1 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | DEATH ROW AND SPECIAL NEEDS MANGEMENT | | | | | | | | | |
| CLOTHING ITEMS | DEATH ROW | | * SPECIAL NEEDS MANAGEMENT * | | | | | | | |
| | 1 | 2 | 1 | 2 | | | | | | |
| | MAX | MIN | MAX | MIN | | | | | | |
| ATHLETIC SUPPORTER | n/a | n/a | n/a | n/a | *In accordance with NCI U.D. 6.10, Inmate Property or | | | | | |
| BASEBALL CAP | n/a | n/a | n/a | n/a | as otherwise directed by the inmate's Mental Health | | | | | |
| BATHROBE (white w/no belt) | 1A* | n/a | 1A* | n/a | Treatment Plan. | | | | | |
| COAT | n/a | n/a | n/a | n/a | | | | | | |
| DOO RAG | 1AC | n/a | 1AC | n/a | | | | | | |
| GLOVES (pair) | n/a | n/a | n/a | n/a | | | | | | |
| GYM SHORTS | 1ABD | n/a | 1ABD | n/a | | | | | | |
| JUMPSUIT | 1F | 1F | 1F | 1F | | | | | | |
| PAJAMAS | 1ABC | n/a | 1ABC | n/a | | | | | | |
| PANTS | n/a | n/a | n/a | n/a | | | | | | |
| RAINWEAR | n/a | n/a | n/a | n/a | | | | | | |
| SHIRT | n/a | n/a | n/a | n/a | | | | | | |
| SHOES/SNEAKERS (1 Commissary, 1 State Issued) | 2ABC | 1F | 1ABC | 1F | | | | | | |
| SHOWER TONGS | 1AB | 1F | 1AB | 1F | | | | | | |
| SLIPPERS (No out of cell use) | 1A | n/a | 1A | n/a | | | | | | |
| SOCKS | 9B | 3BF | 9B | 3BF | | | | | | |
| SWEATPANTS (solid gray only) No pockets | 2AB | n/a | 1AB | n/a | | | | | | |
| SWEATSHIRTS (solid gray only) | 2BD | 1BD | 2BD | 1BD | | | | | | |
| THERMAL UNDERWEAR      (top and bottom) | 2AB | n/a | 2AB | n/a | | | | | | |
| T-SHIRTS (white only) | 9B | 3BF | 9B | 3BF | | | | | | |
| UNDERPANTS (boxers or briefs) | 9B | 3BF | 9B | 3BF | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 1 = Maximum amount allowed | | 2 = Minimum number required that must be issued by the facility and the minimum is reached | | | | | | | | |
| | | | | | | | | | | |
| A  -  Commissary purchase only | | | | | | | | | | |
| B  -  Must be individually inventoried as part of the running inventory | | | | | | | | | | |
| C  -  Only if specifically approved by facility | | | | | | | | | | |
| D  -  Items which shall be permanently marked | | | | | | | | | | |
| E  -  Access only; not in inmate's possession | | | | | | | | | | |
| F  -  State Issue only | | | | | | | | | | |
| G - Inmate may retain item upon admission as long as the item meets the requirements of Attachment B, Female Property Matrix | | | | | | | | | | |
| or Attachment C, Male Property Matrix.  After admission, item shall be commissary purchase only. | | | | | | | | | | |
| H - Item(s) must come from an approved vendor and shall require prior written authorization of the Director of Religious Services | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Death Row = 1 Mirror | | Special Needs-NO MIRRORS | | | | | | | | |
| | | | Updated 6/7/2013 | | | | | | | |
| n/a = Not allowed or applicable to status | | | | | | | | | | |
| *Bathrobe: May retain blue, new purchases White | | | | | | | | | | |



Pursuant to 28 USCS, §1746:

I, Joe Baltas       on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas
Northern C.I.
P.O. Box 665
Somers, CT  06071

# Cannatelli Law, LLC

8 Research Parkway
Wallingford, Connecticut 06492
Phone: (203) 949-1650   Fax: (203) 949-1660
E-mail: cannatellilaw@aol.com

March 17th, 2017

Scott Semple
Commissioner of Correction
24 Wolcott Hill Road,
Wethersfield, CT
06109

Dear Commissioner Semple:

RE: Conditions of Confinement in Connecticut: Freedom of Information Requests

As you are aware, I represent some inmates in a case against the Warden and Deputy Warden at MacDougall.

All of the inmates have voiced legitimate concerns that I feel compelled to bring to your attention. This letter does not pertain to the MacDougall case at all, but is only mentioned so you will know how I have learned this information.

First: I am told that the inmates are not getting enough to eat. I am told that the menu is often changed with items being substituted and not having the proper calorie allowance. This is disturbing and has to be addressed.

Also, I am told that the food is cold and often all mixed together. I am told the Warden at Northern has been notified by the many grievances filed. I have copies if you need to see them.

