UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:19cv1820 (MPS) |
| v. | : | |
| | : | |
| SCOTT ERFE, ET AL., | : | |
| Defendants. | : | |

**RULING AND ORDER**

The plaintiff, Joe Baltas, is incarcerated at the Red Onion State Prison in Pound, Virginia, but was previously an inmate of the Connecticut Department of Corrections ("DOC"). He has filed a civil rights complaint under 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15601, and Article First, § 20 of the Connecticut Constitution against Commissioners Scott Semple and Rollin Cook, Deputy Commissioner Monica Rinaldi, District Administrator Angel Quiros, Director of Offender Classification and Population Management David Maiga ("OCPM Director Maiga"), Wardens Scott Erfe, Henry Falcone, William Mulligan, Giuliana Mudano, and McCormack, Captains Gregorio Robles, Alexander, and Chevalier, Lieutenants Arzt and Betances, Correctional Officers Rizvani and Leone, Counselor Supervisor Tugie, Drs. Lalitha Pieri and Mathews, and Nurse Nancy Hill. *See* Compl., ECF No. 1, at 1-11.

The complaint is 187 pages in length and includes 330 paragraphs, eighteen causes of action, and 105 pages of exhibits. *Id.* at 1-187. The claims arise from the plaintiff's confinement at four different prison facilities over a time period from July 2016 to October 2019. *Id.* The plaintiff has also filed a motion for temporary restraining order and for preliminary injunction and a motion seeking to default the defendants for failing to respond to or oppose the motion for

temporary restraining order and for preliminary injunction.  *See* Mot. TRO & Prelim. Inj., ECF
No. 3; Motion for Judgment and/or Default Judgment, ECF No. 11.

For the reasons set forth below, the claims related to the plaintiff's confinement at
Cheshire Correctional Institution ("Cheshire") from July 2016 to October 2016, his confinement
at Garner Correctional Institution ("Garner") from November 2016 to December 2016, and his
confinement at Northern Correctional Institution ("Northern") from December 2016 to
September 2017 will be dismissed in part, the claims related to the plaintiff's confinement at
Cheshire in October 2017 and from September 2018 to November 2018, his confinement at
Hartford Correctional Center ("Hartford Correctional") from September 10, 2019 to September
12, 2019, and his confinement at Northern from September 12, 2019 to October 22, 2019 will be
severed and dismissed without prejudice, and the motions for temporary restraining order and
preliminary injunction and for a judgment defaulting defendants for failing to respond to the
motion for temporary restraining order and preliminary injunction will be denied.

I.      **Standard of Review**

The court must review prisoner civil complaints against governmental actors and
"dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim
upon which relief may be granted," or that "seeks monetary relief from a defendant who is
immune from such relief."  28 U.S.C. § 1915A.  This standard of review "appl[ies] to all civil
complaints brought by prisoners against governmental officials or entities regardless of whether
the prisoner has paid [a] filing fee."  *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal
quotation marks and citation omitted).  Here, the plaintiff is proceeding *in forma pauperis*.

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  A claim is facially plausible if it is supported by facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint must still include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

## II.    Factual Allegations

During the three-year time period described in the complaint, the plaintiff was a sentenced prisoner.[1]  In 2000, prior to the plaintiff's arrest and confinement in prison, mental

---

[1] The State of Connecticut's Judicial Branch website reflects that on April 16, 2010, a judge in the Connecticut Superior Court for the Judicial District of New Haven sentenced the plaintiff to fifty-five years of imprisonment on one count of murder, ten years of imprisonment on two separate counts for assault in the first degree, twenty years of imprisonment on one count of burglary in the first degree, and ten years of imprisonment on one count of kidnapping in the second degree. *See State v. Baltas*, Docket No. NNH-CR06-0237581-T.  On March 5, 2015, a judge in the Connecticut Superior Court for the Judicial District of Meriden, sentenced the plaintiff to five years of imprisonment on one count of assault in the second degree and twenty years of imprisonment on one count of possession of a weapon in a correctional institution. *See State v. Baltas*, Docket No. N07M-CR14-0276900-S.  Information pertaining to both criminal cases may be found at: http://www.jud.ct.gov/jud2.htm under Superior Court Case Look-up; Criminal/Motor Vehicle; Convictions - by Docket Number.  Connecticut's Department of Correction website reflects that the plaintiff, CT Inmate Number 339650, is serving a total effective sentence of 115 years of imprisonment.  *See* http://www.ctinmateinfo.state.ct.us/.

3

health providers diagnosed him as suffering from Conduct Disorder, Dysthymic Disorder, and

Borderline Personality Disorder.  Compl., ECF No. 1, ¶ 77; Ex. E, at 96-97.

> **A.      Confinement at Cheshire – July 2016 to October 2016**

On July 11, 2016, prison officials at MacDougall Correctional Institution

("MacDougall") transferred the plaintiff to Cheshire.  *Id.*, ¶ 37.  During his confinement at

Cheshire, Warden Erfe required the plaintiff to wear a yellow jumpsuit because he had been

designated as a High Security Status inmate.  *Id.*, ¶¶ 39-42.  The plaintiff endured verbal taunts

and harassment from other prisoners and staff members because of the jumpsuit and engaged in

at least one altercation with another prisoner after an argument regarding the jumpsuit.  *Id.*, ¶¶

43-44.  The plaintiff spoke to Warden Erfe and filed grievances about the requirement that he

wear a yellow jumpsuit as well as the verbal and physical harassment that he had endured.  *Id.*,

¶¶ 45-46.  Warden Erfe denied the grievances.  *Id.*, ¶ 46.  District Administrator Quiros upheld

the decisions of Warden Erfe on appeal.  *Id.*, ¶ 47.

> **B.      Confinement at Garner – November 2016 to December 2016**

On October 25, 2016, Warden Erfe transferred the plaintiff back to MacDougall.  *Id.*, ¶

48.  At MacDougall, the plaintiff was involved in a minor incident that prompted him to engage

in a hunger strike.  *Id.*, ¶ 50.  On November 23, 2016, prison officials at MacDougall transferred

the plaintiff to Garner.  *Id.*

The plaintiff's chosen religion is the Native American religion and he has practiced that

religion since 2009.  *Id.*, ¶ 51.  Garner does not permit inmates who practice the Native

American religion to use a sweat lodge.  *Id.*  The plaintiff met with Warden Falcone and asked

him to either change the policy to permit inmates who practiced the Native American religion to

4

use a sweat lodge or to transfer him to a facility that permitted inmates to use a sweat lodge. *Id.*, ¶ 52. Warden Falcone agreed to attempt to facilitate the plaintiff's transfer to another facility. *Id.* The plaintiff subsequently learned that Warden Falcone had been unable to facilitate his transfer to a different facility. *Id.*, ¶ 53.

The plaintiff filed a grievance regarding Garner's sweat lodge policy. *Id.*, ¶ 54. Correctional staff members retaliated against the plaintiff for filing the grievance by denying him a meal on one occasion and by denying him the opportunity to engage in the smudging ritual as part of the practice of his religion. *Id.*, ¶ 55. The plaintiff reported the instances of alleged retaliatory conduct to Warden Falcone both verbally and in writing. *Id.*, ¶ 56. Warden Falcone took no action in response to this information. *Id.*

On December 13, 2016, the plaintiff's unit officer provided another inmate with smudging supplies but refused to provide the plaintiff with smudging supplies. *Id.*, ¶ 57. Without permission, the plaintiff "grabbed" supplies and proceeded to smudge. *Id.* Later that day, the plaintiff and his unit officer were involved in a "verbal confrontation" during which the officer and the plaintiff exchanged insults. *Id.*, ¶ 58. After this argument, the plaintiff returned to his cell. *Id.*

The unit officer reported the incidents involving the plaintiff to his supervisor. *Id.* A lieutenant arrived at the plaintiff's cell and informed the plaintiff that he would be escorted from his cell to a cell in the restrictive housing unit. *Id.*, ¶ 59. The plaintiff refused to be handcuffed and escorted to the restrictive housing unit and informed the lieutenant that he would have to use force to remove him from his cell. *Id.* The plaintiff also threatened to make a shank after his release from the restrictive housing unit and to use the shank to stab the unit officer in the neck.

5

*Id.*, ¶ 60.

In anticipation of the use of force by the lieutenant and other officers, the plaintiff wrapped a sheet around his face and folded his mattress into the trap in the cell door to avoid the effects of any chemical agent that the lieutenant might spray into his cell. *Id.*, ¶ 61. After a prison official deployed a chemical agent into the plaintiff's cell, an extraction team entered the cell, pushed the plaintiff to the rear of the cell and onto the ground, struck him repeatedly, and used the sheet that he had wrapped around his face to choke him. *Id.*, ¶ 62. After gaining control of the plaintiff, the officers handcuffed the plaintiff, escorted him to a cell in the restrictive housing unit, and applied in-cell restraints to his ankles, wrists and waist. *Id.*, ¶¶ 62-63.

A subsequent search of the plaintiff's cell revealed no weapon. *Id.*, ¶ 64. The plaintiff received a disciplinary report for threats and a disciplinary report for interfering with safety and security. *Id.*, ¶ 66.

On December 14, 2016, the plaintiff spoke with Warden Falcone regarding the incident involving his verbal exchange with the unit officer. *Id.*, ¶ 67. Warden Falcone agreed that the incident was not serious and directed staff members to remove the plaintiff from in-cell restraints and to impose minimal sanctions as punishment for the disciplinary charges. *Id.* The plaintiff pleaded "no contest" to the disciplinary charges and received sanctions below the minimum level of sanctions set forth in the Department of Correction's Administrative Directives. *Id.*, ¶ 68.

On December 21, 2016, Warden Falcone sent a memorandum to OCPM Director Maiga and District Administrator Quiros seeking consideration for the plaintiff's placement on Administrative Segregation ("AS") at Northern due to his violent behavior and gang influence. *Id.*, ¶ 70; Ex. B, at 86-87. The memorandum referred to the plaintiff's history of involvement

with the Diablos Motorcycle Club, a designated disruptive group within the Department of Correction. *Id.* The plaintiff's father, who had been incarcerated within the Department of Correction at one time, had established a Connecticut chapter of the Diablos Motorcycle Club and had served as its National President. *Id.*

On December 22, 2016, Dr. Pieri met with the plaintiff and performed an assessment of his mental health. *Id.*, ¶ 75; Ex. F, at 101-05. During the assessment, Dr. Pieri considered whether there were any contraindications to the plaintiff's placement on AS. *Id.*, ¶ 76. Dr. Pieri completed the mental health assessment form and cleared the plaintiff for placement on AS despite his mental health disorders. *Id.*, ¶¶ 77-81. On December 23, 2016, prison officials at Garner transferred the plaintiff to Northern to be considered for AS placement. *Id.*, ¶ 82.

### C.    Confinement at Northern – December 2016 to September 2017

Upon his arrival at Northern, prison officials placed the plaintiff on Administrative Detention status pending AS placement. *Id.*, ¶ 83. As part of Administrative Detention status, the plaintiff was required to wear handcuffs, leg irons and a tether chain connecting the handcuffs and leg irons every time that he left his cell, including when he showered. *Id.*, ¶¶ 85, 87. In addition, he could not send or receive social mail, make social telephone calls, buy items at the commissary or retain items of personal property. *Id.*, ¶ 86. He was permitted to have contact with his attorney. *Id.*

On December 27, 2016, a counselor supervisor provided the plaintiff with a notice of his upcoming AS placement hearing. *Id.*, ¶ 88. The plaintiff believed that some of the information in the notice was inaccurate. *Id.*, ¶ 89. The plaintiff requested that an advisor be assigned to assist him in preparing for the hearing and indicated that he intended to present statements from

two witnesses and that he would like to review the videotape of the incident involving his verbal argument with his unit manager and his extraction from his cell at Garner. *Id.*, ¶ 90. The plaintiff refused to sign the hearing notice but accepted a copy of it. *Id.*, ¶ 97.

On December 28, 2016, the plaintiff met with his advisor. *Id.*, ¶ 93. During the meeting, the plaintiff provided the advisor with his written statement regarding the incidents and information that were described in the hearing notice and that formed the basis for the decision to consider him for placement on AS. *Id.* He also asked the advisor to secure statements from two witnesses and to secure a copy of video footage of the incidents that had occurred at Garner on December 13, 2016. *Id.* The plaintiff's advisor refused to secure the witness statements or the video footage. *Id.*

The plaintiff called Attorney Cannatelli, who represented him in a federal civil case, and explained that he had been unable to secure witness statements or video footage in connection with his upcoming AS placement hearing. *Id.*, ¶ 94. Attorney Cannatelli sent a letter to Commissioner Semple indicating that the plaintiff's advisor had failed to secure witness statements or permit him to view the video footage of the incident that had occurred at Garner on December 13, 2016. *Id.*, ¶ 95. Commissioner Semple did preserve the video footage but did not otherwise assist the plaintiff. *Id.*, ¶ 96.

On December 29, 2016, officers escorted the plaintiff to the shower in full restraints. *Id.*, ¶ 97. The leg shackles caused cuts the skin around the plaintiff's his ankles. *Id.*, ¶¶ 87, 97. The plaintiff worried that he might contract a MRSA infection because the leg irons had been worn by other inmates. *Id.*, ¶ 98. The plaintiff informed the officers who removed him from the shower that he had suffered cuts around his ankles that were bleeding. *Id.*, ¶ 99. The officers

8

ignored his wounds and escorted him back to his cell.  *Id.*

Later that day, the plaintiff informed Lieutenant Arzt that he had suffered cuts to his ankles and that the cuts were still bleeding.  *Id.*, ¶ 100.  Lieutenant Arzt indicated that he would contact the medical department.  *Id.*  About three hours later, an officer informed the plaintiff that Nurse Hill would not be coming to examine or treat his injuries.  *Id.*, ¶ 101.  The plaintiff then covered the window of his cell door.  *Id.*, ¶ 102.  He subsequently encountered Nurse Hill when she was dispensing medication to inmates in his housing unit.  *Id.*  She stated that she would not be treating the plaintiff because he was "a whiney little shit."  *Id.*

Lieutenant Arzt responded to the plaintiff's cell because the cell window remained covered.  *Id.*, ¶ 103.  The plaintiff uncovered the window and requested medical treatment.  *Id.*  Lieutenant Arzt stated that Nurse Hill had already determined that he did not require treatment.  *Id.*  Lieutenant Tuttle arrived at the plaintiff's cell, viewed the cuts to the plaintiff's ankles, and concluded that the injuries required medical treatment.  *Id.*, ¶ 104.  He ordered officers to escort the plaintiff to the medical treatment room.  *Id.*  Before the officers arrived at the treatment room, Nurse Hill informed Lieutenant Arzt that she would not treat the plaintiff's cuts and suggested that the plaintiff wash the cuts using soap from his cell.  *Id.*, ¶ 105.

As Nurse Hill began to leave the unit, the plaintiff called her a derogatory name.  *Id.*, ¶¶ 106-07.  Lieutenant Arzt ordered the officers to secure the plaintiff to a wall in the hallway and warned the plaintiff that if the plaintiff engaged in other verbal outbursts that he would spray him with a chemical agent.  *Id.*, ¶ 109.  The officers then escorted the plaintiff to a cell to be placed in in-cell restraints.  *Id.*

After his placement in the cell, the plaintiff informed Lieutenant Arzt that the walls were

covered with fecal matter.  Lieutenant Arzt disagreed with the plaintiff's observation.  *Id.*, ¶ 110.

Officers took a photograph of the lacerations to the plaintiff's ankles and a nurse put a band-aid

over the lacerations.  *Id.*, ¶ 111.  Officers then placed the plaintiff in handcuffs, leg irons and a

tether chain connecting the leg irons to the handcuffs.  *Id.*  The plaintiff received a disciplinary

report for insulting language.  *Id.*, ¶ 112.

