UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:19cv1820 (MPS) |
| SCOTT ERFE, et al., | : | |
| *Defendants*, | : | |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Joe Baltas, has commenced a civil rights action asserting claims related to

time spent incarcerated at Connecticut Department of Correction ("DOC") prisons between 2016

and 2019. *See* Compl., ECF No. 1. Plaintiff's complaint included eighteen causes of action. *Id*. at

64-80. However, many of these claims have already been dismissed or severed from this case. At

this stage, nine claims remain: (1) First Amendment retaliation claims against Warden Erfe and

District Administrator Quiros relating to a prison transfer in October 2016; (2) First Amendment

retaliation claims against Captain Robles and Warden Mulligan relating to the placement of an

inmate with known sexual proclivities beside plaintiff's recreation cage; (3) First Amendment

free exercise claims against Warden Falcone and District Administrator Quiros relating to

plaintiff's inability to participate in smudging rituals and sweat lodge ceremonies while confined

at Garner Correctional Institution; (4) First Amendment free exercise claims against Warden

Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and District

Administrator Quiros relating to plaintiff's ability to practice his Native American religion while

placed in Administrative Segregation; (5) Eighth Amendment deliberate indifference to medical

needs claims against Nurse Hill, Warden Mulligan, and Captain Robles relating to the failure to

treat an ankle laceration; (6) Eighth Amendment deliberate indifference to mental health needs

claims against Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi and District Administrator Quiros; (7) an Eighth Amendment excessive force claim against Lieutenant Arzt relating to plaintiff's placement in in-cell restraints; (8) Fourteenth Amendment due process claims against Commissioner Semple, OCPM Director Maiga, District Administrator Quiros, and Deputy Commissioner Rinaldi challenging the meaningfulness of periodic reviews of plaintiff's confinement in Administrative Segregation; and (9) Eighth Amendment conditions of confinement claims against Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, Warden Mulligan, and Captain Robles relating to plaintiff's confinement in Administrative Segregation. *See* Ruling and Order, ECF No. 18 at 81-82.

The defendants have filed a motion for summary judgment on nearly all remaining claims.[1] This motion asserts that: (1) plaintiff failed to properly exhaust the majority of his claims; (2) plaintiff cannot establish the merits of his remaining claims; and (3) defendants are protected by qualified immunity. Defs.' Mot. for Summ. J., ECF No. 166; Defs.' Mem. Of Law in Supp. of Summ. J., ECF No. 166-1 at 2. For the reasons that follow, defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**FACTS**[2]

The plaintiff is a sentenced DOC inmate serving a lengthy prison sentence. Defs.' L.R. 56 (a)(1), ECF No. 166-2, ¶ 1; Pls.' L.R. 56(a)(2), ECF No. 186, ¶ 2. On July 11, 2016, plaintiff was transferred to Cheshire Correctional Institution ("Cheshire"). ECF No. 166-2, ¶ 2. In October

---

[1] Because plaintiff has not served defendant Nurse Hill, she has not been included as a party to the defendants' summary judgment motion. ECF No. 166-1 at 20.  As discussed below, the Court nonetheless grants summary judgment to Nurse Hill as to the claim against her.

[2] The facts noted within this order are drawn largely from the parties' competing Local Rule 56(a) statements and their supporting exhibits.

2016, Cheshire's Warden, Warden Erfe, received a report concerning a recorded telephone conversation between plaintiff and plaintiff's mother, in which they discussed a particular Cheshire correctional officer. ECF No. 166-3 at 1, ¶¶ 6-7. The report states that plaintiff told his mother: "I haven't seen my crush around cute little chick named [officer's name] … I was just saying I was stressed because my crush hasn't been around this cute little chick … it's very disheartening." *Id*.[3]

Warden Erfe contends that he arranged for plaintiff to be transferred to MacDougall-Walker Correctional Institution ("MacDougall") after reading the report of plaintiff's telephone conversation. *Id*. at 1-2. Warden Erfe further asserts that he arranged this transfer to protect the officer named in plaintiff's telephone call from plaintiff's potentially dangerous fixation. *Id*.

Plaintiff counters that Warden Erfe used the October 25, 2016 report of his recorded telephone conversation as a pretext to justify an already-arranged facility transfer. ECF No. 186, ¶¶ 5-6. To support this contention, plaintiff has submitted a DOC record that appears to show that Warden Erfe requested plaintiff's transfer on October 24, 2016 – one day prior to the issuance of the report that Warden Erfe claims motivated his transfer decision. ECF No. 184, Ex. 7; Pls.' Mem. Of Law in Opp'n to Summ. J., ECF No. 185 at 2. Whatever the motivation, the parties agree that plaintiff was transferred from Cheshire to MacDougall on October 25, 2016. ECF No. 184, ¶ 8.

Plaintiff was again transferred, this time to Garner Correctional Institution ("Garner"), on November 23, 2016. ECF No. 166-2, ¶ 7. Unlike some other DOC facilities, Garner does not have a Native American sweat lodge. *Id*., ¶ 12. This proved to be problematic, as plaintiff practices the Native American religion. ECF No. 1, ¶ 51. While the parties disagree about the

---

[3] Plaintiff generally agrees that he made the comments noted in the report but contends that he was not referring to a correctional officer, but, rather, a different woman with the same first name. ECF No. 184-5, ¶ 2.

logistical difficulties of constructing a sweat lodge within a prison, they agree that Garner's Warden, Warden Falcone, did not construct a sweat lodge at Garner. ECF No. 166-4, ¶ 7.

Warden Falcone asserts that he attempted to transfer plaintiff to a prison that had a sweat lodge. ECF No. 166-4, ¶ 9; ECF No. 186, ¶ 15. But, according to Warden Falcone, there were difficulties in transferring plaintiff due to his disciplinary history and separation profiles, and Warden Falcone was not successful in transferring plaintiff to another facility with a sweat lodge. ECF No. 166-4, ¶¶ 9-10. Plaintiff asserts that Warden Falcone never made a sincere effort to transfer him to an in-state facility with a sweat lodge. ECF No. 186, ¶ 14. Although plaintiff could not participate in sweat lodge ceremonies during his time at Garner, he was generally permitted to participate in Native American smudging rituals. ECF No. 186, ¶ 10.

On December 23, 2016, plaintiff was transferred from Garner to Northern Correctional Institution ("Northern"). ECF No. 166-13 at 7. The transfer was prompted by a cell extraction incident during which plaintiff vowed to stab a correctional officer in the neck with a shank. ECF No. 1, ¶¶ 58-60; ECF No. 166-4, ¶ 11.

On December 29, 2016, while at Northern, plaintiff developed a laceration on one of his ankles while guards escorted him to the shower in restraints. ECF No. 1, ¶ 97. The severity of this injury is disputed by the parties. ECF No. 166-7, ¶ 5; ECF No. 186, ¶ 27. Photographic and video evidence presented by plaintiff, however, depicts a relatively minor injury. ECF No. 184-17 at 4; ECF No. 191, Ex. 20 at 14:00.

Seeking medical attention for his injury, plaintiff obscured the view of his cell window in violation of prison rules. ECF No. 166-7, ¶ 4; ECF No. 186, ¶¶ 25-27. When correctional officers arrived to extract plaintiff from his cell, plaintiff stated that he wanted treatment for his ankle injury. ECF No. 166-7, ¶ 5. Lieutenant Arzt then escorted plaintiff to a medical screening area to

be seen by Nurse Hill. ECF No. 166-7, ¶ 5.[4]

The parties dispute what was said between Nurse Hill and the plaintiff during their encounter. Defendants assert that Nurse Hill informed the plaintiff that he should wash his wound with soap and water and that she would provide him with a bandage to cover his laceration. ECF No. 166-2, ¶ 28. Plaintiff asserts that Nurse Hill directed rude and profane language toward him in the course of refusing to provide treatment. ECF No. 186, ¶ 28.  A video of the encounter between plaintiff and Nurse Hill (which lacks audio) shows the two embroiled in a heated conversation. ECF No. 191, Ex. 19 at 33:00-33:50.

Plaintiff admits to having called Nurse Hill a "class act c***." ECF No. 1, ¶ 107. According to defendants, plaintiff continued to yell at Nurse Hill following this initial insult. ECF No. 166-7, Ex. 5, ¶ 7. Plaintiff, in contrast, contends that he maintained total calm. ECF No. 186, ¶¶ 29-30. Video of the incident (which, again, lacks audio) appears to show plaintiff in a somewhat agitated state. ECF No. 191, Ex. 19 at 33:00-33:50.

The parties agree that Lieutenant Arzt ordered plaintiff to be placed in in-cell restraints because of the vulgar language that he directed toward Nurse Hill. ECF No. 186, ¶ 30. However, the parties disagree as to whether Lieutenant Arzt's restraint order was motivated by a need to keep order or a sadistic desire to inflict punishment. *Id*. As officers applied restraints on plaintiff a nurse disinfected and bandaged his ankle – treatment to which plaintiff asserts no objection. *Id.*, ¶ 35.[5] Plaintiff's in-cell restraint ultimately lasted for approximately 13 hours. *Id.*, ¶ 38.[6]

---

[4] Plaintiff asserts that he "never entered medical screening," but acknowledges that he spoke with Nurse Hill. ECF No. 186, ¶ 28.

[5] The parties dispute whether plaintiff was treated by "Nurse Fryer" or "Nurse Mosier." ECF No. 186. ¶ 35. This dispute is immaterial.

