# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOE BALTAS,
*Plaintiff,*

CIVIL NO  3 19-CV-1820 (MPS)

v

ERFE, *et al*
*Defendants*

MAY 15, 2026

## DEFENDANTS' MOTION FOR SANCTIONS

This is a civil rights action filed by the plaintiff, Joe Baltas, against the defendants, pursuant to 42 U S C § 1983  The plaintiff is incarcerated and effectively serving a life sentence  Over the past several years in litigating multiple legal actions in this and other jurisdictions  the plaintiff has engaged in a pattern of harassment, manipulation  and abuse through violent threats and efforts to intimidate directed at DOC staff, defendants, defense counsel, and the Court itself

On October 18  2023, the defendants in Baltas v  Rizvani, 3 21cv00436(MPS) pending before this Court  filed a motion for sanctions against the plaintiff for his egregious behavior spanning several years and multiple locations  In that matter  on December 11  2023  the Court issued an order in which it stated, in clear terms, that it would "not tolerate abusive conduct including threats of violence against anyone " ECF No  127  The Court forewarned the plaintiff that any violation of this order would result in the dismissal of the plaintiff's actions pending in this district without additional warning  Id  In spite of that order, the plaintiff continued to engage in harassing and manipulative violent threats and conduct in violation of this Court's order  He proceeded to issue a series of written threats of violence toward an active defendant in litigation pending in this Court, related to relief

he sought in such litigation  As this Court is aware  the plaintiff's conduct has spanned numerous lawsuits and several locations   It has been directed, at various times, at defendants, witnesses  counsel  and even the Court   He has continued to engage in such behavior despite clear warning from the Court of the repercussions for such continued misconduct

Faced with this misconduct, this Court issued an order in *Rizvani for plaintiff* to show cause why all Mr  Baltas  actions in this District should not be dismissed   This court issued a ruling dismissing only the *Rizvani* case    This Court's detailed ruling sets forth Mr  Baltas' history  of misconduct    See, *Rizvani* ECF #221 attached hereto as Exhibit A  In its ruling dismissing *Rizvani,* this Court again warned Mr  Baltas that further threats of violence  or attempts  to intimidate  the participants  in  the proceeding  could  result  in dismissal

In spite of this Court's dismissal of Rizvani  which was recently affirmed by the Second Circuit Court of Appeals, and the warning to the plaintiff about misconduct, the plaintiff has again engaged in serious misconduct clearly designed and orchestrated to intimidate    As set forth in  the affidavit of William Mulligan, Mr  Baltas directed two individuals to attend the trial wearing their gang attire  Mr  Baltas most directed these individuals to sit directly behind the defendants    He told them to "fucking grill the defendants, grill the assholes, give them shitty looks" and these individuals complied with his direction  The audio of Mr  Baltas' call can be played for the Court upon request

The  direction  to  his  cohorts  was,  and  is,  a  clear  attempt  to  intimidate  the defendants and perhaps the jury as Mr  Baltas appeared to direct the individuals to be sure they could see the jury and the jury could see them   This is not a situation where

Mr Baltas was simply looking for support at trial   Instead the colloquy was a clear instruction to these individuals to identify themselves as gang members and to intimidate the defendants   Such conduct should not be condoned or overlooked

Accordingly, the defendants again request that this Court issue sanctions against the plaintiff and, as this Court has already forewarned, dismiss the plaintiff's various actions pending in this district and issue an injunction enjoining the filing of future actions absent permission of the Court   Such relief is, at this time, demonstrably necessary Respectfully   Mr  Baltas should not be able to use these proceedings and this Court to intimate the participants   The Court has provided the plaintiff with multiple clear warnings that threatening and abusive behavior intermingled with his pending lawsuits would lead to the dismissal of all of his pending cases in this district and his enjoinment from filing future lawsuits without leave of the Court to do so   Despite such clear warning, the plaintiff has, yet again  attempted to advance his litigation goals through intimidation against defendants in his lawsuits   It is well within the Court's discretion to issue the sanctions against the plaintiff that he was forewarned would occur   Such sanctions  in fact, are necessary not just to potentially curb the plaintiff's future willful abuse and misuse of the legal process  but to also deter other similarly situated litigants from engaging in such behavior

Respectfully submitted,
DEFENDANTS
Semple, et al

WILLIAM TONG
ATTORNEY GENERAL

By:  /s/Steven M  Barry  #ct07825
 Assistant Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Tel  (860) 808-5450
Fax (860) 808-5591
E-mail  steven barry@ct gov

# CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026  a copy of the foregoing was electronically filed   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system   Parties may access this filing through the Court's system  A copy of the foregoing was also sent to

/s/ Steven M  Barry
Steven M  Barry
Assistant Attorney General

4

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOE BALTAS,<br><br>    *Plaintiff,*<br><br>    v<br><br>MUHAMET RIZVANI, NATHAN ALEXANDER, THOMAS DONAHUE, MEGAN TYBURSKI, E TUGIE, DAVID MAIGA, AND ROBERT BOWLES,<br><br>    *Defendants* | No 3·21-cv-00436-MPS |

## RULING OF DISMISSAL AS SANCTION FOR PERSISTENT THREATS OF

## VIOLENCE

Litigants come to court to resolve their differences peacefully   Threats of violence between litigants have no place in litigation, and courts must not look the other way when they appear   It makes no difference whether a litigant threatens to harm an opposing litigant, opposing counsel, a witness, a judge, or even, as in this case, a third party with whom the opposing litigant has a professional relationship, by introducing intimidation and fear into the legal process, a litigant's threat to inflict physical harm to gain an advantage in litigation subverts the mission of the courts to render justice based on the evidence and the law   When that happens, a judge must step in to stop the misconduct and deter its recurrence.

In this case, inmate and Plaintiff Joe Baltas sent a letter to a defendant in another case pending before another judge in this Court threatening to kill third parties with whom the defendant had a professional relationship if the defendant did not take steps to afford him the same relief he was seeking in that case, i.e., a transfer to another prison in another state   Ordinarily, the question of how to respond to such an act would be entirely up to my colleague who is presiding over that

1

case  But here, I must take my own action, because in this case I thrice specifically warned Baltas, a serial litigant who had made similar threats in this and other cases pending before me in the past, that I would dismiss this case (and possibly others) if I learned that he was engaging in similar behavior in any of his cases pending in this District.  By sending the most recent threat, he has tested my willingness to enforce that order  I find that I must, even recognizing that dismissal of a lawsuit is a harsh sanction for misconduct.  His threats of violence, which have been backed by assaults on corrections personnel, have become a pattern, and they risk compromising the ability of this Court to render justice based on the evidence and the law  No sanction short of dismissal will adequately protect the civil justice system or deter Baltas from similar behavior in the future.

## I.   FINDINGS OF FACT

On August 29, 2025, I held an evidentiary hearing to determine whether Baltas sent the threatening letter at issue here  My findings of fact appear below

Joe Baltas is an inmate currently housed at McDougall-Walker Correctional Institution, where he is serving a 95-year sentence for murder *Inmate Information (Joe Baltas)*, CONN STATE DEP'T OF CORR., https.//www ctinmateinfo state ct us/detailsupv asp?id_inmt_num=3396 50 (last visited Sep 2, 2025)  He has filed a total of 14 cases in this Court.[1] Nine of those cases remain open and of those nine, four are assigned to me [2] He is also a defendant in at least three

---

[1] *Baltas v Snyder*, No. 3·24-cv-01487-VAB (D Conn. Sep 17, 2024), *Baltas v Quiros*, No 3 24-cv-01277 VAB (D Conn. Aug 1, 2024); *Baltas v Hardy*, No 3:23-cv-00930-VAB (D Conn. July 13, 2023)· *Baltas v Bowers*, No 3 23 cv-00764-VAB (D Conn June 13, 2023); *Baltas v Dones*, No 3·22-cv-00038-MPS (D Conn. Jan 10, 2022), *Baltas v Cook*, No. 3·21-cv-01461 MPS (D Conn. Oct. 29, 2021); *Baltas v Fitzgerald*, No 3 21-cv-00587 MPS (D Conn Apr 29, 2021), *Baltas v Jones*, No 3 21-cv-00469-MPS (D Conn Apr 5, 2021)· *Baltas v Rizvani*, No 3:21-cv-00436-MPS (D Conn. Mar 30, 2021), *Baltas v Maiga*, 3·20-cv-01177 MPS (D Conn. Aug. 13, 2020), *Baltas v Erfe*, No 3 19-cv-01820-MPS (D Conn Nov 15, 2019); *Baltas v Rivera*, No. 3 19-cv-01043 MPS (D Conn July 1, 2019); *Baltas v Frenis* No. 3 18-cv-01168-VAB (D Conn. July 16, 2018); *Baltas v Chapdelaine* No. 3 17-cv-00242-MPS (D Conn. Feb. 15, 2017)