Second: I am told your supervisors are not doing their tours once a week. The kitchen supervisor is supposed to do a tour, I'm told, pursuant to Administrative Directive 6.1, § 5B8. If this occurred, the supervisor would be told about these grievances. My clients inform me that this touring issue was communicated – in a grievance – and answered, to be addressed on December 22, 2016. As of today, it has not been addressed. This is simply unfair.

Third: Ignoring the due process requirements of the grievance process.

All the inmates I represent believe the grievance process is a sham. They write grievances which are often bonafide, but often ignored. They believe your administration is acting in bad faith. You cannot have an administration that states – it is being addressed, but it never is addressed. This is bad faith. Further, if it is to be addressed, it must be done.

Fourth: A denial of hats and gloves and footwear to inmates prior to going outside in the winter time. The inmates given recreation outside must have appropriate garments. The coats are shared and not washed in a timely fashion. This is a cruel attempt to allow inmates to go outside – without proper garments. This is cruel and indifferent to their needs. Why is this happening?



EXHIBIT

N

Pursuant to 28 USCS, §1746:

I, Joe Baltas on oath state that the copies attached as pages to this exhibit are true genuine copies of the documents they purport to represent. Signed under the pains and penalties of perjury on this date, 10.22.19 .

Joe Baltas
Northern C.I.
P.O. Box 665
Somers, CT 06071

# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
### OFFENDER CLASSIFICATION & POPULATION MANAGEMENT
1153 EAST STREET SOUTH
SUFFIELD, CONNECTICUT 06080

David Maiga
Director

April 17, 2017

**Connecticut**
*still revolutionary*

Tel (860) 292-3403
Fax (860) 292-3479/3422

Frank Cannatelli
8 Research Parkway
Wallingford, Connecticut 06492
Re: Inmate Baltas, Joe #339650

Mr. Cannatelli,

This will acknowledge receipt of your correspondence sent to Commissioner Semple, dated March 17, 2017. It has been forwarded to my office for a response.

You have submitted your concerns to Commissioner Semple regarding inmate Baltas' placement onto Administrative Segregation. Administrative Directive 9.4 Restrictive Status, Section 3, Subsection B defines Administrative Segregation as follows: "Placement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population." The threats to commit violent acts and barricading the door to his cell to prevent observation are direct threats to the safety and security of the facility, inmates and staff. I carefully reviewed the details of the incident when I authorized placement.

You further state that inmate Baltas asked for, "advocate services", and that he did not receive appropriate services in this regard. Inmate Baltas was afforded an advocate when he received Notification of Hearing. Additionally, inmate Baltas met with his selected advocate on December 28, 2016 and provided a written statement which was presented to the hearing officer during the Administrative Segregation hearing.

Sincerely,

Director David Maiga
Offender Classification and Population Management

CC: Commissioner Semple
Director Martucci
Director Lewis
OCPM File



Pursuant to 28 USCS., §1746:

I, Joe Baltas         on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas
Northern C.I.
P.O. Box 665
Somers, CT 06071

09/18/2019 03:24
COM189

DEPARTMENT OF CORRECTIONS
CT DOC - PRODUCTION
District 1

Page   1   of      8
OOROSRCC
10.2.1.1

S A L E S   R E C E I P T

Location:    141-1            Name: BALTAS, JOE              DOC# :   0000339650

09/18/2019                    Sales Order Id: 13721763   207   Staff ID:COM189

---

BEGINNING BALANCES:    Available Balance is      50.45   Spending Limit Balance is       25.00

---

| Quantity | Description | Price |
|---|---|---|
| 5 | STAMPED ENVELOPE | 3.35 |
| 3 | MANILA ENVELOPE * | 0.60 |
| 2 | WRITING PAD * | 1.72 |
| 1 | BLISTEX LIP OINTMENT* | 1.95 |
| 2 | SPORT BAR SOAP * | 1.60 |
| 1 | MEN'S BODY WASH* | 1.93 |
| 1 | POWER-UP DEODORANT* | 2.31 |
| 1 | COTTON SWABS * | 0.88 |
| 1 | COFFEE CUP, PLASTIC* | 1.66 |
| 1 | AA BATTERIES * | 2.37 |
| 1 | SALT SHAKER | 0.37 |
| 1 | PEPPER SHAKER | 1.15 |
| 1 | GYM SHORTS 4X* | 15.73 |
| 1 | LOW-CUT SOCKS, MEN'S 3PK* | 6.13 |
| 1 | CROISSANT, ASSORTED FLAVOR FILLED* | 1.10 |
| 1 | DANISH, ASSORTED* | 1.26 |
| 2 | CHOCOLATE ICED HONEY BUN* | 1.36 |

|  |  | SUB TOTAL | 45.47 |
|---|---|---|---|
|  |  | TOTAL TAX | 2.47 |
|  |  | TOTAL | 47.94 |

---

ENDING BALANCES:   Available Balance is        2.51  Spending Limit Balance is       0.31

---

Due to supply shortage from our normal vendor the price of the California
Sage will increase to $9.45 until further notice.