On December 30, 2016, officers removed the plaintiff from in-cell restraint status and

escorted him to his AS placement hearing that was to be held at 8:00 a.m.  *Id.*, ¶¶ 113-115; Exs.

H & I, at 136-39.  Counselor Supervisor Tugie presided over the hearing and the plaintiff's

advisor was also present.  *Id.*, ¶ 115.  The plaintiff informed Counselor Supervisor Tugie that

there was inaccurate information in the hearing notice and offered his version of what had

occurred during the argument with his unit manager and the cell extraction.  *Id.*, ¶ 116.  The

plaintiff's advisor provided Counselor Supervisor Tugie with the plaintiff's written statement.

*Id.*, ¶¶ 93, 116.  The plaintiff requested that Counselor Supervisor Tugie secure witness

statements and review the video footage of the incident.  *Id.*  Counselor Supervisor Tugie

directed the plaintiff's advisor to secure the witness statements.  *Id.*

On January 10, 2017, Counselor Supervisor Tugie concluded that the plaintiff's conduct

did not meet the threshold for AS placement and recommended that his placement on AS be

deferred for 120 days.  *Id.*, ¶ 118; Ex. J, at 140-41.  On January 11, 2017, OCPM Director Maiga

chose not to follow Counselor Supervisor Tugie's recommendation and authorized the plaintiff's

placement on AS because of the plaintiff's involvement in multiple incidents impacting facility

operations, safety and security.  *Id.*, ¶¶ 119-20.  The plaintiff appealed the decision.  *Id.*, ¶ 121.

Deputy Commissioner Rinaldi upheld the decision of OCPM Director Maiga and noted the

plaintiff's disciplinary history as support for the decision.  *Id.*, ¶ 122.

The plaintiff was subjected to many restrictive conditions during his confinement on AS at Northern.  *Id.*, ¶¶ 123-28.  Inmates who have been confined at Northern on Special Needs Management Status or Special Circumstances Status are not required to endure the same restrictive conditions of confinement.  *Id.*, ¶ 127.

On January 10, 2017, the plaintiff received some items of his personal property including his clothes, food, books, magazines, headphones, a radio, and cosmetics.  *Id.*, ¶ 129.  He was not permitted to possess other items including his: hardcover books, footwear, pillow, television, hot pot, video games, fan, beard trimmer, and electric razor.  *Id.*, ¶ 130.

The plaintiff spoke to Captain Robles and Warden Mulligan regarding the general conditions of confinement in the AS program as well as the items of property that he could not possess.  *Id.*, ¶¶ 138, 140.  Captain Robles indicated that the conditions were imposed to make inmates learn "their place" and Warden Mulligan indicated that the conditions were imposed to make inmates as uncomfortable as possible.  *Id.*

As of January 13, 2017, the plaintiff's ankles were swollen and painful and the lacerations from the leg irons appeared to be infected.  Nurse Hill denied his requests for medical treatment.  *Id.*, ¶ 133.  He received no response to his medical grievance.  *Id.*, ¶ 134.

Before escorting the plaintiff to take a shower, officers subjected the plaintiff to a strip search in his cell.  *Id.*, ¶¶ 135-36.  Instead of permitting the plaintiff to put his clothes back on after the strip search, the officers escorted the plaintiff to the shower area in nothing other than his "open fly boxers."  *Id.*  This practice exposed the plaintiff's bare body and genitals to female and male staff members and inmates who were in the area during the plaintiff's escort to the

shower.  *Id.*  At times, the inmates and staff members taunted the plaintiff and made sexually suggestive comments about him as he walked by them.  *Id.*

The plaintiff spoke to Captain Robles about the practice of forcing inmates to walk around without clothes in front of other inmates and staff members and the fact that the practice violated the PREA.  *Id.*, ¶ 136.  Captain Robles indicated that the practice would not change and that it was in place for staff convenience.  *Id.*, ¶ 137.  Warden Mulligan denied the plaintiff's grievance in which he requested that the shower escort policy be reviewed under the PREA.  *Id.*, ¶ 139.

The plaintiff informed Warden Mulligan that he did not understand the criteria for his placement on AS.  *Id.*, ¶ 142.  Warden Mulligan indicated the criteria for placement on AS was "whatever [he] want[ed] it to be."  *Id.*  The plaintiff filed a grievance requesting that Warden Mulligan comply with State of Connecticut Department of Correction Administrative Directive 9.2(4)(F), which required officials to make sure that every inmate understood the classification procedures and criteria used for placing an inmate on AS.  *Id.*, ¶ 144; Ex. K, at 144.  Warden Mulligan denied the plaintiff's grievance.  *Id.*

The plaintiff also questioned Warden Mulligan and Captain Robles regarding the periodic reviews that were to be conducted every thirty days after the initial 7-day review pursuant to State of Connecticut Department of Correction Administrative Directive 9.4.  *Id.*, ¶¶ 145-46; Ex. G, 106-08, 121-22, 127.  Both Mulligan and Robles indicated that the reviews were meaningless and that he must remain on AS for at least ten months.  *Id.*

On January 27, 2017, the plaintiff participated in recreation outside without a coat, hat, or gloves.  *Id.*, ¶ 148.  The cold temperature caused the plaintiff to experience severe pain.  *Id.*  The

plaintiff spoke to Captain Robles regarding the lack of available coats, gloves, hats, and footwear. *Id.*, ¶ 149. Captain Robles indicated that inmates on AS would not be provided with winter outerwear. *Id.* Warden Mulligan denied the plaintiff's grievance requesting that he be provided with winter outerwear. *Id.*, ¶ 150. The plaintiff chose to alternate between going to recreation and not going to recreation on days that it was cold outside. *Id.*

On January 31, 2017, a grievance coordinator returned a grievance that the plaintiff had filed regarding the conduct of Nurse Hill and Lieutenant Arzt and instructed the plaintiff to refile it. *Id.*, ¶ 151. When the plaintiff refiled the grievance, Warden Mulligan rejected it on the ground that it had not been filed in a timely manner. *Id.*

The plaintiff informed Warden Mulligan and Captain Robles that he had not received a response to his medical grievance regarding Nurse Hill's denial of medical treatment. *Id.*, ¶ 152. They both indicated that they had no control over the disposition of medical grievances. *Id.*

At the end of January 2017, the plaintiff began to experience extreme anxiety, stress, depression, sleep deprivation, and despair as a result of the isolative conditions of confinement in the AS program. *Id.*, ¶ 153. The plaintiff received no responses to his many requests and grievances seeking mental health treatment. *Id.*, ¶¶ 154, 156.

In February 2017, the plaintiff informed Captain Robles and Warden Mulligan that he needed mental health treatment and that a mental health provider had not examined him or assessed the status of his mental health as required by Administrative Directive 9.4. *Id.*, ¶ 155. Warden Mulligan and Captain Robles indicated that mental health providers were not required to treat him because his mental health level was a level 2. *Id.*

On February 8, 2017, the plaintiff filed a grievance seeking to be progressed to Phase II

of the AS program because he had completed the Phase I in-cell programming paperwork as of January 26, 2017. *Id.*, ¶ 157. A prison official denied the grievance. *Id.*

On or about February 8, 2017, a correctional officer placed Inmate Blair into a fenced recreation cage that was adjacent to the fenced recreation cage in which the plaintiff was confined. *Id.*, ¶ 158. During the recreation period, Inmate Blair exposed his genitals and masturbated. *Id.*, ¶ 160. The plaintiff asked Captain Robles to instruct officers not to place Inmate Blair in a recreation cage near him. *Id.*, ¶ 161. Captain Robles suggested that officers would continue to place Inmate Blair in an adjacent recreation cage because the plaintiff had filed grievances. *Id.*

On multiple occasions, Correctional staff members placed Inmate Blair in a recreation cage near or adjacent to the plaintiff's recreation cage. *Id.*, ¶ 162. The plaintiff filed a grievance seeking to be separated from Inmate Blair and to file a PREA complaint against the officers for subjecting him to the sexually explicit behavior of Inmate Blair. *Id.*, ¶ 163. Warden Mulligan rejected the grievance. *Id.*

On March 10, 2017, the plaintiff spoke to a deputy warden regarding his mental health issues and explained that he was having thoughts of harming himself. *Id.*, ¶ 165. The deputy warden facilitated an appointment between the plaintiff and a psychologist at Northern. *Id.* The psychologist informed the plaintiff that Warden Mulligan and District Administrator Quiros had issued orders that no records be created that might suggest that the plaintiff should be released from AS because he required mental health treatment. *Id.*, ¶ 166. The psychologist indicated that the only treatment that he could provide would be to place the plaintiff on suicide watch if the plaintiff insisted that he wanted to harm himself. *Id.* The plaintiff denied any feelings of

self-harm.  *Id.*  The plaintiff received no other mental health treatment during his confinement at Northern.  *Id.*

On March 15, 2017, during a tour of the outside perimeter of Northern, staff members obstructed the view out of the plaintiff's exterior cell window by throwing mud at it.  *Id.*, ¶ 167. Captain Robles refused to have the plaintiff's window cleaned.  *Id.*, ¶ 168.

On March 15, 2017, the plaintiff wrote to Commissioner Semple regarding the conditions in the AS program at Northern.  *Id.*, ¶ 169.  On March 17, 2019, Attorney Cannatelli sent two letters to Commissioner Semple regarding the conditions of confinement in the AS program at Northern.  *Id.*, ¶ 170.

On March 21, 2017, the plaintiff filed a grievance because staff members were denying him one hour of recreation every two weeks.  *Id.*, ¶ 171.  On March 24, 2017, Warden Mulligan placed the plaintiff on grievance restriction.  *Id.*, ¶ 172.  Warden Mulligan indicated that Commissioner Semple had received his letters and that the conditions at Northern would remain the same.  *Id.*

On April 17, 2017, OCPM Director Maiga responded to Attorney Cannatelli's letters regarding the plaintiff's placement on AS and the conditions at Northern.  *Id.*, ¶ 173.  Director Maiga indicated that the plaintiff had been placed on AS because he had threatened violence and had barricaded his door.  *Id.*

The plaintiff remained on AS at Northern until late September 2017.  *Id.*, ¶ 174.  During the plaintiff's confinement at Northern, he filed many Level 1 grievances regarding conditions of confinement.  ¶ 175.  Warden Mulligan denied the Level 1 grievances and District Administrator Quiros denied the Level 2 appeals of the Level 1 grievance decisions by Warden Mulligan.  ¶¶

15

175-76.  Deputy Commissioner Rinaldi denied the Level 3 appeals of the decisions by District

Administrator Quiros.  *Id.*, ¶ 178.

### D.       Confinement at Cheshire – October 2017 and September - November 2018

In October 2017, prison officials at Northern transferred the plaintiff to Cheshire.  *Id.*, ¶

179.  The plaintiff remained at Cheshire for three weeks.  *Id.*, ¶ 180.[2]  During this time, the

plaintiff was housed in a cell in the restrictive housing unit.  *Id.*  Officers deprived the plaintiff of

warm water, items of personal property, and his legal work and required him to remain in his cell

all day and night.  *Id.*  The vents in the cell was covered with black mold.  *Id.*  When the plaintiff

spoke to Warden Erfe about the conditions, he remarked that the plaintiff would be leaving the

facility soon.  *Id.*, ¶ 181.

In September 2018, the plaintiff was again housed at Cheshire.  *Id.*, ¶ 183.  At the time,

the plaintiff was on Chronic Discipline Status.  *Id.*  In October 2018, staff members removed the

plaintiff from Chronic Discipline Status and placed him in general population.  *Id.*, ¶ 184.  In

November 2018, Warden Erfe transferred the plaintiff to a prison in Massachusetts under the

Interstate Compact Agreement because the plaintiff was a threat to the safety and security of all

Connecticut facilities.  *Id.*, ¶¶ 185-86.  Prison officials in Massachusetts periodically returned the

plaintiff to Hartford Correctional to enable him to appear in court for hearings.  *Id.*, ¶ 187.

### E.       Confinement at Hartford Correctional – September 2019

On September 10, 2019, prison officials in Massachusetts transferred the plaintiff to

Hartford Correctional because he had an upcoming court hearing.  *Id.*, ¶ 190.  Correctional

---

[2] Based on allegations asserted by the plaintiff in a complaint filed in *Baltas v. Frenis, et al.*, Case No. 3:18cv1168(VLB), prison officials at Cheshire transferred the plaintiff to Garner on November 1, 2017.  The plaintiff remained at Garner until at least June 2018.  *See id.* (Compl.,

Officer Rizvani confronted the plaintiff about a lawsuit that he had filed against Department of Correction employees, *Baltas v. Rivera, et al.*, Case No. 3:19cv1043(MPS).  Officer Rizvani threatened to harm the plaintiff because some of the defendants in the lawsuit were his friends. *Id.*, ¶¶ 188-192.  The plaintiff informed Captain Alexander that Officer Rizvani had threatened to harm him.  *Id.*, ¶ 193.  Captain Alexander indicated that he would remove Officer Rizvani from the plaintiff's housing unit.  *Id.*

On September 11, 2019, Rizvani worked as the Unit Control Officer in the plaintiff's housing unit.  *Id.*, ¶ 194.  During his shift, Officer Rizvani verbally harassed and threatened the plaintiff multiple times. *Id.*, ¶ 194-98.

On September 12, 2019, Officer Rizvani continued his verbal harassment of the plaintiff. *Id.*, ¶¶ 199-200.  The plaintiff confronted Officer Rizvani as he delivered a meal to another inmate in the housing unit.  *Id.*, ¶ 202.  The plaintiff suggested that Officer Rizvani should not be so upset about the lawsuit pending against his co-workers, patted Officer Rizvani on the arm, and walked back to his cell.  *Id.*, ¶ 203.  Officer Rizvani did not appreciate the suggestion and threatened to harm the plaintiff.  *Id.*, ¶ 204.  The plaintiff told Officer Rizvani to calm down and patted his arm again.  *Id.*, ¶ 205.  Officer Rizvani then lunged at the plaintiff, grabbed the plaintiff by the shirt collar, slammed the plaintiff into the door frame, and pressed his fists into the plaintiff's throat.  *Id.*, ¶¶ 206-07.  The plaintiff lashed out in self-defense with his right arm in an attempt to force Officer Rizvani out of his cell.  *Id.*, ¶ 208.  The plaintiff and Officer Rizvani continued to struggle until staff members arrived at the plaintiff's cell.  *Id.*, ¶¶ 209-11.  The plaintiff left his cell, kneeled on the ground, and placed his hands behind his head.  *Id.*, ¶ 212.

---

ECF No. 1, at 4-9 ¶¶ 26-78).

Staff members sprayed the plaintiff with a chemical agent, slammed him to the ground, piled on top of him, and yelled stop resisting. *Id.*, ¶¶ 212-13.

After gaining control over the plaintiff, staff members escorted him to the shower, placed his head under the shower for several seconds to rinse off the chemical agent, and placed him in a cell in the restrictive housing unit. *Id.*, ¶ 214. Staff members applied in-cell restraints to the plaintiff's ankles, wrists, and waist in an improper manner. *Id.*, ¶¶ 215-16. The plaintiff received no medical assessment or treatment of his injuries or his asthmatic condition. *Id.*, ¶¶ 217-18.

The plaintiff informed Captain Alexander that staff members had failed to effectively decontaminate him from the chemical agent and had improperly applied the in-cell restraints. *Id.*, ¶ 219. He requested to be properly decontaminated and to be released from the restraints or to have the restraints reapplied. *Id.* Captain Alexander denied these requests. *Id.*, ¶¶ 220-22. After the plaintiff smeared the walls of his cell with feces, officers escorted him to the shower and permitted the plaintiff to clean himself off. *Id.*, ¶¶ 222-23. Officers then escorted the plaintiff to meet with a Connecticut State Trooper regarding the altercation with Officer Rizvani. *Id.*, ¶ 223. The officers would not permit the plaintiff to make a statement to the State Trooper outside of their presence. *Id.*, ¶ 224.