[6] Defendants claim that plaintiff was shackled through two shifts, whereas plaintiff makes a point of arguing that he was restrained over the course of three shifts. This is a factual dispute of little consequence, as the parties agree that plaintiff was restrained from approximately 7:45 p.m. to 8:40 a.m. ECF No.186, ¶ 38.

On January 11, 2017, following a hearing on the matter, plaintiff was authorized for placement in Administrative Segregation (AS) by OCPM Director Maiga. ECF 166-5 at 2, 6. AS is a restrictive housing status that results in an inmate's separation from other prisoners and a loss of privileges afforded to the general inmate population. *See* State of Connecticut Department of Correction Administrative Directive 9.4(B), Attachment A.

To be removed from AS placement, prisoners must complete three progressively less restrictive phases of segregation. ECF 166-5 at 2-3; see also, DOC AD 9.4, Attachment A. Progression to a less restrictive phase of AS requires review and approval from facility staff. ECF 166-5 at 2.

On April 25, 2017, Captain Robles reviewed, and approved, plaintiff for progression from Phase I to Phase II of AS. *Id*. at 7. On May 2, 2017, plaintiff was transferred from Northern to MacDougall. *Id*. at 3. On July 24, 2017, MacDougall staff conducted a review and progressed plaintiff to Phase III of AS. *Id*. at 8. On September 12, 2017, MacDougall's warden, Warden Mulligan, recommended plaintiff's removal from AS placement. *Id*. at 9. On September 18, 2017, Director Maiga accepted this recommendation, and removed plaintiff from AS. *Id*. at 10.

While in AS placement, the parties agree that plaintiff was not permitted to participate in congregational worship (*i.e.*, worship with other inmates). ECF No. 166-2, ¶ 46; ECF No. 186, ¶ 46. But they dispute the extent to which plaintiff's practice of the Native American religion was otherwise accommodated. ECF No. 186, ¶¶ 39-49. The parties also dispute whether plaintiff had access to mental health services while placed in AS. ECF No. 166-2, ¶ 50; ECF No. 186, ¶ 50.

It is undisputed that plaintiff filed many administrative grievances and appeals from July 2016 to September 2017. *Id*., ¶¶ 57-90; Pl.'s Sworn Dec., ECF No. 184-2, at 2-5. The parties disagree, however, as to whether these grievances and appeals properly exhausted the remaining

6

claims in this case. ECF No. 166-1 at 23; Pl.'s Mem. in Opp'n to Summ. J., ECF 185 No. at 10.

**LEGAL STANDARD**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P. The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*. 554 F. 3d. 255, 266 (2d Cir. 2009). He or she cannot "rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted). In deciding a motion for summary judgment, the court must draw all reasonable inferences from the evidence in favor of the non-moving party. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

Although a court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**DISCUSSION**

**A.  Exhaustion of Remedies**

The defendants assert that "plaintiff did not exhaust administrative remedies for the

majority of his claims." ECF No. 166-1 at 23. To the extent plaintiff has not exhausted his administrative remedies, those claims may be dismissed without a review of their merits. *See Feaster v. U.S. Bureau of Prisons*, 37 F. App'x 15, 17 (2d Cir. 2002) (declining to review the merits of claims that failed on exhaustion grounds). Accordingly, this Court begins its analysis with consideration of the exhaustion arguments.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id*. This provision requires an inmate to exhaust his or her administrative remedies before filing any type of action in federal court, *see Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless as to whether the inmate may ultimately obtain the specific relief he or she desires through the available administrative process. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).

The PLRA does not require full exhaustion of administrative remedies when those remedies are not, as a practical matter, available to an aggrieved inmate. Such unavailability may exist when: (1) a grievance system "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use;" or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 643-44 (2016). When remedies are available though, the PLRA requires "proper exhaustion," which entails compliance with all "procedural rules," such as filing deadlines, prescribed by a particular penal grievance system. *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

The Connecticut Department of Correction requires inmates to adjudicate grievances pertaining to conditions of their confinement in accordance with its Administrative Directive 9.6. Following this directive, as it was enacted between 2016 and 2017, an aggrieved inmate must first seek informal resolution with an appropriate correctional facility staff member. This informal resolution requires initial verbal consultation. If verbal consultation fails, an inmate must then submit an Inmate Request Form clearly stating the nature of his or her problem and any remedy sought. This request is termed a "grievance." If a "grievance" is denied or rejected, an inmate may subsequently pursue an administrative "Level 2" appeal. In limited circumstances, a subsequent "Level 3" appeal is permitted following an adverse ruling on a Level 2 appeal. See Connecticut Department of Correction Administrative Directive 9.6 (Effective date Aug. 15, 2013).

In this case, the defendants do not contest the proper exhaustion of plaintiff's Fourteenth Amendment due process claim. But all other claims, defendants argue, were not properly and fully exhausted. ECF No. 166-1 at 23-28.

Before addressing the exhaustion of plaintiff's claims individually, the Court addresses plaintiff's broadside against all of the defendant's exhaustion arguments – his contention that the DOC grievance process is a "sham" designed to be a "dead end" for inmates seeking recourse from prison officials. ECF No. 185 at 12. In support of this contention, plaintiff notes that he has personally filed over 300 administrative grievances, without one ever having been granted. ECF No. 184-2, ¶ 26.

If DOC's grievance system did, in fact, operate as a dead end—with officers unwilling to provide any relief to aggrieved inmates—then plaintiff would be correct in claiming that he had no available remedies to exhaust. *See Ross*, 578 U.S. at 643. But plaintiff's contention of a

broken grievance system is not an inference that can be reasonably drawn from his personal knowledge of his own experience. While plaintiff may have, thus far, had no success in receiving recourse through DOC's grievance process, this could be the result of plaintiff's failure to submit meritorious complaints.

Without concrete evidence suggesting otherwise, this Court declines to presume that DOC's grievance system is broken and will now address the exhaustion of plaintiff's individual claims.

### 1.    First Amendment Retaliation Claim Relating to the Plaintiff's Transfer to MacDougall

In support of their argument that plaintiff did not exhaust his remedies with respect to the alleged retaliatory transfer from Cheshire to MacDougall, the defendants rely upon an affidavit submitted by Cheshire's Administrative Remedies Coordinator (ARC). ECF No. 166-1 at 25. In this affidavit, the ARC avers that he or she has attached all grievances submitted by plaintiff relating to his confinement in Cheshire in 2016. ECF No. 166-15 at 2-3. Since none of these attached grievances relate to plaintiff's transfer from Cheshire to MacDougall, defendants argue, plaintiff has not exhausted his remedies. ECF No. 166-15 at 6-12; ECF No. 166-1 at 25.

The defendants' exhaustion argument is undermined by a grievance form attached as an exhibit to plaintiff's brief. On this grievance form—which is dated November 28, 2016—plaintiff wrote:

> I am grieving my transfer back to MacDougall as retaliation by
> Warden Erfe and DA Quiros as retaliation for my grievance
> filings.

ECF No. 184-2 at 8. On January 8, 2017, an unidentified DOC official appears to have labeled the disposition of this grievance as "rejected." As explanation for this disposition, it is noted: "TRANSFERES [sic] NOT GREIVABLE." *Id.* Additionally, the official appears to have

checked a box on the grievance form stating: "You have exhausted DOC's Administrative Remedies." *Id.*

The documentation provided by plaintiff at least raises a genuine dispute about whether he grieved a retaliatory transfer from Cheshire to MacDougall. Once rejected, this grievance should have been appealable. *See* AD 9.6(6)(D), (K). But the writing on the form suggests that a DOC official conveyed, in no uncertain terms, that plaintiff was not permitted to administratively challenge his transfer and that he had already exhausted his administrative remedies. Such an affirmative misrepresentation from a prison official would have deprived plaintiff of the opportunity fully to exhaust his administrative remedies. *See Ross v. Blake*, 578 U.S. at 644. Thus, this Court will not grant summary judgment on the retaliation claim related to plaintiff's prison transfer on the basis that plaintiff failed to exhaust his administrative remedies.

### 2.    First Amendment Retaliation Claim Relating to Placement Beside Inmate Blair

In support of their argument that plaintiff did not exhaust his remedies with respect to the allegedly retaliatory placement beside Inmate Blair, defendants rely upon an affidavit submitted by a DOC official with general access to DOC administrative grievance records. ECF No. 166-1 at 26. Records submitted by this officer indicate that plaintiff did file a grievance related to his placement next to Inmate Blair during recreation. ECF No. 166-13, 27. However, this grievance took issue with Northern staff's alleged failure to comply with the Prison Rape Elimination Act (PREA) and did not allege retaliatory placement. *Id.* This grievance was rejected on March 13, 2017. *Id.* The rejection does not indicate that plaintiff had exhausted his administrative remedies, and, according to the defendants' records, plaintiff never filed an appeal related to a retaliatory placement near Inmate Blair. *Id.* at 3, 46-66.

In opposing summary judgment, plaintiff has submitted the same PREA grievance record

– with one significant difference. On the grievance form submitted by plaintiff, someone has checked a box stating: "You have exhausted DOC's Administrative Remedies." ECF No. 184-2 at 44. Since this box *was not* marked on the record submitted by defendants, it raises the possibility that someone altered an exhibit record with an intent to deceive the Court. As it is not currently clear whether the checked or unchecked version of the relevant grievance document is the legitimate record, however, this Court reaches no conclusion on the matter.