[2] *Baltas v Dones*, No 3.22-cv-00038-MPS (D Conn Jan. 10, 2022), *Baltas v Rizvani*, No 3.21-cv-00436-MPS (D Conn. Mar 30 2021); *Baltas v Maiga*, 3:20-cv-01177 MPS (D Conn Aug. 13 2020), *Baltas v Erfe*, No 3 19-cv-01820-MPS (D Conn. Nov 15, 2019)

pending state criminal cases *Pending Criminal/Motor Vehicle (Joe Baltas)*, STATE OF CONN JUD BRANCH, https //www jud2 ct.gov/crdockets/parm1.aspx (last visited Sep 2, 2025) (Dkt Nos DBD-CR23-0196095-T, H14H-CR23-0760213-S, K21N-CR22-0166876-S) Each of these cases involves allegations that Baltas assaulted corrections officers, including a case charging Baltas with attempted murder *See id.* (Dkt. No DBD-CR23-0196095-T)

Baltas is a savvy and experienced litigator who has years of experience representing himself before this Court and the Connecticut state courts *See e.g , Baltas v Department of Corrections*, No HHB-CV23-5033364-S (Conn Super Ct. Mar 15, 2023) I have found his papers to be detailed, well-organized, and well-written. He has managed to survive motions to dismiss and summary judgment in several cases and has won reversal (in part) of two of my rulings against him in the Court of Appeals *See Baltas v Chapdelaine*, No 22-2813-cv, 2025 WL 2524458 (2d Cir Sept. 3, 2025), *Baltas v Maiga*, 119 F 4th 255 (2d Cir 2024) He reads orders and documents carefully and has a firm understanding of how to use these documents, as well as case law, on his own behalf

Baltas initiated this case—a *pro se* civil rights lawsuit brought against Connecticut Department of Correction ("DOC") employees—on March 30, 2021 Shortly thereafter, on July 1, 2021, Baltas and attorneys representing Connecticut and Virginia (where Baltas was temporarily transferred) participated in a phone call to negotiate a global settlement of Baltas's cases ECF No 115-2 at 2 (Declaration of Lisamaria Proscino) ("I participated in a phone call on July 1, 2021 with [Baltas]     an Assistant Attorney General from Virginia, a staff attorney with the Connecticut Department of Correction     and two other Assistant Attorneys General from Connecticut The purpose of the phone call was to continue settlement discussions with [Baltas] in the civil matters he had pending against the Defendants in Connecticut and     in Virginia.") During the

call, the parties discussed Baltas's potential transfer from Virginia (where he was then incarcerated) to Connecticut. *Id.* That discussion hit a roadblock, however, after Baltas made additional demands for certain property *Id.* at 3 ("During the phone call      [Baltas] was repeating his demand for additional concessions including an Xbox 360, which Defendants would not agree to ") Proscino, an Assistant Attorney General for Connecticut, declared under oath that as the discussion progressed, Baltas "became agitated and stated loudly to the Virginia [Assistant Attorney General] words to the effect of, 'If you don't accept my deal right now, I'm going to assault a couple of staff'" *Id.*

On May 22, 2023, Baltas wrote a letter to Assistant Attorney General Jacob McChesney, counsel for the Defendants in this case ECF No 115-4 The letter again addressed the topic of global settlement, with Baltas stating, "If your office has changed its position on the property issue than[*sic*] I'd agree to global resolutions I'll add that the end result would also be me ceasing to litigate against Conn DOC (as I can contractually waive the exerci[s]e of future rights) & I'd cease assaulting DOC personnel Without the items etc I see no reason or motivation to stop any of my actions " ECF No 115-4 at 2

On October 4, 2023, Baltas filed an objection to my order denying in part his motion for reconsideration, stating, "It is the constant abuses of DOC and AGs and Judge Shea's habitual efforts to allow, facilitate and encourage said abuse that led to Plaintiff beginning to and continuing to stab +/or kill Corrections Staff Because of this habitual misconduct, there will be many more such incidents to come " ECF No 109 at 2 Around this same time, Baltas also sent a vulgar and profanity laced letter to the Assistant Attorney General representing the Defendants in *Baltas v Fitzgerald*—another case assigned to me No 3 21-cv-00587 (D Conn Apr 29, 2021) In the letter, Baltas wrote, "Fuck your Late motion for summary judgment, fuck the Court shit, fuck it

4

all  You can suck all 9 inches of my cock " ECF No  115-6 at 2  Baltas had also drawn a penis on the back of the letter *Id* at 3

On October 18, 2023, the Defendants in this case moved to sanction Baltas, citing the above conduct. ECF No  115  In response to the Defendants' motion, I entered an order warning that.

> Neither counsel nor parties, including pro se litigants, are permitted to threaten or harass opposing counsel or the Court. Nor is a pro se inmate permitted to make threats of violence against prison staff in court-related or any other communications  The Court will not tolerate abusive conduct including threats of violence against anyone, obscene or harassing communications, or the use of profanity in written or oral communications between litigants and counsel or in written or oral communications with the Court. All such harassing or abusive conduct is prohibited, and no party or lawyer shall engage in such conduct in this case  Should there be any violation of this Order or should the Court be apprised of any such conduct by the Plaintiff *in this or any of the cases he has filed in this District it will, without further warning, dismiss this action and/or others filed in this Court*; the Court may also issue a pre-filing injunction that would enjoin Plaintiff from filing future litigation in this District without first obtaining leave of Court.

ECF No  127 (emphasis added)  I entered the same order in *Baltas v  Erfe* and *Baltas v  Dones* *See* ECF No  313, No  3 19-cv-01820-MPS (D  Conn  Nov  15, 2019), ECF No  164, No  3 22-cv-00038-MPS (D  Conn  Jan  10, 2022)  While I ultimately denied the motion for sanctions, in doing so, I again warned Baltas that "the Court will dismiss without warning this case and others filed by [him] in this District if he engages in any abusive conduct such as threats of violence or obscene or harassing communications " ECF No  132. I intentionally used broad language in both warnings to respond to misconduct that spanned multiple cases

On December 28, 2023, Baltas informed the Court that he had been transferred to a prison in Cranston, Rhode Island. ECF No  128

On February 9, 2024, the Defendants renewed their motion for sanctions, alleging that Baltas "has continued to engage in a harassing and manipulative manner in violation of this Court's order" and "has continued to threaten violence in written correspondence with correctional

5

officials if his demands are not met." ECF No 137 1 at 1, *see also id.* at 4 ("On December 7, 2023, [Baltas] shouted at an officer, 'I am definitely going to stab an Officer'    On January 30, 2024, he told an officer 'I'm going to stick a knife in your throat.'"), *id.* at 5 ("In a letter dated January 24, 2024, and received by Connecticut's interstate unit staff    [Baltas] wrote [']I suggest you all begin searching for another placement for me, as I am not staying in RI I will terminate this housing, by any means necessary You people know I mean what I say & will not stop until my goal is accomplished [']"), *id.* at 6 ("[O]n February 5, 2024, Rhode Island DOC's office of legal counsel received a letter from [Baltas] In this letter, [Baltas] stated that he anticipated filing a civil complaint in Rhode Island federal district court    He then wrote [']You may notify your Director & AG that I'm willing to accept an early settlement for costs & termination of my housing in RI, never to return. I note that if RI does not accept this gracious offer, then the conduct that Conn. experienced will continue here in RI & it will escalate One way or another I will be removed from this state, whether it's your decision or something I force [']") (internal citations omitted)

I denied the Defendants' motion because, at the time it was filed, "none of [Baltas]'s asserted harassing and/or threatening conduct toward R.I DOC staff b[ore] any relationship to this Court or its disposition of his litigation pending in this Court." ECF No 150 I noted that although "[Baltas]'s letter to Connecticut DOC Interstate Unit [ ] suggests that [Baltas] may take adverse, violent action if he is not removed from Rhode Island    even with its reference to his need for a return to Connecticut for trials in this Court    the letter presents no threat towards this Court or counsel or any witnesses related to his pending litigation in this District." *Id.* I made clear, however, that the denial was "without prejudice to renewal should [Baltas] engage in harassing or violent behavior that interferes with this Court's orderly disposition of his litigation pending in this District." *Id.* And I reminded Baltas that "the Court's prior warning    remains in effect." *Id.*

6

On September 17, 2024, Baltas filed *Baltas v Snyder*, seeking a transfer from Rhode Island back to Connecticut. ECF No 1 ¶ 242, No 3 24-cv-01487-VAB (D Conn Sep 17, 2024) (Plaintiff seeks    Injunctive Relief in [Defendants'] Official Capacities Commanding they return him to Conn. where he can [receive] the equal protection of Conn. Law or alternatively remove him from RI to relieve him of the violation of his Rights "), *see also id.* ¶ 245 ("Plaintiff seeks Injunctive Relief in [Defendants'] Official Capacities Commanding them to remove him from RI ") On February 27, 2025, Baltas filed an "emergency motion for preliminary injunction" in *Snyder*, seeking a court order "commanding Defendants to terminate and cease housing [him] in Rhode Island." ECF No 23 at 1 This motion was denied as moot on June 04, 2025, ECF No 52, after Baltas informed the Court he was no longer housed in Rhode Island ECF No 50