Thank you



Pursuant to 28 USCS, §1746:

I, Joe Baltas         on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

Joe Baltas
Northern CI
P.O. Box 665
Somers, CT 06071



# Notification of Hearing
## Connecticut Department of Correction

CN 9402
REV 09/20/17

| Inmate name: BALTAS, JOE | Inmate number: 339650 |
| --- | --- |
| Facility: NORTHERN CI | Date: 09/23/2019 |

You are being considered for placement to:

☒ Administrative Segregation ☐ Special Needs Management ☐ Chronic Discipline

| A hearing will take place on | FRIDAY SEPTEMBER 27, 2019 | at | 8:30 AM |
| --- | --- | --- | --- |
| | date | | time |

The purpose of this hearing is to determine whether your presence in general population presents a threat to the safety and security of the institutional community due to repetitive disciplinary infractions and/or involvement in a serious incident.

### REASON FOR HEARING

On September 12, 2019 at approximately 9:41 am in the South Block Housing Unit at Hartford Correctional Center, you were observed touching an Officer's arm and getting into the Officer's personal space. The Officer gave you verbal direction to not touch him again to which you responded by touching the Officer's arm again. The Officer attempted to secure you to a fixed surface but you responded by raising your hand to the Officer's throat and repeatedly striking the Officer. A call for staff assistance was made and chemical agent was deployed to gain your compliance. You continued to be combative but eventually complied with staff direction and gave yourself up. The Officer that you assaulted needed to be treated by an outside medical facility. State Police were contacted, responded, and charged you with Assault on a Public Safety Officer.

You are currently serving a 115 year sentence for Murder, Assault 1$^s$ with Serious Physical Injury, Burglary 1st with Bodily Injury, Burglary 1st with a Deadly Weapon, Kidnapping 2nd, Weapon in a Correctional Institution, and Assault 2nd with a Weapon/Without discharging of Weapon. You have a pending charge for Assault on a Public Safety Officer as a result from this incident. Throughout your incarceration history, you have received 68 Disciplinary reports including, but not limited to: nine for Disobeying a Direct Order, eight for Interfering with Safety and Security, nine for Public Indecency, 11 for Threats, seven for Fighting, one for Assault on DOC, and one for Conspiracy to Assault.

Due to the severity of your assault on a DOC employee and because of your disruptive behavior, Warden McCormick is requesting that you be reviewed for a higher level of security.

Therefore, a classification hearing will be held to review you for placement on Administrative Segregation, Chronic Discipline or Special Needs Management status. If you desire a staff advisor to act on your behalf, you are to indicate this below, in ranking order, the advisor of your choice. A reasonable number of relevant and non-redundant witnesses' statements may be requested on your behalf. This hearing will determine possible placement into Administrative Segregation, Chronic Discipline or Special Needs Management. If placed into Administrative Segregation, Chronic Discipline or Special Needs Management, you will be managed in accordance with Administrative Directive 9.4, Restrictive Status and may not earn Risk reduction Earned Credit in accordance with Administrative Directive 4.2A.

| Advisor Choice(s): | | Witness(es) Requested: | |
| --- | --- | --- | --- |
| 1. | CCT  K. Saunders | 1. | |
| 2. | CTO  Sessions | 2. | |
| 3. | | 3. | |

| ☒ Advisor Declined | ☐ Witness(es) Declined |
| --- | --- |

| Delivered by | K. Saunders    CCT | on | 9·24·19 | at | 11⁴⁵ am |
| --- | --- | --- | --- | --- | --- |
| | Staff name and title - print | | date | | time |

| Inmate signature: Refused to Sign | Date: |
| --- | --- |
| Staff signature: | Date: 9·24·19 |

- Staff witness shall indicate if inmate refuses to sign
- Distribution: Director of Offender Classification and Population Management, inmate master file, inmate



Pursuant to 28 USCS, §1746:

I,   Joe Baltas         on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _10.22.19_ .

_____

Joe Baltas

_Northern Cil._

_P.O. Box 665_

_Somers, ct 06071_



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| Inmate name: Baltas, Joe | | Inmate number: 339650 |
|---|---|---|
| Disciplinary report: | | Report date: |
| Advisor: CCT K. Saunders | Offense: AS Placement Hearing | |
| Date and time form initiated: 9/26/19 | Time: 11:00  ☒ am  ☐ pm | |

### ACCUSED INMATE INTERVIEW

I have been assaulted by Corrections staff multiple times over the Past few years, I have suffered Physical injuries & serious mental & emotional traumas from those incidents. Two of those incidents were investigated by Security Division & Conn. State Police. The Doc took no corrective or disciplinary action against the offending staff & the States Attorneys office "declined Prosecution." State officials have sent a clear message to Corrections staff that they can harm me at will without consequences.