Dr. Mathews visited the plaintiff at his cell but refused to speak to the plaintiff in private or offer him treatment. *Id.*, ¶ 225. Warden McCormack and District Administrator Erfe initiated the plaintiff's placement on AS. *Id.*, ¶ 226. Dr. Mathews cleared the plaintiff for placement on AS without conducting an assessment of his mental health status. *Id.*, ¶ 228. Later that day, prison officials at Hartford Correctional transferred the plaintiff to Northern. *Id.*, ¶ 229.

18

**F.      Confinement at Northern – September 12, 2019 to October 21, 2019**

Upon the plaintiff's arrival at Northern, prison officials placed him in a housing unit with inmates who had been classified to Special Needs Management Status and Special Circumstances Status.  *Id.*, ¶ 230.  On September 13, 2019, Captains Chevalier and Robles and Warden Mudano informed the plaintiff that he would not be returning to the prison in Massachusetts if the Office of Classification and Population Management authorized his placement on AS.  *Id.*, ¶¶ 231-32.

The plaintiff received two disciplinary reports in connection with his altercation with Officer Rizvani, one charging him with assaulting a correctional officer and one charging him with interfering with safety and security.  *Id.*, ¶ 233.  Disciplinary Investigator Leone met with the plaintiff to discuss the disciplinary charges.  *Id.*  The plaintiff informed Investigator Leone that neither report had been delivered to him.  *Id.*  The plaintiff requested witness statements and video evidence in order to challenge the disciplinary charges.  *Id.*, ¶ 234.

The plaintiff experienced the same conditions of confinement that he had been exposed to during his confinement at Northern in 2017.  *Id.*, ¶ 235.  On September 19, 2019, the plaintiff spoke to Captain Chevalier and Warden Mudano regarding the restrictive conditions of confinement.  *Id.*, ¶ 237.  They both indicated that the conditions would not be modified.  *Id.*  On September 20, 2019, Captain Robles confirmed that the conditions would remain the same.  *Id.*, ¶ 238.  On September 22, 2019, the plaintiff wrote to Captains Chevalier and Robles, Wardens Mudano and Mulligan, OCPM Director Maiga, Mulligan, District Administrator Quiros and Commissioner Cook regarding the conditions in AS, his mental health issues, and the fact that the assault on Officer Rizvani constituted a Level 2 Incident and did not warrant his placement

19

on AS. *Id.*, ¶ 239.  The plaintiff did not receive a response to this letter.  *Id.*

On September 24, 2019, a staff member provided the plaintiff with a notice of his upcoming AS placement hearing.  *Id.*, ¶ 240.  The plaintiff believed that the notice contained inaccurate information.  *Id.*  The plaintiff requested that the staff member appoint an advisor to assist him in preparing for the hearing and informed the staff member that he intended to submit witness statements and to review the videotape of the incident involving his altercation with Officer Rizvani.  *Id.*, ¶ 241.  The plaintiff's advisor did not secure witness statements or the video footage and falsely indicated that he had not requested the services of an advisor.  *Id.*, ¶ 243.  The plaintiff's advisor collected his written statement prior to the hearing.  *Id.*, ¶ 242.

On September 27, 2019, Counselor Supervisor Tugie presided over the AS hearing.  *Id.*, ¶ 244.  The plaintiff identified the information in the hearing notice that he thought was inaccurate and pointed out that Administrative Directive 9.2 prohibited his placement on AS because the incident involving his altercation with Officer Rizvani was a Level 2 Incident and that there had been no findings of fact regarding the disciplinary report charging him with assault on a correctional officer.  *Id.*, ¶¶ 243, 245.

On October 7, 2019, Counselor Supervisor Tugie recommended that the plaintiff be placed on AS due to his deliberate assault on a Department of Correction employee.  *Id.*, ¶ 252; Ex. S, at 185-87.  Later that day, OCPM Director Maiga upheld the recommendation and authorized the plaintiff's placement on AS because of the plaintiff's direct/intentional assault on a Department of Correction employee and because the plaintiff continued to threaten the safety, security and orderly operation of correctional facilities.  *Id.*, ¶ 253.  The plaintiff appealed the decision.  *Id.*, ¶ 256.

20

On October 9, 2019, the plaintiff participated in a hearing to address the two disciplinary reports that he had received in connection with his altercation with Officer Rizvani.  *Id.*, ¶¶ 257-58.  The plaintiff argued that he had not been provided with notice of the hearing and his advisor had neglected to secure his witness statements or any other evidence.  *Id.*, ¶ 258.  The plaintiff did provide a written statement of his defense to the charges of assaulting a correctional officer and interfering with safety and security.  *Id.*  Lieutenant Betances refused to make any attempt to secure witness statements for the plaintiff. *Id.*, ¶ 259.  Lieutenant Betances found the plaintiff guilty of both disciplinary charges based on the recommendation and/or interpretation of the evidence by Investigator Leone. *Id.*, ¶¶ 259-60.

On October 11, 2019, the plaintiff wrote to Commissioner Cook about the incidents that had occurred at Hartford Correctional in September 2019 and at Northern in September and October 2019.  *Id.*, ¶ 262.  The plaintiff did not receive a response from Commissioner Cook.  *Id.*  On October 21, 2019, the plaintiff asked Attorney Cannatelli to send a letter to Commissioner Cook regarding the incidents that had occurred at Hartford Correctional and Northern in September and October 2019.  *Id.*, ¶ 263.

## III.   Discussion

The plaintiff claims that the defendants violated his rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, RLUIPA, PREA, and under Article First § 20 of the Connecticut Constitution.  He seeks punitive and compensatory damages and injunctive and declaratory relief.

### A.    Section 1983 – Declaratory Relief and Damages – Official Capacity

The plaintiff sues Nurse Hill and Lieutenant Arzt in their individual capacities and the

21

remaining defendants in their individual and official capacities.  To the extent that the plaintiff

seeks monetary damages from Semple, Cook, Rinaldi, Quiros, Maiga, Erfe, Falcone, Mulligan,

Mudano, McCormack, Robles, Alexander, Chevalier, Betances, Rizvani, Leone, Tugie, Pieri,

and Mathews in their official capacities, those claims are barred by the Eleventh Amendment and

are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).  *See Kentucky v. Graham*, 473 U.S. 159

(1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also

protects state officials sued for damages in their official capacity).

The plaintiff seeks a declaration that the defendants violated his rights under the First,

Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and his

rights under RLUIPA and PREA.  *See* Compl. at 62-65, 70-71, 73, 75-76, 78.  Under the doctrine

of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive and

declaratory relief to address an ongoing or continuing violation of federal law or an imminent

threat of a future violation of federal law.  *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d

Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000).  In determining whether *Ex Parte

Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint

alleges an ongoing violation of federal law and seeks relief properly characterized

as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002)

(internal quotation marks and citation omitted).

The plaintiff is currently confined in Virginia.  His requests for declaratory relief are

addressed to conditions and incidents that occurred at Garner, Cheshire, Northern, and Hartford

Correctional from July 2016 to October 2019.  Absent a request for relief to remedy ongoing

violations of the plaintiff's rights or a threat of a violation of his rights in the future, a declaration

that the defendants violated his rights in the past is barred by the Eleventh Amendment.

*See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young*... to claims for retrospective relief") (citations omitted). Accordingly, the request for declaratory judgment is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

> **B.      Section 1983 – Requests for Injunctive Relief**
> **Motion for Temporary Restraining Order and for Preliminary Injunction**
> **Motion for Judgment and/or Default Judgment**

The complaint includes requests for injunctive relief related to the plaintiff's confinement at various prison facilities within Connecticut and an order directing the Office of the Chief State's Attorney in Connecticut to investigate the allegations in the complaint to determine whether any of the defendants engaged in "criminal wrongdoing."  *See* Compl. at 62, 64, 66, 68-73, 75-78, 80.[3]  The plaintiff has also filed a motion for temporary restraining order and preliminary injunction seeking orders directing the defendants to remove him from confinement on AS status at Northern, to stop confining him in isolation, and to return his personal property items, including his electronic devices and appliances.  *See* Mot. TRO & Prelim. Inj., ECF No. 3, at 1-2.  The plaintiff seeks a default judgment because the defendants have not opposed the motion seeking a restraining order or a preliminary injunction.

---

[3] Although the plaintiff includes a request in his prayer for relief seeking a court order prohibiting the State of Connecticut from indemnifying the defendants from paying punitive damages that the court or the jury might award to him, the court does not consider this a request for injunctive relief from the defendants.  *Id.* at 80.  The decision by the State of Connecticut to indemnify or not to indemnify any defendant, a state employee, if a judgment is entered against that employee, will be governed by Conn. Gen. Stat. § 5-141d(a). The request is thus premature.

23

An inmate has "no constitutional right to an investigation of any kind by government officials." *Banks v. Annuci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted).  Nor is an inmate entitled to the prosecution of the alleged perpetrator of the crime.  *See Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (inmates alleging beating by prison guards lack standing to challenge prison officials' request to magistrate not to issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Joyce v. Hanney*, No. 3:05cv1477(WWE), 2009 WL 563633, at *9 (D. Conn. Mar. 4, 2009) (prisoner has no constitutional right to have defendants disciplined or prosecuted).  Accordingly, the request for injunctive relief seeking an investigation of the conduct of the defendants by the Office of the Chief State's Attorney is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

The Second Circuit has held that an inmate's request for prospective injunctive relief from correctional staff in connection with conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged from that institution, is transferred to a different institution or has received the relief requested.  *See Shepard v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief.") (citation and internal quotation marks omitted); *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed").  The requests for injunctive relief asserted in the complaint pertain to the plaintiff's confinement at Cheshire, Garner, Northern and Hartford Correctional from July 2016 to October 2019 and the requests for injunctive relief sought in the motion for temporary restraining order and

24

preliminary injunction relate to the plaintiff's confinement on AS at Northern as of October 22, 2019.  As indicated above, the plaintiff has been transferred to a prison in Virginia.

Because the plaintiff is no longer confined in any facility within the Connecticut Department of Correction, the requests asserted in the complaint seeking injunctive relief from prison officials in Connecticut that are related to conditions of confinement in Connecticut prison facilities are moot and are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).  For the same reasons, the requests pertaining to the plaintiff's removal from AS placement at Northern and the return of personal property items by prison officials at Northern that are included in the motion seeking injunctive relief are also moot.[4]  Accordingly, the motion for temporary restraining order and for preliminary injunction is denied as moot and the motion seeking a judgment and/or default judgment because the defendants' have not opposed the motion for temporary restraining order and for preliminary injunction is denied.

### C.     Confinement at Cheshire from July to October 2016

The plaintiff alleges that during his confinement at Cheshire from July 11, 2016 to October 25, 2016, Warden Erfe required him to wear a different color jumpsuit than other inmates confined at Cheshire.  Warden Erfe denied multiple grievances filed by the plaintiff regarding the requirement that he wear a yellow jumpsuit.  District Administrator Quiros upheld the decisions of Warden Erfe on appeal.  The plaintiff also challenges the decision by Warden Erfe and District Administrator Quiros to transfer him from Cheshire to MacDougall on October 25, 2016.

---

[4] To the extent any property has still not been returned to him, the plaintiff must pursue his administrative remedies under the State of Connecticut Department of Corrections Administrative Directive 9.6(16). *See infra*, note 8.

### 1.      Jumpsuit Requirement – Violation of Administrative Directive

The plaintiff contends Warden Erfe violated Administrative Directive 9.4(14) by requiring him to wear a yellow jumpsuit during his confinement at Cheshire in 2016.  The plaintiff does not dispute that he had been placed on High Security status prior to his transfer to Cheshire on July 11, 2016.  *See* Compl. ¶ 39; Ex. B, at 85-86.  Administrative Directive 9.4(14) governs the management of inmates who have been placed on High Security status.  *See* Compl. ¶ 40; Ex. G, at 107, 117-19.  Although Administrative Directive 9.4(14) does not specifically authorize prison officials to clothe an inmate in a different color jumpsuit, it also does not prohibit such conduct.

Furthermore, the failure to follow a prison directive or procedure does not state a claim under section 1983.  *See Whitaker v. Evans*, No. 3:19CV1129 (MPS), 2019 WL 6700188, at *3 (D. Conn. Dec. 9, 2019) ("[D]efendants' failure to comply with prison regulations or administrative directives does not constitute a basis for relief under Section 1983 because a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983." (internal quotation marks omitted)). Thus, to the extent that the plaintiff alleges that Warden Erfe and District Administrator Quiros violated an administrative directive by requiring him to wear a jumpsuit that was different than the jumpsuits worn by other inmates at Cheshire, the claim is dismissed as lacking an arguable legal basis.  *See* 28 U.S.C. § 1915A(b)(1).

### 2.      Jumpsuit Requirement - Discrimination

The plaintiff also contends that requiring him to wear a different colored jumpsuit violated his right to equal protection under the Fourteenth Amendment.  The Equal Protection

Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  It does not mandate identical treatment for each individual or group of individuals.  Instead, it requires that similarly situated persons be treated the same.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000).  The plaintiff has not alleged that Warden Erfe or District Administrator Quiros treated him differently or discriminated against him because of his membership in a protected class or based on some suspect classification.

Absent allegations to support "class-based" discrimination, an individual may state an equal protection claim by alleging that he or she has been intentionally and "irrationally singled out as a . . . class of one."  *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008).  A plausible class of one claim requires the plaintiff to demonstrate an "'extremely high degree of similarity'" with the person to whom he or she is comparing himself or herself.  *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).  Thus, the plaintiff must demonstrate the existence of a person who is "prima facie identical" to him or her and who was treated differently.  *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (internal quotation marks and citation omitted).

27

The plaintiff does not identify another inmate who was essentially identical to him and who was treated differently.  Thus, the facts in the complaint do not state a plausible class-based equal protection claim or a plausible class of one equal protection claim against either Warden Efre or District Administrator Quiros.  Accordingly, the claim that Warden Erfe and District Administrator Quiros violated the plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment by requiring him to wear a yellow jumpsuit during his confinement at Cheshire in 2016 is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 3.    Prison Transfer Claim

The plaintiff alleges that a little over three months after his arrival at Cheshire, Warden Erfe and District Administrator Quiros decided to transfer him back to MacDougall.  The plaintiff argues that the transfer violated his First and Eighth Amendment rights.

### a.    Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. VIII.  It is made applicable "to States through the Due Process Clause of the Fourteenth Amendment."  *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991) (citing *Robinson v. California*, 370 U.S. 660, 666-67 (1962)).

An inmate has no Eighth or Fourteenth Amendment right to be confined at a particular prison facility.  *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (inmates have no right to be confined in a particular state or a particular prison within a given state); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (transfer among correctional facilities, without more, does not violate inmate's constitutional rights, even where conditions in one prison are "more disagreeable" or the prison has "more severe rules"); *Andrews v. Semple*, No. 3:17-cv-1233 (SRU), 2017 WL

5606740, at *4 (D. Conn. Nov. 21, 2017) (dismissing due process claim that prison officials refused to transfer inmate to prison facility of his choice, Garner Correctional Institution, because "he has no constitutionally protected right to be housed" at Garner or any other facility); *Remillard v. Maldonado*, No. 3:15-CV-1714(SRU), 2016 WL 3093358, at *3 (D. Conn. June 1, 2016) ("The Eighth Amendment does not require the least restrictive housing for a prisoner."). Thus, the transfer of the plaintiff to MacDougall, in and of itself, does not state a violation of the Fourteenth or the Eighth Amendments.

Furthermore, the possibility that the plaintiff may have experienced more restrictive conditions of confinement at MacDougall does not rise to the level of cruel and unusual punishment under the Eighth Amendment. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."). The claim that Warden Erfe and District Administrator Quiros violated the plaintiff's Eighth Amendment rights by transferring him to MacDougall on October 25, 2016 is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### b.    First Amendment

The plaintiff also suggests that the decision by Warden Erfe and District Administrator Quiros to transfer him to MacDougall was made in retaliation for his having filed grievances about the requirement that he wear a jumpsuit that was a different color than the jumpsuits worn by other inmates at Cheshire. The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."

*Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015).  Retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted).  To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).

The Second Circuit has held that "the filing of prison grievances is a constitutionally protected activity."  *Davis*, 320 F.3d at 352–53 (citations omitted).  A transfer of an inmate in retaliation for filing a lawsuit or a grievance may constitute adverse action.  *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) ("We had stated, at least as early as 1998, that, while '[a] prisoner has no liberty interest in remaining at a particular correctional facility,' prison authorities 'may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.'") (quoting *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir. 1998)).

The plaintiff contends that prison officials at MacDougall transferred him to Cheshire in July 2016 because of his involvement in organizing "a mass grievance filing and a multi-plaintiff federal lawsuit" and that his transfer back to MacDougall in October 2016 was adverse because MacDougall was "less hospitable" than any other facility.  Compl. ¶¶ 37, 46.  Given the allegation that MacDougall was "less hospitable" than any other facility and the relatively short time period between the filing of grievances by the plaintiff at Cheshire and the transfer, at most three and one-half months, the court will permit this First Amendment retaliation claim to proceed against Warden Erfe and District Administrator Quiros in their individual capacities for further development of the record.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)

(passage of six months between dismissal of prisoner's lawsuit and alleged act of retaliation by prison officers, one of whom was a defendant in the prior lawsuit, sufficiently supports an inference of causal connection in a First Amendment retaliation claim).

### D.    Confinement at Garner from November to December 2016

The plaintiff alleges that during his month-long confinement at Garner from November 23, 2016 to December 23, 2016, Warden Falcone and District Administrator Quiros denied him the right to practice his religion in violation of the First Amendment and RLUIPA, Warden Falcone, District Administrator Quiros, and OCPM Director Maiga discriminated against him on the basis of his ancestry, and Warden Falcone and District Administrator Quiros, OCPM Director Maiga, and Dr. Pieri were deliberately indifferent to his mental health conditions.

#### 1.    First Amendment - Religion

The plaintiff alleges that he is an adherent of the Native American religion or faith and that during his confinement at Garner in 2016, he could not participate in the sweat lodge ceremony and could not engage in the religious practice of smudging.  He contends that Warden Falcone and District Administrator Quiros violated his First and Eighth Amendment rights.

As a preliminary matter, there are no facts to support a claim that either Warden Falcone or District Administrator Quiros violated the plaintiff's Eighth Amendment rights by depriving him of the opportunity to engage in the smudging ritual or participate in the sweat lodge ceremony.  The fact that the plaintiff might not have been able to participate in a religious ceremony or perform a religious practice does not constitute the deprivation of a basic human need or life necessity.  See *Rhodes*, 452 U.S. at 347 (To satisfy the objective component of an Eighth Amendment claim, a prisoner must demonstrate that his or her conditions of confinement

31

alone or in combination resulted in "unquestioned and serious deprivations of basic human needs" or "deprive[d] [him or her] of the minimal civilized measures of life's necessities.").  The claim that Warden Falcone and District Administrator Quiros violated the plaintiff's Eighth Amendment rights when they denied him the opportunity to participate in a religious ceremony and to engage in a religious practice is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

It is well-established that an inmate has a First Amendment[5] right to freely exercise his or her chosen religion.  *See O'Lone v. Estate of Shabazz*, 283 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.").  An inmate's First Amendment rights, however, are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system."  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (internal quotation marks and citation omitted).  Thus, an inmate's right to freely exercise his or her religion is not without limits and may be subject to restrictions related to legitimate concerns involving safety and security.  *See Pell v. Procunier,* 417 U.S. 817, 822 (1974) (A "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").

To state a First Amendment free exercise claim, an inmate is required to make a threshold showing "that the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006).[6]  In determining whether an inmate's

---

[5] The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...."  U.S. Const. amend. I.

[6] In the last several years, the Second Circuit has recognized that a question exists as to whether an inmate must establish that the conduct of prison officials resulted in a "substantial

religious beliefs are sincere, a district court should not "evaluate the objective reasonableness of the [inmate's] belief" but consider only whether the [inmate] "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

If an inmate asserts sufficient facts to state a plausible claim that prison officials engaged in conduct that burdened the free exercise of his or her religious beliefs, those officials then must "identify[] the legitimate penological interests that justif[ied] [their] conduct. *Salahuddin*, 467 F.3d at 275 (citations omitted). "The burden remains with the [inmate] to show that" the concerns articulated by the prison officials are "irrational." *Id.* (internal quotations omitted).

The plaintiff has alleged that he has practiced the Native American religion or faith since 2009 and that he was unable to engage in meaningful worship according to the dictates of his religion during his confinement at Garner because Warden Falcone and District Administrator Quiros did not arrange for him to participate in the sweat lodge ceremony and did not intervene to stop correctional officers from denying him the opportunity to smudge. *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("The exercise of religion often involves not only belief and

---

burden" on his religious beliefs in order to state a First Amendment free exercise claim. *See Brandon v. Kinter*, 938 F.3d 21, 32 n.7 (2d Cir. 2019) ("Our Circuit has not yet decided whether the substantial burden requirement remains good law after the Supreme Court's decision in *Employment Division v. Smith*. . . ."); *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'") (quoting *Salahuddin*, 467 F.3d at 274–75 and citing *Ford*, 352 F.3d at 592 (assuming without deciding that substantial burden requirement applies)). Because the issue has not yet been squarely addressed by the Second Circuit, this court will continue to apply the substantial burden test. *See Richard v. Strom*, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *3 (D. Conn. Nov. 19, 2018)(noting the "Second Circuit['s] uncertainty" as to whether an inmate must continue to make a "threshold showing" that the conduct of the prison official substantially burdened his or her religious beliefs, but observing that "absent instruction to the contrary, Second Circuit courts have continued to assume the validity of the substantial burden test when addressing free exercise claims") (citations omitted).

profession but the performance of physical acts such as assembling with others for a worship

service or participating in sacramental use of bread and wine.") (internal citation omitted);

*Goode v. Bruno*, No. 3:10CV1734 (SRU), 2013 WL 5448442, *6 (D. Conn. Sept. 30, 2013)

("Plaintiff identifies the right at issue as his First Amendment right to possess objects, participate

in ceremonies and observe holidays that are part of his sincerely held religious beliefs and

necessary to practice his religion.").  The court concludes that the plaintiff has stated a plausible

claim that Warden Falcone unconstitutionally and substantially burdened his right to free

exercise of his sincerely held religious practices in violation of the First Amendment.

Although the plaintiff seeks both money damages and injunctive and declaratory relief in

connection with this claim, the court has dismissed the request for declaratory relief as seeking

retrospective relief and dismissed the request for injunctive relief as moot because the plaintiff is

no longer confined at Garner or any other Connecticut correctional facility. [7]  Thus, the First

Amendment free exercise claim that arises from the plaintiff's confinement at Garner from

November to December 2016 will proceed against Warden Falcone and District Administrator

Quiros in their individual capacities only.

## 2.    RLUIPA

Included in the plaintiff's third cause of action, is a claim that Warden Falcone and

District Administrator Quiros permitted their staff to deny him the opportunity to smudge in

violation of RLUIPA.  *See* Compl. ¶¶ 273-75.  RLUIPA states that "[n]o government shall

---

[7] The plaintiff sought injunctive relief for both his First Amendment free exercise claim and his RLUIPA claim in the form of an order directing Warden Falcone to build a sweat lodge at Garner or to transfer him to a prison facility in Connecticut that has a sweat lodge and a declaratory judgment that Warden Falcone and District Administrator Quiros had violated his rights under the First Amendment and RLUIPA.  *See* Compl. ¶ 276.

impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).  To state a claim under RLUIPA, a plaintiff must "demonstrate that the state has imposed a substantial burden on the exercise of his [or her] religion."  *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010).  The burden then shifts to the state to demonstrate "that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Id.*

The Second Circuit has held that RLUIPA "does not authorize monetary damages against state officers in either their official or individual capacities."  *Holland*, 758 F.3d at 224 (citations omitted).  Thus, a plaintiff may only obtain injunctive or declaratory relief as a remedy for a RLUIPA violation.  *See Pilgrim v. Artus*, No. 9:07-cv-1001 (GLS/RFT), 2010 WL 3724883, *16 (N.D.N.Y. Mar. 18, 2010) (limiting prisoner's RLUIPA claims to injunctive and declaratory relief against state correction officers).  Accordingly, the request for monetary damages for violations of RLUIPA is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

The court has concluded above that the requests for injunctive relief related to the plaintiff's First Amendment free exercise claim are moot.  For the same reasons, the requests for injunctive and declaratory relief for violations of RLUIPA are also moot.  See *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013) ("Since Washington is no longer in the Special Housing Unit, we dismiss his RLUIPA claim for injunctive and declaratory relief as moot.") (citations omitted).  The requests for declaratory and injunctive relief for violations of the

plaintiff's rights under RLUIPA are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 3.      Eighth and Fourteenth Amendments – Mental Health Needs

The plaintiff alleges that on December 22, 2016, pursuant to the decision by District Administrator Quiros and OCPM Director Maiga to consider him for placement on AS, Warden Falcone instructed Dr. Pieri to conduct an assessment of his mental health status prior to transferring him from Garner to Northern.  The plaintiff contends that Dr. Pieri was deliberately indifferent to his serious mental health conditions in violation of the Eighth and Fourteenth Amendments when she cleared him for placement on AS.

The Eighth Amendment, which applies to the States through the Fourteenth Amendment, prohibits deliberate indifference to an inmate's serious medical or mental health need.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.") (internal quotation marks and citation omitted); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (Eighth Amendment "forbids" not only "deliberate indifference to serious medical needs of prisoners," but also deliberate indifference to serious "mental health care" needs) (internal quotation marks and citation omitted).  Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle*, 429 U.S. at 104-05.

To state a claim for deliberate indifference to a serious medical or mental health need, two elements must be met.  The objective element requires the inmate to assert facts to demonstrate that his or her medical or mental health need or condition is "a serious one."

*Brock v. Wright,* 315 F.3d 158, 162 (2d Cir. 2003) (citations omitted).  In determining whether a condition is serious, the court considers whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

The second element is subjective.  To meet this element, the inmate must allege that the prison official was actually aware that his or her actions or inactions would cause a substantial risk of serious harm to him.  *See Salahuddin*, 467 F.3d at 279-80.  Mere negligent conduct does not constitute deliberate indifference.  *See id.* at 280 (reckless indifference "entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.").  Nor does a difference of opinion between a medical provider and an inmate regarding a diagnosis or appropriate medical treatment rise to the level of deliberate indifference. *See Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

The plaintiff claims that in 2000, prior to his incarceration, mental health providers diagnosed him as suffering from Conduct Disorder, Dysthymic Disorder, and Borderline Personality Disorder.  Compl. ¶ 77; Ex. E, at 96-97.  He suggests that in December 2016, when Warden Falcone, District Administrator Quiros, and OCPM Director Maiga determined that he should be considered for placement on AS, he still suffered from these mental health conditions.

Dr. Pieri assessed the plaintiff's mental health status on December 22, 2016 to determine

37

whether there were any contraindications to placing him on AS.  The plaintiff claims that Dr. Pieri should have classified him with a mental health level of 3 or 4 because he had been diagnosed in the past as suffering from Dysthymic Disorder, which is a depressive disorder, as well as Borderline Personality Disorder.  Instead, Dr. Pieri classified the plaintiff with a mental health level of 2.  The plaintiff does not allege that he sought or received mental health treatment or medication for his mental health disorders during his confinement at Cheshire, MacDougall, or Garner.  It is evident that the plaintiff disagrees with the determinations made by Dr. Pieri as part of her assessment of his mental health.  This disagreement, however, does not constitute deliberate indifference to the plaintiff's mental health needs.  *See Daniels v. Murphy*, No. 3:11-cv-00286 (SRU), 2014 WL 3547235, at *9 (D. Conn. July 17, 2014) (Inmate's "disagreement with [physician's] diagnosis of the severity of [his] conditions and treatment of those conditions" did not state claim that physician was deliberately indifferent to those conditions in violation of the Eighth Amendment); *McEachin v. Bek*, No. 06-CV-6453 MAT, 2012 WL 1113584, at *10–11 (W.D.N.Y. Apr. 2, 2012) ("McEachin's mere disagreement with Trapasso's assessment of his mental health status is not an actionable Eighth Amendment claim for purposes of 42 U.S.C. § 1983.")

The plaintiff does not allege that he sought treatment from Dr. Pieri or that she denied him mental health treatment.  Nor are there allegations that Dr. Pieri was involved in the subsequent decision to authorize the plaintiff's placement on AS at Northern.  The plaintiff has failed to state a claim that Dr. Pieri was deliberately indifferent to his mental health needs when she performed an assessment of his mental health status and found no mental health issues to preclude consideration of his placement on AS by District Administrator Quiros and OCPM

Director Maiga.  The Eighth and Fourteenth Amendment claims related to the mental health assessment performed by Dr. Pieri are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 4.      Fourteenth Amendment – Discrimination

The plaintiff alleges that on December 21, 2016, Warden Falcone sent a memorandum to District Administrator Quiros and OCPM Director Maiga requesting that he be considered for AS placement because of his violent behavior and gang influence.  Compl. ¶ 70; Ex. B, at 85-87.  The plaintiff contends that in approving Warden Falcone's request that he be considered for placement on AS, District Administrator Quiros and OCPM Director Maiga discriminated against him based on his ancestry because they relied on a statement made by his father, in a presentence investigation report, to conclude that he had influence with the Diablos Motorcycle Club.  The plaintiff's father, now deceased, was the founder of a Connecticut chapter of the Diablos Motorcycle Club.  Compl. ¶¶ 72-73, 186; Ex. B, at 85-87.

The plaintiff asserts this discrimination claim under the First, Eighth, and Fourteenth Amendments of the United States Constitution.  There are no facts to support a claim under either the First or Eighth Amendments.  Thus, both the First and Eighth Amendment claims are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

The Equal Protection Clause of the Fourteenth Amendment protects individuals from invidious discrimination.  To state an equal protection claim, a plaintiff must allege facts showing that he was treated differently from similarly situated individuals and the reason for the different or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel*, 232 F.3d at 103 (internal quotation marks and citation omitted).

39

The Supreme Court has held that "discrimination by States on the basis of ancestry violates the Equal Protection Clause of the Fourteenth Amendment." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (citations omitted).

It is apparent that the plaintiff is attempting to argue that Warden Falcone, District Administrator Quiros, and OCPM Director Maiga discriminated against him by attributing his father's involvement in the Diablos Motorcycle Club to him in deciding whether to consider him for placement on AS. The court cannot discern how this conduct constitutes discrimination based on ancestry. The Supreme Court considers ancestry to be a close cousin of national origin.

> It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country where a person was born, or more broadly, the country from which his or her ancestors came. Often, however, the two are identical as a factual matter.

*Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 614, (1987) (Brennan, J., concurring). The cases in which the Supreme Court has considered equal protection challenges based on ancestry have involved discrimination based on an individual's racial descent or national origin. In *Hernandez v. State of Texas*, 347 U.S. 475 (1954), the Supreme Court considered ancestry-based exclusion from juries of Mexican–Americans and concluded that "[t]he exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment." *Id.* at 479. In *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943), the Supreme Court sustained a war measure which involved restrictions against citizens of Japanese descent. *Id.* at 100. In *Oyama v. California*, 332 U.S. 633, (1948), the Supreme Court held that the application of California's Alien Land Law to prohibit ownership of agricultural land by a minor American citizen based solely on his father's

40

country of origin – Japan - was not justified by a compelling interest and violated the Equal

Protection Clause of the Fourteenth Amendment.  *Id.* at 640, 646-47.