The critical point, for the purpose of this exhaustion issue, is that the plaintiff, in the only grievance that he filed related to his placement beside Inmate Blair, alleged a violation of PREA, not retaliation. The text of the grievance alleges no facts suggesting that the placement of Inmate Blair was retaliatory. Further, the grievance makes no mention of Captain Robles and Warden Mulligan, who are the two defendants on the First Amendment retaliation claim. In his sworn declaration, plaintiff essentially concedes that the grievance makes no mention of retaliation but asserts that he did not mention retaliation because retaliation was "well known" and did not need to be "restated with legal analysis." ECF No. 184-2 at 4. While the plaintiff was not required to set forth legal analysis in the grievance, he cannot rest a First Amendment retaliation claim on a grievance that sets forth not a single fact suggesting retaliation. *See Shifflet v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019) ("Retaliation is a separate claim, and therefore must be separately grieved." (internal citation omitted)). Accordingly, the Court will grant summary judgment on the retaliation claim related to plaintiff's placement beside inmate Blair on the ground that plaintiff did not exhaust his administrative remedies.

### 3.   First Amendment Free Exercise of Religion Claim Relating to Plaintiff's Confinement at Garner

The plaintiff's free exercise claim alleges that Warden Falcone and DA Quiros infringed upon his right to participate in Native American smudging and sweat lodge rituals. ECF No. 18

at 33-34. The defendants concede that plaintiff has exhausted his First Amendment free exercise claim to the extent it pertains to his inability to participate in sweat lodge ceremonies. ECF No. 166-1 at 25. And plaintiff, in turn, concedes that "he did not file any grievance regarding smudging." ECF No. 185 at 13.

In sum, the parties agree that plaintiff's free exercise claim is exhausted to the extent it implicates sweat lodge ceremonies, but not to the extent it implicates smudging. Accordingly, the Court will limit its review of plaintiff's free exercise claim relating to Garner to the alleged inability to participate in sweat lodge ceremonies.

### 4. First Amendment Free Exercise Claim Relating to Plaintiff's Nine-Month Placement in AS

Grievance records submitted by the defendants indicate that the plaintiff never filed a grievance specifically related to an infringement upon his free exercise of religion while placed in AS. Accordingly, defendants argue that plaintiff has failed to exhaust this claim. ECF No. 166-1 at 27.  Plaintiff responds by contending that he filed "a broad gri[e]vance regarding all condition[s] at Northern including the lack of religious services and activities," which prison officials never acknowledged. ECF 185 at 13. But in support of this argument, plaintiff cites only the statement in his affidavit that he filed a grievance on February 22, 2017 "regarding the conditions for A/S prisoners," to which he "received no receipt or response." ECF 184-2, ¶ 19. The affidavit itself cites "Attachment M," which is a level 2 and level 3 grievance that makes no reference to free exercise rights or religion but merely states that plaintiff requests "to be treated equally with SN or released from A/S." ECF No. 184-2 at 47. Especially given the large number of specific "conditions for A/S prisoners" about which he is complaining in this lawsuit, plaintiff fails to raise a genuine dispute of material fact concerning exhaustion of a particular issue – here, infringement of his right to freely exercise his religion in AS – simply by pointing to a vague,

catch-all statement in his affidavit about a "broad grievance regarding the conditions for A/S prisoners" or a grievance form stating that he wants to be released from A/S. Although a grievance need not "lay out the facts, articulate legal theories, or demand particular relief," it "must provide enough information about the conduct [of which it] complain[s] to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2009). A "broad grievance" complaining about "conditions for A/S prisoners" – without further specification, and Baltas does not point to any – would not "provide enough information" about the opportunities or ability (or lack thereof) to practice one's religion while in A/S at Northern "to allow prison officials to take appropriate responsive measures." *See also Riles v. Semple*, 2022 WL 124231, at *2-3 (D. Conn. Jan. 13, 2022) (discussing degree of specificity required for grieving particular issues).

Plaintiff also contends that he exhausted his free exercise claim relating to AS placement by appealing the denial of the free exercise grievance that he filed in Garner while he was at Northern. ECF No. 185 at 13. The free exercise claim relating to plaintiff's time spent in Garner, however, deals with plaintiff's inability to participate in sweat lodge ceremonies *at Garner*; his free exercise concerning his later AS confinement – a restrictive status quite different from his status at Garner – deals with his ability to participate in religious activities *while in AS at Northern and MacDougall-Walker*.  These are separate claims and had to be grieved separately.

Since plaintiff has not submitted evidence supporting a finding that he grieved his lack of religious accommodations while placed in AS, this Court grants summary judgment on the AS free exercise claim. Unlike plaintiff's other nonexhausted claims, however, the Court elects to address the merits of this claim below.

### 5.    Eighth Amendment Deliberate Indifference to Medical Needs Claim and Eighth Amendment Excessive Force Claim

14

Defendants correctly note that plaintiff raised his Eighth Amendment deliberate indifference and excessive force claims within the same grievance. ECF 166-1 at 27. This grievance, submitted on February 5, 2017, was rejected because it was not filed within 30 days of the events that prompted plaintiff's complaints, as required by Administrative Directive 9.6(6)(C). ECF No. 166-13 at 16. Because proper PLRA exhaustion requires compliance with administrative filing deadlines, *see Woodford*, 548 U.S. at 90-91, the defendants argue, plaintiff has failed to exhaust his excessive force and indifference to medical needs claims. ECF 166-1 at 27.

Plaintiff responds by submitting additional evidence showing that he submitted an earlier grievance raising deliberate indifference to medical needs and excessive force claims on January 26, 2017. ECF No. 184-2 at 22. Because the events giving rise to plaintiff's Eighth Amendment claims occurred on December 29, 2016, this initial grievance was filed within Administrative Directive 9.6(6)(C)'s 30-day deadline.

Plaintiff's initial grievance was returned to him without disposition, on the ground that it improperly raised discrete claims implicating custody and medical treatment within a single grievance form. ECF No. 184-2 at 24. Although the returned grievance form instructed plaintiff to re-file, by the time it was returned to plaintiff, on January 31, 2017, 32 days had already passed from the events that gave rise to his complaints. Thus, it was literally impossible for plaintiff to re-file a grievance within Administrative Directive 9.6(6)(C)'s 30-day deadline. This, plaintiff argues, deprived him of an available remedy for the alleged violations of his Eighth Amendment rights. ECF No. 184-2, ¶¶ 8-12.

Plaintiff's exhaustion argument is consistent with a prior ruling made by this Court in this case. In its Initial Review Order, this Court reviewed a cause of action in which plaintiff alleged

that his due process rights had been violated by the grievance coordinator who returned his January 26, 2017, grievance without disposition. This Court dismissed this cause of action because inmates do not possess a protected liberty interest in the proper application of state grievance procedures. However, this ruling came with the caveat that "[t]he fact that the plaintiff may not have been able to completely or properly exhaust all available grievance procedures did not preclude him from seeking redress for his claims against" those allegedly responsible for violating his Eighth Amendment rights. ECF No. 18 at 70.

This Court's Initial Review Order has subsequently been interpreted by another judge, in *Sease v. Frenis*, as standing for the proposition that "a correctional officer's returning a grievance to an inmate with an instruction to re-file it and then rejecting the re-filed grievance as untimely would constitute 'thwart[ing] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Sease v. Frenis*, 2021 WL 260398, at *8 (D. Conn. Jan. 25, 2021) (quoting *Ross* 578 U.S. at 644).

The *Sease* Court also questioned the premise that Administrative Directive 9.6(6)(C)'s 30-day filing deadline applies to re-submissions of grievances initially returned without disposition. *Sease*, 2021 WL 260398 at *8. While Administrative Directive 9.6 expressly authorizes the re-filing of grievances returned without disposition following an inmate's correction of error, it does not purport to establish a re-filing deadline. *See* AD 9.6(6)(E) (Effective date August 15, 2013). And it is not logical to assume that Administrative Directive 9.6(6)(C)'s general filing deadline applies to such re-submissions, since this would, in practice, deny the right to petition for redress to many inmates who diligently, but imperfectly, submit grievances.

If Administrative Directive 9.6(6)(C)'s general 30-day filing deadline did apply to re-

filings authorized by Administrative Directive 9.6(6)(E), this would result in an administrative scheme "so opaque that it becomes, practically speaking, incapable of use." *Sease*, 2021 WL 260398 at *9 (quoting *Ross* 578 U.S. at 643). Inmates would be justifiably confused by directives that, at best, failed clearly to convey a precise deadline for re-submitting grievances returned without disposition. *See also Sease*, 2021 WL 260398 at *9 ("the administrative scheme in this case—on the Defendants' theory—would also be prohibitively opaque because A.D. 9.6 would provide *contradictory* guidance.")

Here, plaintiff filed a timely grievance raising Eighth Amendment indifference to medical needs and excessive force claims. By returning that grievance without disposition, and subsequently rejecting its re-submission as untimely, prison officials deprived plaintiff of an available administrative remedy for his Eighth Amendment claims. Adopting this conclusion does not unfairly prejudice the defendants.  Plaintiff put them on notice of what his claims were in his original grievance, with ample time for them to take action to address it; his grievance was returned without disposition only because of the technical defect that it set forth more than one claim. While DOC is free to adopt such a requirement, it may not use that requirement to prevent an inmate from exhausting his administrative remedies by failing to reset the clock, at least where, as here, it is on notice from the original grievance of what the claims are. Thus, this Court will deny summary judgment on these two Eighth Amendment claims on the ground that plaintiff failed to exhaust his administrative remedies.