On June 6, 2025, the Defendants in this case submitted a letter to the Court that they claimed Baltas had sent in violation of my prior orders ECF No 190-1 The letter was addressed to Jaclyn Osden and copied David Snyder, William Mulligan, and Angel Quiros *Id.* All four of these individuals are defendants in *Snyder* Furthermore, Osden, Quiros, and Mulligan are defendants in cases assigned to me *See Baltas v Maiga*, No 3 20-cv-01177-MPS (D Conn. Aug 13, 2020) (Osden and Quiros), *Erfe*, No 3 19-cv-01820-MPS (Quiros and Mulligan) [3]

The letter reads

Miss Osden,
    I'm in receipt of your correspondence. I don't know why you keep stating my worlds[*sic*] are veiled threats Let me be more direct, in the last 3 months, I've assaulted RI DOC staff approx. 6 times
    For as long as I remain in RI I am going to continue assaulting RI staff with ever increasing violence and intend to stab multiple pigs and kill them
    You are all on Notice What happens to them is on you It's no sweat off my nutz, I'll happily spend the next decade assaulting these RI pigs
See Enclosed

---

[3] Quiros was also a defendant in this case, but I earlier dismissed the claims against him *See* ECF No 45

ECF No 190-1 at 2 "Enclosed" with the letter were three prison disciplinary reports, each documenting separate infractions of either violence or threats of violence Baltas committed against Rhode Island DOC personnel The letter itself is dated May 15, 2025, at which point Baltas's motion in *Snyder* for emergency relief to be removed from Rhode Island was still pending before this Court. The letter is unsigned, but it appears to be written in Baltas's handwriting—with which I am very familiar, having presided over cases in which he has filed mostly handwritten pleadings and memoranda for the past 6 years The Defendant's filing suggested that the letter was sent in an envelope containing Baltas's name, inmate number, and Rhode Island address (in his handwriting) *Id.* at 7 Also handwritten on the envelope is Osden's name and work address, along with the word "Privileged," which appears in the bottom right corner *Id.* The Defendants argued that "[t]his letter was a clear attempt to manipulate correctional officials, in this case a defendant in a pending lawsuit, to give him the very relief he s[eeks] in that lawsuit," that the letter "violated this Court's previous orders regarding sanctions," and that Baltas "was on notice that such threatening remarks" would lead to sanctions ECF No 190 at 3-4

Because the letter appeared to threaten violence to induce an opposing party to accord him the very relief he was seeking in the *Snyder* lawsuit, I directed Baltas to show cause why "this case and all of his cases pending in the U S District Court for the District of Connecticut should not be dismissed for his violation of court orders" under Federal Rule of Civil Procedure 41, ECF No 191, as well as "why the Court should not enjoin him from filing any further lawsuits in this district." ECF No 192 I also ordered the Defendants to "submit to the Court the correspondence to which the letter apparently sent by Plaintiff responds," ECF No 191, as well as "any other further correspondence the Defendants believe is related to Plaintiff's apparent letter," *id.*, and "any and all evidence they have that Plaintiff actually sent the letter " ECF No 193 I permitted the

Parties to submit briefs in response to the show cause orders, *id.,* and entered a similar order in *Erfe,* in which Baltas was represented by experienced counsel, inviting his counsel "to file a response to this order to show cause as well " ECF No 419

The parties timely submitted their briefs responding to the show cause order ECF Nos 202 and 203 The Defendants also provided additional correspondence related to the letter In Baltas's response to the order—specifically, his response to the potential imposition of a filing injunction—Baltas argued

> The denial of such a fundamental right as seeking judicial redress would serve no legitimate goal It would not dissuade the Plaintiff from any future misconduct, and would likely result in him feeling no other option than to resort to the alternative [of] force to resolve all dispute[*sic*] no matter how small Frankly, the Plaintiff has a hard enough time controlling his impulses as it is, something he does not like admitting Depriving the Plaintiff of an alternative avenue that may serve in the future to dissuade him from giving into his more violent impulses would not be in the best interest of anyone

ECF No 202 at 11

Because Baltas claimed in his response that the letter was a "fabrication &/or manipulation," *id.* at 5, I scheduled an evidentiary hearing, "the sole purpose of which [was] to determine whether [Baltas] sent the letter and the other letters attached to the Defendants' response to the order to show cause " ECF No 204 In scheduling the hearing, I invited Baltas's counsel in *Erfe* to represent Baltas during the hearing, but Baltas declined the representation. *See* ECF No 208 at 1 ("First, the Plaintiff Notifies the Court he will proceed to any [hearing] in this matter of sanctions pro se The Court's attempt to appoint counsel without Plaintiff's consent or so much as an inquiry violates Plaintiff's Rights ") I set aside an entire day for the hearing, allowing each side half a day to present their version of events ECF No 204 I also notified the parties that, "[b]ecause any dismissal would obviously favor the defendants, they will have the burden of proof at the hearing and will proceed first " *Id*

9

Over Baltas's objection, I ordered that Baltas attend the hearing virtually I had good cause to do so, "based on the Court's previous experience with [Baltas] and statements from the CT and RI DOCs in other cases    " *Id., see also Baltas v Dones*, No 3.22-cv-00038 (MPS), 2025 WL 744211, at *5 (D Conn Mar 7, 2025) ("However, as to the security risks presented by [Baltas]'s presence, the CT DOC has raised significant security concerns and cited numerous incidents of alleged prior assaults on DOC staff, particularly during transport to court proceedings "), *Baltas v Frenis*, No 3 18-cv-1168 (VAB), 2024 WL 5010486, at *4 (D Conn Dec 6, 2024) ("[W]hile Mr Baltas undoubtedly has a significant interest in his physical presence at trial to present his case and provide testimony, the CT DOC has raised serious safety concerns and cited several incidents of alleged prior assaults on DOC staff, including during transport to court proceedings ")

The Court held the hearing on August 29, 2025 The only witness at the hearing was Osden—Baltas chose not to testify—and I derive the facts that follow from Osden's testimony, ECF No 219, as well as the Defendants' exhibits ECF Nos 203-1, 203-2, 203-3, 203-4

### A. Osden's Testimony

Osden works for the Connecticut DOC as part of the Sentence Calculation Interstate Management ("SCIM") unit, which is located at the McDougall-Walker Correctional Institution ECF No 219 at 5.21-6 1-4 Osden's job in the unit is to oversee the transfer of prisoners into and out of Connecticut under interstate compact agreements between Connecticut and other states *Id.* at 6 15-18 Prior to receiving the letter in question, Osden was familiar with Baltas, as her unit had previously effectuated his transfer to several out-of-state facilities *Id at* 7 3-9 In December 2023, the SCIM unit oversaw Baltas's transfer to Rhode Island, where Baltas remained until his return to Connecticut in May 2025 *Id.* at 8 6-8

10

Incoming mail sent to MacDougall-Walker is first handled by the facility mail handler, who sets aside any mail addressed to the SCIM unit. *Id.* at 9 13-20 That mail then arrives to the SCIM unit unopened, *id* at 9 21-23, and the unit's administrative assistant "open[s] up the envelopes, review[s] the content    see[s] who it's addressed to    stamp[s] [ ] a received date stamp on the correspondence, and then distribute[s] it accordingly " *Id.* at 10 1-5 The mail is also electronically logged. *Id.* at 10 6-12 On other occasions, Osden herself opens the mail, reviews it, and adds it to the electronic log *Id.* at 13 16-24

On March 17, 2025—after Baltas filed the *Synder* suit—Osden received an undated letter from Baltas ECF No 203 1 at 5 The letter was sent in an envelope postmarked March 11, 2025, addressed to Osden, and containing Baltas's return address in Rhode Island along with his inmate number *Id.* at 3 In the bottom right corner of the envelope, Baltas wrote, "PRIVILEGED " *Id.* Baltas wrote the letter on stationery with an image of a lion and bearing his name and address *Id.* at 5 He addressed the letter to Osden and signed it. *Id.* In the letter, he alleges he is being housed in an unconstitutional manner, *id* ("You're aware RI is housing me + treating me in a horribly unconstitutional manner + in violation of Conn. Law "), before remarking, "And now, because of how I'm housed + treated, I've been suffering psychological breaks + psychotic episodes (see Attached), which will lead down a darker path It really is terrible of you to subject your RI brethren to all this I wonder how much RI will tolerate    " *Id.* (ellipses in original) He continues, "I understand the animosity + wanting to send me somewhere shitty, but then your[*sic*] just putting 3rd parties into the fray    " *Id.* at 6 Baltas attached five prison disciplinary reports to the letter *Id* at 7-16 These reports documented threats and assaults Baltas committed against Rhode Island DOC personnel *See e g , id.* at 7 ("At 4 48pm inmate Baltas attempts to reach through his trap door and grab a hold of Officer Bell Officer Bell is able to free himself from inmate Baltas' grip