I have been held in HCC periodically over the course of the last year. Wherein, I have been repeatedly subjected to threats of violence, harassments, assaults & excessive force. Those violations have been grieved, reported, etc. to DOC officials inclusive of Pop. Management. A federal civil action was filed over said violations several months ago, Docketed at 3.19-cv-01043 (mps). Their was full Notice given to DOC regarding these issues, yet Pop. management intentionally continued to house me at HCC & subject me to the Abusive conduct of staff.

C/o Rievan is involved in the incidents giving rise to the federal law suit. said lawsuit seeks the attachment of Defendents Pensions, accounts, Property, etc.

P. 1 of 8

**With my signature I acknowledge that I have met with my advisor.**

| Inmate signature: *Joe Baltas* | Date: 9.27.19 |
|---|---|



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| | |
|---|---|
| Inmate name: Baltas, Joe | Inmate number: 339650 |
| Disciplinary report: | Report date: |
| Advisor: CCT K. Saunders | Offense: AS Placement Hearing |
| Date and time form initiated:  9/26/19 | Time: 11:00   ☒ am   ☐ pm |

### ACCUSED INMATE INTERVIEW

On 9.11.19 C/o Rizvani worked 2nd Shift in the SB housing unit, which is an RHU. Throughout the shift Rizvani made multiple abusive, harassing & derogatory comments to me & made statements related to his anger over the federal action. Rizvani also threatened me multiple times.

At approx. 8:15pm while I was out on the tier Rizvani abandoned his post in the housing unit control & left said control completely unattended, he entered the tier with me able attempted to initiate a physical confrontation, he used verbal abuse & was aggressive. I walked away & entered the unit dey room. His conduct continued throughout the night.

On 9.12.19 Rizvani worked 1st Shift in the SB housing unit. His verbally abusive conduct continued. At approx. 9:30am while I was in the unit dey room he improperly had the control officer open the dayroom door & handed me clothing, he stated to me that he had "rubbed them on his nuts". I ignored this. At approx. 9:45am I decided to abandon recreation & lock in my cell in order to avoid any further confrontations with Rizvani.

After exiting the dey room I heard Rizvani tell the control officer to leave my cell door opened. I entered my cell, took off my jumpsuit & sat on my bunk waiting for my cell to secure.

P. 2 of 8

**With my signature I acknowledge that I have met with my advisor.**

| | |
|---|---|
| Inmate signature: | Date: 9.27.19 |



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| | |
|---|---|
| Inmate name: Baltas, Joe | Inmate number: 339650 |
| Disciplinary report: | Report date: |
| Advisor: CCT K. Saunders | Offense: AS Placement Hearing |
| Date and time form initiated: 9/26/19 | Time: 11:00  ☒ am  ☐ pm |

### ACCUSED INMATE INTERVIEW

Rizvani entered the tier with the chow cart. While serving chow to 1-cell he began to verbally abuse me again. I exited my cell & walked up to him & asked him "what exactly is your problem?"; he responded saying "you're a lawsuit filing bitch", I asked him "that's it?" I then patted him on the arm & told him "it's not that serious" I then turned & began to go back to my cell. Rizvani said "it is" & something along the lines of he was going to fuck me up or something to that effect.

I turned back towards him, & told him "you should calm down" & then patted him on the arm again in an attempt to de-escalate his clear aggression.

Rizvani then lunged at me, seized me by the shirt & slammed me against the door way of my cell, causing my back & head to strike the door frame violently. Rizvani then forced his closed fists, which still held my shirt, up into my throat choking me. As this attack was happening he yelled at me that he would "break my fucking back."

Due to Rizvani's threat & physical assault I was in a complete state of fear & panic.

P. 3 of 8

**With my signature I acknowledge that I have met with my advisor.**

| Inmate signature: _(signature)_ | Date: 9.27.19 |



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| | |
|---|---|
| Inmate name:  Baltas, Joe | Inmate number: 339650 |
| Disciplinary report: | Report date: |
| Advisor:  CCT K. Saunders | Offense:  AS Placement Hearing |
| Date and time form initiated:  9/26/19 | Time:  11:00   ☒ am   ☐ pm |

**ACCUSED INMATE INTERVIEW**

In that Panic'd & terrified state I unconsciously & instinctively reacted by pushing my arm out towards Rizvani's neck & collar bone area to push him away from my & cease his choking of me. My actions were reactions to Rizvani's unlawful physical assault & were soley instinctive actions of self defense.

Rizvani rolled away from my intended push & forced me back into the interior of the cell where in he struck me repeatedly with his right hand & kept hold of me with his left. At no time in the cell did I strike Rizvani, I continued to grapple with him & attempt to push him off of me so that I could get away from him & his vicous assault.