There are no facts to suggest that Warden Falcone, District Administrator Quiros, and

OCPM Director Maiga were aware of or relied on the plaintiff's ancestry, national origin,

ethnicity, or race in determining that he should be considered for AS placement in December

2016.  Nor has the plaintiff identified any other similarly situated inmates who were treated

differently than he was in order to support either a class-based or a class of one equal protection

claim.

Furthermore, it is evident that the plaintiff's alleged involvement in or association with

the Diablos Motorcycle gang was not a factor in the ultimate decision to authorize his placement

on AS.  *See* Compl. ¶¶ 118-22; Ex. H, at 135-37; Ex. J, at 140-41.  Accordingly, the plaintiff has

not stated a plausible claim that Warden Falcone, District Administrator Quiros, and OCPM

Director Maiga discriminated against him on the basis of his ancestry in violation of the

Fourteenth Amendment.  The Fourteenth Amendment equal protection claim based on ancestry

is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### E.      Confinement at Northern from December 2016 to September 2017

The plaintiff alleges that during his confinement at Northern from December 23, 2016

until late September 2017, Commissioner Semple, Deputy Commissioner Rinaldi, District

Administrator Quiros, OCPM Director Maiga, Warden Mulligan, Captain Robles, Lieutenant

Arzt, Counselor Supervisor Tugie, and Nurse Hill violated his rights under the First, Fourth,

Fifth, Eighth, and Fourteenth Amendments and his rights under the PREA.  He asserts

retaliation, deliberate indifference to medical and mental health needs, excessive force,

unconstitutional conditions of confinement, discrimination, procedural due process, access to courts, and association claims.

### 1.      First Amendment Retaliation Claims

The plaintiff contends that the issuance of a disciplinary report charging him with using insulting language towards Nurse Hill and his placement in in-cell restraints constituted acts of retaliation in violation of his First Amendment right to free speech.  He also contends that Captain Robles retaliated against him for filing grievances by placing Inmate Blair, who was known to masturbate in front of other inmates, in a fenced recreation cage adjacent to the recreation cage in which he was confined.  As articulated above, to plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).

### a.      Issuance of Disciplinary Report and Placement in Restraints

The plaintiff suggests that he has a protected First Amendment right to verbally insult other individuals.  Courts have concluded that "vulgar, insulting, and threatening statements" do not constitute "protected speech for purposes of the First Amendment."  *Chevalier v. Schmidt*, No. 11-CV-788, 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012); *see also Jackson v. Onondaga Cnty*, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (holding that profane or threatening language in addressing corrections staff is not protected speech); *Doe v. Selsky*, 973 F. Supp. 2d 300, 304 (W.D.N.Y. Sept. 20, 2013) (citations omitted) (concluding that "saying 'something nasty'" does not constitute protected speech).  Thus, the plaintiff has failed to satisfy

the first element of a retaliation claim based on the issuance of the disciplinary report for using insulting language.  The retaliation claim asserted against Lieutenant Arzt and Nurse Hill is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### b.   Placement of Inmate Blair in Adjacent Recreation Cage

The plaintiff alleges that on February 8, 2017, shortly after he filed a grievance seeking to progress to the next phase of the AS program, officers placed Inmate Blair in a fenced recreation cage that was adjacent to the recreation cage in which he was confined.  Compl. ¶¶ 158-59. During the recreation period, Inmate Blair exposed his genitals and masturbated in the recreation cage next to the plaintiff's recreation cage.  Id. ¶ 160.  When the plaintiff asked Captain Robles to instruct officers not to place Inmate Blair in a recreation cage near him, Captain Robles responded that "Blair goes out with whoever likes to file grievances."  *Id.*, ¶ 161.  The plaintiff filed a grievance with Warden Mulligan seeking to be separated from Inmate Blair during recreation but Warden Mulligan rejected the grievance.  *Id.*, ¶ 161.  The plaintiff contends that Captain Robles retaliated against him for filing grievances by directing officers to continue to place Inmate Blair in a recreation cage next to his recreation cage.

The filing of a grievance constitutes protected activity under the First Amendment.  The plaintiff has also alleged that being repeatedly subjected to the inappropriate sexual behavior of another inmate constituted adverse conduct.  In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action*" Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366–67 (S.D.N.Y. 2011) (internal quotation marks and citations

omitted).  The statement made by Captain Robles suggests a causal connection between the

filing of grievances by the plaintiff and the placement of Inmate Blair in a recreation cage

adjacent to the plaintiff's recreation cage.  The plaintiff has plausibly alleged a First Amendment

retaliation claim against Captain Robles and Warden Mulligan in their individual capacities.

### 2.    Fourth Amendment

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. Const. amend. IV.  Although the plaintiff claims that his confinement on Administrative

Detention and AS at Northern from December 2016 to September 2017 and the conditions to

which he was exposed during that period of confinement violated his Fourth Amendment rights,

he does not assert facts to support a plausible claim under the Fourth Amendment.  Thus, any

Fourth Amendment claim is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 3.    Fifth Amendment – Due Process

The plaintiff alleges that his placement on AS at Northern from January to September

2017 violated his Fifth Amendment rights.  To the extent that the plaintiff is asserting a claim

that the defendants violated his right to due process under the Fifth Amendment in connection

with the hearing held and decision made to authorize his placement on AS and to continue to

confine him at Northern on AS for nine months, the Due Process Clause of the Fifth Amendment

applies only to actions by the United States government and federal employees.  *See Dusenbery

v. United States*, 534 U.S. 161, 167 (2002) (holding that the Fifth Amendment's due process

clause only protects citizens against the conduct of federal government officials, not state officials). The plaintiff is not suing federal officials. Accordingly, the Fifth Amendment claim is dismissed as lacking an arguable legal basis. *See* 28 U.S.C. § 1915A(b)(1).

### 4.      Eighth Amendment - Excessive Force

The plaintiff alleges that his placement in in-cell restraints in response to the derogatory comment that he directed towards Nurse Hill constituted the use of excessive force. When an inmate alleges use of excessive force by a correctional officer, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). The "core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (internal quotations and citation omitted).

The plaintiff alleges that officers placed him in in-cell restraints on December 29, 2016 and officers removed him from in-cell restraints the following day. A prison official's decision to place an inmate in restraints in an effort to "maintain[] prison security, without more, does not violate the Eighth Amendment." *Alston v. Butkiewicus*, No. 3:09-CV-207 CSH, 2012 WL 6093887, at *11 (D. Conn. Dec. 7, 2012). The plaintiff alleges that he did not engage in dangerous, unruly or aggressive behavior. Rather, he directed a verbal insult towards a medical staff member. He contends that Lieutenant Arzt's decision to place him in in-cell restraints was

45

excessive and unnecessary and was intended as punishment.  The court concludes that the

plaintiff has stated a plausible Eighth Amendment claim of excessive force against Lieutenant

Arzt in his individual capacity.

### 5.      Eighth Amendment - Mental Health and Medical Needs

The plaintiff alleges that in late December 2016, he suffered a serious injury that required

medical treatment, but Nurse Hill refused to treat the injury.   The plaintiff contends that the

isolating conditions to which he was exposed during his confinement on AS caused him to suffer

mental distress and interfered with his ability to sleep.  He claims that he requested mental health

treatment but neither Warden Mulligan, nor Captain Robles facilitated the provision of mental

health treatment for him.

### a.      Medical Needs

The plaintiff has alleged that he suffered lacerations to his ankles that were painful and

ultimately became infected.  Courts have held that infectious conditions, accompanied by pain,

satisfy the objective element of an Eighth Amendment deliberate indifference claim.  *See,*

*e.g., Salahuddin,* 467 F.3d at 280 (holding Hepatitis C infection satisfies objective

element); *Chance,* 143 F.3d at 702–03 (infected tooth causing great pain, rendering inmate

unable to chew tooth, and resulting in need to have more teeth extracted was serious medical

condition under Eighth Amendment); *Hardy v. City of New York,* 732 F.Supp.2d 112, 129–30

(E.D.N.Y.2010) (ear infection resulting in "excruciating pain," swelling, drainage and difficulty

walking was serious medical need for objective prong of Eighth Amendment deliberate

indifference claim).  Thus, the plaintiff has arguably asserted facts to meet the objective prong of

the Eighth Amendment standard.

46

The plaintiff asserts that Lieutenant Arzt attempted to facilitate treatment for the injuries caused by the restraints by contacting the medical department.  Thus, Lieutenant Arzt did not ignore the plaintiff's injuries and was not deliberately indifferent to those injuries.

Nurse Hill, however, refused to examine or treat the plaintiff's infected lacerations and instructed other medical providers to refrain from providing medical treatment to the plaintiff. The plaintiff spoke to Warden Mulligan and Captain Robles regarding Nurse Hill's refusal to provide him with treatment, but they failed to take any action to facilitate medical treatment for his injuries.  These allegations are sufficient to meet the subjective element of a deliberate indifference to medical needs claim against Nurse Hill, Warden Mulligan, and Captain Robles. Accordingly, the Eighth Amendment claim of deliberate indifference to the plaintiff's need for treatment for the lacerations to his ankles will proceed against Nurse Hill, Warden Mulligan, and Captain Robles.  The deliberate indifference to medical needs claim against Lieutenant Arzt is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### b.    Mental Health Needs

At the end of January 2017, the plaintiff began to experience the effects of the isolative conditions of confinement on AS.  He experienced extreme anxiety, stress, depression, sleep deprivation, and despair.  Compl. ¶ 153.  The plaintiff received no responses to his many requests and grievances seeking mental health treatment.  *Id.*, ¶¶ 154, 156.  In February 2017, the plaintiff informed Captain Robles and Warden Mulligan that he needed mental health treatment and that he had never been evaluated or assessed by a mental health provider since the decision authorizing his placement on AS.  *Id.*, ¶ 155.  Warden Mulligan and Captain Robles indicated that mental health providers were not required to treat him because his mental health level was a

47

level 2.  *Id.*  The plaintiff alleges that he filed grievances regarding his need for mental health treatment and that Commissioner Semple, District Administrator Quiros and Deputy Commissioner Rinaldi denied the grievances and grievance appeals.  *Id.* ¶¶ 169, 175-78.

Although the plaintiff met with a psychologist in March 2017, the psychologist indicated that he could not provide the plaintiff with mental health treatment for his symptoms of anxiety, stress, or depression pursuant to instructions from Warden Mulligan and District Administrator Quiros.  *Id.*, ¶ 166.  Rather, he could only offer treatment if the plaintiff was in danger of harming himself.  *Id.*  The plaintiff received no other mental health treatment during his confinement at Northern.

The court concludes that the plaintiff has alleged sufficient facts to meet the objective component of the Eighth Amendment standard.  *See e.g., Young v. Choinski*, 15 F. Supp. 3d 194, 199 (D. Conn. 2014) ("In the context of mental health needs, propensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as "sufficiently serious.") (collecting cases).  The plaintiff has also alleged that he made Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros aware of his need for mental health treatment and that they disregarded or ignored that need.  The claim of deliberate indifference to the plaintiff's need for mental health treatment during his confinement at Northern in 2017 will proceed against Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros in their individual capacities.

### 6.    Eighth Amendment - Conditions of Confinement

The plaintiff alleges that Lieutenant Arzt placed him in an unsanitary cell from December 29, 2016 to December 30, 2016.  The plaintiff alleges further that during his confinement on AS from January 2017 to September 2017, he was exposed to thirty-one restrictive or harsh conditions.  *Id.* ¶ 125(a) – (gg).  He contends that Warden Mulligan and Captain Robles were directly involved in imposing these conditions and that he made Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros aware of the conditions through grievances and letters.  *Id.* ¶¶ 169-72, 175-78.

The Supreme Court has held that an inmate's conditions of confinement may be "restrictive or even harsh" but may "not involve the wanton and unnecessary infliction of pain" or violate "contemporary standard[s] of decency."  *Rhodes*, 452 U.S. at 347 (citation omitted). To state a claim of deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element.  To meet the objective element, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[]" or posed "a substantial risk of serious harm" to his health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes*, 452 U.S. at 347.  The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise.  *See Wilson*, 501 U.S. at 304; *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); R*hodes,* 452 U.S. at 348.  The Second Circuit has held that sleep is "critical to human existence." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013).  To meet the subjective element, an inmate

must allege that the defendants possessed culpable intent; that is, the officials knew that he faced a substantial risk to his or her health or safety and disregarded that risk by failing to take corrective action.  *See Farmer*, 511 U.S. at 834, 837.

### a.      Unsanitary Cell – December 2016

The plaintiff alleges that on December 29, 2016, officers escorted him to a cell and placed him in in-cell restraints pursuant to the order of Lieutenant Arzt.  The plaintiff claims that the walls of the cell were smeared with feces.  The plaintiff remained in the offensive-smelling cell until the following morning when officers removed him to attend his AS placement hearing at 8:00 a.m.

The plaintiff claims that he informed Lieutenant Arzt that the walls of the cell were smeared with feces but Lieutenant Arzt disregarded his complaint.  The plaintiff was confined in the cell for at most one day.  This temporary exposure to an unsanitary condition/unpleasant odor does not meet the objective prong of the Eighth Amendment standard.  *See McNatt v. Unit Manager Parker,* No. 3:99CV1397(AHN), 2000 WL 307000, at *4 (D. Conn. Jan. 18, 2000) (finding no Eighth Amendment violation when inmates endured stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions); *Mahase v. City of New York,* No. 96 CV 6105, 2000 WL 263742, at *6 (E.D.N.Y. Jan. 5, 2000) (noting that "short-term confinement under unsanitary or uncomfortable conditions, without more, typically does not amount to a constitutional violation").  Because the plaintiff has not asserted facts to meet the objective element, his Eighth Amendment claim fails.  The allegation that Lieutenant Arzt violated the

plaintiff's Eighth Amendment rights by subjecting him to placement in an unsanitary cell for at most a day is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

> **b.** **Lack of Programs, Activities, and Job Opportunities Limits on Showers, Commissary Spending, and Retention of Personal Property Items**

The plaintiff alleges that during his confinement on AS, he could not participate in social or educational programs or social or recreational activities; he was not permitted to hold a prison job, purchase certain items at the commissary, or spend more than $25.00 during each commissary visit; and he could not retain all items of his personal property in his cell. Compl. ¶ 125(c) – (g), (v) – (w), (aa). Those property items included his: hardcover books, footwear, pillow, television, hot pot, video games, fan, beard trimmer, and electric razor.[8] *Id.*, ¶ 130. Because he could not keep his television in his cell, he had no access to the news or "cultural issues." *Id.* ¶ 125(cc). In addition, prison officials limited his showers to three per week. *Id.* ¶ 125(w).

These restrictions or limitations imposed on the plaintiff for approximately nine months do not constitute deprivations of the plaintiff's basic life necessities. *See Pagan v. Dougherty*,

---

[8] Although the plaintiff describes this condition as a deprivation of property items, he does not allege that those items of property were lost or stolen or that he would not receive those items back after his release from AS. Thus, the court does not construe this allegation as a claim of a deprivation of the plaintiff's items of property in violation of the Due Process Clause of the Fourteenth Amendment. Even if the court were to construe the complaint to assert a Fourteenth Amendment claim of permanent loss or destruction of property, "[a] prisoner may challenge the deprivation of property in a § 1983 action only if the State provides no adequate post-deprivation remedy." *Edwards v. Erfe*, 588 F. App'x. 79 (2d Cir. 2015) (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)). Connecticut provides inmates with a remedy for lost or destroyed property. *See* State of Connecticut Department of Correction Administrative Directive 9.6(16) (Aug. 15, 2013) (available on the Department of Correction's website under Directives and Policies at: https://portal.ct.gov/DOC/AD/AD-Chapter-9); Connecticut General Statutes § 4– 141 *et seq.*

No. 3:18-CV-1668 (VLB), 2019 WL 2616975, at *6-7 (D. Conn. June 26, 2019) (deprivation of phone privileges, visits from friends and family, eligibility for parole, and access to educational and vocational services as well as a limitation on showers to three per week during inmate's confinement on administrative segregation for two years did not state claim of unconstitutional conditions of confinement under Eighth Amendment); *Bernier v. Sweet*, No. 15-CV-209 (RJA) (HBS), 2018 WL 1047103, at *3 (W.D.N.Y. Feb. 26, 2018) (normal conditions of segregation permitting only two showers per week did not constitute sufficient deprivation under Eighth Amendment); *Vega v. Rell*, No. 09-CV-0737, 2011 WL 2471295, at *25 (D. Conn. June 21, 2011) (It is well established that "[i]nmates have no constitutional right to purchase items from the prison commissary") (citing cases); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (finding no constitutional right to a job in the absence of underlying state law mandating jobs for prisoners); *Manley v. Bronson*, 657 F. Supp. 832 (D. Conn. 1987); *Banks v. Norton*, 346 F. Supp. 917, 921 (D. Conn. 1972) (noting that an inmate has no right to a particular job in a correctional institution); State of Connecticut Department of Correction Administrative Directive 10.1(4)A ("No inmate shall have entitlement or a legitimate expectation to any work, programmatic or educational assignment or compensation therefor," with certain exceptions not here relevant).[9] Thus, these deprivations do not meet the objective component of an Eighth Amendment conditions claim.