>     **6.    Eighth Amendment Deliberate Indifference to Mental Health Needs During Confinement at Northern**

Grievance records submitted by defendants indicate that plaintiff never filed a grievance related to the lack of mental health services during his confinement at Northern. Accordingly, they argue that plaintiff has failed to exhaust this claim. ECF No. 166-1 at 27.

Defendants' argument is undermined by a sworn declaration in which plaintiff contends that he did, in fact, file grievances challenging the lack of mental health services but that prison officials never responded to them. ECF No. 184-2, ¶ 34. Plaintiff's sworn statement is sufficient to defeat summary judgment. *See Baltas*, 2020 WL 6199821 at *11. Thus, this Court will deny summary judgment on the deliberate indifference to mental health needs claim on the grounds that plaintiff failed to exhaust his administrative remedies.

### 7. Eighth Amendment Conditions of Confinement During AS Confinement

At this stage in litigation, plaintiff's Eighth Amendment conditions of confinement claim implicates the following alleged conditions of AS confinement: (1) complete isolation; (2) 24-hour confinement, with the exception of five one-hour recreation periods a week; (3) deprivation of stimuli; (4) sensory deprivation; (5) loud, chaotic living environment; (6) lack of opportunities to exercise; (7) extreme temperatures within cell; (8) poor ventilation; (9) poor plumbing; (10) unsanitary eating conditions; (11) unsanitary food service conditions; (12) nutritionally inadequate food; (13) a requirement to be in full restraints at all times outside of cell; (14) transport to shower wearing only boxer shorts; (15) exposure to extreme outdoor weather during recreation; and (16) sleep deprivation. ECF No. 1 at 32-35; ECF No. 28 at 61. Defendants contend that plaintiff neglected to file grievances implicating many of these alleged conditions of confinement. And, to the extent that plaintiff did submit grievances, defendants assert that he generally neglected to file administrative appeals. Thus, the defendants argue that plaintiff has failed to exhaust all aspects of his Eighth Amendment conditions of AS confinement claim, except for his complaint regarding the nutritional inadequacy of his meals. ECF No. 166-1 at 28.

Based on the Court's review of grievance records submitted by plaintiff and defendants, however, it appears that plaintiff did file grievances that implicate many of the alleged Eighth

Amendment violations noted above. ECF 184-2 at 18, 29, 31, 33, 36, 49, 52, 56. And, on the grievance forms submitted by plaintiff, someone has marked boxes indicating that the denial/rejection of grievance represents an exhaustion of administrative remedies. *Id*. Interestingly, on the corresponding grievance forms submitted by defendants, the boxes indicating an exhaustion of remedies *are not* checked. (ECF No. 166-13 at 12, 14, 23, 25, 27, 33, 35, 37). As noted earlier in this ruling, this variance suggests that someone may have altered exhibits submitted to this Court. But to determine which set of grievance records is legitimate (the forms conveying exhaustion or the forms that do not convey exhaustion), this Court would need to make credibility findings. Accordingly, this Court denies the defendants summary judgment on the ground that plaintiff failed to exhaust available administrative remedies with respect to his Eighth Amendment conditions of confinement claim.

**Conclusion**

This Court grants summary judgment to the defendants on the ground that plaintiff failed to exhaust his available administrative remedies for the following claims: (1) the First Amendment retaliation claims relating to plaintiff's placement beside Inmate Blair; (2) the First Amendment free exercise claims relating to plaintiff's confinement in Garner to the limited extent that it implicates the practice of smudging; and (3) the First Amendment free exercise claims relating to plaintiff's placement in AS. This Court will now consider defendants' arguments as to the remaining claims (and the free exercise claim concerning AS) on the merits.

 **B.**  **Merits and Qualified Immunity**

   **1.**  **First Amendment Retaliation Claim Relating to Plaintiff's Transfer to MacDougall**

To establish a First Amendment retaliation claim, a plaintiff must show: "(1) that the speech or conduct at issue was protected, (2) that the defendant(s) took adverse action against the

plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). The Court must "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

The Court has construed plaintiff's retaliation claim against Warden Erfe and DA Quiros as alleging that: (1) plaintiff engaged in protected speech by organizing the filing of administrative grievances and a multi-party lawsuit; and (2) prison officials took retaliatory, adverse action by transferring plaintiff from Cheshire to Garner, a "less hospitable" prison. ECF No. 18 at 30. The Court further determined that the proximity in time between plaintiff's orchestrating administrative and legal filings and his prison transfer (at most three and one-half months) permitted an inference of retaliation so as to warrant "further development of the record." *Id.*

Since the Court last considered plaintiff's retaliation claim, the defendants have provided additional factual context. In an affidavit, Warden Erfe explains that he decided to transfer plaintiff after receiving a report of a telephone conversation during which plaintiff expressed an infatuation with a particular female Cheshire correctional officer. Warden Erfe states that he was motivated to transfer plaintiff due to his concerns about this female officer's safety. ECF No. 166-3 at 2-3.  The defendants also submit the report that purportedly prompted Warden Erfe's transfer decision. This report is dated October 25, 2016 – the same date that plaintiff was transferred from Cheshire to MacDougall. ECF No. 166-3 at 6-7.

In opposition to summary judgment, plaintiff claims that he was not actually referring to the correctional officer indicated in the report of his recorded telephone conversation, but, rather, a woman with the same first name. ECF No. 185, 2-3; ECF No. 186, ¶ 3. This claim does not raise a genuine dispute of material fact because plaintiff does not contest that Warden Erfe reviewed a report that indicated that he expressed infatuation with a woman who shared the same first name as the correctional officer, and the Warden's conclusion that plaintiff was referring to the correctional officer was reasonable, both because Cheshire is a men's prison and because the first name in question—"AnnaMaria"—is distinctive. ECF No. 186, ¶ 4.  Even if Warden Erfe was mistaken in believing that plaintiff was referring to a particular officer, that would not suggest that he was not, in fact, motivated by a concern about officer safety in initiating plaintiff's transfer.

Plaintiff has submitted a piece of evidence, however, that does raise a genuine dispute for trial. Specifically, plaintiff has submitted what appears to be a DOC record indicating that Warden Erfe requested plaintiff's transfer on *October 24, 2016*, the day before he was alerted to plaintiff's telephone call. ECF No. 184-7 at 2. Plaintiff points out that Warden Erfe could not have been motivated to request his transfer on October 24th, on the basis of information he first received on October 25th. This impossibility, plaintiff asserts, supports an inference of pretext, which, in turn, supports his allegation of retaliation. ECF No. 185, 2-3; ECF, No. 186, ¶ 126. The Court agrees.  Because plaintiff has submitted evidence that calls Warden's Erfe's reported motivation for his transfer into question, this Court will deny summary judgment as to his retaliation claim.

### 2. First Amendment Free Exercise of Religion Claim Relating to Plaintiff's Confinement at Garner

Plaintiff alleges that Warden Falcone and DA Quiros violated his First Amendment right

to the free exercise of religion by not allowing him to participate in Native American sweat lodge ceremonies while confined at Garner. ECF No. 1, ¶ 273. Plaintiff acknowledges that Garner had no sweat lodge during his confinement there but contends that the defendants could have accommodated his religious needs by transferring him to a facility that did have a sweat lodge or by periodically constructing temporary sweat lodges at Garner. ECF No. 186, ¶¶ 12, 14.

In moving for summary judgment specifically on behalf of DA Quiros, the defendants assert that DA Quiros had no involvement in plaintiff's request for sweat lodge access until denying a grievance appeal in March of 2017. ECF No. 166-1 at 14; ECF No. 166-2, ¶ 58. By this time, plaintiff had already been transferred to Northern, rendering DA Quiros's appeal decision moot. ECF No. 166-1 at 14. I need not address this issue, however, because I conclude that both Warden Falcone and D.A. Quiros, whatever their personal involvement, are protected by qualified immunity as to this claim.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). It protects all government officials except "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether an official is entitled to qualified immunity, courts consider two factors: (1) whether alleged facts "make out a violation of a constitutional right;" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Callahan*, 555 U.S. at 232. A court is not required to address the first of these two factors if an analysis of the second factor establishes an officer's right to qualified immunity. *See*

22

*Callahan*, 555 U.S. at 242 ("the judges of the district courts and the courts of appeals are in the best position to determine the order of [qualified immunity] decision-making that will best facilitate the fair and efficient disposition of each case.") Accordingly, the Court now considers whether plaintiff has alleged a violation of a clearly established constitutional right.

Although the parties disagree about whether Warden Falcone sincerely attempted to transfer plaintiff to a facility with a sweat lodge and about whether Garner could accommodate a sweat lodge, they agree that Garner did not have a sweat lodge. The question is, thus, whether an inmate-practitioner of the Native American religion has a clearly established First Amendment right to demand construction of a sweat lodge within a prison or to transfer to a prison with sweat lodge access to accommodate his participation in religious sweat lodge ceremonies. If no such right is clearly established, then the defendants are protected by qualified immunity.