At 4 49 50 inmate Baltas is seen on CCTV footage    throwing a bag filled with urine and feces directly into Officer Bell's face and chest area "), *id.* at 15 ("Inmate Baltas then made alarming comments, including threats of violence stating to me that if 'I have to kill someone I will, to get back to Connecticut.") On April 1, 2025, Osden replied to Baltas, writing, "Your comment of 'I wonder how much RI will tolerate    ' is a veiled threat You are reminded to be mindful with your words and your approach " *Id.* at 2

"Around March 20th," Osden become aware of her status as a defendant in the *Snyder* suit. ECF No 219 at 15 12-19 She was also made aware that Baltas's suit sought his removal from Rhode Island *Id.* at 15 24-16 4 [4]

On April 2, 2025, Osden received another letter from Baltas The letter was sent in an envelope postmarked March 27, 2025, addressed to Osden, and containing Baltas's return address and inmate number ECF No 203 2 at 3 The word "PRIVILEGED" appears in the envelope's bottom right corner *Id.* The letter itself is dated March 18, 2025 and addressed to Osden *Id.* at 5 While Baltas did not sign the letter, it is, like the previous letter, written on the same lion-adorned stationery in what appears to be his handwriting In the letter, Baltas proposes a transfer to New Mexico before stating

> You're going to have to figure something out, because I expect after the next few incidents they will be kicking me out. I know they were already talking to you about taking me back I'm trying to give you all viable options, but I feel like you're not giving me any choice, but to do certain things If I hear nothing back I'll assume I have no other option available

*Id* On April 23, 2025, Osden responded, writing to Baltas

> Your comments of "    I expect after the next few incidents they will be kicking me out    ", "    I feel like you're not giving me any choice, but to do certain things    "

---

[4] Question.  And why were you contacted by the Office of the Attorney General?"
Answer· 'Uh, they advised me that Mr Baltas had filed some core action wherein I was named  um, and part of it was he wanted to be either returned to Connecticut at the time or potentially a third state, alternate state placement."

and "If I hear nothing back I'll assume I have no other options available" are veiled threats  Again, you are reminded to be mindful with your words and your approach

*Id.* at 2

On May 20, 2025, Rhode Island DOC forwarded Osden a letter Baltas sent to Lynne Cory, the warden of the Rhode Island facility where Baltas was housed. ECF No  219 at 63 5-64 12, 66 14-15  In the letter, Baltas writes

> [Y]ou are Notified, your persistent abuse of me including your improper housing of me in a suicide precaution cell, deprivations of entitlements, and violations of my rights as well as your violative disciplinary action has done nothing but guarantee further violence against your personnel  As you want to continue to stack 9 bookings that is 9 more staff you have guaranteed will be assaulted with ever escalating <u>violence</u>  Be they man or woman, security or treatment. Their blood will be on your hands

ECF No  203-4 at 5 (emphasis in original)

On May 23, 2025, Osden received the letter that prompted me to enter the show cause order  This letter was sent in an envelope addressed to Osden and containing Baltas's name, inmate number, and return address in Rhode Island  ECF No  203-3 at 3  It was not written on the lion-adorned stationery  The envelope is postmarked May 19, 2025, with "Privileged" handwritten in the envelope's bottom right corner  *Id*  The letter itself is dated May 15, 2025 and addressed to Osden  *Id.* at 5  It also copied Quiros, Mulligan, and Synder (defendants in *Snyder, Maiga, Erfe,* and, at one point, this case)  *Id.* The letter states

> Miss Osden,
>     I'm in receipt of your correspondence. I don't know why you keep stating my worlds[*sic*] are veiled threats  Let me be more direct, in the last 3 months, I've assaulted RI DOC staff approx  6 times
>     For as long as I remain in RI I am going to continue assaulting RI staff with ever increasing violence and intend to stab multiple pigs and kill them
>     You are all on Notice  What happens to them is on you  It's no sweat off my nutz, I'll happily spend the next decade assaulting these RI pigs
> See Enclosed

13

*Id.* Attached to the letter are three prison disciplinary reports *Id.* at 6-8 Like the reports attached to Baltas's previous undated letter, these reports documented threats and assaults he committed against Rhode Island DOC personnel *See e g , id.* at 6 ("Inmate Baltas, still handcuffed in the front, suddenly and without provocation charged toward Officer Toth and assaulted him in the facial area with his right forearm "), *id.* at 8 ("Following an assault on two Correctional Officers, Inmate Baltas did threaten that next time, it will be a knife ")

On May 22, 2025, Baltas was transferred back into the custody of Connecticut DOC On June 5, 2025, Osden replied to Baltas *Id.* at 2 She acknowledged receipt of his letter, *id.* ("This office is in receipt of two letters you wrote to this Unit – one dated May 15, 2025 (received May 23, 2025)     "), before noting that he is currently housed in Connecticut, and if he wishes to transfer elsewhere, he must follow Connecticut DOC's rules and regulations *Id.* ("Records indicate that you are currently housed in CT DOC's MacDougall-Walker Correctional Institution

The application process for a voluntary Interstate Corrections Compact transfer begins at the facility level with your Unit Counselor     You are encouraged to follow the rules and regulations of CT DOC     as states are more likely to accept offenders who are not management concerns ") Osden's reply made no mention of Baltas's threats

### B. Weighing the Evidence

I find by at least clear and convincing evidence that Baltas wrote and sent the May 15 letter

While the May 15 letter is unsigned and is not written on Baltas's lion-adorned stationery, there are multiple other indications that he was the author and sender Like earlier mailings the envelope contains Baltas's return address and inmate number, along with the word "Privileged," and the letter is written in handwriting identical to the handwriting found in the previous letters— letters that Baltas signed and wrote on his stationery And this was not the only letter Baltas sent

14

that is unsigned, *see* ECF No 203 2 at 5, ECF No 203-4 at 5, and not written on his stationery *See e g*, ECF No 203-3 at 10 Most importantly, the letter's content fits easily into both the colloquy that he and Osden were having at the time and the pattern of Baltas's past correspondence In the May 15 letter, Baltas threatens to assault staff if Osden and her colleagues do not meet his demands—a recurring theme found in his letters to defendants, defense counsel, the Warden of the Rhode Island facility, and this Court—and is plainly responding to Osden's April 1 and April 23 letters, in which Osden admonishes Baltas for making "veiled threats " Furthermore, the May 15 letter's threats to assault staff "with ever increasing violence" echo threats Baltas made in a letter to Warden Cory, in which he threatened to assault staff with "ever escalating violence." *See* ECF No 203-4 at 5

I found Osden to be a credible witness Her testimony was consistent with the documents presented, and she limited herself to matters within her personal knowledge Osden, who has received many letters from Baltas over the years, *id.* at 7 10-16,[5] testified that she believed Baltas authored the May 15 letter *See id* at 49 1-13 [6] Osden has grown familiar with both Baltas's handwriting and the tone of his letters, and she testified that "most, if not all," of his

---

[5] Question "Approximately how long have you known Mr Baltas?'
Answer· 'For years. Um, I know previously he was housed, um, out of state in Massachusetts and Virginia as well as under the Interstate Corrections Compact.
Question "And you've had interactions with Mr Baltas during each of these times he s been housed out of state?'
Answer· "Yes, correspondence back and forth

[6] Question "I first want to ask you about page 4 of Exhibit C Do you recognize that record?"
Answer 'Yes "
[   ]
Question. 'What is that record?'
Answer· 'Uh, a letter from Mr Baltas to myself dated 5/15 possibly 2025 "
[   ]
Question 'Does this appear to be handwritten?"
Answer· "Yes.
Question. 'Does this appear to you to have been handwritten by Mr Baltas?"
Answer "Yes "

correspondence to her was handwritten *See id* at 9·2-12 [7] She also understood the May 15 letter to be a response to the letters she sent to Baltas referencing "veiled threats " *See* ECF No 219 at 56 9-21 [8]

Like Osden, I have substantial experience with Baltas's handwriting, as he often submits lengthy handwritten complaints and other filings *See  e g* , ECF No  1, *Baltas v  Cook*, No  3 21 cv-01461-MPS (D  Conn. Oct. 29, 2021)  I find the handwriting in the May  15 letter to be indistinguishable from the handwriting found in Baltas's filings

Baltas was given an opportunity to present evidence of his own, including his own testimony, but he chose not to testify and limited himself to cross-examination  In doing so, he failed to rebut the clear and convincing evidence that he penned the letter  During his cross-examination and in his closing argument, Baltas made several points I now address  First, he asked Osden why, unlike in her previous responses, her response to the May 15 letter made no mention of the threats that letter contained  But Osden had already addressed this issue on direct, explaining that because she received the letter on May 23, 2025—the day *after* Baltas had been returned to Connecticut—the letter's threats against Rhode Island DOC personnel were effectively moot. ECF No  219 at 55 11-19 ("At the time      Mr  Baltas was already housed in Connecticut DOC  And

---

[7] Question  "How often have you received communications from Mr  Baltas that were handwritten?'
Answer·  When he was housed out of state most recently in Rhode Island, most, if not all, of those correspondences have been handwritten.
Question   And had you previously received any handwritten correspondence from Mr  Baltas?'
Answer·  'Yes "
Question   'Would you say you re familiar with Mr  Baltas s handwriting?'
Answer·  'Yes."