As soon as I was able to get away from Rizvani, due to my shirt tearing in his hands causing him to lose his grip on me, an officer or Lt. arrived. I immediately exited the cell alone & kneeled down & put my hands on my head. As I was exiting the cell & kneeling down chemical agent was sprayed at me. At no time did I "remain combative."

P. 4 of 8

**With my signature I acknowledge that I have met with my advisor.**

| | |
|---|---|
| Inmate signature: | Date: 9.27.19 |



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| Inmate name: Baltas, Joe | Inmate number: 339650 |
|---|---|
| Disciplinary report: | Report date: |
| Advisor: CCT K. Saunders | Offense: AS Placement Hearing |
| Date and time form initiated: 9/26/19 | Time: 11:00  ☒ am  ☐ pm |

**ACCUSED INMATE INTERVIEW**

At No time did I commit a direct assault against Rizvani. At No time did I attack Rizvani or intentionally strike Rizvani.

Rizvani initiated a Physical attack against me. I acted solely out of fear & Panic to defend my Personal safety. As soon as Rizvani released me & ceased his assault I exited the cell of my own power & knelt with my hands behind my head.

It is Doc's responsibility & duty to protect me & Provide me with safety. I was attacked by a Doc officer, sworn to protect me & who exercises extreme control & dominion over me. I did not attack the officer or initiate combat. I took No action that poses any kind of threat to inmates/self/staff/or the institution. I acted solely in self defense of my Personal safety, & securing my safety from Physical violence. Can now possibly Pose a threat & is in fact, Constitutionally Protected Conduct & lawfully Protected Conduct.

further, Rizvani sustained no injuries, their was no "severity of assault" in this incident, nor was I disruptive.

It should further be noted that their is no rule that states I am Prohibited from touching a staff members shoulder, nor did Rizvani report any Perception of a threat.

*P. 5 of 8*

**With my signature I acknowledge that I have met with my advisor.**

| Inmate signature: | Date: |
|---|---|



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| Inmate name: Baltas, Joe | Inmate number: 339650 |
|---|---|
| Disciplinary report: | Report date: |
| Advisor: CCT K. Saunders | Offense: AS Placement Hearing |
| Date and time form initiated: 9/26/19 | Time: 11:00  ☒ am  ☐ pm |

**ACCUSED INMATE INTERVIEW**

This incident does not meet the threshold for A/S Placement, nor is the consideration of A/S Placement appropriate for this incident.

## EVIDENCE

I Request the following evidence be Reviewed:
1. Video of the incident on the previous evening (HCC/SB - 9.11.19 - 7:50pm-8:30pm);
2. Video of the incident (HCC/SB - 9.12.19 - 9:30am - 10:00am);
3. Witness statements from the inmates within the unit;
4. Officer Reveals Clearly egregious Conduct;
5. Written video synopsis by NCI staff - (Attached).

## DUE PROCESS ISSUES

False information has been introduced into my hearing Process. The "Notice of Hearing" form is Replete with false inculpatory evidence/statements. The officer gave no verbal direction not to touch him, See Disciplinary Report. The officer did Not attempt to Secure me to an affixed Surface, he slammed me against a wall/door frame, Choked me & then pushed me into the cell.

P. 6 of 8

**With my signature I acknowledge that I have met with my advisor.**

| Inmate signature: | Date: 9.27.19 |
|---|---|



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| | |
|---|---|
| Inmate name: Baltas, Joe | Inmate number: 339650 |
| Disciplinary report: | Report date: |
| Advisor: CCT K. Saunders | Offense: AS Placement Hearing |
| Date and time form initiated: 9/26/19 | Time: 11:00   ☒ am   ☐ pm |

**ACCUSED INMATE INTERVIEW**

I did Not repeatedly strike the officer, nor is that evidenced anywhere. Chemical Agent was not deployed to gain my compliance Nor did I remain combative, I exited the Cell & kneeled down of my own power, Chemical agen was deployed as I was doing this, not before.

Rivera did not need to be treated by an outside hospital, he was seen by institutional medical staff with no injuries & immediately returned to his duties, as he wrote the DR Report within a half hour.

Their was No Severe Assault No any disruptive Conduct.

## ADMIN. DIR. ISSUES

This incident was Classified as a "Level 2 Assault on DOC Employee" incident. The c/o did not have any Serious Injury or any Injury for that matter, the c/o was not placed in an "Acute Care" hospital unit.

Pursuant to AD 9.2 § 12(A), a level 2 incident is mandated to result in a level 4 Placement & Disc. Level 4 placement. The language "Shall" mandates this & thereby Bars Placement in Level 5 for a single Level 2 Assault on Doc employee incident. This incident would be a "Chronic Placement."