---

[9] The Court takes judicial notice of State of Connecticut Department of Correction Administrative Directive 10.1 (effective as of October 22, 2015), available on the Department of Correction's website under Directives and Policies at: https://portal.ct.gov/DOC/AD/AD-Chapter-10. *See Nicholson v. Murphy*, No. 3:02-cv-1815 (MRK), 2003 WL 22909876, at *7 n.2 (D. Conn. Sept. 19, 2003) (taking judicial notice of Administrative Directives as "written guidelines, promulgated pursuant to Connecticut General Statutes § 18–81, establishing the parameters of operation for Connecticut correctional facilities.") (citation omitted).

Accordingly, the allegations that the plaintiff had no access to programs, activities, a job, certain personal property items and experienced limitations on showers and commissary purchases and spending do not state a claim under the Eighth Amendment. This Eighth Amendment conditions claim that is asserted against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, Warden Mulligan, and Captain Robles is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### c.      Visitation and Telephone Calls

The plaintiff alleges that due to his placement on AS, Warden Mulligan and Captain Robles restricted the number of telephone calls that he could make and visits that he could participate in with family members. The plaintiff was limited to one fifteen-minute social telephone call per week, and one thirty-minute visit with an immediate family member per week. *Id.* ¶ 125(aa). The plaintiff states, however, that he did not have any visitors during his confinement at Northern because Warden Mulligan and Captain Robles refused to "approve his immediate family members." Compl. ¶ 125(aa). Thus, he was unable to associate with members of his family.

An inmate has no Eighth Amendment right to visitation or to make social telephone calls. *See Overton v. Bazzetta*, 539 U.S. 126, 136-37 (2003) (disciplinary regulation that subjected some inmates to ban of at least two years on *all* visitation, including non-contact visits, exclusive of clergy and attorneys, did not violate the Eighth Amendment, though some more permanent or arbitrary ban might); *Caldwell v. Goord*, No. 09-CV-00945 SR, 2013 WL 1289410, at *5 (W.D.N.Y. Mar. 27, 2013) ("[T]he Court also notes that denial of visitation for a limited time

does not amount to the sort of wanton infliction of pain prohibited by the Eighth Amendment.")
(citations omitted); *Riddick v. Arnone*, No. 3:11cv631(SRU), 2012 WL 2716355, at *3, 6 (D.
Conn. July, 2012) (dismissing claim that prison officials denied Plaintiff access to telephone on
ground that inmates do not have a "constitutional right to unrestricted telephone use" and
Plaintiff did not allege that he was barred from communicating through mail during period when
he could not use telephone); *Marrero v. Weir*, No. 3:13-cv-0028, 2014 WL 4799228 (D. Conn.
Sept. 26, 2014) (no Eighth Amendment violation where plaintiff's phone privileges and all visits
from his mother were suspended indefinitely as a disciplinary measure); *Henry v. Davis*, No. 10
Civ. 7575(PAC)(JLC), 2011 WL 5006831, at *2 (S.D.N.Y. Oct. 20, 2011) (telephone use
restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate
means of communication); *Griffin v. Cleaver*, No. 3:03-cv-1029 (DJS)(TPS), 2005 WL 1200532,
at *6 (D. Conn. May 18, 2005) (inmate had "no constitutional right to telephone use, social visits
and commissary privileges").  Nor does the plaintiff allege that the limitations on telephone calls
and visits deprived him of a life necessity.  The allegation that Warden Mulligan, Captain
Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator
Quiros limited the plaintiff's access to social telephone calls and visits fails to state a claim under
the Eighth Amendment and is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

The plaintiff's allegations may also be construed to assert a First Amendment right of
association claim related to the refusal of Warden Mulligan, Captain Robles, Commissioner
Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros to approve any of his
family members as individuals who could visit him at Northern.  *See* Compl. ¶ 125(aa).  The
court concludes, however, that Warden Mulligan, Captain Robles, Commissioner Semple,

Deputy Commissioner Rinaldi, and District Administrator Quiros are entitled to qualified immunity on the ground that the plaintiff did not have a clearly established constitutional right to in-person visits with his family during his confinement at Northern.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 566 U.S. 658, 663 (2012). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 664 (citations, brackets and internal quotation marks omitted). Although there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citation omitted).

In *Overton*, the Supreme Court considered the existence of an inmate's First Amendment right to visitation but declined "to explore or define the ... right of association at any length or determine the extent to which it survives incarceration...." 539 U.S. at 132. Nor has any Second Circuit case clearly established an inmate's right to visitation arising from the First Amendment. *See Malave v. Weir*, 750 F. App'x 65, 67 (2d Cir. 2019) (summary order) (acknowledging that "*Overton* did not consider whether there is a First Amendment right to visitation in prison. . . ." and that "[c]ases in this circuit also have not clearly established a right to spousal visitation in prison."); *Mills v. Fischer,* 497 F. App'x 114, 116 (2d Cir.2012) (summary order) ("assuming [without deciding] that inmates and their families have a right to visitation protected by the First Amendment").

55

Thus, an inmate's First Amendment right to association through visitation with family members was not clearly established during the plaintiff's confinement at Northern in 2016 and 2017 for the purposes of a damages claim against Warden Mulligan and Captain Robles under § 1983. The court has dismissed all requests for declaratory and injunctive relief. Accordingly, to the extent that the plaintiff asserts a First Amendment right to association claim arising from the restrictions placed on his visitation with immediate family members during his confinement at Northern in 2016 and 2017, qualified immunity bars that claim and the claim is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### d.      Access to Libraries and Reading Materials

The plaintiff suggests that both a general library and a law library existed at Northern during his confinement on AS and that he did not have access to either library or reading materials. Compl. ¶ 125(t) – (u). Neither the denial of access to reading materials that might have been available in a general library at Northern, or the denial of access to a law library at Northern, state a deprivation of a life necessity. Thus, any Eighth Amendment claim regarding lack of access to libraries or reading materials is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

The plaintiff does not allege that his lack of access to the law library interfered with his access to the courts. The plaintiff asserts no allegations related to any interference with his attempt to pursue a legal claim or file a lawsuit while he was confined at Northern in 2017. In fact, on February 15, 2017, Attorney Cannatelli filed a civil rights complaint on behalf of the plaintiff and a number of other inmates. *See Baltas, et al. v. Chapdelaine, et al.*, Case No. 3:17cv242(RNC). Thus, the plaintiff has not alleged that he suffered an actual injury due to lack of access to a law library. The allegation that the plaintiff could not visit or use law library

during his confinement at Northern in 2017 fails to state a claim of denial of access to the courts under the First Amendment and is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### e.  Sexual Harassment

The plaintiff alleges that in January 2017, he was subjected to verbal taunts and sexually suggestive comments when officers escorted him to the shower in his boxer shorts.  Compl. ¶ 135.  The plaintiff also asserts that in February 2017, unnamed correctional officers and Captain Robles subjected him to sexual harassment by placing Inmate Blair, who was known to engage in masturbation in the presence of other inmates and staff members, in a fenced recreation cage adjacent to the fenced recreation cage in which he was confined.  *Id.* ¶¶ 157-62.  On multiple days, Inmate Blair exposed his genitals and engaged in masturbation.  At some point, in February 2017, the plaintiff chose not to participate in recreation to avoid his exposure to the sexual exploits of Inmate Blair.  The plaintiff asserts a claim of sexual harassment under the Eighth Amendment.

In *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997), the Second Circuit acknowledged that physical "sexual abuse" of a prisoner by a correctional officer "may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind" in violation of a prisoner's Eighth Amendment right to be free from cruel and unusual punishment.  *Id.* at 861.  In *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015), the Second Circuit clarified the Eighth Amendment excessive force standard that must be applied to a claim of sexual abuse of an inmate by a prison official and held that in view of the changing standards of human decency, an inmate may state a claim for deliberate indifference if "[a] corrections officer's intentional contact with an inmate's

genitalia or other intimate area ... serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" *Id.* at 257.

There are no allegations that the plaintiff was confined in the same recreation cage with Inmate Blair or that the plaintiff could not turn or look away from the sexual behavior of Inmate Blair.  Nor has the plaintiff alleged that any defendant or inmate subjected him to physical sexual abuse either in connection with the taunts or comments made in response to his being escorted to the shower in only his boxer shorts or in connection with his placement in a recreation cage near Inmate Blair.  Allegations of verbal sexual harassment or comments do not state a claim under the Eighth Amendment.  *See Trowell v. Theodarakis*, No. 3:18CV446(MPS), 2018 WL 3233140, at *3 (D. Conn. July 2, 2018) (allegation that correctional officer had called the plaintiff "derogatory names based on [plaintiff's] sexual orientation" did not state claim of sexual abuse under Eighth Amendment); *Keaton v. Ponte*, No. 16 CIV. 3063 (KPF), 2017 WL 3382314, at *10 (S.D.N.Y. Aug. 4, 2017) (dismissing prisoner's Eighth Amendment claims of sexual abuse against female corrections officers where there was no "illicit physical contact between a corrections officer and an inmate" and the corrections officers' alleged "verbal harassment," encouraging the inmate to use the shower, watching him shower, and making sexual gestures with lipsticks and tongues, "without more, [were] not actionable" as cruel and unusual punishment in violation of the Eight Amendment); *Jones v. Harris*, 665 F. Supp. 2d 384, 396 (S.D.N.Y. 2009) ("verbal sexual harassment of a prisoner, without physical contact, does not violate the Eighth Amendment") (collecting cases).  Neither the plaintiff's allegations regarding sexually suggestive comments made by other inmates and staff members, none of whom are identified by name or listed as defendants, when viewing him in his boxer shorts, nor the

58

allegations regarding his placement in a separate, fenced, recreation cage that was near another inmate who chose to engage in sexual behavior, state an Eighth Amendment claim of sexual abuse under *Crawford*. Thus, the Eighth Amendment claims of sexual harassment are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### f.       Good Time Credit

The plaintiff alleges that he was unable to earn good time credit during his confinement on AS. Compl. ¶ 125(gg). The Second Circuit has held that prisoners in Connecticut have no liberty interest in earning good time credits. *See Abed v. Armstrong,* 209 F.3d 63, 66–67 (2d Cir.2000) ("Although inmates have a liberty interest in good time credit they have already earned, no such interest has been recognized in the opportunity to earn good time credit where, as here, prison officials have discretion to determine whether an inmate or class of inmates is eligible to earn good time credit."); *Joyce v. Hanney,* 3:05CV1477 (WWE), 2009 WL 563633, at *6 (D. Conn. Mar. 4, 2009) ("Connecticut courts have held that a liberty interest is created only when an inmate loses previously earned good time credit; the loss of the ability to earn good time credit in the future does not create a liberty interest."). Nor did the lack of an opportunity to earn good time credit deprive the plaintiff of a basic human need. Accordingly, the plaintiff's claim that he could not earn good time credit during his confinement on AS does not state a claim of a violation of his Eighth or Fourteenth Amendment rights and is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

g.   **Isolation, Excessive Noise, Lack of Sleep, Extreme Cell Temperatures, Unsanitary Conditions; Lack of Exercise, Outdoor Clothing, and Nutritional Meals; Inadequate Ventilation; Placement in Restraints When Leaving Cell and Showering**

The plaintiff alleges that he was subjected to a number of conditions of confinement that did deprive him of basic human needs.  He states that he was confined in his cell twenty-three hours a day and that the isolation from other inmates as well as the deprivation of visual stimuli caused him to experience extreme anxiety, stress, depression, and sleep deprivation.  Compl. ¶¶ 125(a) – (b),(i),(j); 153.  In addition, he suffered sleep deprivation due to his exposure to constant screaming and banging by other inmates and staff members.  *Id.* ¶ 125(k)(ee).  At times, he experienced either extremely hot or extremely cold temperatures.  *Id.* ¶ 125(m).  He could not engage in meaningful exercise either in his cell or out in the recreation cage.  *Id.* ¶ 125(l).  The ventilation system was not operational and/or the air filters were not changed on a regular basis, the toilets and the sinks were on timers which limited the number of times each could be used every half an hour, and the toilets also did not flush properly which caused waste water in the toilets to flow back and forth between adjacent cells.  *Id.* ¶ 125(n) – (p).  Staff members served the plaintiff's meals to him in his cell from unsanitary food carts.  *Id.* ¶ 125(q) - (r).  The meals did not meet his nutritional or caloric needs.  *Id.* ¶ 125(s).  Staff members placed the plaintiff in handcuffs, leg irons and a tether chain every time he left his cell and failed to provide him with a hat, coat, or gloves during outdoor recreation when it was cold.  *Id.* ¶ 125(x) - (z).  Staff members strip-searched the plaintiff at his cell, placed him in restraints, and escorted him from his cell to the shower with nothing on but boxer shorts, and did not remove the restraints when the plaintiff showered.  *Id.* ¶¶ 125(x) – (y).

60

The court concludes that the plaintiff has plausibly alleged that these conditions either subjected him to deprivations of basic human needs such as food, clothing, sanitation, exercise, sleep, adequate shelter or warmth or exposed him to a substantial risk or harm to his health or safety. Accordingly, the allegations that the conditions described in paragraph 125(a) – (b), (i) – (s), (x) – (z), (ee) of the complaint violated the plaintiff's rights under the Eighth Amendment will proceed against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, Warden Mulligan, and Captain Robles in their individual capacities.

### h.    Religious Services

The plaintiff alleges that he could not attend congregate religious services or engage in the meaningful practice of his Native American religion during his nine-month confinement in AS. *Id.* ¶ 125(h). Although the plaintiff includes this allegation in his description of restrictive conditions of confinement, the court construes it as a claim that the prohibition against congregate religious services substantially burdened his sincerely held Native American religious beliefs and practices in violation of the First Amendment. *See Holland*, 758 F.3d at 220 (assuming without deciding that "a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs" to state a First Amendment free exercise claim) (citations omitted). The court will permit the claim that Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros violated the plaintiff's right to practice or exercise his religious beliefs during his confinement in AS to proceed for further development of the record.

### 7.    Fourteenth Amendment - Due Process
### Administrative Segregation Placement and Reviews

The plaintiff contends that Commissioner Semple, Deputy Commissioner Rinaldi,

District Administrator Quiros, OCPM Director Maiga, Warden Falcone, Counselor Supervisor Tugie, and Dr. Pieri failed to provide him with procedural due process in connection with the AS placement hearing held on December 30, 2016 and the decision made on January 10, 2017 to place him on AS.  The plaintiff also contends that Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, OCPM Director Maiga, Warden Mulligan, and Captain Robles neglected to afford him periodic reviews of his continued placement on AS for nine months.