"To determine whether the relevant law was clearly established, [courts must] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terbesi v. Torresco*, 764 F.3d 217, 231 (2d Cir. 2014). District court decisions, which are by their nature non-precedential, typically do not constitute clearly established law. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("Many Courts of Appeals [ ] decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity […] district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.")

Neither party has cited, and the Court is unaware of, any Second Circuit or U.S. Supreme Court precedent that specifically addresses an inmate's First Amendment right either to demand construction of a sweat lodge within a prison facility, or to transfer to a prison facility with sweat

23

lodge access, to accommodate the inmate's free exercise of the Native American religion. And, looking beyond Second Circuit precedent, inmate-practitioners of the Native American religion do not appear to enjoy a clearly defined right to sweat lodge access when housed at a prison that has no sweat lodge. *See Buckles v. Crowe*, 2021 WL 1341887, at * 6 (D. Mont. Feb. 22, 2021) (broadly reviewing federal caselaw and determining that there is "no clearly established constitutional right to access a sweat lodge in prison to practice the Native American religion.")

Given the current state of the law, defendants did not violate a clearly established right when they failed either to transfer plaintiff to a facility with sweat lodge access or to arrange for the construction of a sweat lodge within Garner. Thus, this Court will grant defendants summary judgment on plaintiff's First Amendment free exercise claim relating to his time spent at Garner.

### 3.     First Amendment Free Exercise Claim Relating to Plaintiff's Nine-Month Placement in AS

As noted, although the Court has concluded that plaintiff did not exhaust his free exercise claim relating to his confinement in A/S, it will nonetheless address the claim on the merits, ultimately as an alternative ground for its summary judgment ruling on this claim. The plaintiff's claim asserts that Warden Mulligan, Captain Robles, Commissioner Semple, Deputy Commissioner Rinaldi, and DA Quiros violated his First Amendment right to the free exercise of religion by not permitting him to attend congregational religious services, or otherwise engage in the meaningful practice of his Native American religion, while placed in AS. ECF No. 18 at 61. In responding to defendants' motion for summary judgment, plaintiff concedes that he was able to practice his Native American faith while placed in AS in some (in his view insufficient) respects. For example, plaintiff was able to participate in smudging rituals, and keep a "medicine bag" in his cell. ECF No. 184-5, ¶ 11; ECF No. 186, ¶ 48. Plaintiff also concedes that he was permitted to keep religious texts in his cell, ECF No. 184-5, ¶ 12, but claims that unreasonable

size and weight restrictions on books effectively precluded him from possessing religious literature. *Id.* The parties disagree about whether plaintiff ever notified prison officials at Northern that he adhered to the Native American religion. ECF No. 186, ¶ 47.

Based on plaintiff's opposition to summary judgment, it appears that his free exercise claim principally relates to his inability to participate in congregational "Native American Circle" services and sweat lodge ceremonies. ECF No. 185 at 18. By defendants' admission, no inmates placed in AS may participate in such joint worship. ECF No. 166-6, ¶ 10. It is not clear from the current record whether the facilities that housed plaintiff during his time in AS (Northern and McDougall) had sweat lodges available for inmate use.

To the extent that plaintiff takes issue with his inability to participate in sweat lodge ceremonies while placed in AS, the current group of defendants enjoy qualified immunity for much the same reason that Warden Falcone and DA Quiros have qualified immunity protecting them against plaintiff's claim that he was wrongly deprived of sweat lodge access while at Garner. Second Circuit precedent does not clearly establish a constitutional right to inmate sweat lodge access to accommodate the practice of the Native American religion. And to the extent such a right does exist, it likely does not extend to inmates placed in AS. *See Fowler v. Crawford*, 534 F.3d 931, 939 (8th Cir. 2008) ("[N]o reasonable jurist, affording due deference to prison officials, can dispute that serious safety and security concerns arise when inmates at a maximum security prison are provided ready access to [ ] burning embers and hot coals, [ ] blunt instruments such as split wood and large scalding rocks, […] and [ ] an enclosed area inaccessible to outside view.") At the very least, Second Circuit decisions do not clearly establish this right for such inmates.

In arguing that such a right does exist, plaintiff cites *Yellowbear v. Lampert*, 741 F.3d 49

(10th Cir. 2014) for the proposition that inmates possess a right to sweat lodge access even when housed in a segregated unit. ECF No. 185 at 18-19. But this characterization of *Yellowbear's* holding is misleading, since the plaintiff, in that case, was housed in a special protective unit not because of any disciplinary infractions on his part, but, rather, because of threats from other inmates against him. *Yellowbear*, 741 F.3d at 53. Moreover, *Yellowbear* wasn't decided on First Amendment grounds. *Yellowbear*, 741 F.3d at 64. And, as a Tenth Circuit opinion, *Yellowbear* is not clearly established law within the Second Circuit. See *Terbesi*, 764 F.3d at 231 (Sister circuit precedent may be treated as clearly established law, but only to the extent that it "clearly foreshadow[s]" a particular ruling on an issue within the Second Circuit).

In support of his argument that he should have been permitted to participate in group religious activities while placed in AS, plaintiff cites *Mawhinney v. Henderson*, 542 F.2d 1 (2d Cir. 1976). ECF No. 185 at 18. There, the Second Circuit held that "not every prisoner in segregation can be excluded from [group worship]; because not all segregated prisoners are potential troublemakers; the prison authorities must make some discrimination among them." *Mawhinney*, 542 F.2d at 3. The Court in *Mawhinney* reversed the district court's dismissal of the plaintiff's free exercise claim and noted that "an evidentiary hearing will establish what policies concerning religious practices exist [ ] and whether officials had a reasonable basis for limiting [the plaintiff's] participation at group services." *Id.*

It is not clear what sort of administrative findings prison officials needed to have made to place the *Mawhinney* plaintiff on segregated status, which in *Mawhinney's* case was "punitive segregation," not administrative segregation. In this case, we know that plaintiff's AS placement necessarily reflected a judgment by DOC officials—following a hearing, ECF No. 1 ¶ 115-122— that his "behavior or management factors pose[d] a threat to the security of [a] facility or a risk to

the safety of staff or other inmates and that [he could] no longer be safely managed in general population." Administrative Directive 9.4(3)(B). So one could reasonably argue that DOC officials made an individualized determination that plaintiff was a "potential troublemaker." And, in *LeReau v. MacDougall*, the Second Circuit held that it did not violate the First Amendment's Free Exercise Clause to prohibit inmates deemed "unruly" from attending group worship. *LeReau v. MacDougall*, 473 F.2d 974, 979 (1972); *see also Matiyn v. Henderson*, 841 F.2d 31, 37 (2d Cir. 1988) (rejecting free exercise claim of inmate in administrative segregation who asserted that his confinement prevented him from engaging in congregational religious services because the confinement was "for reasons related to legitimate penological objectives.")

The Court is not suggesting that defendants have a free hand to impose a blanket ban on group worship on all inmates placed in AS. Such a ruling might rub against Second Circuit precedent requiring particularized findings of necessity before New York State Department of Correctional Services (DOCS) officials may prohibit inmates placed in "keeplock" from attending congregational services. *See Salahuddin v. Goord*, 467 F.3d 263, 277 (2d Cir. 2006) (Inmate's placement in keeplock for conspiring to assault another inmate who was housed at a different prison did not support prohibition from participation in congregational religious services); *but see Salahuddin v. Jones*, 992 F.2d 447, 449 (1993) (Inmate's placement in keeplock for fighting with another inmate sufficient to support prohibition from participation in congregational religious services). The Court is making the more limited point that the Second Circuit has not considered whether the particular findings supporting each inmate's placement in DOC's AS—specifically, that an inmate cannot be safely managed in general population, A.D. 9.4(3)(B)—would suffice to bar that inmate from participating in congregational religious services.

Because existing Supreme Court and Second Circuit precedent does not clearly bar prison officials from prohibiting all inmates placed in AS (who have, by definition, been deemed dangerous or disruptive) from attending group worship, defendants are entitled to qualified immunity on plaintiff's AS free exercise claim.

### 4.      Eighth Amendment Deliberate Indifference to Medical Needs Claim

Plaintiff alleges that Nurse Hill, Warden Mulligan, and Captain Robles violated his Eighth Amendment rights by exhibiting deliberate indifference to his medical needs. (ECF No. 1, ¶¶ 151-52, 283.[7] This claim survived initial review because this Court interpreted plaintiff's complaint as contending that defendants ignored his need for medical treatment related to an ankle laceration that was painfully infected. ECF No. 18 at 46. However, it appears that this Court was wrong to have interpreted plaintiff's complaint as alleging an injury of this magnitude. In opposition to summary judgment, plaintiff clarifies that he suffered a laceration that merely *had the potential to become infected*. ECF No. 185 at 5.

To be sure, plaintiff still characterizes his laceration as a grave injury. ECF No. 186, ¶¶ 27, 35. But the photographic and video evidence submitted by plaintiff in opposition to summary judgment depicts a relatively minor injury. ECF No. 184-17 at 4; ECF No. 191, Ex. 20 at 14:00. This was not a gaping wound from which blood continuously flowed, as one might think from reading plaintiff's account. ECF No. 186, ¶¶ 27, 35. To the extent that plaintiff's allegations are

---

[7] Because plaintiff has not served Nurse Hill, she is not currently represented by defendants' counsel. *See* Order, ECF No. 150. Accordingly, no one has moved for summary judgment on her behalf. ECF No. 166-1 at 20. This Court will, however, consider her entitlement to summary judgment *sua sponte*. *See Schwan-Stablio Cosmetics GmbH & Co. v. Pacificlink Intern. Corp.*, 401 F.3d 28, 33 (2d Cir. 2005) ("District courts have the discretion to grant summary judgment sua sponte, even without notice in certain circumstances. However, care should be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." (citation and quotation marks omitted)). Because plaintiff has extensively argued the merits of his Eight Amendment claim in opposition to summary judgment, and Nurse Hill is entitled to dismissal from this action for the same reasons as defendants who properly moved for summary judgment, there is no prejudice to plaintiff.