[8] Question    When you reviewed the May 15th, 2025, letter, did you read that to respond to your 4/1 and 4/23 correspondence?'
Answer·  'Yes."
[     ]
Question  'The May 15th letter references veiled threats
Answer·  "Yes.
Question  "And you had called out veiled threats in your 4/1 and 4/23 correspondence?'
Answer·  "Yes."

the threats language in the correspondence that I was responding to, he was threatening Rhode Island DOC officials     so I didn't think that the threats really pertained anymore because he was already back in Connecticut DOC at the time  He was no longer in Rhode Island. So he didn't have access to Rhode Island DOC officials to assault essentially ")  Second, Baltas pointed out that the May 15 letter was not written on his stationery, *see* ECF No  202 at 4 ("This document was not written on Plaintiff's standard stationery he writes his communications on ") (internal citation omitted), but, as the Defendants note, other letters Baltas sent were also not written on his stationery, *see* ECF No  203-3 at 10 (Letter to Snyder, dated May 25, 2025), and Osden testified that Baltas sent her letters signed and unsigned, both on and not on his stationery  ECF No  219 at 19 7-12, 19 19-24 [9]  Third, Baltas suggested that the letter could have been fabricated using artificial intelligence  Osden testified on cross-examination that she had access to AI platforms, *see* ECF No  219 at 94 12-19,[10] but Baltas didn't follow up on this point further, and without more, this is just speculation  Fourth, Baltas pointed out that unlike his previous letters, which Osden typically received five to seven days after being postmarked, the May 15 letter was marked outgoing on May 21, 2025 and received on May 23, 2025—just two days later  *Id.* at 102:21-

---

[9] Question  'Have you received communications from Mr  Baltas with letterhead at the top before?"
Answer· 'Yes "
Question. 'Has your office ever received communications from Mr  Batlas without letterhead at the top?'
Answer· 'Yes.
[   ]
Question. 'Have you received communications from Mr  Baltas previously that were signed?'
Answer· 'Yes
Question "Have you received communications from Mr  Baltas that were unsigned?'
Answer· 'Yes

[10] Question      Do you have access to AI?'
Answer· 'Where?"
Question  'I don't know  But I'm asking if you have access
The Court· "To AI, artificial intelligence? Was that the question?"
Mr  Baltas  'Yes  Yes, Judge
The Court: "Okay"
The Witness  'Uh, yes, I suppose so

103 3 [11] Osden testified that weekends and staff shortages could account for this discrepancy, both reasonable explanations *See id.* at 111 9-21 [12] In any event, the varying speeds of the U S mail are too slim a reed to support a finding that the letter was fabricated Fifth, Baltas made much of the fact that the Defendants didn't produce a log from Rhode Island DOC showing that he sent the May 15 letter *See id.* at 82 22 83 7 [13] But all such a log would show is that *a letter* was sent, as Baltas himself stated that Rhode Island DOC was not opening outgoing prisoner mail *See* ECF No 202 ("[T]he Plaintiff    asserts there is no clear and convincing evidence that Plaintiff actually wrote the document, sent the document in the alleged envelope nor can there be absent evidence from RI DOC that cannot exist because RI DOC does not open or inspect outgoing mail ") Furthermore, incoming Connecticut DOC mail logs show that Baltas sent many letters during this time, further reducing the scant evidentiary weight such a mail log would have.[14] Sixth, Baltas

---

[11] Question. 'So two days for U S mail to deliver to MacDougall Walker, MacDougall Walker to be able to process it, provide it to your office, and your office to open it and stamp it, two days right? This one communication somehow got in the mail and the entire process in two days.
Answer· 'It appears so."

[12] Question  'The timeline that you will get and your office will process mail for intake, is that impacted by the weekend.
Answer· 'Yes "
Question  'How?'
Answer· So if, for instance, a piece of mail was delivered to our unit on a    by the facility mail handler on a Friday afternoon after a regular shift, our office would not be getting that until the next business day which would be Monday presumably if the appropriate staff member were there that day to open the mail
Question "And you had indicated that sometimes it's impacted by availability of staff to do the review and intake?"
Answer· 'Correct.

[13] Question   Were you aware that, based on my Rhode Island litigation, Rhode Island DOC logged all my incoming and outgoing mail."
Answer· 'No "
Question  'Okay They never provided copies of any of those logs to you in any way?"
Answer· 'Not that I can recall, no
Question "In all their communication with you about me and everything happening in Rhode Island, they never informed you that they were logging all of my mail, incoming and outgoing?'
Answer· 'Not that I can recall, no

[14] On cross-examination, Baltas also elicited from Osden that she was aware of Baltas's allegation that he was under 24-hour surveillance at the time he was writing these letters *See also ECF* No 202 at 97 (Letter to Osden from Baltas, dated March 10 2025) ("Your RI agents have placed me in a suicide precaution strip camera cell    '). Osden made no effort to obtain video footage of him writing the May 15 letter But any such footage would not show *particular*

noted that his master file did not contain the original letter ECF No 219 at 97 3-8 [15] Osden

testified that she sometimes includes the inmate's original letter with her responses and just keeps

a copy, on other occasions, she includes a copy of the letter and retains the original *Id* at 40 23-

41 12 [16] The wisdom of this practice aside, it does explain why Baltas's master file contains some

copies and some originals [17] Moreover, the Defendants did present the original envelope the May

15 letter was sent in, *see* Exhibit J, and Osden testified she recalled receiving the May 15 letter in

this envelope ECF No 219 at 50 4-7 [18] Seventh, Baltas appeared to argue, based on the substance

---

letters that Baltas wrote; instead, it would just show him engaging in writing, which is something he does frequently, as is clear from the frequency and length of the motions and pleadings he files in all of his cases in this Court.

[15] Question 'You didn t produce an original of this document    right?    Exhibit C?"
Answer "I would need to see the   "
The Court: 'No Now he s asking about the May 15th letter   "
The Witness 'Correct.

[16] The Witness "That s our general practice. We would typically send the original back to the offender with our   our response. My thought process is we want to send at least the original or a copy of it so the offender knows what specifically we are responding to and they have a copy of that in front of them so
The Court:  So is there   is there any rhyme or reason to when the original letter sent by the inmate was sent back, or was it just  Sometimes we did and sometimes we didn't'?"
The Witness "Yeah, I think it's the second  Sometimes we did, sometimes we didn't. Generally speaking, our practice is to send the original back. But, I mean, it's a very busy office  We're moving a million miles  So, yes, things happen."

[17] During the hearing, the Defendants introduced both copies and originals from Baltas s master file into evidence, including a copy of a letter Baltas sent on May 25, 2025  It is Baltas s position that all of the letters in his master file except the May 15 letter are originals, *see* ECF No 220 at 1 ("ALL communications save for Defendant s Exhibit C, the document in question, were originals)  and after the hearing, he sent the Court the original May 25, 2025 letter, which he says he took from his master file. *Id* at 3  Baltas offers no evidence to corroborate that this letter came from his master file as opposed to his own personal collection of correspondence with Osden  In any event, it makes no difference whether the letter came from his master file or elsewhere. Even if the master file contained originals of every letter Baltas sent to Osden *except* the May 15 letter (something Baltas has not proved), circumstantial evidence of this sort does not outweigh the clear and convincing evidence proffered by the Defendants

Baltas also argued that Osden would not have returned the original May 15 letter to him  as the letter was contraband. *See id* at 98·6-8 ("You would have sent me a document with a threat to kill staff. That s contraband, isn t it? It's a threat. You would provide that to me?"). To bolster his argument, Baltas subsequently submitted email correspondence concerning a letter Baltas allegedly authored wherein he threatened to kill Massachusetts DOC officials. ECF No. 218  In that correspondence, an Assistant Attorney General for Connecticut declined to submit the letter into evidence due, in part, to concerns that the DOC 'could conceivably consider the letter contraband because it threatens to kill law enforcement. *Id.* at 5  But even if it were the practice of the Connecticut Attorney General s Office not to return threat letters to the offender (something the email correspondence does not say), this is not probative of Osden's practice, as Osden works for the DOC, not the Attorney General s Office.