P. 7 of 8

**With my signature I acknowledge that I have met with my advisor.**

| | |
|---|---|
| Inmate signature: | Date: 9.27.19 |



# Advisor Report
## Connecticut Department of Correction

CN 9508/1
REV 8/28/17

| Inmate name: Baltas, Joe | Inmate number: 339650 |
|---|---|

| Disciplinary report: | Report date: |
|---|---|

| Advisor: CCT K. Saunders | Offense: AS Placement Hearing |
|---|---|

| Date and time form initiated: 9/26/19 | Time: 11:00  ☒ am  ☐ pm |
|---|---|

**ACCUSED INMATE INTERVIEW**

Further, AD 9.2 §12 states level increases are considered upon "new information" yet my Notice of Hearing contains an array of false information.

Lastly it should Be noted I have No Convictions for Kidnapping or Burglary & my sentence is 95 years. The inclusion of those charges & a 115yr sentence is mere false information introduced into my Process.

## CONCLUSION

I committed No Assault or Attack of a Correction officer. I was attacked. This incident was not severe & my actions posed no threat. This incident does not meet the threshold for A/S placement Nor is A/S Placement appropriate for this incident.

Further, Pursuant to AD 9.2 §12(1) Level 5/Admin. Seg. Placement is expressly Prohibited for this Level 2 incident.

For these reasons I should not be Placed in N/S

*I* It Must Also Be stated I have not even had a DR hearing yet & Their has been NO Doc finding I engaged in Any of the Accused conduct.

P. 8 of 8

**With my signature I acknowledge that I have met with my advisor.**

| Inmate signature: | Date: 9.27.19 |
|---|---|



# Disciplinary Supplemental Information
## Connecticut Department of Correction

CN 9506
REV 2/01/16

Addendum to:
☐ Disciplinary report
☒ Disciplinary investigation report
☐ Disciplinary process summary
☐ Page (specify)

Facility/Unit: **NORTHERN C.I.**

Report number: **NCI – 1909016**

Inmate name: **BALTAS, JOE**

Inmate number: **339650**

Report date: **9-12-19**

Time: **9:41** ☒ am ☐ pm

Text (continued):

## -VIDEO SYNOPSIS-

THE FOLLOWING IS A VIDEO TIME STAMP SYNOPSIS OF THE HCC SOUTH BLOCK FACILITY CAMERA VIDEO FOR THE DATE, TIME, AND LOCATION OF THE ALLEGATION OF MISCONDUCT DOCUMENTED ON NCI-1909016:

- 9:48:52 – I/M BALTAS ENTERS SB-12 CELL
- 9:48:58 – OFFICER ON TIER WITH FOOD CART, SB-12 CELL DOOR REMAINS OPEN AS THE OFFICER PREPARES TO FEED THE INMATE HOUSED IN SB-1 CELL OPPOSITE SB-12 HOUSING I/M BALTAS
- 9:49:08 – THE OFFICER'S ATTENTION IS DRAWN TO THE OPEN SB-12 CELL
- 9:49:17 – OFFICER CONTINUES TO PLACE FOOD ON THE TRAP DOOR OF SB-1 CELL AS I/M BALTAS EXITS HIS CELL
- 9:49:22 – THE OFFICER PUSHES THE FOOD CART FURTHER DOWN THE TIER AS I/M BALTAS ENTERS THE OFFICER'S PERSONAL SPACE AND BOTH INDIVIDUALS ARE SPEAKING TO ONE ANOTHER
- 9:49:30 – THE OFFICER MOVES CLOSER TO SB-1 CELL TO SECURE THE TRAP CLOSURE AND I/M BALTAS FOLLOWS HIM REMAINING IN THE OFFICER'S PERSONAL SPACE
- 9:49:32 – I/M BALTAS PLACES HIS LEFT HAND ON THE OFFICER'S RIGHT SHOULDER FOR A MOMENT, THEN TURNS AWAY TOWARDS HIS OPEN CELL
- 9:49:34 – I/M BALTAS STOPS, TURNS AROUND AS BOTH INDIVIDUALS ARE SPEAKING WITH ONE ANOTHER AND RE-ENTERS THE OFFICER'S PERSONAL SPACE
- 9:49:35 – I/M BALTAS TOUCHES THE OFFICER'S RIGHT UPPER ARM WITH HIS LEFT HAND. THE OFFICER GRABS I/M BALTAS WITH BOTH HANDS IN THE UPPER CHEST AREA AND PUSHES HIM BACKWARD INTO THE OPENING OF SB-12 CELL
- 9:49:37 – I/M BALTAS THROWS A CLOSED FIST STRIKE WITH HIS RIGHT ARM TO THE LEFT SIDE OF THE OFFICERS HEAD AS THE TWO INDIVIDUALS ARE AT THE THRESHOLD OF SB-12 CELL
- 9:49:39 – BOTH INDIVIDUALS GO OFF CAMERA INTO SB-12 CELL
- 9:49:58 – RESPONDING STAFF MEMBER ENTERS SB-12 CELL
- 9:50:04 – I/M BALTAS EXITS SB-12 CELL UNDER HIS OWN POWER, KNEELS DOWN AND PLACES HIS HANDS BEHIND HIS HEAD
- 9:50:10 – ADDITIONAL RESPONDING STAFF SECURE I/M BALTAS TO THE TIER FLOOR

Signature: **Leone**

Title: **correction officer**

Date: 9-20-19



Pursuant to 28 USCS, §1746:

I, Joe Baltas on oath state that the copies attached as pages to this exhibit are true genuine copies of the documents they purport to represent. Signed under the pains and penalties of perjury on this date, 10.22.19 .