The plaintiff generally asserts that the conduct of Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, OCPM Director Maiga, Warden Mulligan, Captain Robles, Warden Falcone, Counselor Supervisor Tugie, and Dr. Pieri constituted violations of his rights under the First, Eighth, and Fourteenth Amendments.  Compl. ¶¶ 295, 298.  There are no facts to support plausible claims under either the First or the Eighth Amendments in connection with the AS placement hearing that was held in December 2016, the placement decision made in January 2017, or the lack of periodic reviews from January 2017 to September 2017.  Thus, the First and Eighth Amendment claims are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property." U.S Const. amend. XIV. "Liberty interests protected by the Fourteenth Amendment may arise from two sources -- the Due Process Clause itself and the laws of the States."  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the

62

procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court recognized that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Id.* at 483-84. A plaintiff has a protected liberty interest only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship. *See Tellier v. Fields,* 280 F.3d 69, 80-81 (2d Cir. 2000).

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court applied the *Sandin* analysis to a due process claim asserted by inmates who had been classified for placement in a high security state prison for safety and security, rather than disciplinary reasons. *See id.* at 223. The Court concluded that the restrictive nature of the conditions in the high security facility coupled with the fact that the inmates' confinement under those conditions was indefinite "impose[d] an atypical and significant hardship" on the inmates and gave "rise to a liberty interest in their avoidance." *Id.* at 223-24.

The plaintiff alleges that he remained on AS from January 10, 2017 until the end of September 2017. The court concludes that the restrictive conditions under which the plaintiff was confined on AS for approximately nine months were sufficiently atypical and/or significant as compared to the basic conditions of prison life to give rise to a liberty interest in their avoidance. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (holding that "in determining whether [an inmate] endured an atypical and significant hardship" a district court should consider the duration of the inmate's confinement in segregation and "the extent to which the conditions [in] ... segregation differ from other routine ... conditions" in general population.)

63

(internal quotation marks and citation omitted).

In *Hewitt*, the Supreme Court held that prior to placing an inmate on administrative confinement, he "must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation." 459 U.S. at 476. As long as these two requirements are met, the non-adversary proceeding is held "within a reasonable time following the inmate's transfer" to administrative segregation, "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Id.* & n.8.

### a. AS Placement Hearing and Placement Decision

There are no facts to suggest that Dr. Pieri, Warden Falcone, or District Administrator Quiros were present for or involved in the AS placement hearing on December 30, 2016 or the decision made on January 10, 2017, to place the plaintiff on AS. Thus, the court concludes that the plaintiff has not alleged that Dr. Pieri, Warden Falcone, or District Administrator Quiros, violated his due process rights in connection with the AS placement hearing or the decision by OCPM Director Maiga to authorize his placement on AS. The Fourteenth Amendment procedural due process claim asserted against Dr. Pieri, Warden Falcone, and Administrator Quiros are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

The plaintiff acknowledges that on December 27, 2016, he received notice of the AS hearing and that an advisor was appointed to assist him in preparing for the hearing. The plaintiff alleges that Attorney Cannetelli contacted Commissioner Semple before the hearing regarding his advisor's alleged failure to arrange for him to view the video footage of the incident that precipitated his consideration for AS placement or to secure witness statements.

64

The plaintiff appeared and made an oral statement at the AS hearing held on December 30, 2016.  He also submitted a written statement to Counselor Supervisor Tugie.  When the plaintiff mentioned that he had been unable to secure statements from two witnesses, Counselor Supervisor Tugie directed the plaintiff's advisor to submit the witness statements identified by the plaintiff.  On January 10, 2017, Counselor Tugie issued her decision recommending that the plaintiff not be placed on AS.  There are no allegations that Commissioner Semple was present for the hearing or involved in Counselor Tugie's decision issued after the hearing.  The plaintiff has failed to assert facts to state a claim that Counselor Supervisor Tugie or Commissioner Semple violated his procedural due process rights in connection with the AS hearing itself or in connection with the decision not to recommend his placement on AS.  The Fourteenth Amendment due process claim asserted against Counselor Supervisor Tugie and Commissioner Semple is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

The plaintiff alleges that the decision by OCPM Director Maiga not to accept the recommendation of Counselor Supervisor Tugie and to authorize his placement on AS was arbitrary because it was not supported by sufficient evidence and that Deputy Commissioner Rinaldi improperly approved the decision of OCPM Director Maiga.

Once prison officials have provided an inmate with notice of the charges and he has had an opportunity to present his views to the hearing officer or official, the final decision as to whether segregation is justified may rest on "'purely subjective evaluations and on predictions of future behavior.'"  *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (quoting *Hewitt*, 459 U.S. at 474).  The plaintiff has alleged that prison officials provided him with notice of the basis for the recommendation that he be placed on AS and that that he had an opportunity to be heard

both orally and in writing regarding the request for AS placement.

Under *Hewitt*, the decision to place an inmate on administrative segregation must be based on "some evidence." *See Superintendent v. Hill,* 472 U.S. 445, 454 (1985)(procedural due process requires that the decision to revoke good time credits in connection with prison disciplinary hearing be "supported by some evidence in the record"); *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir. 2001) (holding that a prisoner facing confinement in close custody must be provided with a meaningful notice of the basis for the decision as well as a decision that is based upon "some evidence.")(quoting *Hill,* 472 U.S. at 455–56); *Davis v. Barrett*, No. 02-CV-0545 SR, 2011 WL 2421109, at *3 (W.D.N.Y. June 13, 2011) ("In accordance with the standards for such a hearing, the Court must find "some evidence" in the record that could support the hearing officer's conclusion that placement in administrative segregation was warranted.")(citation omitted).  The determination of whether the standard of "some evidence" has been met, "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill,* 472 U.S. at 455–56.

Administrative Directive 9.2(12)(C), Assignment to Overall Risk Level 5/Administrative Segregation, provides that a prison official may consider raising an inmate's risk level to 5 and placing an inmate on Administrative Segregation "when any totality of facts, information or circumstances which indicates an immediate threat to safety and/or security of the public, staff or other inmates." *See* Compl., Ex. K, at 152.  OCPM Director Maiga's decision not to follow the recommendation of Counselor Supervisor Tugie and to authorize his placement on AS was based

on the plaintiff's involvement in multiple incidents that had impacted the operation of various facilities as well as the safety and security of those facilities. *See id.*, Ex. J, at 140-41. The decision was supported by the following evidence: the incident that had occurred at Garner on December 13, 2016 during which the plaintiff concedes that he threatened to make a shank and stab an officer in the neck, his refusal to exit his cell to be placed in the restrictive housing unit, his actions in barricading his cell door which necessitated the use of a cell extraction team; the threats made during his confinement at Garner to take whatever action might be necessary to get himself transferred from Garner to Cheshire; the fact that he had already been placed on high security status due to a journal having been found in his possession which included a formula of how to make a bomb; and his assault on an inmate in 2014 using a sharpened piece of metal. *See* Compl. ¶ 59-62; Exs. A & B, at 83-87; Ex. J, at 140-41. Thus, some evidence supported OCPM Director Maiga's decision to authorize the plaintiff's placement on AS and Deputy Commissioner Rinaldi's decision to uphold that authorization. The Fourteenth Amendment procedural due process claim asserted against OCPM Director Maiga and Deputy Commissioner Rinaldi is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### b.      Periodic Reviews

In *Hewitt*, the Supreme Court held that "prison officials must engage in some sort of periodic review of the confinement of [an] ... inmate[s]" placed on administrative segregation or detention to ascertain "whether [the inmate] remains a security risk." 459 U.S. at 477 n.9. These reviews are necessary to ensure that prison officials are not using "administrative segregation ... as a pretext for indefinite confinement of an inmate." *Id.* The Second Circuit has observed that periodic reviews of an inmate's placement in administrative segregation are "flexible and

may be based on 'a wide range of administrative considerations,' including but not limited to observations of the inmate in Ad[ministrative] Seg, 'general knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and any ongoing investigations." *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9).

The plaintiff alleges that in January 2017, he spoke to Warden Mulligan and Captain Robles about the fact that no reviews had been conducted of his placement on AS.  Compl. ¶¶ 142-45.  Both Mulligan and Robles indicated that the reviews were meaningless because he was required to remain on AC for at least ten months.  *Id* ¶ 145.  The plaintiff claims that Attorney Cannatelli sent letters to Commissioner Semple regarding the conditions of confinement at Northern and his initial and continued placement on AS placement and that Director of OCPM responded to the letters regarding his continued placement on AS.  The court concludes that the plaintiff has stated a plausible Fourteenth Amendment procedural due process claim relating to his long-term confinement on AS without meaningful, periodic reviews.  This claim will proceed against Commissioner Semple, OCPM Director Maiga, District Administrator Quiros, Warden Mulligan, Captain Robles, and Deputy Commissioner Rinaldi in their individual capacities.

### 8.      First and Fourteenth Amendments - Grievances

The plaintiff claims that on January 31, 2017, a grievance coordinator returned the grievance that he had filed regarding the conduct of Lieutenant Arzt and Nurse Hill with an instruction to refile it.  *Id* ¶ 151.  When the plaintiff refiled the grievance, Warden Mulligan rejected it as untimely.  *Id.*  On March 24, 2107, Warden Mulligan placed the plaintiff on grievance restriction.  *Id* ¶ 172.  The plaintiff claims that Warden Mulligan interfered with his

ability to file grievances under State of Connecticut Department of Correction Administrative Directive 9.6.

The Second Circuit has held that neither state directives nor "state statutes ... create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights. *See Swift v. Tweddell,* 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established [ ] that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.") (collecting cases); *Fernandez v. Armstrong*, 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures [set forth in Administrative Directive 9.6] is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right."). In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341–42 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest.")).

The plaintiff's allegation that Warden Mulligan failed to properly process his grievance

69

regarding the conduct of Lieutenant Arzt and Nurse Hill in accordance with the Administrative

Directive 9.6 by rejecting it as untimely does not rise to the level of a due process violation under

the Fourteenth Amendment. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012)

("Brown's argument that he has a federally-protected liberty interest in the state's compliance

with its own prison grievance procedures is meritless.").  Furthermore, the plaintiff has not

alleged that the rejection of his grievance by Warden Mulligan or his placement on grievance

restriction in March 2017, interfered with his right to petition the government for redress of

grievances under the First Amendment.  The fact that the plaintiff may not have been able to

completely or properly exhaust all available grievance procedures did not preclude him from

seeking redress for his claims against Lieutenant Arzt or Nurse Hill or any other claim regarding

conditions at Northern in this court.  *See* 42 U.S. § 1997e(a) (requiring prisoners to

exhaust administrative remedies only to the extent that the remedies are available); *Baltas v.

Rivera*, No. 3:19-CV-1043 (MPS), 2019 WL 3944435, at *10–11 (D. Conn. Aug. 21, 2019) ("If

prison officials 'thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation' the grievance procedure would be unavailable

and the inmate would be able to proceed to federal court.") (quoting *Ross v. Blake*, 136 S. Ct.

1850, 1859 (2016)).  The First Amendment redress of grievances claim and Fourteenth

Amendment due process claim related to the processing of grievances and placement of the

plaintiff on grievance restriction status by Warden Mulligan are dismissed. *See* 28 U.S.C. §

1915A(b)(1).

### 9.      Fourteenth Amendment - Equal Protection – Restrictive Conditions

The plaintiff alleges that the conditions to which he was exposed during his confinement

70

on AS at Northern in 2017 were more restrictive than the conditions to which, other inmates at

Northern who were similarly situated to him, were exposed.  He identifies these similarly

situated inmates as Level 5 prisoners who had been placed on Special Needs Management Status

or Level 5 inmates who had been placed on Special Circumstances Status.  Compl. ¶¶ 127, 301,

303.  He contends that Warden Mulligan, Captain Robles, Commissioner Semple, and Deputy

Commissioner Rinaldi violated his rights under the Equal Protection Clause of the Fourteenth

Amendment by confining him under more restrictive conditions than the conditions to which

other Level 5 inmates were confined.

The plaintiff has not alleged that the defendants treated him differently or discriminated

against him because of his membership in a protected class or based on some suspect

classification.  *See Lee v. Governor of State of New York*, 87 F.3d 55, 60 (2d Cir. 1996)

("[P]risoners either in the aggregate or specified by offense are not a suspect class....").  Rather,

the plaintiff's claim may be construed as a class of one equal protection challenge.  *See Engquist,*

553 U.S. at 601 (Absent allegations to support "class-based" discrimination, an individual may

state an equal protection claim by alleging that he or she has been intentionally and "irrationally

singled out as a . . . class of one.")

Although the plaintiff compares himself to inmates who had been classified as special

needs inmates or former death row inmates who had been classified as special circumstances

inmates, he has not asserted facts from which the court could infer that the inmates classified to

either Special Needs Management Status or Special Circumstances Status were essentially

identical to him.  *See Ruston*, 610 F.3d at 59 (A plausible class of one claim requires the plaintiff

to demonstrate an "extremely high degree of similarity" with the person to whom he or she is

comparing himself or herself.) (internal quotation marks and citation omitted); *Hu*, 927 F.3d at

92 (a class-of-one plaintiff must demonstrate the existence of a person who is "prima facie

identical" to him or her and who was treated differently) (internal quotation marks and citation

omitted).  The facts in the complaint do not state a plausible class-based equal protection claim

or a plausible class of one equal protection claim relating to restrictive conditions of confinement

to which the plaintiff was exposed at Northern in 2016 and 2017 against either Warden Erfe,

District Administrator Quiros, Commissioner Semple, Deputy Commissioner Rinaldi, or District

Administrator Quiros.  This Fourteenth Amendment equal protection claim is dismissed.  *See* 28

U.S.C. § 1915A(b)(1).

### 10.    Violation of PREA

The plaintiff claims that Warden Mulligan denied his request to file a PREA claim

regarding the incidents involving Inmate Blair's behavior in exposing himself and masturbating

during recreation.  The plaintiff also claims that the practice of requiring him to walk to the

shower in only his boxer shorts violated the PREA and that both Warden Mulligan and Captain

Robles refused to investigate whether this practice violated the PREA.

To the extent that the plaintiff alleges that Warden Mulligan, Captain Robles,

Commissioner Semple, and District Administrator Quiros either failed to follow the PREA by

refusing to investigate his allegations or violated his rights under the PREA, such allegations do

not state a claim of a violation of the plaintiff's constitutionally or federally protected rights.

The PREA is intended to compile data and statistics concerning prison rape and to develop and

implement national standards for the detection, prevention, reduction, and punishment of prison

rape.  *See* PREA, 42 U.S.C. §§ 30302-03, 30306-07 (formerly cited as §§ 15602-03, 15606-07)).

The Act includes no language that grants specific rights to inmates.  *See Gonzaga University v. Doe*, 563 U.S. 273, 279-80 (2002) (in the absence of "an 'unambiguous' intent to confer individual rights," such as a right to sue, courts will not imply such a right in a federal funding provision).  Consequently, courts within the Second Circuit have routinely held that there is no private right of action for inmates to sue prison officials for non-compliance with the PREA. *See Brown v. Rose*, No. 3:16-CV-00229 (JCH), 2018 WL 3637474, at \*7 (D. Conn. July 31, 2018) ("Because the PREA does not create a private right of action for prisoners, Brown cannot show that he was actually injured if Captain Cichetti prevented him from pursuing a PREA claim.") (collecting cases); *Patterson v. Patterson*, No. 1:16-CV-00844 EAW, 2017 WL 1383899, at \*4 (W.D.N.Y. Apr. 14, 2017) ("[N]othing in the statute suggests that PREA intended to establish a private cause of action for allegations of prison rape, and every court to address the issue has determined that PREA cannot support such a cause of action by an inmate.") (internal quotation marks and citations omitted); *Chinnici v. Edwards,* No. 1:07-cv-229, 2008 WL 3851294, at \*3 (D. Vt. Aug. 12, 2008) ("[T]he PREA confers no private right of action. The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue.") (citation omitted).