"blatantly contradicted" by photographic and video evidence, they will not preclude summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Eighth Amendment prohibits only those punishments that are "repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Thus, "not every lapse in [a prisoner's] medical care is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2006). To establish an Eighth Amendment deliberate indifference claim, a prisoner must, as a threshold matter, allege a "sufficiently serious" deprivation of medical care. *Id.* And, in this vein, allegations of minor cuts and lacerations do not support, without more, a finding that a prisoner was constitutionally entitled to medical treatment. *See Dawes v. Coughlin*, 159 F.3d 1346, *1 (2d Cir. 1998) (unpub. mem.) ("[A] reasonable finder of fact could not conclude that Dawes's claimed injury, a one-and-a-half inch laceration on his elbow, was sufficiently serious to give rise to an Eighth Amendment claim."); *Smith v. United States*, 2011 WL 777969, *12 (N.D.N.Y. Feb. 3, 2011) ("A small cut requiring minor first aid is insufficient to establish the objective element of Smith's Eighth Amendment claim.")

Plaintiff undoubtedly suffered an injury that Nurse Hill refused to treat herself. But this injury—a minor laceration—was not severe enough to require medical treatment under the Eighth Amendment. And while Nurse Hill may have been rudely dismissive of plaintiff's request for treatment, the Constitution doesn't protect prisoners from verbal chastisement. *See Williams v. Dubray*, 557 Fed. Appx. 84, 86 (2d Cir. 2014) ("verbal harassment, without more, is not actionable under § 1983.") Thus, defendants (including Nurse Hill) are entitled to summary judgment on plaintiff's deliberate indifference to medical needs claim.

Warden Mulligan and Captain Robles are also entitled to summary judgment on the ground that they had no personal involvement in the alleged violation of plaintiff's Eight

Amendment rights. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)). From plaintiff's complaint, and the parties' summary judgment filings, there is no indication that Warden Mulligan or Captain Robles advised or encouraged Nurse Hill to withhold medical treatment. Rather, these defendants have been included as parties to this particular claim only because they discussed Nurse Hill's alleged conduct with plaintiff afterwards. ECF No. 1, ¶ 152; ECF No. 18 at 47). By the time these conversations occurred, plaintiff had long since received the medical care he had initially sought (bandaging) from another nurse. ECF No. 186, ¶ 35. Since Warden Mulligan and Captain Robles did not overlook a continued withholding of medical care, they cannot be held liable for Nurse Hill's alleged violation of constitutional law. *See Jordan v. Gifford*, 19-cv-1628 (CSH), 2022 WL 3106965, *26 (D. Conn. Aug. 4, 2022) ("[A]llegations that a supervisor did not do enough *after* a constitutional violation has already occurred [are] not enough to show personal involvement of the supervisor in the violation of a prisoner's constitutional rights.")

### 5. Eighth Amendment Deliberate Indifference to Mental Health Needs Claim

Plaintiff alleges that Warden Mulligan, Captain Robles, Commissioner Semple, DA Quiros, and Deputy Commissioner Rinaldi violated his Eighth Amendment rights through their deliberate indifference to his mental health needs while he was confined at Northern. ECF No. 1, ¶¶ 280-81. In moving for summary judgment, defendants argue that all inmates placed in AS, including plaintiff, have access to mental health treatment. ECF No. 166-1 at 20. Defendants assert that if an inmate requests mental health services, it is their practice to pass along the request to mental health staff. ECF No. 166-2, ¶¶ 50-51; ECF No. 166-6, ¶ 14; ECF No. 166-9, ¶

4.

In his sworn complaint, Plaintiff specifically asserts that he experienced serious mental health problems while in isolated confinement at Northern, and informed Warden Mulligan and Captain Robles of those problems, but that these defendants did nothing to provide him with mental health treatment. *Id.*, ¶¶ 153-56.

With respect to Commissioner Semple and DA Quiros, plaintiff asserts that he also informed these defendants of his need for mental health treatment. But plaintiff makes this claim in his unsworn Local Rule 56(a)2 Statement and fails to support his allegation with a citation to any admissible evidence in the record. ECF No. 186 ¶¶ 60, 68. With respect to Deputy Commissioner Rinaldi, plaintiff claims, again in his unsworn Local Rule 56(a)2 Statement, that he "personally complained to her about all of the issues raised in his complaint" when she toured his housing unit. *Id.*, ¶ 96. This assertion is also unsupported by a citation to admissible evidence in the record. Plaintiff's unsworn and unsupported statements fail to establish the personal involvement of defendants Semple, Quiros, and Rinaldi in the alleged violation of his Eighth Amendment rights. *See* Fed. R. Civ. P. 56(c).[8]

To be sure, the plaintiff does allege – in his sworn complaint – that he "wrote to Commissioner Semple regarding all of these issues [in the complaint]," that "Commissioner Semple was on notice of all issues raised [in the complaint," that "[a]ll of these grievances were appealed to [DA] Quiros[,] who upheld all of [Warden] Mulligan's denials and took no action to correct or cure any of the issues raised [in the complaint]," and that Deputy Commissioner

---

[8] In his sworn complaint, plaintiff does allege that defendants Mulligan and Quiros sent a psychiatrist to his cell with "unofficial orders" to ensure that there was "no paper trail" of his mental illness. ECF No. 1, ¶ 166. However, plaintiff attributes his knowledge of Mulligan and Quiros's alleged orders to statements of a psychiatrist who visited his cell. *Id.* Plaintiff cannot rely upon this hearsay evidence to raise a question about D.A. Quiros's personal involvement in an alleged violation of his Eighth Amendment rights. *See* Fed R. Civ. P. 56(c)(2), (c)(4).

Rinaldi upheld all of the denials of grievances by Mulligan and Quiros "related to issues raised [in the complaint] regarding A/S." ECF No. 1 ¶¶ 169, 175-78. But these averments that the plaintiff apprised Semple, Rinaldi, and Quiros – none of whom actually worked at Northern or MacDougall-Walker, or supervised AS – of "all issues" raised in his complaint are, without more, too vague to create a factual dispute that each of them was personally involved specifically in conduct amounting to deliberate indifference to his mental health issues. As the length of this ruling and the 84-page initial review order (ECF No. 18) suggests, the plaintiff has raised a host of issues about A/S.  So simply saying, under oath or otherwise, that he informed these three defendants of "all issues" in his complaint does not provide specific evidence that any of them had enough involvement in overseeing his mental health treatment or responding to his complaints about such treatment to make them liable for an Eighth Amendment violation. Especially given the large number of claims and defendants in this case, it was incumbent upon the plaintiff at the summary judgment stage to submit specific evidence raising genuine factual disputes about each of his claims against each defendant.  The brief, catch-all statements in his sworn complaint fall short with respect to the deliberate indifference claim against these three defendants.  *See Davidson v. Donnelly*, 2004 WL 1941349, at *3 (W.D.N.Y. Aug. 29, 2004) (granting summary judgment where "Plaintiff has presented no specific evidence that [one of the defendants] was personally involved in [plaintiff's] transfer."); *Hemmings v. Gorczyk*, 134 F.3d 104, 109 n.4 (2d Cir. 1998) (instructing district court to require inmate to file new complaint "specifying the acts of which he complains as to each of the State Defendants," where complaint "contain[ed] only minimal and vague references to the personal involvement of the various State Defendants other than Dr. Stickney and Nurse Young in exercising deliberate indifference to his medical needs"); *Boys v. Continental Cas. Co.*, 808 F. Supp.2d 410, 415 (D. Conn. 2011(finding

32

"vague and conclusory affidavit … insufficient to defeat" summary judgment, noting that "[t]he Second Circuit has held that affidavits in opposition to summary judgment must be based upon concrete particulars, not conclusory allegations," and citing cases (internal quotation marks omitted)).

Plaintiff has raised a genuine dispute for trial regarding the adequacy of defendants Mulligan's and Robles's response to his alleged requests for mental health treatment. As for the other named defendants, he has not. Thus, this Court denies summary judgment to defendants Mulligan and Robles, but grants summary judgment to defendants Semple, Quiros, and Rinaldi on plaintiff's Eight Amendment indifference to mental health needs claim.

### 6.    Eighth Amendment Excessive Force Claim

This Court has previously interpreted plaintiff's complaint as alleging that Lieutenant Arzt used excessive force, in violation of his Eighth Amendment rights, by ordering his placement in in-cell restraints. ECF No. 18 at 45-46. In arguing the merits of summary judgment, the parties appear to agree that Lieutenant Arzt ordered in-cell restraints, at least partially, because of plaintiff's vulgar language toward Nurse Hill. ECF No. 186, ¶ 30.[9] However, the parties disagree about the degree of hostility that plaintiff directed toward Nurse Hill, and the proportionality of the discipline administered by Lieutenant Arzt in relation to plaintiff's offending behavior. ECF No. 185 at 22; ECF No. 186 ¶¶ 29, 30.