[18] Question  'Do you recall receiving this envelope?'
Answer· Yes.
Question   And do you recall that this letter was in this envelope?"
Answer· 'Yes.

of his questions, that because he knew he was going to be transferred back to Connecticut well in advance of the May 15 letter, he would have no motive or incentive to make threats to effectuate that transfer *See id.* at 79 14-80 2, 81 2-10 [19] While Osden testified that she received a phone call on May 7, 2025 regarding Baltas's possible transfer out of Rhode Island, *id.* at 67 7 10, she also testified that she had no reason to believe Baltas would have been aware of his transfer and that it was her unit's policy to refrain from informing inmates of potential transfers because of the obvious security risks such information poses *Id.* at 68 6-12 [20] This a credible explanation, and Baltas presented no evidence to suggest he was aware of his return to Connecticut [21]

---

[19] Question    you don't notify them of the exact day for safety purposes, but you notify them of a pending transfer at some point in the future, don t you?"
Answer· 'No we generally do not
Question 'I myself am notified constantly of when there s a transfer I was notified two days ahead of time that I was transferred to Rhode Island, that being the practice in my experience with Connecticut DOC in every instance "
Answer· "Yeah, that's news to me, Mr Baltas My position is that, and as far as I know our agency s position is that information is supposed to be confidential, need-to-know basis among staff, and the offender population is not to know at all, again, for safety-security reasons relative to that transport and the safety-security of the staff on both ends of that equation.
[   ]
Question "I was party to conversations with yourself and Snyder and others regarding transferring me out of state for several months, correct?'
Answer· "Could you repeat that, please?'
The Court 'I think he s asking you if he participated in conversations with you, Mr Snyder, and others about transferring out of state."
The Witness    I can t recall"
Mr Baltas "I ll move on

[20] Question "Would Mr Baltas have reason to be aware that Rhode Island had requested his return?"
Answer· 'No It would be our position, our agency s position, to keep that confidential as confidential as possible, a need-to-know basis only Safety-security is at stake for transporting staff, Rhode Island DOC staff, Connecticut DOC staff, as well as the public."

[21] In a filing submitted after the hearing, Baltas attached emails suggesting that. (1) he learned of his transfer out of a facility in Virginia before it occurred, and (2) a large number of Connecticut DOC personnel were regularly apprised of Baltas s forthcoming transfers ECF No 217 at 7 14 As to Baltas's knowledge of his transfer out of Virginia, the email suggests that the sender, a member of the Interstate Compact Office, is both surprised and concerned that Baltas has this knowledge *Id* at 7 ("Our AGs office called inquiring about Baltas coming back to CT    When I asked how she became aware of this information, she said his attorney Here is what his attorney wrote    [Baltas] reported that he was told by the Warden at [the Virginia Prison] that he'd be put of there "within two weeks    We have some big concerns. Let s talk today ') While the email suggests that inmates sometimes find out about these transfers, the email does not show that Baltas was aware of his transfer out of *Rhode Island*, and the email s disconcerted tone corroborates Osden s testimony that, for security reasons, CT DOC s policy was not to inform inmates of impending transfers. As to the emails demonstrating that numerous individuals in CT DOC were aware of Baltas s transfers, *id.* at 9-13 these emails likewise do not suggest that Baltas himself was aware of his transfer out of Rhode Island

Finally, the theme of Baltas's arguments—that the Connecticut DOC and the Attorney General's Office conspired against him by fabricating the May 15 letter, presumably to use it to secure a dismissal of his lawsuits—is implausible  First, the Assistant Attorney General representing the Defendants did not file a motion seeking the sanction of dismissal on this occasion—probably because I had denied his previous two motions seeking that relief when Baltas sent earlier threats and obscene material  Instead, he submitted the letter to the Court to support his opposition to Baltas's request for a further extension of time to file a response to the Defendants' summary judgment motion  *See* ECF No  190  Second, even if he had filed such a motion, any lawyer in his position could not have had any reasonable certainty that I would grant it—given that I had denied the last two  Third, as for his clients, the Connecticut DOC personnel who Baltas claims fabricated the letter, there is no evidence they were even aware of my orders and warnings to Baltas in this case. In short, the whole notion that the letter was fabricated is dubious

It's also worth noting that even in his closing remarks at the hearing, Baltas seemed to qualify his own denial that he wrote the May 15 letter  "I didn't write this, *not as it is*  I didn't create this document *as it sits here today* " ECF No  219 at 133 6-7 (emphasis added)  There are less equivocal ways to deny authorship  In any event, putting aside Baltas's own remarks, the Defendants have shown by clear and convincing evidence that he wrote the May 15 letter

## II.    LEGAL STANDARD

### a.  Rule 41(b)

Federal Rule of Civil Procedure 41(b) governs the involuntary dismissal of actions under particular circumstances  "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it  Unless the dismissal

order states otherwise, a dismissal under this subdivision     operates as an adjudication on the merits " FED R. CIV P  41(b)

### b.  Inherent Authority

In addition to the power to dismiss under Rule 41(b), courts also have the inherent authority to dismiss a case as a sanction for misconduct. A court's inherent authority to sanction is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases " *Chambers v NASCO Inc.*, 501 U S  32, 42 (1991)  Courts generally have "broad discretion with respect to the imposition of sanctions " *Koehl v Bernstein*, 740 F 3d 860, 862 (2d Cir  2014)  Courts can impose sanctions for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons," *Chambers*, 501 U S at 45-46, and for "misconduct during the course of litigation " *Milltex Indus  Corp  v  Jacquard Lace Co* , 55 F 3d 34, 37 38 (2d Cir  1995)  However, a court cannot typically issue sanctions unless there is a relationship between the misconduct and the litigation pending before the court. *See Anheuser-Busch Inc v Nat Beverage Distribs* , 69 F 3d 337, 348 (9th Cir  2011) (explaining a relationship must exist "between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'"), *see also Kalwasinski v Ryan*, No  96-cv-6475, 2007 WL 2743434, at *2 (W.D N Y  Sept. 17, 2007) (dismissing the case as a sanction where plaintiff's threats to corrections officers— "whose testimony at trial would impact the outcome of the case"—showed plaintiff's intent to "'interfere with the rightful decision of the case '") (citing *Anheuser-Bush*, 69 F 3d at 348))

The use of a court's inherent authority to dismiss a case "is a particularly severe sanction," *Chambers*, 501 U S  at 45, and should "be used only in extreme situations, and then only when a court finds willfulness, bad faith, or any fault by the non-compliant litigant." *Koehl*, 740 F 3d at

22

862 (internal quotation marks and citation omitted) Nonetheless—and even in cases involving *pro se* litigants, to whom courts must "afford a special solicitude," *Tracy v Freshwater*, 623 F 3d 90, 101 (2d Cir 2010)—"dismissal of a[n]    action as a sanction may    be appropriate so long as a warning has been given that noncompliance can result in dismissal " *Koehl*, 740 F 3d at 862 (internal quotation marks and citations omitted)

"Dismissal is particularly appropriate where the plaintiff's conduct is so egregious that the Court seeks 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Kalwasinski*, 2007 WL 2743434, at *2 (quoting *National Hockey League v Metropolitan Hockey Club Inc* , 427 U S 639, 643 (1976)) Because dismissal "is the harshest of sanctions," it "must be proceeded by particular procedural prerequisites Specifically, notice of the sanctionable conduct, the standard by which it will be assessed, and an opportunity to be heard

" *Mitchell v Lyons Professional Services Inc* , 708 F 3d 463, 467 (2d Cir 2013) "Moreover, the sanction of dismissal with prejudice    must be supported by clear evidence of misconduct and a high degree of specificity in the factual findings " *Id.* (internal quotations omitted)

## III.    DISCUSSSION

### A. Dismissal under Rule 41(b)[22]

By sending the May 15 letter to Osden, Snyder, Mulligan, and Quiros, Baltas has failed to

comply with my December 11, 2023, February 8, 2024, and August 13, 2024 orders ECF Nos

127, 132, 150  Those orders expressly prohibited "threats of violence      in written or oral

communications between litigants," and warned that where there was "a relationship between [the]

misconduct and the litigation pending in this Court," "in this or any of the cases [Baltas] has filed

in this district," I would sanction him by dismissing this action and potentially others *Id* Baltas

violated these orders by threatening violence against Rhode Island DOC officials if the four

recipients of his May 15 letter did not accede to his demand to be returned to Connecticut, the

same demand he was making of this Court in *Baltas v Snyder*

Rule 41(b) permits a district court to dismiss an action "[i]f the plaintiff fails      to comply

with      a court order " "A district court considering a Rule 41(b) dismissal must weigh five

factors  (1) the duration of the plaintiff's failure to comply with the court order, (2) whether

plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants

are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest

---

[22] As I noted above, the Defendants initially brought the May 15 letter to my attention in their objection to Baltas's motion for an extension of time, not in a motion for sanctions *See* ECF No 190 However in their objection, the Defendants remarked that Baltas's conduct is "worthy of sanctions, not reward," *id* at 1, 5, and that it violated my orders *Id* at 4-5 ("[Baltas] was on notice that such threatening remarks      would violate the Court's previous orders He has shown flagrant disregard for the Court's prior warnings "). Moreover, this is the third time the Defendants have brought Baltas s misconduct to my attention, *see* ECF Nos 115, 137, and I declined to impose sanctions on the first two occasions. ECF Nos. 132  150 It's possible that, after these denials, the Defendants were hesitant to move for sanctions a third time In any event, in their response to the show cause order, the Defendants have now expressly requested that I  dismiss this case and others filed by the plaintiff in this District, without additional warning." ECF No 203 at 16-17  While I construe such a request as, among other things, a motion to dismiss under Rule 41(b), such a motion isn't required, notwithstanding Baltas s arguments to the contrary *See* ECF No 202 at 5  I may dismiss an action under Rule 41(b) *sua sponte Ferran v  Office of Dist. Atty  of County of Rensselaer*, 260 Fed. App x 365, 366 (2d Cir  2008) (summary order) ("Under Rule 41(b) of the Federal Rules of Civil Procedure, a district court has the discretion to dismiss an action 'if the plaintiff fails to      comply with      a court order ') (ellipses in original)

in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal " *Baptiste v Sommers*, 768 F 3d 212, 216 (2d Cir 2014) (internal quotations omitted) No single factor is dispositive *Id*