Joe Baltas
Northern c.i.
P. O. Box 665
Somers, CT 06071



**Inmate Request Form**

CN 9601
REV 1/31/09

**Connecticut Department of Correction**

Inmate name: Baltas, Joe

Inmate number: 339650

Facility/Unit: NCI- 1 West

Housing unit: 1 West- 107

Date: 10.2.19

Submitted to: Captain Chevalier - Unit Manager -     cc. File, Attorney

Request: On this date you arbitrarily and capriciously Ordered me moved from 207 too 107. It's Valleria & Titus compelled this move against my will under your orders with threats of force.

Cell 107 is not fit for human habitation. This cell is not properly lighted, the opening in the sink/toilet for toilet paper is sealed with a steel plate, the cosmetics storage shelf above the sink is sealed with a steel plate, the mirror is damaged & not useable & poses a safety risk should I attempt to shave with it, and the air vents are sealed with a substance. These issue's deny me the minimal living conditions I am entitled to & are not experienced in the top tier cells.

The conditions of this cell violate my 8th Amendment Rights & **AD 9.4 § 4 (A).**

I request you have maintenance fix these issues immediately, inclusive of a New mirror;

*continue on back if necessary*

Previous action taken: Installation of a shelf above the sink; installation of a hole for toilet paper storage; cleaning of the air vents; & new light bulbs.

*continue on back if necessary*

Acted on by (print name): Chevalier

Title: Captain

Action taken and/or response: In response to your concerns about your current cell. I did have staff move you as we discussed when I toured the unit. When you asked ~~why~~ I told you I made the move due to your recent interactions with custody and medical staff while housed in cell 207. You accumulated numerous DR's for threats on staff as well as public indecency. To limit your interaction with said staff members, I moved you to cell 107 on the bottom tier which is the responsibility of other medical staff members. This move from cell 207 which has a security trap, to cell 107, also with a security trap, was to limit your ability to assault staff as you have made →

*continue on back if necessary*

Staff signature:

Date: 10-7-19

threats to be too strong to me, when I explained this to you, that made sense to you. We discussed the vent needing to be cleaned and I sent a request to maintenance to have that done. While the vent is in need of cleaning, there is adequate ventilation in your cell and this would not preclude me from placing you in the cell as your Your recent threats to harm staff require you to be in a cell with a safety trap.

As to the lighting in the cell, from what I observed when I talked to you at the cell, it was properly light and you made no mention of it at the time. However I will have maintenance check that as well.

As to the mirror, it is a safety mirror made of plastic, they are not the quality of a glass mirror, however they provide adequate reflection to shave.

As Far as a shelf over your sink, there is adequate space on the sink to place your cosmetics, as it is flat on top around the two sides and front.

As to the toilet paper holder, as you stated in your request AD 9.4 Sec 4 A requires that you be housed in a cell consistent with general population. Many cells in the state do not have toilet paper holders.

I realize you are frustrated with your current AS placement, however continuing your disruptive, threatening behavior will not help you move through the program. As you know, if you stay DR Free For 120 days you will progress through the program and work towards general p I would encourage you to strive For this goal.



Pursuant to 28 USCS, §1746:

I, Joe Baltas      on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, 26-22-77 .

Joe Baltas
Northern C.I
P.o. Box 665
Somers, CT 06071



| **Restrictive Status Report of Hearing for Placement or Removal**<br>Connecticut Department of Correction | CN 9404/1<br>REV 09/20/17 |
|---|---|

Facility/Unit: NORTHERN CI

| Inmate name:   BALTAS, JOE | Inmate number:   339650 |
|---|---|

| **Hearing for:** | ☒ Administrative Segregation | ☐ Chronic Discipline | ☐ Special Needs Management |
|---|---|---|---|

### SECTION 1 - HEARING

| Date:  09/27/2019 | Time:  9:53 | ☒ am ☐ pm | ☐ Advisor requested |
|---|---|---|---|

| Hearing officer/title:  E. TUGIE, CORRECTIONAL COUNSELOR SUPERVISOR | ☒ Advisor not requested |
|---|---|
| Recorder/title:  R. RICCIO, CORRECTIONAL COUNSELOR | ☐ Advisor not requested, but assigned |
| Name of Advisor:  N/A | Title: |