The allegations that Warden Mulligan, Captain Robles, Commissioner Semple, and District Administrator Quiros failed to comply with or violated the PREA by refusing to permit him to file a PREA claim or to investigate his claims of sexual harassment do not state a claim of a violation of the plaintiff's constitutionally or federally protected rights.  Accordingly, any claim asserted under the PREA is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

73

### 11.   Connecticut Constitution – Article First, Section Twenty

Article First § 20 of the Connecticut Constitution provides that: "[n]o person shall be denied equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."  Art. I, § 20.  The plaintiff asserts two claims under this provision.  First, he contends that in approving Warden Falcone's request that he be considered for placement on AS, District Administrator Quiros, and OCPM Director Maiga discriminated against him on the basis of his ancestry in violation of Article First § 20 of the Connecticut Constitution because they relied on a statement made by his father, in a presentence investigation report, to conclude that he had influence with the Diablos Motorcycle Club.  Compl. ¶¶ 277-78; Ex. B, at 85-87.  Second, the plaintiff contends that Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, OCPM Director Maiga, Warden Falcone, Counselor Supervisor Tugie, and Dr. Pieri violated his rights under Article First § 20 of the Connecticut Constitution when they unlawfully authorized his placement on AS in January 2017.  *See* Compl. ¶ 295.  In support of this claim, the plaintiff relies on the phrase in Article First § 20, "nor be subjected to segregation."  *Id.*

This court and the Connecticut Superior Court have routinely declined to recognize a private right of action under Article First § 20 of the Connecticut Constitution.  *See, e.g., Richard v. Strom*, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *8 (D. Conn. Nov. 19, 2018) (concluding "[t]here is no established private right of action under the religious discrimination, due process, or equal protection provisions (Article First §§ 3, 8, and 20)); *Minto v. Dep't of Mental Health & Addiction Servs.*, No. HHDCV176076730S, 2018 WL 710124, at *9 (Conn.

Super. Ct. Jan. 11, 2018) ("Connecticut courts have unanimously declined to recognize a private cause of action under article first, § 20"); *Doe v. Crowley v. Town of Enfield*, No. 3:14 cv 01903 (MPS), 2015 WL 4162435, at *3 (D. Conn. July 9, 2015) (declining to recognize a private right of action under Article First, §§ 8 and 20); *Johnson v. State Dep't of Children & Families*, No. 3:11cv996(WWE), 2012 WL 6049583, at *5 (D. Conn. Dec. 5, 2012) ("Court will join numerous courts that have declined to recognize a private right of action pursuant to Article First, § 20"); *Silvera v. Connecticut Dep't of Corr.*, 726 F. Supp. 2d 183, 199 (D. Conn. 2010) (declining to recognize a private right of action under, *inter alia*, Article First § 20).

The court concludes that it would be inappropriate to exercise supplemental jurisdiction over potential claims under the Connecticut constitution that raises new and undeveloped issues under state law. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raises a novel or complex issue of State law"). Accordingly, the court declines to exercise supplemental jurisdiction over the claim that Warden Falcone, District Administrator Quiros, and OCPM Director Maiga discriminated against the plaintiff on the basis of ancestry in violation of Article First, § 20 of the Connecticut Constitution when they relied on a statement that the plaintiff's father made to conclude that the plaintiff had influence with a motorcycle gang and should be considered for placement on AS and the claim that Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, OCPM Director Maiga, Warden Falcone, Counselor Supervisor Tugie, and Dr. Pieri violated the plaintiff's rights under Article First, § 20 of the Connecticut Constitution when they unlawfully authorized his placement on AS in January 2017. This claim is therefore dismissed without prejudice.

**E.     Confinement - Cheshire - October 2017 and September-November 2018;
       Confinement - Hartford Correctional – September 2019;
       Confinement - Northern – September-October 2019**

The plaintiff asserts additional claims under the Eighth and Fourteenth Amendments

regarding his confinement at Cheshire in October 2017 and from September to November 2018,

his confinement at Hartford Correctional for three days in September 2019, and his confinement

at Northern from September to October 2019.  The claims are asserted against fifteen defendants,

ten of whom were not involved in the incidents and conditions that occurred during the

plaintiff's confinement at Cheshire and Garner in 2016 and at Northern from December 2016 to

September 2017.  *See* Compl. ¶¶ 7-11, 179-264, 307-330.

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action

only if "any right to relief is asserted against them jointly, severally, or in the alternative with

respect to or arising out of the same transaction, occurrence, or series of transactions and

occurrences, and any question of law or fact common to all defendants will arise in the action."

Fed. R. Civ. P. 20(a)(2).  The court approaches the determination of "[w]hat [might] constitute

the same transaction or occurrence . . . on a case by case basis."  *Kehr ex rel. Kehr v. Yamaha

Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).  In

interpreting the terms transaction or occurrence as used in Rule 13(a), Fed. R. Civ. P., the Second

Circuit has observed that whether a counterclaim arises out of the same transaction as the

original claim depends upon an assessment of "the logical relationship between the claims" and a

determination of whether the "essential facts of the various claims are so logically connected that

considerations of judicial economy and fairness dictate that all the issues be resolved in one

lawsuit."  *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978) (citations omitted). The court

76

applies an analogous interpretation to the terms transaction or occurrence as used in Rule 20(a)(2).

Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any claim against a party" pursuant to a motion filed by a party to the action or on its own.  Fed. R. Civ. P. 21.  In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: "(1) [do] the claims arise out of the same transaction or occurrence; (2) [do] the claims present some common question of law or fact; (3) [would] settlement of the claims or judicial economy be facilitated; (4) will prejudice [] be avoided; and (5) [will] different witnesses and documentary proof [be] required for the separate claims."  *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–66 (D. Conn. 2012) (citation omitted).

The additional allegations in the complaint pertain to: an incident that occurred at Cheshire in October 2017 that led to a separation profile between the plaintiff and a staff member at Cheshire and the plaintiff's transfer from Cheshire, conditions of confinement at Cheshire for approximately three weeks in October 2017, the plaintiff's transfer back to Cheshire in September 2018, the plaintiff's transfer to a prison in Massachusetts in November 2018, an altercation that occurred between the plaintiff and a correctional officer at Hartford Correctional in September 2019, disciplinary hearings and an AS placement hearing held at Northern in September and October 2019, and conditions of confinement at Northern in September and October 2019.  It is evident that these allegations do not all arise out of the same transaction or occurrence as the various First, Eighth and Fourteenth Amendment claims related to the incidents that occurred and conditions of confinement to which the plaintiff was exposed at Cheshire and Garner in 2016 and Northern in 2016 and 2017.

77

The claims arising from incidents that occurred from October 2016 to September 2017 are not reasonably related to the claims arising from incidents that occurred from October 2017 to October 2019 and the factual and legal theories related to each claim are not all common to each other. Thus, different witnesses/testimony and documentary evidence would be required to prove the separate sets of claims at trial.  The court concludes that the sets of unrelated allegations and defendants are not properly joined in this action and the relevant factors favor severance of these claims.  *See Lindsay v. Semple*, No. 3:19-CV-751 (JCH), 2019 WL 3317320, at \*10–11 (D. Conn. July 24, 2019) (severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of Fed. R. Civ. P. 20)(citing *Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 1471908, at \*6 (D. Conn. Mar. 31, 2015) (advising plaintiff that improperly joined claims must be pursued in separate actions)).

Thus, the court will sever and dismiss without prejudice the Eighth and Fourteenth Amendment claims arising from the plaintiff's confinement at Cheshire in October 2017 and from September to November 2018, his confinement at Hartford Correctional for three days in September 2019, and his confinement at Northern from September to October 2019, pursuant to Rules 20 and 21.  If the plaintiff seeks to pursue these claims, he must do so by filing separate lawsuits.

## ORDERS

In accordance with the foregoing analysis, the court enters the following orders:

**(1)**      The Motion for Temporary Restraining Order and Motion for Preliminary Injunction, [**ECF No. 3**], is **DENIED** as moot.  The Motion for Default and/or Default Judgment, [**ECF No. 11**], seeking to default the defendants' for failing to oppose the motion for

temporary restraining order and preliminary injunction, is **DENIED**.

The section 1983 claim for money damages and the requests for declaratory and injunctive relief against Semple, Cook, Rinaldi, Quiros, Maiga, Erfe, Falcone, Mulligan, Mudano, McCormack, Robles, Alexander, Chevalier, Betances, Rizvani, Leone, Tugie, Pieri, and Mathews defendants in their official capacities are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1) and (2).  The following claims that arise from the plaintiff's confinement at Cheshire and Garner in 2016 and Northern in 2016 and 2017 are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1):  The RLUIPA claim; the PREA claim; the Fourth Amendment claim; the Fifth Amendment claim; the claim that Warden Erfe and District Administrator violated Administrative Directive 9.4 by requiring the plaintiff to wear a yellow jumpsuit; the First Amendment retaliation claim against Lieutenant Arzt and Nurse Hill;  the First Amendment access to courts claim; the First Amendment association claim; the First Amendment redress of grievances claim; the First and Eighth Amendment claims that Warden Falcone, Administrator Quiros, and OCPM Director Maiga discriminated against the plaintiff on the basis of his ancestry; the First and Eighth Amendment claims related to the AS placement hearing held in December 2016, the placement decision made in January 2017, and the lack of periodic reviews of the plaintiff's continued placement on AS against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, OCPM Director Maiga, Warden Falcone, Counselor Supervisor Tugie, and Dr. Pieri; the Eighth Amendment claim that Warden Erfe and District Administrator Quiros improperly transferred the plaintiff to MacDougall; the Eighth Amendment deliberate indifference to medical needs claim against Lieutenant Arzt; the Eighth Amendment unsanitary cell claim against Lieutenant Arzt; the Eighth Amendment claims related

79

to conditions at Northern in 2016 and 2017 including: lack of programs, activities, a job, access to libraries, reading materials, and personal property items, and limitations on showers, visitation, telephone calls, and commissary purchases and spending; the Eighth Amendment sexual harassment claims; the Eighth Amendment claim that Warden Falcone and District Administrator Quiros denied the plaintiff the opportunity to practice his religion at Garner; the Eighth and Fourteenth Amendment good time credit claim; the Eighth and Fourteenth Amendment claim that Dr. Pieri, Warden Falcone, District Administrator Quiros and OCPM Director Maiga were deliberately indifferent to the plaintiff's mental health needs in connection with the assessment of the plaintiff's mental health status in December 2016; the Fourteenth Amendment due process claim related to the AS placement hearing in December 2016 and the placement decision made in January 2017 against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, OCPM Director Maiga, Warden Falcone, Counselor Supervisor Tugie, and Dr. Pieri; the Fourteenth Amendment due process claim related to the processing of grievances against Warden Mulligan; the Fourteenth Amendment equal protection claim against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, Warden Mulligan, and Captain Robles related to restrictive conditions of confinement at Northern in 2016 and 2017; the Fourteenth Amendment equal protection claim against Warden Erfe and District Administrator Quiros related to the jumpsuit requirement; and the Fourteenth Amendment equal protection claim based on ancestry against Warden Falcone, District Administrator Quiros, and OCPM Director Maiga.  The court declines to exercise supplemental jurisdiction over the claims asserted under Article First § 20 of the Connecticut Constitution, and that claim is dismissed without prejudice.

(**2**)    The Eighth and Fourteenth Amendment claims arising from the plaintiff's confinement at Cheshire in October 2017, his confinement at Cheshire from September to November 2018, his confinement at Hartford Correctional for three days in September 2019, and his confinement at Northern from September to October 2019 are **SEVERED** and **DISMISSED** without prejudice pursuant to Rules 20 and 21, Fed. R. Civ. P.  *See* Compl. ¶¶ 179-264, 307-330. *See* Doc. #1 at 150-207 (¶¶ 426-593). The plaintiff may pursue these claims in separate lawsuits.

Accordingly, all claims against Commissioner Rollin Cook, Dr. Lalitha Pieri, Counselor Supervisor E. Tugie, Correctional Officer Rizvani, Captain Alexander, Dr. Mathews, Warden McCormack, Captain Chevalier, Warden Giuliana Mudano, Correctional Officer Leone, and Lieutenant Betances have been **DISMISSED**.  The Clerk is directed to terminate them as parties.

(**3**)    The following claims shall **PROCEED**:  The First Amendment retaliation claim relating to the plaintiff's transfer to MacDougall in October 2016 against Warden Erfe and District Administrator Quiros in their individual capacities; the First Amendment retaliation claim relating to the placement of Inmate Blair in a recreation cage adjacent to the plaintiff's cage against Captain Robles and Warden Mulligan in their individual capacities; the First Amendment free exercise of religion claim relating to the plaintiff's confinement at Garner from November to December 2016 against Warden Falcone and District Administrator Quiros in their individual capacities; the First Amendment free exercise of religion claim relating to the plaintiff's confinement at Northern from December 2016 to September 2017 against Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros in their individual capacities; the Eighth Amendment deliberate indifference to medical needs claim against Nurse Hill, Warden Mulligan, and Captain Robles in

their individual capacities; the Eighth Amendment deliberate indifference to mental health needs claim relating to the plaintiff's confinement at Northern from December 2016 to September 2017 against Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District Administrator Quiros in their individual capacities; the Eighth Amendment excessive force claim relating to the plaintiff's placement in in-cell restraints in December 2016 against Lieutenant Arzt in his individual capacity; the Fourteenth Amendment due process claim relating to the plaintiff's long-term confinement on AS at Northern in 2017 without meaningful, periodic reviews against Commissioner Semple, OCPM Director Maiga, District Administrator Quiros, Warden Mulligan, Captain Robles, and Deputy Commissioner Rinaldi in their individual capacities.  The Eighth Amendment conditions of confinement claims related to isolation, excessive noise, lack of sleep, extreme cell temperatures, unsanitary conditions, the opportunity to exercise, inadequate ventilation, the denial of outdoor clothing, the denial of nutritional meals, placement in restraints when leaving the cell, being escorted to the shower in nothing but boxer shorts, and showering in restraints, shall proceed against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, Warden Mulligan, and Captain Robles in their individual capacities.  *See* Compl. at 32-35 ¶¶ 125(a) – (b), (i) – (s), (x) – (z), (ee).  Because the claims that will proceed arise from events at different facilities, they may be subject to severance under Rules 20 and 21. For now, however, they will proceed in this action.

**(4)**      Within twenty-one (21) days of this Order, the Clerk shall verify the current work addresses of: Commissioner Scott Semple, Deputy Commissioner Monica Rinaldi, District Administrator Angel Quiros, Director of Offender Classification and Population Management David Maiga, Warden Scott Erfe, Warden Henry Falcone, Captain Gregorio Robles, Lieutenant

Arzt, and Nurse Nancy Hill with the Department of Correction Office of Legal Affairs and mail

a copy of the complaint, this order and a waiver of service of process request packet to each of

these defendants in his or her individual capacity at the confirmed address. On the thirty-fifth

(35th) day after mailing, the Clerk shall report to the court on the status of the request.

(5)     Defendants Semple, Rinaldi, Quiros, Maiga, Erfe, Falcone, Robles, Arzt, and Hill

shall file a response to the complaint, either an answer or motion to dismiss, within sixty (60)

days from the date the notice of lawsuit and waiver of service of summons forms are mailed to

them.  If they choose to file an answer, they shall admit or deny the allegations and respond to

the cognizable claims recited above. They may also include all additional defenses permitted by

the Federal Rules.

(6)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be

completed within six months (180 days) from the date of this order. Discovery requests need not

be filed with the court.

(7)     All motions for summary judgment shall be filed within seven months (210 days)

from the date of this order.

(8)     The Clerk shall send a courtesy copy of the complaint and this order to the

Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

(9)     The parties must comply with the District of Connecticut "Standing Order Re:

Initial Discovery Disclosures" which will be sent to the parties by the Clerk. The order also can

be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

SO ORDERED at Hartford, Connecticut this 20th day of April, 2020.

_____/s/_____
Michael P. Shea
United States District Judge