When an inmate alleges excessive use of force by a correctional officer, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously

---

[9] Lieutenant Artz claims to have been also motivated by plaintiff's prior act of covering his cell window. ECF No. 166-7, ¶ 8. Plaintiff contends that the "use of restraints was solely to punish [him]for his derogatory language against [Nurse] Hill. ECF No. 186, ¶ 30. For the limited purpose of ruling on summary judgment, this Court presumes, as plaintiff alleges, that Lieutenant Artz was solely motivated by plaintiff's vulgar language toward Nurse Hill.

and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). The use of excessive force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injuries. *Id.* at 4. Thus, the "core of judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

There are objective and subjective components to an excessive force claim. *Hudson*, 503 U.S. at 8. Objectively, a court must consider the level of force used against the inmate and determine whether that force is "repugnant to the conscience of mankind." *Id*. at 9-10. Subjectively, a court must determine whether a defendant had a "wanton" state of mind when administering force. *Id*. at 8. "The inmate-plaintiff bears the burden of establishing both components." *Baltas v. Rivera*, 3:19-cv-1043, 2020 WL 6199821, at *14 (D. Conn. Oct. 10, 2020).

"The use of in-cell restraints in prisons is not prohibited by the Eighth Amendment and is certainly justified under many circumstances." *Caballero v. Lantz*, 3:05-cv-140 (CFD), 2008 WL 638397 *3 (D. Conn. March 5, 2008). "When considering claims relating to the use of restraints, courts consider the circumstances surrounding use of the restraints, including both the length of time the restraints were applied and the objective sought to be achieved through their use." *Shehan v. Erfe*, 15-cv-1315 (MPS), 2017 WL 53691 at *9 (D. Conn. January 4, 2017).

Here, Lieutenant Arzt had a valid reason to order Plaintiff's placement in in-cell restraints. Allowing inmates to insult correctional employees in vulgar terms without consequence would undermine prison order and foster a toxic work environment for correctional staff. In arguing that his conduct did not warrant discipline, Plaintiff emphasizes Nurse Hill's

own allegedly less-than-professional behavior. ECF No. 185 at 22. [10] But plaintiff understates the aggression and hostility that he, himself, directed toward Nurse Hill, and, in any event, two wrongs don't make a right.

This Court must afford Lieutenant Arzt "wide-ranging deference in the adoption and execution of policies and practices that in [his] judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). While other prison officials may have exercised their discretion differently, plaintiff cannot plausibly argue that Lieutenant Arzt's disciplinary decision went so far beyond the pale as to constitute an Eighth Amendment violation.

Having determined that Lieutenant Arzt was justified to order in-cell restraint, this Court must next consider whether the nature and duration of plaintiff's restraint was excessive. Video evidence submitted by plaintiff shows that prison officials placed him in restraints without incident. ECF No. 191, Ex. 20, 0:00-15:00. The restraint procedure included a strip search. ECF No. 166-7, ¶ 32. The restraint lasted for approximately 13 hours and did not result in injury. ECF No. 166-7, ¶¶ 4, 14; ECF No. 186, ¶ 38.[11]

"There is consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Shehan*, 2017 WL 53691 at *10 (citation and quotation marks omitted). Plaintiff's excessive force claim would present triable issues of fact had he been restrained for a particularly long time or suffered a

---

[10] The video recording of the verbal altercation between plaintiff and Nurse Hill lacks audio. *See* ECF No. 191, Ex. 19 at 33:00-33:50.

[11] Plaintiff did have a pre-existing ankle laceration when he was placed in restraints. ECF No. 186-2, ¶ 35. A nurse disinfected and bandaged this wound at the outset of restraint. *Id*. And while plaintiff characterizes his laceration as "significant," he does not allege that it was worsened by his in-cell restraint. ECF No. 186 ¶¶ 27, 35, 38.

lasting injury as a result of his restraint. *See Id.* at *9-10 (Trial warranted when plaintiff was kept in in-cell restraints for nearly two days and allegedly suffered permanent nerve damage as a result). However, plaintiff was restrained for just half a day with no apparent injury beyond fleeting discomfort. These circumstances do not warrant a trial on an excessive force claim.

Plaintiff supplements his excessive force claim by alleging that he was restrained in "a filthy cell covered in fecal matter." ECF No. 186, ¶ 32.  But this allegation appears, at best, embellished. In a video taken of plaintiff's placement in in-cell restraints, plaintiff points Lieutenant Arzt to a particular spot on his cell wall that he claims is a fecal stain. (ECF No. 191, Ex. 20, 2:40). Lieutenant Arzt disagrees with plaintiff's assessment, stating: "there is no feces on the wall." (No. 191, Ex. 20, 2:40). As depicted on the video, plaintiff's cell clearly was not "covered" in excrement. Nor was it in a visible condition that the Court would describe as "filthy." To the extent that plaintiff's allegations are "blatantly contradicted" by video evidence, they will not preclude summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The record before this Court, at most, supports a finding that plaintiff was held in the proximity of an isolated fecal stain for approximately 13 hours. This is not sufficient to convert plaintiff's otherwise lawful restraint into a constitutional transgression.

Plaintiff challenges his in-cell restraint in a few additional, minor respects. Specifically, he notes that he was provided with just one blanket, no footwear, and no hygiene items, like soap, during his 13-hour confinement. ECF No. ECF No. 185 at 6. He also contends that he was provided meals "wherein the staff remove [food] items from the tray and shuffle it around." *Id*. These ancillary allegations do not move the needle of his excessive force claim.

In sum, no reasonable jury could conclude that plaintiff's in-cell restraint constituted a use of force that was both repugnant to the conscience of mankind and sadistically motivated.

Thus, this Court will grant defendants summary judgment on plaintiff's Eighth Amendment excessive force claim.

**7.      Fourteenth Amendment Due Process Claim**

This Court has previously interpreted plaintiff's complaint as alleging that Commissioner Semple, OCPM Director Maiga, DA Quiros, and Deputy Commissioner Rinaldi violated his Fourteenth Amendment due process rights by not conducting meaningful, periodic reviews to justify his long-term placement in AS. ECF No. 18 at 57. In his complaint, plaintiff specifically takes issue with DOC Administrative Directives that require AS placements to last at least 300 days, notwithstanding the fact that reviews of AS placement should occur every seven days during an inmate's first two months of placement and every 30 days thereafter. ECF No. 1, ¶¶ 145-46. Plaintiff asserts that the prescribed reviews could not possibly have resulted in his release from AS and were thus "meaningless" and a violation of his due process rights. ECF No. 1, ¶¶ 145-46; ECF No. 185 at 4.

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property." U.S. Const. Amend. XIV. "Liberty interests protected by the Fourteenth Amendment may arise from two sources – the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983). The standard analysis for a procedural due process claim "proceeds in two steps: [a court] first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so [the court] ask[s] whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

The defendants do not dispute that plaintiff has a liberty interest in remaining free from placement in AS. Instead, they argue that they conducted periodic reviews, "as evidenced by the

37

plaintiff's progression through the [AS] phases." ECF No. 166-1 at 23.

After an inmate has been initially placed in AS, "prison officials must engage in some sort of periodic review of the confinement of" him or her to ascertain whether he or she "remains a security risk." *Hewitt*, 459 U.S. at 477 n.9. Further, these reviews must be "meaningful," in the sense that they could, potentially, inform a decision to release a prisoner from AS placement. *See Proctor v. Leclaire*, 846 F.3d 597, 614 (2d Cir. 2017) ("periodic reviews of Ad Seg satisfy procedural due process only when they are meaningful. Reviews are meaningful only when they … consider all of the relevant evidence that bears on whether [the] administrative justification [for confinement in Ad Seg] remains valid…")

DOC's AS program consists of three distinct phases, with Phase I being the most restrictive and Phase III being the least restrictive. *See* A.D. 9.4, Attachment A. According to Inmate Handbooks submitted by plaintiff, inmates could not, at the time plaintiff was placed on AS, graduate from Phase I to Phase II, until they had spent at least four months at Northern.[12] ECF No. 184-15 at 6. Subsequently, inmates were required to spend at least 90 days each in Phases II and III of AS. ECF No. 184-15 at 8-9. These documents support plaintiff's claim that inmates designated to AS are required to spend at least 300 days in AS regardless of how well they might behave. Plaintiff is also correct in noting that Administrative Directives allude to a requirement for staff to review an inmate's AS status on a weekly basis during his or her first two months of placement and every 30 days thereafter. A.D. 9.4, Attachment B. The Directives do not specify, however, what purpose these reviews are intended to serve.

Because the Court must construe all ambiguities in the record in plaintiff's favor, the

---

[12] It isn't clear whether inmates could receive credit for time spent in Northern prior to their official placement on AS.

Court will presume that prescribed weekly and monthly reviews serve no real purpose in terms of progressing/releasing an inmate through/from the AS program until an inmate has spent a certain amount of time within a particular phase of AS placement.