I begin by noting that these factors, which courts typically apply when a party fails to do something the court has ordered it do and thereby delays the progress of the case, are not a good fit for the type of egregious behavior involved in this case These factors are well-suited to assessing behavior—such as failing to file a brief or pleading or failing to respond to discovery requests after being ordered to do so—that is sanctionable because of the delay and expense it imposes on the opposing party, who is often forced to seek orders requiring the sanctioned party to advance the litigation, and because of the delay and consequent docket clogging it imposes on the court Baltas's conduct, however, is sanctionable for a different reason his threats of violence and obscene, harassing mailings sent to opposing counsel create a risk that opposing litigants or opposing counsel will be intimidated by him, and will surrender justifiably held legal positions to appease him And that raises the specter that the litigation will reach an outcome not on the basis of the evidence and the law but instead on the basis of fear So while I will proceed to apply the five factors now, I note at the outset that, as applied here, they fail to take account of the most compelling considerations *See Lewis v Rawson*, 564 F 3d 569, 576 (2d Cir 2009) ("[T]he cases in which we have announced and applied [these] factors have almost exclusively concerned instances of litigation misconduct such as the failure to comply with a scheduling order or timely to respond to pending motions    In such contexts, where dismissal operates as a sanction for dilatory tactics during the course of litigation    the straightforward application of the factors identified above provides a reasonable means for evaluating a district court's exercise of its

discretion under Rule 41(b) This case [involving a dismissal following a plaintiff's refusal to testify unless he was moved to a different correctional facility], however, presents a quite different scenario," and "the factors    are not particularly helpful to our analysis ") (internal citations omitted)

The first factor—the duration of the Plaintiff's failure to comply—better fits a scenario in which the plaintiff fails to respond to a command to do something, not, as here, one in which he does something the court prohibited. Nonetheless, I note that my original order warning of dismissal if Baltas made more threats was posted on December 11, 2023 But, as indicated in my findings of fact, during a span of two months (from March 11, 2025 to May 15, 2025), Baltas threatened Osden on multiple occasions, violating my order repeatedly As to the second factor, Baltas was on notice that these violations would result in dismissal On three separate occasions, I warned him that such misconduct would result in the dismissal of this case, other cases, and the possible imposition of a filing injunction *See* ECF No 127 ("Should there be any violation of this Order or should the Court be apprised of any such conduct by the Plaintiff in this or any of the cases he has filed in this District, it will, without further warning, dismiss this action and/or others filed in this Court; the Court may also issue a pre-filing injunction that would enjoin Plaintiff from filing future litigation in this District without first obtaining leave of Court."), ECF No 132 ("Plaintiff was expressly warned that the Court will dismiss without warning this case and others filed by Plaintiff in this District if he engages in any abusive conduct such as threats of violence or obscene or harassing communications "), ECF No 150 ("In two prior orders, the Court has warned Plaintiff it will dismiss this case and other pending litigation in this district if he engages in abusive or threatening conduct or communication related to this Court or counsel in connection with litigation pending in this Court    the Court's prior warning to Plaintiff remains in effect ")

26

Baltas argues that he lacked notice because there "was no order of the Court in the *Snyder* case commanding against such conduct    " ECF No  202 at 8  But my order in this case made clear that he would face dismissal of this and other cases if he threatened litigants in *any* of his cases in this Court. "The Court will not tolerate abusive conduct including threats of violence against anyone     *[S]hould the Court be apprised of any such conduct by the Plaintiff in this or any of the other cases he has filed in this District*, it will, without further warning, dismiss this action and/or others filed in this Court " ECF No  127 (emphasis added)

As to the third factor, whether further delay would prejudice the Defendants, I make no finding that Baltas has delayed these proceedings, except to the extent that I have had to set aside time to determine whether his conduct was sanctionable, and if so, what the appropriate sanction should be  But his conduct *has* prejudiced the Defendants  Baltas made threats to obtain the same outcome he sought in the *Snyder* litigation, i e , a return to the Connecticut DOC, and he knew that Osden, Mulligan, Quiros, and Snyder knew that these threats were not empty  Osden was aware of Baltas's violent conduct, and Baltas sent disciplinary reports that detailed his violent conduct. Furthermore, his alleged stabbing of two correction officers has been widely reported in the media. Josh LaBella, *Man serving life sentence for murder attacks doctor and guard in CT prison  officials say*, CT INSIDER (Nov  3, 2023, at 10 43 AM), https.//www ctinsider com/news/article/ct-inmate-murderer-attacked prison-doctor-guard-18462974 php  Osden and the other three had every reason to believe Baltas's threats would be backed by action  His threats put pressure on them to take the same action they were opposing taking in the *Snyder* litigation. Defending a lawsuit is challenging enough, adding extra-legal stressors to that burden unfairly tilts the playing field. And Baltas's litigation history makes clear that, had Connecticut or Rhode Island DOC officials threatened to hurt or kill him, he would be quick to file suit and demand money damages  Neither

the Defendants in this case nor Osden or the other recipients of his letter have any similar remedy against Baltas, who is judgment proof At this point, a failure to sanction his threats would send a message to all of them that the Court's continued tolerance of Baltas's misconduct amounts to favoritism

As to the fourth factor, I do not find that Baltas's conduct significantly hindered docket management—though such conduct usually begets motion practice from defendants The Court's interest here is not in docket management but in safeguarding the integrity of the civil justice system and in protecting parties from being coerced into resolutions that have nothing to do with the merits of the case That interest outweighs Baltas's interest in having his claims heard in this case (one of nine Baltas currently has pending in this Court)

Finally, no lesser sanction would be effective Baltas is unable to pay any fine, he is proceeding in this lawsuit *in forma pauperis* ECF No 39 Nor would a fine be appropriate, as a court should not permit a litigant to buy his way out of misconduct of this character and severity Accordingly, dismissal is the only appropriate remedy It is intended not only to punish Baltas, but also to deter other litigants who might contemplate employing Baltas's tactics to achieve their own litigation goals *See Valentine v Museum of Modern Art*, 29 F 3d 47, 49-50 (2d Cir 1994) ("[Dismissal]    must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of a deterrent.") I warned Baltas on multiple occasions that such conduct would prompt dismissal He proceeded to violate my orders anyway

So only numbers two and five of the *Baptiste* factors clearly favor dismissal here, although the third factor also favors dismissal once "delay" is removed from the prejudice calculus As I

28

have noted, however, these factors are a poor fit for the type of litigation misconduct involved here.

The Fourth Circuit has developed dismissal factors for instances where litigation misconduct does not involve delay but rather "abuses    that [are] utterly inconsistent with the orderly administration of justice or undermine[ ] the integrity of the process," such as fraud on the court. *U.S. v Shaffer*, 11 F 3d 450, 462 (4th Cir 1993), *see also Lewis*, 564 F 3d at 576 (reformulating the dismissal issue where the *Baptiste* factors were a poor fit for the facts before the court) These factors offer a better fit with the facts of this case Under the *Shaffer* test, a court should consider the following factors before dismissing a case "(1) the degree of a wrongdoer's culpability,    (3) the prejudice to the judicial process and the administration of justice[23], (4) the prejudice to the victim, (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future, and (6) the public interest." *Id.* at 462-63

Application of these factors plainly supports dismissal The degree of Baltas's culpability weighs heavily in favor of sanctions Baltas's conduct was reprehensible and willful, and the blame falls squarely on his shoulders He chose to engage in this misconduct—despite warnings— because he was determined to make the Connecticut DOC take him back by any means I have already explained how his conduct prejudiced the judicial process, the administration of justice, and the DOC defendants in this case and the *Snyder* case I have also explained why other sanctions would be ineffective and dismissal is the only appropriate sanction in this case Finally, Baltas's conduct plainly implicates the public interest The public has an interest in maintaining the integrity of the judicial process and in ensuring that decisions made by government employees

---

[23] The second factor concerns attorney misconduct, which is not at issue in this case

defending a lawsuit are the product of reasoned deliberation based on evidence and the law, rather than concern about what harm might befall innocent third parties if the opposing party's demands are not met.