**Summary of placement rationale:**
On September 12, 2019 at approximately 9:41 am in the South Block Housing Unit at Hartford Correctional Center, inmate Joe Baltas #339650 was observed touching an Officer's arm and getting into the Officer's personal space. The Officer gave i/m Baltas verbal direction to not touch him again to which Baltas responded by touching the Officer's arm again. The Officer attempted to secure inmate Baltas #339650 to a fixed surface but i/m Baltas responded by raising his hand to the Officer's throat and repeatedly striking the Officer. A call for staff assistance was made and chemical agent was deployed to gain inmate Baltas' compliance. Inmate Baltas continued to be combative but eventually complied with staff direction and gave himself up. The Officer that was assaulted needed to be treated by an outside medical facility. State Police were contacted, responded, and charged Inmate Baltas with Assault on a Public Safety Officer.
Inmate Baltas #339650 is currently serving a 115 year sentence for Murder, Assault 1st with Serious Physical Injury, Burglary 1st with Bodily Injury, Burglary 1st with a Deadly Weapon, Kidnapping 2nd, Weapon in a Correctional Institution, and Assault 2nd with a Weapon. He has a pending charge for Assault on a Public Safety Officer as a result of this incident. Throughout his incarceration history, i/m Baltas has received 69 Disciplinary reports including, but not limited to: nine for Disobeying a Direct Order, eight for Interfering with Safety and Security, ten for Public Indecency, 11 for Threats, seven for Fighting, one for Assault on DOC, and one for Conspiracy to Assault.
Due to the severity of inmate Baltas' assault on a DOC employee and because of his disruptive behavior, Warden McCormick has requested that Inmate Baltas #339650 be reviewed for a higher level of security.

**Inmate statement:**
**Hearing officer explained A/S process, implications of RREC and Administrative Remedies appeals for Restrictive Status. Notice read to inmate.**
That CO and I have had issues for a while. He had been threatening me for days. I preserved the video. On the first day CO Rizvani was talking shit to me. He came out of the bubble, called me a punk and made comments to me about a federal lawsuit I filed. On the second day, CO Rizvani came out of the bubble and told the officer to leave the door open. He started running his mouth again. He was feeding Cell-1 and I touched his arm and asked what his problem was. He told me to chill out. I touched his arm again and that is when he lunged at me. He tried pushing me into the cell so that he could assault me where no cameras would catch it. He initiated contact, not me. I did not hit him. His fists were holding my jumpsuit and the jumpsuit came up so that the officer's fist went up to my neck. I tried to push him off but he pushed me into the cell. We tussled and rolled against the wall in the cell. The inmate in the cell across from me saw everything. I asked staff to get a statement from the inmate about what really happened, but nobody did anything. I never got a statement. I don't know who the inmate is. I was only there for one day. *** Inmate Baltas declined an advisor. The afternoon before the hearing he submitted an eight page written statement which has been attached***

| Staff name: | Title: |
|---|---|
| Staff statement: | |

| Inmate witness #1 name: | Inmate number: |
|---|---|
| Inmate witness #1 statement: | |

| Inmate witness #2 name: | Inmate number: |
|---|---|
| Inmate witness #2 statement: | |



# Restrictive Status Report of Hearing for Placement or Removal
## Connecticut Department of Correction

CN 9404/2
REV 09/20/17

| SECTION 2 - HEARING DISPOSITION | |
|---|---|
| ☒ Recommend placement | ☐ Do not recommend placement |

Reason(s) for recommendation:  Recommend placement on Administrative Segregation due to deliberate assault on a DOC employee.

Information relied on:  Memo from Warden McCormick/Director Maiga dated September 12, 2019, Incident Report package HCC-2019-09-034, and NICE Vision footage of the incident.

Signature of Hearing Officer: _E. Tugie_                                    Date: 10/7/19

| ☐ Recommend placement | ☐ Do not recommend placement |
|---|---|

Signature of Unit Administrator
(close custody only):                                               Date:

| SECTION 3 – DIRECTOR OF OCPM AUTHORIZATION | |
|---|---|
| ☑ Placement authorized | ☐ Placement not authorized |

Reason(s): A/S placement authorized due to direct/intentional assault on a DOC employee. Offender continues to threaten safety, security and/or orderly operation after greater than six months on CD status.

Signature of Director of OCPM: _____                  Date: 10/07/19

| SECTION 4 - RELEASE | |
|---|---|

*Release rationale:

Signature of Unit Administrator                                     Date:

| ☐ Release approved | ☐ Release not approved |
|---|---|

Comments:

Signature of Commissioner/designee:                              Date:

---

**\*Attach disciplinary and incident reports resulting in original placement on administrative segregation, along with disciplinary record.**

cc:  Place in inmate master file on completion.



T. Bates 339050
Norelen Cl.
P.O. Box 665
Somers, CT 06071

To: U.S. District Court
915 Lafayette Blvd.
Bridgeport, CT 06071

NEOPOST                    PRIORITY MAIL
11/13/2019
US POSTAGE $015.05⁰
ZIP 06071
0411M1292713