The record nonetheless discloses that the plaintiff did receive reviews and that they were meaningful in the sense that they resulted in his progression to less restrictive phases and, eventually, his release from AS. On April 25, 2017, plaintiff was reviewed and approved for progression from Phase I to Phase II of AS. ECF 166-5 at 2-3. Not long after, on July 24, 2017, plaintiff was reviewed and approved for progression from Phase II to Phase III of AS. *Id*. at 8. Finally, on September 12, 2017, plaintiff was reviewed and, one week later, approved for release from AS. *Id*. at 9-10. Further, the AS placement lasted just 269 days, thanks to accelerated progression through Phases II and III – not the 300 days described in the documents submitted by the plaintiff.  Plaintiff does not contest that these reviews occurred or that a review occurring prior to his 300th day in AS resulted in his release. ECF No. ECF No. 184-16, at 2-7. Although plaintiff disagrees that the reviews were "meaningful," reviews that result in an inmate's progression through, and, ultimately, release from, the AS program surely are "meaningful" in some sense. *See Proctor*, 846 F.3d at 613 (describing non-meaningful reviews as those preordained to result in adverse outcomes for an inmate: "[correctional official] stat[ed] that there is *nothing* that [plaintiff] can do that would convince [correctional] officials to release him [from Ad Seg].").

While Supreme Court and Second Circuit precedent does not clearly establish how frequently meaningful reviews of AS placement must occur, reviews conducted at least quarterly likely suffice. *See Alston v. Cahill*, 07-cv-472 (RNC) 2012 WL 3288923, at *9 n.9 (D. Conn. Aug. 10, 2012) (finding no violation of due process when an inmate was reviewed for potential

AS progression at least once every four months). "And neither the Second Circuit nor the Supreme Court has spoken about … whether [periodic] reviews must evaluate the inmate's placement in administrative segregation as opposed to his progression through an administrative segregation program." *Id.* The lack of clearly established law indicating that to be "meaningful" every AS review must embrace the possibility of progression *and* immediate release entitles the defendants to qualified immunity on the plaintiff's due process claim. *See Alston*, 2012 WL 3288923 at *9 (lack of precedent regarding mandatory frequency and breadth for AS reviews entitled prison officials to qualified immunity). Thus, this Court will grant summary judgment to the defendants on plaintiff's due process claim.

### 8.     Eighth Amendment Conditions of Confinement Claim

Plaintiff alleges that Commissioner Semple, Deputy Commissioner Rinaldi, District Administrator Quiros, Warden Mulligan, and Captain Robles violated his Eighth Amendment rights by subjecting him to various deprivations of basic human needs while placed on AS. ECF No. 1, ¶ 125 (a)-(gg). While this Court has limited the breadth of plaintiff's initial conditions of confinement claim, it still covers a variety of alleged constitutional violations. ECF No. 18 at 61. Among these remaining conditions of confinement sub-claims, plaintiff alleges that he was provided with nutritionally inadequate meals while placed in AS. *Id.*, at 60.

In moving for summary judgment, the defendants address plaintiff's sub-claim of inadequate nutrition separately from his other challenged conditions of confinement. ECF No. 166-1 at 21. The Court, accordingly, also reviews the sub-claim relating to inadequate nutrition separately from the rest of plaintiff's conditions of confinement claim.

### A.     General Conditions of Confinement Claim

Aside from an already rejected exhaustion argument, the defendants do not argue that

40

Captain Robles is entitled to summary judgment on the bulk of plaintiff's conditions of confinement claims. ECF No. 166-1 at 16-17. Defendants do, however, contend that Commissioner Semple, Deputy Commissioner Rinaldi, Warden Mulligan, and DA Quiros are entitled to summary judgment on the merits of plaintiff's claims. *Id*. This is so, defendants argue, because prison officials cannot incur § 1983 liability based solely on account of their supervisory position. *Id*.

Defendants correctly note that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). But in the context of Eighth Amendment conditions of confinement claims, supervising officials are still liable for their own deliberate indifference to constitutionally intolerable prison conditions. *See Tangreti v. Bachmann*, 983 F.3d 609, 618-19 (2020) ("[T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *quoting Ashcroft*, 556 U.S. at 676).

In responding to defendants' summary judgment motion, plaintiff submits an affidavit in which he asserts that Commissioner Semple, Deputy Commissioner Rinaldi, and Warden Mulligan each toured his housing unit on multiple occasions. ECF No. 184-5, ¶¶ 18, 20-21. During these tours, plaintiff asserts that he complained to each of them about the conditions of AS confinement that are the subject of his claims in this case. *Id*. In addition, plaintiff submits evidence that Commissioner Semple received correspondence in which an attorney raised a few of plaintiff's specific condition-of-confinement complaints on his behalf. ECF No. 184-5 at 10, 12.

With respect to Commissioner Semple, Deputy Commissioner Rinaldi, and Warden

41

Mulligan, plaintiff submits evidence suggesting more than just *respondeat superior* liability. Thus, his conditions of confinement claims against those defendants, and Captain Robles, may proceed.

Defendants' argument for summary judgment in favor of DA Quiros is on stronger footing. Plaintiff suggests that DA Quiros was aware of squalid AS conditions because administrative directives required him to tour special housing units a minimum of once every two months. ECF No. 186 ¶ 93. However, plaintiff does not submit evidence suggesting that DA Quiros was actually aware of his specific living conditions. Plaintiff's evidence, at most, suggests that DA Quiros should have been aware of allegedly unconstitutional conditions of confinement.

With the exception of a food nutrition issue, which will be discussed shortly, nothing in plaintiff's response to summary judgment supports a finding that DA Quiros was actually aware of plaintiff's alleged conditions of confinement. Thus, this Court will grant DA Quiros summary judgment for all aspects of plaintiff's conditions of confinement claims, except for the plaintiff's claims regarding inadequate nutrition.

## B.    Inadequate Nutrition Sub-Claim

The defendants' summary judgment arguments give particular attention to the sliver of plaintiff's conditions of confinement claims that take issue with the nutritional adequacy of his meals. ECF 185 at 21. With respect to this sub-claim, plaintiff asserts that, on a near-daily basis, meals at Northern were distributed to inmates with missing menu items, or menu items that had been "replaced" with foods of lesser nutritional value. ECF No. 184-5, ¶ 13.

Defendants argue that Warden Mulligan is entitled to summary judgment on plaintiff's "lack of nutritionally adequate food" sub-claim, because his only involvement with this issue involved his response to a "vague" grievance filed by plaintiff. ECF No. 166-1 at 21; ECF 166-9,

¶ 6. This argument fails for two reasons.

First, the grievance to which Warden Mulligan responded is adequately specific in explaining plaintiff's concerns. In it, plaintiff writes:

> Almost every day their [sic] are items missing from our trays, such as soup, veg, bread, etc. At no time has their [sic] been a substitute item placed on these trays to meet our daily [nutritional] requirements. Posing serious health concerns.

ECF No. 166-13 at 25.

Second, in responding to defendants' motion for summary judgment, plaintiff has submitted a sworn statement, in which he alleges that the deprivation of adequate nutrition eventually led inmates, including himself, to go on a hunger strike. ECF No. 184-4, ¶ 7. According to plaintiff, Warden Mulligan, Captain Robles, and DA Quiros personally met with the inmates on hunger strike, promised to do something to resolve the recurring issue of missing food items, but never did so. *Id.*, ¶¶ 7-8.

Defendants separately argue that Captain Robles is entitled to summary judgment on plaintiff's "inadequate nutrition" claim, because he was unaware of plaintiff's complaints. ECF No. 166-1, 21. But this claim is, again, in direct conflict with plaintiff's sworn allegations. ECF No. 184-5, ¶ 15.

By plaintiff's sworn accounting of events, Warden Mulligan, Captain Robles, and DA Quiros were each aware of a recurring problem that led to the distribution of nutritionally inadequate meals for inmates placed in AS. Thus, this Court will deny defendants' motion for summary judgment to the extent that it implicates the inadequate nutrition portion of plaintiff's broader Eighth Amendment conditions of confinement claim.[13]

---

[13] Defendants make no specific argument as to why Commissioner Semple or Deputy Commissioner Rinaldi are entitled to summary judgment on plaintiff's inadequate nutrition sub-claim. ECF No. 166-1 at 21.

## Conclusion

The Defendants' Motion for Summary Judgment, [**Doc. No. 166**], is **GRANTED in part and DENIED in part**. The following claims are dismissed in their entirety: (1) the First Amendment retaliation claims relating to the placement of Inmate Blair in a recreation cage beside plaintiff's cage; (2) the First Amendment Free Exercise of religion claims relating to the plaintiff's confinement both at Garner and in AS; (3) the Eighth Amendment deliberate indifference to medical needs claims; (4) the Eighth Amendment excessive force claim; and (5) the Fourteenth Amendment due process claims.

The following claims will proceed as specified: (1) the First Amendment retaliation claims relating to plaintiff's transfer to MacDougall will proceed against Warden Erfe and DA Quiros; (2) the Eighth Amendment deliberate indifference to mental health needs claims will proceed against Warden Mulligan and Captain Robles; and (3) the Eighth Amendment conditions of confinement claims related to plaintiff's placement in AS will proceed against Commissioner Semple, Deputy Commissioner Rinaldi, Warden Mulligan, and Captain Robles; this claim will also proceed against DA Quiros but only to the extent that it implicates the nutritional adequacy of plaintiff's food.

The Clerk is directed to terminate Warden Falcone, Lieutenant Arzt, Nurse Hill and OCPM Director Maiga as parties to this action.

**SO ORDERED** at Hartford, Connecticut, this 15th day of September, 2022.

/s/
Michael P. Shea, U.S.D.J.