## B. Dismissal under the Court's inherent authority

In most cases where courts have dismissed an action due to the type of misconduct involved here, they have relied on their inherent authority In *Buxbaum v Sommer*, the court dismissed the action under its inherent authority after defense counsel submitted evidence that the plaintiff, a serial litigant, had on multiple occasions directed abusive language and threats of violence toward counsel and parties No 24-cv-09546-JAV, 2025 WL 1114319, at *2 (S.D N Y Apr 15, 2025) ("[A] district court has the inherent power to sanction a party    including by dismissing an action    In this case, the Court finds that the Plaintiff's continued engagement in egregious behavior is in direct violation of this Court's previous Order and shows a total disregard for the authority of this Court    ") In *Jallow v Geffner*, the court used its inherent authority to dismiss a *pro se* prisoner's civil rights suit after the prisoner "used profanity, slurs, [ ] insults, [and threats] in multiple emails to Defendants' counsel and in his filings to the Court." No 23-cv-3969-LGS-KHP, 2025 WL 624077, at *1-3 (S.D.N Y Jan 30, 2025) (recommended ruling), *Jallow*, 2025 WL 622582 (S D.N Y Feb 26, 2025) (adopting recommended ruling) In *Davis v Saint Luke s Roosevelt Hospital*, the court relied on its inherent authority to grant the defendant's motion for sanctions and dismiss the case after the plaintiff made threats of violence against counsel and other parties No 16-cv-6279-JPO, 2018 WL 10384114, at *1 (S.D N Y April 16, 2018) ("It is well settled that federal courts have the inherent authority to impose sanctions, including dismissal    [T]he record clearly supports a finding that plaintiff intended to intimidate participants in the administration of justice by making threats of lethal physical harm    ") (internal citations and

30

quotations omitted) And in *Kalwasinski*, the court used its inherent authority to grant a motion for sanctions and dismiss a *pro se* plaintiff's civil rights lawsuit after the court became aware of a letter in which he threatened to kill two corrections officers involved in the case. 2007 WL 2743434, at *2-3 ("It is well settled that federal courts have the inherent authority to impose sanctions, including dismissal, for a litigant's bad faith conduct    Given [the Plaintiff's] conduct, a sanction more lenient than dismissal is not, in my view, an appropriate response to such a serious offense ") *Howard v Harris* is also instructive *See* 744 Fed App'x 364 (9th Cir 2018) In that case, the Ninth Circuit used its inherent authority to dismiss a state prisoner's appeal after the prisoner made threats, not to the defendants themselves but to corrections officers generally *Id* at 365-366 ("[Plaintiff] wrote a letter to the Deputy Attorney General then assigned to the case in which he threatened to kill one or more correctional officers if the case were not resolved to his satisfaction    Dismissal under a court's inherent powers is justified in extreme circumstances    We conclude that dismissal is appropriate under the extreme circumstances presented here.")

These cases lend support to my dismissal of this action. In some of these cases, the action was dismissed after the plaintiff violated an order warning against future misconduct. *See e g*, *Buxbaum*, 2025 WL 1114319, at *1 ("[T]his Court    issued an Order placing Plaintiff on notice that his abusive language and threats of violence directed at counsel and the parties would not be tolerated ") In others, the Court simply found that the conduct itself was antithetical to the purpose and spirit of litigation. *See e g*, *Kalwasinski*, 2007 WL 2743434, at *3 ("Although [the Plaintiff] is not a lawyer, he is an experienced *pro se* litigator who is very familiar with the court system and the fundamental requirements of due process and the fair administration of justice By deliberately and intentionally participating in making threats of physical harm against parties and witnesses in his case, he has engaged in conduct that he should have known would threaten a fair decision in

this matter  Indeed, his misconduct was intended to intimidate others and improperly influence the outcome of his case ")  When compared to the above cases, Baltas's conduct was no less recalcitrant or subversive  It is equally deserving of dismissal

I acknowledge that in each of the above cited cases, there was a clear connection between the case before the court and the misconduct—a connection Baltas argues is lacking here  ECF No  202 ("Plaintiff Objects to the Court's entire premise, as the Court has no authority nor is [there] any precedent for dismissing multiple cases or all cases for alleged misconduct that had no nexus or connection to the direct cases at hand     ")  But there are two problems with Baltas's argument  First, it ignores that his conduct plainly violated my orders in this case  *See  e g*, ECF No  127 ("The Court will not tolerate abusive conduct including threats of violence against anyone, obscene or harassing communications, or the use of profanity in written or oral communications between litigants     Should there be any violation of this Order or should the Court be apprised of any such conduct by the Plaintiff in this *or any of the cases he has filed in this District,* it will, without further warning, dismiss this action and/or others filed in this Court     ") (emphasis added)  Second, dismissal under my inherent authority is appropriate because of the unique circumstances Baltas and his cases present. Baltas is a serial litigant with so many cases in this Court that they involve another judge as well  If I were to conclude that I could not impose sanctions against Baltas merely because his misconduct targeted another DOC defendant in another case before this Court, he could easily use his collection of lawsuits to escape any consequence for his willful violation of court orders by limiting his threats to cases in which the Court had not posted an express warning  It was to forestall such a shell game that I specifically warned him that he could not make threats of violence against anyone in his communications with other litigants, and that I would

32

dismiss this "and/or other cases" if I was "apprised of any such conduct in this or any of the cases he has filed in this District." ECF No 127

## C. Breadth of the Sanctions

Both my original order and the order to show cause raised the prospect of dismissal not only of this case, but of all of Baltas's cases, as well as a possible filing injunction ECF No 127 ("Should there be any violation of this Order or should the Court be apprised of any such conduct by the Plaintiff in this or any of the cases he has filed in this District, it will, without further warning, dismiss this action and/or others filed in this Court; the Court may also issue a pre-filing injunction that would enjoin Plaintiff from filing future litigation in this District without first obtaining leave of Court."), ECF No 191 ("Plaintiff shall SHOW CAUSE why this case and all of his cases pending in the U S District Court for the District of Connecticut should not be dismissed for his violation of court orders ") Nevertheless, I have concluded that dismissal of only this case is the appropriate sanction, notwithstanding my warning of broader penalties A filing injunction would not be appropriate because it would prevent Baltas from bringing alleged DOC misconduct to the Court's attention. Baltas and the DOC have an acrimonious history, and there is ill will between them As an inmate who depends on the DOC for the necessities of life, Baltas should continue to have access to the federal courts as a means of checking the behavior of DOC officers towards him, at least absent further abuses by him And a blanket dismissal of all of Baltas's cases would likewise be overly harsh, even for this extreme conduct. Some of these cases (including *Snyder*) are assigned to another judge, and the others before me (*Dones, Erfe,* and *Maiga*) are, unlike this case, in the final stages of litigation. Both *Dones* and *Erfe* have survived summary judgment, *Dones* No 3 22-cv 38 (MPS), 2023 WL 7300559 (D Conn. Nov 6, 2024), *Erfe*, No 3 19-cv 1820 (MPS), 2022 WL 4260672 (D Conn Sept. 15, 2022), and in both cases, a

33

magistrate judge has issued a recommended ruling on issues related to the defendant's PLRA exhaustion defense following a bench trial ECF No 313 (*Dones*), ECF No 424 (*Erfe*) Should I adopt the recommended rulings in those cases, there will be nothing left to do but try them. Given the posture of those cases and how much time Baltas, the Connecticut Attorney General's Office, and the Court have devoted to them, I decline to dismiss them as a sanction for Baltas's conduct.

*Maiga* is a closer call Osden is a defendant in that case, and Baltas directed his threats to harm Rhode Island DOC officers to her The letters make clear that if Osden refused to transfer Baltas, Baltas would harm her "brethren" at the Rhode Island DOC *See* ECF No 203-1 at 5 ("It really is terrible of you to be subjecting your RI bretheren[*sic*] to all this ") But *Maiga*, too, is in an advanced procedural posture It has already gone to the Circuit after a summary judgment ruling, and the Circuit has remanded the case to me, following a partial reversal *Maiga*, 119 F 4th 255 Moreover, I must use the extreme relief of dismissal sparingly *Agiwal v Mid Island Mortg Corp* , 555 F 3d 298, 302 (2d Cir 2009) ("[W]e have recognized that 'dismissal with prejudice is a harsh remedy to be used only in extreme situations '''")

## IV.    CONCLUSION

For the reasons above, I DISMISS this case with prejudice While dismissal is the harshest of sanctions, it is the only sanction appropriate in this case Dismissal serves the purposes of specific and general deterrence and is narrowly tailored to achieve those purposes, as lesser sanctions would be ineffective, and greater sanctions would be wasteful and deprive Baltas of an opportunity to be heard on future claims The Court nevertheless leaves open the option to impose broader dismissal of Baltas's cases or a filing injunction upon further instances of misconduct. All of my earlier warnings in this case still apply

In a submission Baltas filed subsequent to the hearing, he represented to the Court that he "has been incident free since his return to Conn[ecticut] and has kept all interactions with the Court, the Defendant[s] in his actions and Counsel as professional and courteous as he is able " ECF No  217 at 4  The Defendants have not suggested that Baltas has misbehaved since his return to Connecticut, and he was calm and courteous during the hearing  If he continues to act with courtesy and abide by this Court's orders, he need not worry about future sanctions

IT IS SO ORDERED

                                                    _____/s/_____
                                                    Michael P  Shea, U S.D.J

Dated  Hartford, Connecticut
       October 3, 2025