**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOE BALTAS,<br>*Plaintiff*,<br><br>v.<br><br>SCOTT ERFE ET AL.<br>*Defendants*. | No. 3:19-cv-01820-MPS |

**RULING ON POST-VERDICT MOTIONS**

## I. Introduction

Plaintiff Joe Baltas brought suit against Defendants Scott Semple, Monica Rinaldi, Angel Quiros, William Mulligan, and the Estate of Gregorio Robles ("Robles"), claiming that while he was an inmate at Northern Correctional Institution, the defendants did not provide adequate meals, deprived him of sunlight, and cancelled outdoor recreation times in violation of his Eighth Amendment right to be free from cruel and unusual punishment.

After a trial, the jury returned a verdict for Baltas, finding three of the defendants liable.[1] The jury awarded punitive damages against each of the three liable defendants: $46,800 against Quiros, $41,600 against Mulligan, and $41,600 against Robles. The jury also awarded $10 against each of these three defendants in nominal damages, for a total award to the plaintiff of $130,000 in punitive damages and $30 in nominal damages. *See* ECF No. 583.

Defendants now file a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), ECF No. 598, a motion for a new trial under Fed. R. Civ. P. 59, and a motion for remittitur. ECF No. 599. For the reasons set forth below, I DENY the defendants' motions.

[1] Because the jury did not find Scott Semple or Monica Rinaldi liable, I will not discuss them in this ruling.

## II. Procedural History

I presume the parties' familiarity with the facts and the procedural history of this case. At trial, the defendants made a Rule 50(a) motion, arguing that Baltas failed to satisfy the elements of an Eighth Amendment violation. The defendants asserted that Baltas did not show a substantial risk of serious harm or deliberate indifference on behalf of the defendants. ECF No. 589 at 43-44. The defendants also argued that they had qualified immunity because their conduct did not violate clearly established rights. *Id.* at 45-50.

## III. Facts the Jury Reasonably Could Have Found

When the trial evidence is construed in the light most favorable to the plaintiff, and when all reasonable inferences are drawn in his favor, the jury reasonably could have found the following facts.[2]

### A. Northern Correctional Institution

Plaintiff Joe Baltas spent approximately 130 days, from December 2016 to April 2017, at Northern Correctional Institution ("Northern"). Baltas was assigned to the Administrative Segregation Program, one of the most restrictive programs run by the Connecticut Department of Correction ("DOC"). Administrative segregation is designed for inmates who have compiled serious disciplinary records while in prison, due to assaults on staff or other inmates and other serious behavioral problems. Administrative segregation consists of three phases, and when each

[2] As discussed in more detail below, I must, in deciding a Rule 50 motion, view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 150 (2000). Further, I must leave credibility determinations to the jury and disregard all evidence favorable to the moving party that the jury was not required to believe. *See, e.g., Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012) ("[A] jury is entitled to believe part and disbelieve part of the testimony of any given witness, and its assessments of witness credibility and its choices between competing factual inferences are not to be second-guessed") (internal citations omitted); *Wat Bey v. City of New York*, 2013 WL 12082743 *7 (S.D.N.Y. Sep. 4, 2013) ("[T]he jury was not legally required to believe any of Caruso's testimony….").  Although I reviewed all the evidence in crafting the recitation of facts, I have, in some cases where the evidence conflicted, included only the version of the evidence favorable to the non-moving party.  I have noted in other places where there was conflicting evidence—evidence that the jury was not required to believe.

inmate arrives at Northern for placement in administrative segregation, he is placed in Phase 1, the most restrictive phase. During the relevant time, Baltas was in Phase 1 of the program.

In Phase 1 of administrative segregation, Baltas was housed in a cell that was no more than 12 feet by 7 feet, or roughly seven steps in one direction and thirteen in the other. The cells were concrete, with a desk, a bed, a sink, and a metal sliding door. The door had a window and slot for food trays to pass through. Each cell had one narrow windowpane that was recessed in cinderblocks such that no direct sunlight or fresh air could reach into the cell. According to DOC policy, Phase 1 inmates spent 23 hours a day in their cells during the week, and 24 hours on weekends. Administrative directives state that Phase 1 inmates get one hour of recreation time, five days a week, three fifteen-minute showers per week, one fifteen-minute phone call, and one thirty-minute non-contact visit with immediate family.

**B. Nutrition**

The inmates at Northern received three meals a day in their cells. There was a food services menu that said what items and how much of each item the inmates were to receive. If the staff did not have the exact item available listed on the menu, they were supposed to replace it with a similar item. The pertinent administrative directive also required that no more than fourteen hours elapse between dinner and breakfast the following day. Based on evidence presented by Baltas, the jury reasonably could have found that, nearly every day, the meals differed from the set menu, the inmates received portions smaller than listed, and the meals were missing items altogether. Further, there was routinely a gap of more than fourteen hours between dinner and breakfast the following day. Baltas kept a food journal during this time, and he received roughly 900-1,800 calories a day based on his calculations. According to nutritional guidelines published by United States Department of Agriculture that were admitted into evidence, a male of Baltas's age needed, at minimum, 2,400 calories a day. Exhibit 11. Baltas and other inmates testified that despite their

frequent complaints to the defendants and other staff, the meals at Northern left them hungry, with Baltas testifying that he experienced pain and loss of sleep as a result of the food deprivation.

**C. Recreation**

Recreation at Northern was supposed to be provided for one hour a day, five days a week. There was no recreation time on the weekends. Recreation occurred only outdoors in cages, roughly the same size as the cells. There was no opportunity for indoor recreation time. If recreation time was cancelled, there was no make-up time for it. The next opportunity would be the following day.

Recreation was regularly cancelled while Baltas was housed at Northern. He testified that it could be cancelled anywhere from two to five times a week. Other witnesses also testified that recreation was regularly cancelled. If recreation was cancelled on a Monday, that meant Baltas would spend over three days without leaving his cell. The parties dispute whether recreation time was cancelled for non-penological reasons, but the jury reasonably could have chosen not to believe the defendants' evidence on this issue, especially because cancelled recreation sessions were not rescheduled or made up. Baltas testified that recreation was cancelled regularly for no justifiable reason, and the jury was entitled to credit that testimony.

**D. Notice to Defendants**

The grievance process required inmates first to seek informal resolution of their complaints with staff and then to submit a written inmate request. If those initial steps yielded no relief, the inmate could file a grievance, which was subject to an appeals process. The warden reviewed grievances and could uphold, compromise, or deny the grievance. If the prisoners were dissatisfied, they could file a level two grievance that would go to the district administrator. For certain matters, the prisoners could file a level three grievance that would go to the commissioner.

The unit managers toured the facility once a day, Monday through Friday, while the warden toured the facility once a week, and the District Administrator toured monthly. Prisoners could raise issues with staff during these tours.

Robles was a Unit Manager at Northern, Mulligan was the Warden of Northern, and Quiros served as the District Administrator. Baltas complained to Robles about nutrition concerns every day during his tour. Baltas also raised the issue with Mulligan on his twice weekly tours. Mulligan also likely became aware of the issue through daily staff meetings, which included food services staff. 5/19/26 Tr., ECF No. 590 at 86-87. Quiros, on at least one of his tours, heard Baltas's complaint as well. Other inmates also testified that they complained to the defendants about the pervasive issues with inadequate nutrition. Because the verbal complaints and informal resolutions did not yield any change, Baltas filed a grievance. Mulligan reviewed and denied this grievance because he found it lacked sufficient detail. Baltas then filed an appeal of that grievance, which Quiros reviewed and denied because he agreed with Mulligan's decision. One inmate testified that Quiros was aware of the inadequate nutrition "for years because I brought it to his attention," but never did anything to address it. 5/14/26 Tr., ECF No. 588 at 18-19. The inmates at Northern also participated in a hunger strike to protest the perceived nutrition inadequacies.

As to the recreation claim, Baltas complained about the cancellation of recreation to Robles and Mulligan during their tours. With no resolution, Baltas filed a formal grievance. The parties dispute whether Mulligan reviewed that grievance, because it was filed only a few weeks before Mulligan's successor began. Regardless, Baltas testified that he told Mulligan about the issue repeatedly during Mulligan's tours. On one occasion, when Baltas followed up on his complaints about the cancellations of recreation during a tour, Mulligan said, "It's our job to make you as

uncomfortable and miserable as possible, so nothing's going to happen." 5/14/26 Tr., ECF No. 588 at 110.

## IV. Motion for Judgment as a Matter of Law

### A. Legal Standard

Rule 50(a) of the Federal Rules of Civil Procedure permits the entry of judgment as a matter of law if a "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." If the court does not grant the motion made under Rule 50(a) during trial, "the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b).

"The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (quoting *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004)). The only difference is that the focus is "on the evidence that was *actually* admitted at trial." *Rothstein v. Carriere,* 373 F.3d 275, 284 (2d Cir. 2004) (emphasis added). In deciding a motion for judgment as a matter of law, a court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 150 (2000). The Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Weldy v. Piedmont Airline*, 985 F.2d 57, 60 (2d Cir. 1993). The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *ING Global v. United Parcel Service Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). "Such a motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that

reasonable and fair minded persons could not arrive at a verdict against it." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

The defendants fail to appreciate this legal standard and its implications for their legal arguments. For example, the defendants' brief describes the evidence on the nutritional claim as "the occasional substitution of items from trays" or the "occasional deprivation of nutritionally adequate food," and cites cases rejecting Eighth Amendment claims involving "occasional" food deprivations. ECF No. 598 at 1, 5. This amounts to whistling past the graveyard. The legal standard I must apply requires me to assume that the jury rejected any testimony or argument by the defendants that the nutritional inadequacies were just "occasional" and that it instead credited Baltas's evidence that the food was "always" or at least "consistent[ly]" missing items, under-portioned, or otherwise inadequate. ECF No. 588 at 8, 52; *see also* ECF No. 588 at 97 (Baltas testifying that inmates "never" received "more than 1800 calories" per day).

The same goes for the denial-of-recreation claim. At this stage of the case, it is no longer open to the defendants to assert, as they do in their brief, that cancellation of recreation was "occasional." ECF No. 598 at 20. Instead, I must assess the defendants' Eighth Amendment argument from the premise that the jury credited Baltas's evidence that recreation was "[c]onsistently" cancelled on Mondays, leaving Baltas in his cell from Friday morning until Tuesday morning, ECF No. 588 at 82 (Baltas Testimony: "That was almost a guarantee."); and that it was "usual[ly]" cancelled for Baltas three out of the five days each week – sometimes four. *Id.* at 83; *see also id*. ("There were a couple of times where [Baltas] didn't get rec at all the entire week, any out-of-cell time."). In other words, under the legal standard I must apply, I assume the jury found that Baltas was "usual[ly]" allowed out of his cell for recreation only twice per week and that there were weeks that he was allowed out for recreation only once or not at all.

The defendants' brief also relies largely on the defendants' trial testimony, none of which the jury was required to believe. *See, e.g.,* ECF No. 598 at 9 ("Mulligan and Quiros testified that they relied on the food services staff at Northern"); *id.* at 12 ("According to Defendant Mulligan, recreation was only cancelled for 'exigent circumstances' which included inclement weather."); *id.* at 15 ("Mulligan testified that he was not personally involved with managing recreation for inmates" and "that he was not personally in charge of the food at Northern, but instead food was the responsibility of the food services supervisors"). Because of the legal standard applicable on a Rule 50 motion, I ignore that testimony in this ruling because the jury was not required to believe it.

**B. Discussion**

To establish a violation of the Eighth Amendment, an inmate must satisfy an objective prong and a subjective prong. Namely, an inmate must show "(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). "[P]rison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). To satisfy the objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* at 125. "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted); *see also Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) ("Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an

exposure, serious injury is unequivocally not a necessary element of an Eighth Amendment claim."). To meet the subjective element, an inmate must show that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

*i. Nutritional Deprivation*

The defendants argue that "there was no evidence offered that the meals offered to Baltas presented any danger to his health – let alone presented an imminent serious risk to his health." ECF No. 598 at 5. I disagree.

"Prisoners may not be deprived of 'their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety'—and they may not be exposed 'to conditions that pose an unreasonable risk of serious damage to [their] future health.'" *Jabbar*, 683 F.3d at 57. The Constitution "requires 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" *Willey,* 801 F.3d at 69.

Baltas testified that the regular deprivation of food was an ongoing issue that led to weight loss, hunger pain, and difficulty sleeping. As already shown, the defendants fail to engage with the jury's apparent acceptance of Baltas's evidence, and their reliance on cases[3] ruling that isolated food deprivations are insufficient to prove an Eighth Amendment claim is misplaced. The facts of

[3] *Al-Bukhari v. Semple*, 2018 WL 4539661, at *6 (D. Conn. Sept. 21, 2018) (Plaintiff alleged one incident in which his food items were tampered with); *Roundtree v. City of New York*, 2018 WL 1586473, at *8 (S.D.N.Y. Mar. 28, 2018) ("The sole incident of food poisoning did not pose an immediate danger to Roundtree's health."); *Lohman v. King Cty. Jail*, 2014 WL 4187150, at *1 (W.D. Wash. July 1, 2014) (Plaintiff "heard another inmate…screaming about having found a tampon in his spaghetti dinner."); *Ford v. Aramark*, No. 18-cv-2696 (NSR), 2020 WL 377882, at *6 (S.D.N.Y. Jan. 23, 2020) (Plaintiff "notes…four instances that he simply threw out the food and wrote a grievance," which was not enough to plead a "distinct or palpable injury or illness related to this contamination); *Constant v. Prack*, 2019 WL 3287818, at *3, *15 (S.D.N.Y. July 19, 2019) (weight loss alone was not enough to support that Plaintiff's health was in imminent danger due to missing food items).

this case, the jury could reasonably have found, involved a systemic failure to meet inmate nutritional needs.

*1. Objective Element*

As to the objective prong, the defendants argue that there "was no competent evidence offered to establish that any meals provided to the plaintiff were nutritionally inadequate," and that no trial witness was qualified to offer any such opinion. ECF No. 598 at 6.

As noted, the trial evidence included an exhibit showing USDA guidance that specified a minimum of 2,400 calories per day for a male of Baltas's age. Baltas testified, however, that he kept a log of his calories and estimated that the meals ranged from 900-1,800 calories. ECF No. 588 at 100. Further, the parties stipulated that "the recommended intake ranges of the following food groups for males aged 19 to 30 are as follows: 3 to 4 cups of vegetables, 2 to 2 ½ cups of fruit, 8 to 10 ounces of total grains, 3 cups of dairy, and 7 ounces of protein." *Id.* at 40. Based on Baltas's testimony, the jury could reasonably have found that the inmates rarely if ever received this much food:

> We're supposed to get a breakfast juice, 12 ounces of farina, a breakfast pastry, one milk, coffee, four packets of sugar. The farina would typically be 8 ounces, if that, if you were lucky. The breakfast pastry was supposed to measured out as a square. It would be a sliver. Chicken and gravy 8 ounces, you'd get 4. Four ounces would be on the tray. The rice says a cup and a half. You would absolutely not get more than three-quarters of a cup. At the absolute most, you'd get three-quarters of a cup of rice. You'd get the half a cup of carrots. That was pretty consistent. Bread you'd probably get one slice. You'd get lucky if you got two. Dinner, same thing. The sloppy Joe you wouldn't get 8 ounces of protein, of meat on that tray. You'd get 4 ounces. The rice, again, between half a cup and three-quarters of a cup. There was definitely no fresh rolls. We weren't getting a fresh roll at all. That never came. So typically I would say that, looking at what we're supposed to get on the menu, we would get between half and three-quarters of that every day, every meal.

ECF No. 588 at 95-96. And there was ample evidence to corroborate this testimony. Richard Reynolds testified that the meals served were small, did not satisfy his hunger, and did not meet his nutritional needs. ECF No. 587 at 42-43. Kenyon Joseph said he was hungry "daily," ECF No.

588 at 13-14, and he did not receive his breakfast within 14 hours after having dinner, as required by an administrative directive. *Id.* Joseph also said that the meals would be missing food items "three, four times" a week and could be missing food items from "all three meals in one day." *Id.* at 8. Peter Tarasco testified that "portion sizes were small," and "there was always constantly something missing, whether it was soup, fruit. So you would never get a full meal." *Id.* at 52.

Based on this evidence, the jury could have reasonably found that Baltas and his fellow Northern inmates were, on virtually every one of the 130 days Baltas was at Northern, being deprived of both USDA-recommended caloric intake and the parties' stipulated "recommended intake range." Especially in light of the evidence that the Baltas was consistently not receiving even the stipulated recommended food intake, the jury did not need expert testimony to find an Eighth Amendment violation. *See Young v. Southwest Airlines Co.*, 409 F.Supp.3d 110, 116 (E.D.N.Y. 2017) ("[E]xpert testimony is not required where the jury must draw only a common sense causal connection between a plaintiff's injury and one precipitating cause."); *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 89 (2d Cir. 2006) (holding that "causal link" between "hearing loss and repeated exposure to noise so loud that it causes physical pain or ear-ringing" is "widely known").

Further, the jury was entitled to consider the cumulative effect of the deprivation, including Baltas's weight loss, hunger pains, the frequency with which he was denied adequate meals, and the fact that this deprivation occurred on virtually every one of the 130 days he was at Northern, in determining whether the deprivation was sufficiently serious. *Compare Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (Plaintiff stated Eighth Amendment claim where he alleged that prison officials deprived him of a nutritionally adequate diet for fourteen days). Viewed in light of the

nature and duration of the deprivation, a reasonable jury could find that Baltas was denied the minimal civilized measure of life's necessities.

*2. Subjective Element*

The subjective prong requires that an inmate show that the "defendant prison officials possessed sufficient culpable intent." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996) "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* The prison official "must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Viewing the evidence in the light most favorable to Baltas and drawing all reasonable inferences in his favor, I find that there was enough evidence from which a reasonable jury could find that the defendants were aware of a substantial risk of serious harm to Baltas and failed to respond reasonably to the risk.

The defendants argue that Baltas, when filing his grievance with the prison, "made no mention of his caloric estimates and provided only vague allegations about the issue he alleged he was grieving." ECF No. 598 at 7-8. But Mulligan admitted to receiving and denying the following grievance from Baltas:

> Informal resolution not attached. Multiple requests filed with no response. I am grieving the units failure to meet our nutritional needs. Almost everyday there are items missing from our trays, such as soup, veg, bread, etc. At no time has [there] been [] substitute items placed on these trays to meet our daily requirements. Posing serious health concerns. These failures to meet our nutritional needs are in violation of health standards dept. policy; & my 8th & 14th Amendment rights. I request these serious deficiencies be rectified immediately & all of my/our daily dietary/nutritional need be met everyday.

Exhibit 7. Mulligan denied the grievance, he stated, because Baltas did not provide "specific meal dates or shifts that can be properly investigated with Food Services by the Administrative

Remedies Coordinator," *id*, and in his testimony, Mulligan again said that the grievance "wasn't specific enough that I could adequately investigate the issue." ECF No. 590 at 77. But the grievance states that the failure "to meet our nutritional needs" was occurring "[a]lmost everday," which is specific enough to provide a basis to investigate. Tarasco also testified to alerting Mulligan about the food issues at Northern and said nothing was ever done about it. ECF No. 588 at 59.

Further, as the warden at Northern, Mulligan "toured twice a week," during which Baltas says he "talked to him every time he toured." ECF No. 588 at 102. Mulligan testified that he knew Baltas and "interacted with him frequently." ECF No. 590 at 72. In his role, Mulligan was "basically [] responsible for every staff member and the care and custody of inmates in the facility." *Id.* at 54-55. During his tours of Northern, he "would be in the unit on many occasions for multiple hours, engaging with the population." *Id.* at 57. When discussing the administrative directives, Mulligan described them as "basically the Bible on which we [] manage our facilities." *Id.* at 62. Baltas and the other inmates testified, however, that the administrative directive about the amount of time permitted to elapse between dinner and breakfast was frequently violated. ECF No. 188 at 93 (Baltas testifying that the time between dinner and breakfast was "fifteen, [sixteen] hours."); *id.* at 108 (Joseph testifying that it was a "daily thing" to exceed the fourteen-hour limit).

Robles worked as the unit manager, and Baltas testified that he complained to him about the food "daily." ECF No. 588 at 101. Robles testified[4] that, during his time working at Northern, if the inmates assigned to his unit had any issues, "they were brought to [his] attention, and [he] would address them accordingly." ECF No. 590 at 18.

---

[4] As Robles was deceased at the time of trial, I allowed the defendant to read in his testimony from another trial in which the plaintiff made similar allegations.

For his part, Quiros agreed that "once an inmate files a grievance and the issue is brought to [his] attention, it is then [his] responsibility to have that issue taken care of." ECF No. 589 at 195. Quiros reviewed and denied the same grievance from Baltas that Mulligan had denied. In his denial, Quiros said "[y]ou are appealing a level 1 grievance regarding meals at Northern C.I. The response given by Warden Mulligan was appropriate. Soup has been removed from the daily menu, however, nutrition and caloric intake requirements are still being met." Exhibit 8. He did not explain how his comment about "soup" addressed Baltas's broader complaint, and there was no evidence that he investigated the issue further. In addition, the jury heard Quiros acknowledge that there was a "mass hunger strike over that very issue." ECF No. 589 at 193. Tarasco testified that his level 1 grievance about food that Mulligan denied would have automatically gone to Quiros. ECF No. 588 at 58. Joseph said that he knew Quiros "was aware of this for years because I brought it to his attention. This time at 2016, same thing. It wasn't – this is not like it stopped. It was ongoing. It never changed." *Id.* at 18-19.

Based on the exhibits, testimony from inmates, and testimony from the defendants, the jury could have reasonably determined that Robles, Mulligan, and Quiros knew about the nutrition issues at Northern. It is common sense that sustained deprivation of food can pose a substantial risk of harm. Thus, there was enough evidence for a reasonable jury to find that Baltas complained to all three defendants, they were on notice of daily inadequate nutrition, did not investigate the issue further, and were aware that a failure to remedy this issue could lead to serious harm from hunger, weight loss, and hunger pain.

*3. Personal Involvement*

Defendants also argue that "there is no evidence that Quiros, Mulligan, or Robles [was] involved in any way in the preparation of Baltas's food or in the development of the master menu

or any substitutions on the menus." ECF No. 598 at 6. Defendants Mulligan and Quiros testified that "they relied on the food services staff at Northern" and believe "[t]hey are entitled to rely on those experts who designed and prepared the meals for the inmates." *Id.* at 9. The defendants claim that because "no defendant was informed by these experts that Baltas was at substantial risk of harm based upon the food," that Baltas failed to meet the subjective prong of an Eighth Amendment claim. *Id.* at 10. But whether the defendants were directly informed by an expert that Baltas was at a substantial risk of harm is not the test here; Baltas must prove only that the defendants were aware of the problem and had the authority and ability to fix it but failed to do so.

After *Tangreti v. Bachmann*, a plaintiff must establish that each defendant, "through the official's own individual actions, has violated the Constitution." 983 F.3d 609, 618 (2d Cir. 2020). In the Eighth Amendment context, that requires proof that the defendant had actual knowledge of a substantial risk of serious harm and disregarded that risk. *Id.* at 619. Unlike the defendant in *Tangreti*, who lacked actual knowledge of the particular risk that ultimately materialized and referred reported concerns for investigation when they came to her attention, the jury reasonably could find that the defendants here had actual notice and nevertheless failed to take corrective action.

Mulligan's and Quiros's responses to Baltas's grievance belie their current assertions of lack of personal involvement. Mulligan responded to Baltas's grievance by faulting Baltas for lack of specificity, not by suggesting that he lacked authority to investigate the issue or was relying on the food services staff. Baltas then appealed to Quiros, who reviewed the appeal and denied it on the merits, stating that nutritional and caloric requirements were being met, not that it was not his responsibility or that he was relying on others. From these responses, the jury reasonably could infer that both Mulligan and Quiros were aware of the alleged nutritional deprivation, possessed

the authority to investigate and address it, and chose not to do so. Indeed, the defendants testified that they toured the facility, spoke with inmates about problems, and had responsibility for addressing inmate concerns. Quiros specifically testified that when an inmate brings a problem to a supervisor's attention, it is the supervisor's responsibility to address the issue. The jury was entitled to credit that testimony.

This conclusion is consistent with *Edwards v. Quiros*, in which the Second Circuit held that a jury could find Quiros personally involved in an Eighth Amendment violation based on evidence that he was a "hands-on warden" who regularly toured Northern and was aware of the conditions challenged by the plaintiff. 986 F.3d 187, 193 (2d Cir. 2021). The jury could reasonably have reached the same conclusion about Mulligan, who was the warden at Northern while Baltas was there; and the jury reasonably could have concluded that Quiros was a "hands-on" District Administrator from Quiros's own testimony regarding his supervisory practices, facility tours, and review of inmate complaints.

*ii. Recreational Deprivation*

I begin with the parties' dispute about the scope of this claim. The defendants[5] argue that "in this case, the Court and the plaintiff framed the violation as a deprivation of meaningful stimuli and social interaction based on the cancellations of recreation – not the opportunity to exercise," and that such alleged violation, "does not implicate a basic human need recognized under the Eighth Amendment." ECF No. 598 at 11. Baltas argues that defendants deprived him of "recreation time, which encompasses out-of-cell time, sunlight, fresh air, social interaction, and a meaningful opportunity for exercise." ECF No. 606 at 16. I discussed this issue with the parties multiple times during the trial:

[5] The claim of recreational deprivation is against only Robles and Mulligan, not Quiros.

Mr. Barry: "A plaintiff must prove objectively the deprivation the inmate suffered was sufficiently serious that he was denied minimal civilized life necessities" – we tell them that, such as being denied a meaningful opportunity for exercise.

The Court: You know, I've not understood the claim to be that narrow, to be frank with you. Baltas and others testified that this was the only chance they had to socialize with other inmates. This was a big part of why they wanted it. We didn't actually hear him talk, that I can recall, about exercising outside. I don't recall him saying, "I really wanted to go outside to exercise, and I didn't have a meaningful opportunity to exercise." I don't recall that being part of the claim or part of the testimony. Maybe I missed it.

Mr. Barry: That's part of the loss of recreation.

The Court: Says you. I mean, he – it's his claim, and he talked about he wanted to go outside. I remember him saying because it was the only chance to interact with other people. There may have been others reasons too. That's what sticks out most in my mind. I don't recall him – maybe he'd say now, "Yeah, I wanted to exercise too," but I don't recall much testimony, if any, from him about exercise. I'm not suggesting he didn't want to exercise. I'm just saying that never struck me as being the focus of the claim. There was a lot of testimony from him – and you elicited testimony from the defendants – about how they could go out and socialize with other inmates. And you heard how Dr. Grassian talked about that. They all talked about that. That's what seemed to be the focus to me with regard to recreation.

Mr. Barry: Your Honor, I believe Dr. Grassian, I believe plaintiff's counsel asked our clients all: Is the opportunity to exercise, is that important?

The Court: Right, but what you're –

Mr. Barry: Each person.

The Court: The point you're not seeing, from my standpoint, is you're having me call out to the jury a very specific claim which is narrower than any claim that's being made in this case. And I'm a little concerned about doing that because it draws the jury's attention to something that really – I'm not saying – it's in the case, but it's kind of a – it's kind of a back issue compared to rec time as a whole and the other things we've heard about.
Mr. Rueckert.

Mr. Rueckert: Yes, Your Honor. Just the *Edwards v. Quiros* case says exactly – I think what counsel wants to do is to define the issue as one of exercise because he's tried to introduce evidence that there's exercise in the cell. The availability of in-cell exercise does not establish, as a matter of law, that a prisoner had a meaningful opportunity to exercise. So the cases are specifically about out-of-cell exercise.

> The Court: I'm not sure we need to have this debate in the jury instruction because the – you say we give them no guidance. I respectfully disagree with you. There's plenty of guidance on what an Eighth Amendment violation is. And you're – you're asking me to take part of a claim – it's not even the whole claim – which is about rec time and focus the jury in on that. I don't – I don't think that's a – I'm afraid it's going to confuse the jury because, number one, they're going to think, "Oh, this whole thing about rec time, it's just about exercise." So I'm not – I'm not going to do that.

ECF No. 590 at 135-137.The defendants seemingly acknowledged this distinction during Baltas's cross examination:

> Q: Right. Recreation, you weren't able to recreate in your cell; correct?
>
> A. No.
>
> Q: All right. You had the ability to recreate in your cell.
>
> A: What do you mean by "recreate?"
>
> Q: To do exercises. You did exercises in your cell?
>
> A: That's your definition of recreation is exercise?
>
> Q: No. You exercised in your cell; right?

ECF No. 588 at 155. Mulligan testified on direct examination that "there's one recreation period," signaling that this is a distinct concept from in-cell exercise. ECF No. 590 at 56. Further, he said:

> Q: Okay. If you know, did inmates on administrative segregation status find other ways to recreate other than outdoor recreation?
>
> A: They would rec in their cell. I mean, they would exercise in their cell. I shouldn't say – recreation and exercise I would say are two different things.

ECF No. 590 at 66-67.

So as I indicated during the trial, I agree with Baltas's characterization of his recreation claim, i.e., that it encompassed time outside the cell, including interaction with other inmates, access to the outdoors, and the opportunity for meaningful exercise.

As I discuss below, because there was sufficient evidence to support that the defendants knowingly deprived Baltas of recreation time, I deny the motion for judgment for matter of law as to this claim.

*1. Objective Element*

As the defendants recognize, the Second Circuit has held that prisoners have a right "to a meaningful opportunity for physical exercise[.]" *McCray v. Lee*, 963 F.3d 110, 120 (2d Cir. 2020) (collecting cases). The defendants nevertheless contend that Baltas cannot establish an Eighth Amendment violation because he retained "some opportunity" to exercise in his cell. ECF No. 598 at 10-12. The argument overlooks the distinction the Second Circuit has drawn between in-cell activity and a meaningful opportunity for out-of-cell exercise. "[T]he Eighth Amendment requires that prison inmates be allowed some out-of-cell exercise." *Williams v. Greifinger*, 97 F.3d 699, 704 n.5 (2d Cir. 1996). Consistent with that principle, the Second Circuit has "previously permitted Eighth Amendment opportunity-to-exercise claims to proceed where those claims exclusively concerned impediments to out-of-cell exercise." *Edwards*, 986 F.3d at 194. And in rejecting an argument similar to the one advanced here, the court observed that "[t]he availability of in-cell exercise does not establish, as a matter of law, that a prisoner had a meaningful opportunity to exercise." *Id.*

Viewed in the light most favorable to Baltas, the evidence was sufficient to permit the jury to find such a deprivation. The jury viewed photographs of the cells at Northern and heard testimony that they measured approximately "12 by 7" feet and were small enough that a six-foot-one inmate standing in the center could "pretty much touch the walls." ECF No. 587 at 30. Although inmates could perform "basic things" such as pushups and sit-ups in their cells, Reynolds testified that he would not do burpees because "doing that would create problems with people

downstairs." *Id.* at 58. He further testified that the cell allowed only approximately five steps in one direction and ten in the other. *Id.* at 75.

The jury also heard evidence that inmates in administrative segregation were supposed to receive one hour of outdoor recreation five days per week. ECF No. 587 at 78. Baltas testified, however, that he "wouldn't receive rec [] three days a week," sometimes missed recreation four days per week, and occasionally "didn't get rec at all the entire week." ECF No. 588 at 83. Reynolds estimated that recreation was cancelled "a good three times a week on average." ECF No. 587 at 39. Tarasco similarly testified that recreation was unavailable "a good 60 percent of the time" and that "[i]f you got three days out of the week or three hours out of the week, it was a good week." ECF No. 588 at 47. The jury further heard that missed recreation was not made up and that recreation was frequently cancelled on Mondays after inmates had already spent the weekend confined to their cells, resulting in approximately eighty-six consecutive hours without out-of-cell time. *Id.* at 47, 82.

This evidence distinguishes the authorities on which the defendants rely. In *Ruggiero v. Fischer*, the plaintiff continued to receive outdoor recreation but argued that restraints prevented him from performing his *preferred* exercises. 2018 WL 7892966, at *3. The court rejected that claim because the plaintiff was not deprived of the opportunity for out-of-cell exercise itself; rather, he remained able to go outdoors and exercise notwithstanding the restraints. *Id.* The court's observation that the plaintiff could also exercise in his cell therefore addressed further mitigation of the restrictions caused by the restraints when he was outdoors. Here, by contrast, the jury reasonably could have found that Baltas's only opportunity for out-of-cell exercise was routinely cancelled altogether. Likewise, in *Kelly v. Miller*, the plaintiff continued to receive out-of-cell programming. 2025 WL 2301988, at n.1. Thus, unlike the plaintiffs in *Ruggiero* and *Kelly*, Baltas

claimed not merely that the conditions of recreation limited the type of exercise he could perform, but that he was repeatedly denied access to out-of-cell recreation in the first instance. This case more closely resembles *Edwards*. There, the Second Circuit emphasized that "the availability of in-cell exercise does not establish, as a matter of law, that a prisoner had a meaningful opportunity to exercise." 986 F.3d at 195; *see also Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (contrasting cases in which outdoor exercise was required because inmates were "confined in small cells almost 24 hours per day" with cases in which outdoor exercise was unnecessary because inmates otherwise had extensive access to a dayroom). Here, the jury reasonably could have found that Baltas had no comparable alternative opportunity to leave his cell. Recreation was his only regular source of out-of-cell activity, and when recreation was cancelled, he remained confined to a small cell with no substitute opportunity for exercise.

The jury also reasonably could have considered the loss of fresh air, light, and environmental stimulation in assessing the seriousness of the deprivation. In *Blissett v. Coughlin*, the Second Circuit cited *Hoptowit v. Ray*, which held that "the deprivation of nearly all fresh air and light . . . creates an extreme hazard to the physical and mental well-being of the prisoner in violation of the Eighth Amendment." 66 F.3d 531, 537 (2d Cir. 1995) (quoting 682 F.2d 1237, 1257-58 (9th Cir. 1982)). And courts have recognized that "exercise, social interaction, environmental stimulation, and sanitation" constitute basic human needs. *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 380 (N.D.N.Y. 2020).

The jury also heard evidence regarding the effects of these conditions. Baltas testified that recreation provided his only opportunity to obtain fresh air because his cell window did not open and his cell door was solid metal. ECF No. 588 at 88. He further testified that recreation provided his sole opportunity for meaningful interaction with other inmates. *Id.* at 89-90. When deprived of

recreation, he was "thinking about killing [him]self, wanting to die . . . trying to find ways to avoid that and distract [him]self." *Id.* at 91.

Dr. Grassian testified that deprivation of stimulation can "cause changes in the brain wave pattern" and leave people unable to maintain concentration or alertness. ECF No. 589 at 16. He further testified that "more than 15 days of these kinds of conditions involving one hour seven days a week of recreation is generally considered a form of psychological torture and inhumane." *Id.* at 30. The jury also heard evidence that, immediately after leaving Northern, Baltas reported anxiety and depression with auditory hallucinations and that his DOC mental-health classification was increased to require greater support and monitoring. *Id.* at 129-30.

I need not decide whether the deprivation of fresh air, environmental stimulation, sunlight, or social interaction would independently support an Eighth Amendment claim. Those conditions were relevant to the severity of the deprivation and to whether the limited exercise available in Baltas's cell constituted a meaningful substitute for regular out-of-cell recreation. Viewed as a whole, the evidence was sufficient to permit a reasonable jury to find that Baltas was denied a meaningful opportunity for exercise and therefore suffered a sufficiently serious deprivation to satisfy the objective element of the Eighth Amendment claim.

*2. Subjective Element*

The evidence was also sufficient for a reasonable jury to conclude that the defendants knew Baltas was being subjected to conditions that posed a substantial risk of serious harm.

The defendants assert that the deprivation of recreation lasted only seventy-one days, *see* ECF No. 598 at 12, arguing that Baltas's claim is time-limited because he did not file a grievance before March 21, 2017, and grievance regulations require inmates to file each grievance within thirty days of the action complained of. But seventy-one days was enough because this was not a

case involving a single missed recreation period or an isolated complaint. The jury reasonably could have found that, throughout the seventy-one-day period, recreation was usually cancelled three times per week, meaning that Baltas and others on administrative segregation at Northern were usually permitted to exit their cells two days per week, and that inmates repeatedly informed prison officials of the problem.

Baltas testified that he raised the issue with Mulligan "every time he toured." ECF No. 588 at 109. He specifically complained that recreation was routinely being cancelled and asked whether inmates could receive make-up recreation when cancellations occurred for legitimate reasons. *Id.* at 109-10. Baltas also testified that he spoke to Robles daily about the recreation issue. *Id.* at 110.

Other inmates provided similar testimony. Joseph testified that he repeatedly informed Robles about the denial of recreation, both verbally and in writing: "I would tell him what was going on. He would tell me he would look into it, whatever. I gave him a week or two . . . [i]f I didn't hear anything, then I would put it in a paper and send it right to him, give it to him through the door when he did his tour." ECF No. 587 at 89. Joseph further testified that he brought the issue to the defendants' attention "many a times" through inmate requests, inmate grievances, and verbal complaints during tours. *Id.* at 84, 88. Tarasco testified that he raised the issue with Mulligan through "the grievance process or the request system," informed Robles through the request system, and complained to "anyone that [he] could get the issue to." ECF No. 588 at 48-50.

The jury was therefore entitled to find that the defendants heard essentially the same complaint repeatedly from multiple inmates over more than two months. As the Supreme Court explained in *Farmer*, a factfinder may infer actual knowledge where a risk is "longstanding…." 511 U.S. at 842-43. The jury also reasonably could have found that the defendants understood the risk posed by the repeated denial of recreation. As discussed above, the evidence permitted the

jury to find that their hour of recreation was these inmates' sole opportunity for meaningful out-of-cell exercise and that cancellations frequently left inmates confined to their cells for days at a time, including periods of approximately eighty-six consecutive hours without out-of-cell recreation. The jury also heard evidence that inmates repeatedly complained about those conditions through the available processes. Under these circumstances, a reasonable jury could conclude that the defendants were aware not only that recreation was being denied, but also that the deprivation was occurring with sufficient frequency and duration to pose a substantial risk of serious harm. Indeed, "[t]he requisite deliberate indifference may be inferred from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Viewed in the light most favorable to Baltas, the evidence was sufficient to permit a reasonable jury to find that the defendants had actual knowledge of the ongoing deprivation and of the substantial risk associated with it.

*3. Personal Involvement*

The defendants also argue that Baltas failed to establish the personal involvement of Mulligan and Robles. The evidence was sufficient for a reasonable jury to conclude otherwise. As discussed above, the jury reasonably could have found that Mulligan and Robles were repeatedly informed throughout the seventy-one-day period that recreation was being routinely denied. The evidence permitted the jury to find not merely that they occupied supervisory positions, but that they personally received complaints regarding the ongoing deprivation from Baltas and other inmates through conversations, inmate requests, and grievances. The jury further could have found that those complaints continued for weeks while the deprivation remained ongoing.

This case therefore bears little resemblance to one in which liability is premised solely on a defendant's supervisory title or generalized responsibility for prison operations. Rather, the

evidence tied both Mulligan and Robles directly to the deprivation at issue. In *Edwards*, the Second Circuit relied in part on evidence that the warden regularly toured Northern and was aware of the challenged conditions in concluding that a jury could find liability. 986 F.3d at 193. The jury heard comparable evidence here. Mulligan, as the warden, regularly toured the unit, and both Mulligan and Robles repeatedly received complaints concerning the denial of recreation while the deprivation was ongoing.

The defendants suggest that personal involvement required proof that Mulligan or Robles personally cancelled recreation periods. I disagree. The question is whether the evidence connected each defendant, through his own conduct, to the ongoing deprivation found by the jury. Given the evidence that Mulligan and Robles repeatedly received complaints concerning the denial of recreation and that the deprivation nevertheless continued, a reasonable jury could conclude that both defendants were personally involved in the violation.

*iii. Qualified Immunity*

The defendants argue that they are entitled to qualified immunity because "[i]n this case, there is no clearly established precedent that would clearly establish that the menu designed and implemented by food services three times a day, coupled with access to commissary violated the Eighth Amendment." ECF No. 598 at 20. They also contend that "there is no precedent that the occasional cancellation of outdoor recreation in these factual circumstances and under the claim as framed in this case, would make it clear to every reasonable officer that an Eighth Amendment violation occurred." *Id.* According to the defendants, this case presents "precisely the type of situation in which qualified immunity was designed to provide protection." *Id.*

The defendants' argument fails because both rights at issue were clearly established long before the events in this case. The Second Circuit held decades ago that the Eighth Amendment

requires that "prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983). It later reaffirmed that food is among the "basic human needs" protected by the Eighth Amendment. *Phelps*, 308 F.3d at 185. Thus, long before Baltas's time at Northern, it was clearly established that prison officials could not regularly deprive inmates of nutritionally adequate food.

The same is true of the right to meaningful out-of-cell recreation. More than twenty years before the events at issue here, the Second Circuit reversed the granting of qualified immunity for prison officials where plaintiff was subject to a policy preventing him from getting any out-of-cell exercise. *Greifinger*, 97 F.3d at 701-02, 707-08. "The pertinent court of appeals decisions of which we are aware—that is, those decided before Williams was put in medical keeplock in March 1993—are uniform in concluding that the Eighth Amendment requires that prison inmates be allowed some out-of-cell exercise." *Id.* at 704 n.5. The court further held that restrictions on that right are justified only by "unusual circumstances" or legitimate safety concerns and only after prison officials conduct "a detailed review" of feasible alternatives. *Id.* at 705. Even before *Greifinger*, the Supreme Court had recognized the constitutional significance of prolonged confinement in small cells without meaningful opportunities for exercise. *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991). And in *Blissett*, the Second Circuit endorsed a Ninth Circuit decision holding that "the deprivation of nearly all fresh air and light, particularly when coupled with [lack of control over artificial illumination], creates an extreme hazard to the physical and mental well-being of the prisoner in violation of the Eighth Amendment." 66 F.3d at 537 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1257-58 (9th Cir. 1982)) (addressing whether restrictive confinement conditions constituted a sufficiently serious deprivation under the Eighth Amendment).

The defendants' qualified immunity argument depends largely on a characterization of the facts that the jury rejected. Viewing the evidence in the light most favorable to Baltas, this case did not involve isolated missed meals or occasional cancellations of recreation. Rather, the jury reasonably could have found that Baltas was regularly deprived of nutritionally adequate food, usually denied meaningful opportunities for out-of-cell recreation on all but two days per week, confined to his cell for days at a time, and subjected to these conditions for months despite repeated complaints to prison officials. On those facts, a reasonable corrections official would have understood that such conduct violated clearly established law.

Finally, the jury's finding of deliberate indifference undermines the defendants' qualified-immunity defense. As one court has observed, where a jury finds deliberate indifference to a known substantial risk of serious harm, "the question of qualified immunity turns on whether it was objectively reasonable for Defendants to believe that their conduct did not violate [Baltas's] rights." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 300 (D. Conn. 2015). On the facts the jury was entitled to find, it was not objectively reasonable for the defendants to believe that the ongoing deprivation of nutritionally adequate food and meaningful opportunities for out-of-cell recreation complied with the Eighth Amendment. Accordingly, the defendants are not entitled to qualified immunity.[6]

[6] Even if there was no clearly established right to meaningful out-of-cell exercise at the time of the events in this case, the defendants' violation of the clearly established right to adequate nutrition would suffice to defeat the qualified immunity defense of all three defendants. The jury's interrogatory answers suggest that the jurors viewed the deprivation of nutrition and the deprivation of recreation as independent Eighth Amendment violations. The jury was instructed that the only allegation against Quiros was that he deprived Baltas of nutritionally adequate food. ECF No. 578 at 20 (The jury instructions read that Baltas alleged "Defendants Semple, Rinaldi, Mulligan, Robles, and Quiros deprived him of nutritionally adequate food (please note that this is the only allegation that applies to Mr. Quiros))." It nonetheless found Quiros liable on that allegation alone, suggesting that it viewed the deprivation of adequate nutrition as independently sufficient to establish an Eighth Amendment violation. While the jury also found Mulligan and Robles liable for the deprivation of recreation, its verdict as to Quiros—who had less day-to-day involvement with the nutrtional deprivation than Mulligan and Robles—suggests that the nutrition claim alone is sufficient to sustain the verdict against all three defendants.

## V. Motion for a New Trial

### A. Legal Standard

Rule 59 of the Federal Rules of Civil Procedure allows a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The Second Circuit has held that a district court should grant a motion for a new trial only when it finds that "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (alterations omitted). "A new trial may be granted ... when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). In assessing such a motion, the "trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). A court may grant such a motion "even if there is substantial evidence supporting the jury's verdict." *Id.* "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious." *DLC Mgmt. Corp.*, 163 F.3d at 134 (internal quotation marks omitted).

On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner. *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). But trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge "should rarely disturb a jury's evaluation of a witness's credibility," *DLC Mgmt.*, 163 F.3d at 134, and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury," *Landau*, 155 F.3d at 104. In general, "[w]here the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363

(2d Cir. 1992); *see also Landau*, 155 F.3d at 104–05 ("A jury's credibility assessments are entitled to deference.").

**B. Discussion**

The defendants "move for a new trial [] because the verdict was substantially against the weight of the evidence," ECF No. 599 at 4, and contend that "there was simply no evidence" to prove the defendants' liability. *Id.* at 3. Further, the defendants argue that the plaintiff was "permitted over Defendants' objections to offer testimony and argument concerning time confined inside the cell and through his expert, the effects of 'solitary confinement.'" *Id.* at 4.

The defendants do not cite any exhibits or relevant excerpts of the trial testimony but simply assert in a conclusory fashion that they are entitled to a new trial. "Generally speaking, specific reliance upon the trial transcript is necessary to demonstrate one's entitlement to relief on a Rule 59 motion based upon determinations made at trial." *Carlton v. C.O. Pearson*, 384 F.Supp.3d 382, 386 (W.D.N.Y. 2019). "A trial court is not required to parse through transcripts in an effort to identify the grounds of a post-trial motion." *Warren v. Thompson*, 224 F.R.D. 236, 240 n.7 (D.D.C. 2004) (quotation omitted), *aff'd sub nom. Warren v. Leavitt*, 264 F. App'x 9 (D.C. Cir. 2008). Failure of a party moving for new trial to cite the relevant trial transcript may alone warrant denial of motion for a new trial. *See Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to United Nations in New York*, 2019 WL 5260829, at *2 (S.D.N.Y. Oct. 16, 2019); *AMW Materials Testing, Inc. v. Town of Babylon*, 2008 WL 11449231, at *18 (E.D.N.Y. Mar. 13, 2008) ("[U]nsupported contentions, without any evidence cited from the trial transcript, are insufficient to justify the grant of a new trial."). The lack of specificity and failure to point to support in the record in the defendants' motion are themselves grounds to deny it. In any event, the arguments raised in the defendants' new trial motion lack merit.

First, the verdict was not against the weight of evidence presented at trial. The jury could have reasonably found Baltas, Reynolds, Joseph, and Tarasco, or any combination of Baltas's witnesses, credible. Baltas's witnesses offered consistent testimony regarding the conditions at Northern. Because there were relatively few exhibits admitted, the verdict hinged largely on the jury's credibility findings. The defendants had the opportunity to cross-examine all the witnesses, and I see no basis to disturb the jury's assessment of their credibility. Apparently, nor did defense counsel: In his closing argument, defense counsel himself acknowledged the credibility of two of Baltas's inmate witnesses. "Reynolds came in here. He testified credibly," and "Mr. Kenyon Joseph, he was credible." ECF No. 591 at 58. And because these two witnesses corroborated much of Baltas's testimony, defense counsel's acknowledgment of their credibility was an acknowledgement of Baltas's. Where a verdict was based "almost entirely on the jury's assessments of credibility," it "should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418–19 (2d Cir. 2012). This is not such a case.

The defendants next argue that Dr. Grassian offered testimony about the effects of "solitary confinement," ECF No. 599 at 4, which pushed his testimony beyond the scope of what I allowed during the pretrial conference. During the pretrial conference, I told Baltas's counsel that Dr. Grassian's testimony would have to be limited to the impacts arising from the specific claims in the case, i.e., inadequate nutrition, cancellation of recreation, and the lack of sunlight. ECF No. 501 at 35-36. I told him that "[if Dr. Grassian strays,] there's going to be lots of objections…and I'm going to be sustaining those objections…." ECF No. 501 at 36. I thus made clear that it was the defendants' responsibility to object whenever Dr. Grassian "strayed."

On direct examination, Baltas did not elicit testimony about solitary confinement. When Dr. Grassian discussed potential impacts of the amount of time spent in the cell, the defendants objected only a few times, but for the most part, the defendants did not object to his testimony. The defendants now argue for the first time since the pretrial conference that Dr. Grassian should not have been allowed to testify about the effects of "solitary confinement." But they point to no objection on this issue that they made and that I failed to sustain. There was no objection, for example, when Dr. Grassian testified as follows:

> People in situations of social isolation become desperate, desperately alone, desperately lonely, and desperately depressed. So the opportunity for meaningful social interaction can be a lifesaver. The incidents of suicide among people who are so deprived is about seven to ten times greater than it is in inmates in general population, and a lot of that isolation, that utter emptiness without social interaction.

ECF No. 589 at 15. Nor did they object here:

> The deprivation of this type of stimulation…is well known to cause changes in the brain wave pattern. People's brains actually change, and you can see that change within days of people in those conditions. Basically, it's moving the electroencephalogram, the brain wave pattern, towards a pattern that's seen in delirium. People are unable to maintain any sense of concentration, any alertness. They either go into a fog or they become kind of obsessed. They start thinking about something, and they can't stop thinking about it.

*Id.* at 17. Their failure to object means that they cannot complain now. "[U]nless there is plain error, failure to object to an issue during trial precludes review of that issue on a motion for a new trial." *Hardy v. Saliva Diagnostic Sys., Inc.*, 52 F. Supp. 2d 333, 340 (D. Conn. 1999) (internal quotation marks omitted; *see also Smart v. USA Labor for Hire, Inc.,* 2025 WL 1217365, at *3 (2d Cir. Apr. 28, 2025) (summary order) ("Defendants did not contemporaneously object to these statements at trial, and thus did not provide the district court with an opportunity to cure any potential prejudice. Under our precedent, that alone is reason to uphold the district court's refusal to grant a new trial or remittitur on these grounds").

Next, the defendants argue that "this Court's narrowing of permissible testimony concerning why Baltas was subject to a more restrictive environment led to a result that was against the weight of the evidence for the claims at issue before this jury." ECF No. 599 at 5. Courts in this Circuit have held that, to obtain a new trial on the ground of erroneous evidentiary rulings, "a litigant must do more than merely voice a disagreement with the court's evidentiary rulings. Rather, a motion for new trial on the basis of improper evidentiary rulings will be granted only where the improper ruling affects a substantial right of the moving party." *Litras v. Long Island R.R.*, 2006 WL 1455466, at *11 (E.D.N.Y. May 23, 2006) (internal quotation marks and citations omitted). During the pretrial conference, I questioned the defendants about why they wanted to introduce Baltas's disciplinary history, and they replied they would seek to do so "[o]nly if he opens the door." ECF No. 501 at 46-47. Nonetheless, although I perceived no door opening on this point, during trial, the defendants elicited testimony from Baltas explaining some reasons he may have been placed in administrative segregation. ECF No. 588 at 143 ("I made a verbal threat to an officer that I would make a shank and stab them in the neck. Yes, I did that.") He admitted to fighting with another inmate. *Id.* at 144 ("I absolutely possessed a weapon for the amount of time it took me to take it from him. And then I beat him upside the head.") [7] Even if the defendants did not get in all the testimony they wished to regarding the reasons Baltas was in administrative segregation, they fail to show how this prejudiced them, as this testimony ultimately had little if any probative value with to respect to Baltas's claims that the defendants violated his rights to adequate nutrition and recreation.

Finally, the defendants assert that I erred in not propounding a jury interrogatory regarding solitary confinement "to explore whether the jury impermissibly expanded the recreation claim

[7] Further, the defendants were allowed to admit the fact that Baltas had been convicted of a felony, "murder," for purposes of attacking his credibility. ECF No. 598 at 73-74.

which the plaintiff had exhausted[] and was allowed to present." ECF No. 599 at 5. The defendants did not offer such a proposed interrogatory at any time. Their proposed interrogatories did not have questions seeking to evaluate whether the jury expanded the recreation claim. *See* ECF No. 569. During the charge conference, in which the parties had an opportunity to raise any issues regarding the jury instructions, the defendants were not prepared to present interrogatories to myself or the plaintiff. *See* ECF No. 590 at 145-46. The defendants then presented a rough draft of the interrogatories and we discussed them briefly, during which time I identified some deficiencies defense counsel needed to address and granted them additional time to do so. *Id.* at 146-52. At no time during this discussion did they propose any interrogatory relating to solitary confinement.

Once the jury was sent to deliberate, I further discussed the defendants' proposed interrogatories. Again, they did not raise any issue concerning solitary confinement or any need to determine whether the jury might "impermissibly expand[]" the recreation claim.[8] It is also unclear how, if the jury did in fact view recreation more broadly, this would relate to concerns over testimony about solitary confinement. And while the defendants ask the Court to incorporate their Rule 50 brief by reference, that brief does not offer any further insight into this issue, and does not mention solitary confinement at all.

## VI. Motion for Remittitur

### A. Legal Standard

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1329 (2d Cir. 1990) (citation and quotation marks omitted). "It is well settled that calculation of damages is

---

[8] An answer to proposed question number 36, "[d]o you find, by a preponderance of the evidence that Baltas had the ability to exercise in his cell?" would not have indicated whether the jury had "expanded" the recreation claim. ECF No. 569 at 11; *see supra* Section B(*ii*).

the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). Federal law, however, provides that a verdict is excessive if "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (citation and quotation marks omitted). To determine whether an award shocks the judicial conscience, "a review of comparable cases is appropriate." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012). A court should not "average the high and low awards," but must "focus instead on whether the verdict lies within the reasonable range." *Id.* (citation, quotation marks, and alteration omitted.) When the award involves punitive damages, the court also evaluates an excessiveness challenge using the *Gore* factors, i.e., (1) the degree of reprehensibility, (2) the ratio of the award to the actual harm inflicted on the plaintiff, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995). If a district court opts for the remittitur procedure, it should remit the jury's award "only to the maximum amount that would be upheld by the district court as not excessive." *Zeno*, 702 F. 3d at 672 (citation omitted.)

**B. Discussion**

*i. Sufficient Evidence*

The defendants argue "there is simply no evidence to support any award of punitive damages," ECF No. 599 at 7, and "there are quite simply no aggravating factors attributable to [the defendants]." *Id.* at 8. Baltas contends that the defendants did not preserve their argument on whether there was a legally sufficient basis for punitive damages because the defendants, in

making their Rule 50(a) motion, "did not argue that, based on the evidence presented, any punitive damages award would be unsupported by the evidence." ECF No. 607 at 17. Though framed as a motion for remittitur, the defendants effectively argue that they are entitled vacatur of the jury's punitive damages award as a matter of law. "Because this argument challenges the sufficiency of the evidence to support the predicate findings for punitive damages, however, [the defendants] w[ere] required to raise it in [their] Rule 50(a) motion, and [they] did not. Rule 50 is the proper mechanism to challenge the legal basis of punitive damages." *Williams v. Marinelli*, 2017 WL 11473740, *22 (D. Conn. Feb. 8, 2017). The defendants did not raise the issue of punitive damages during their Rule 50(a) motion during trial. *See* ECF No. 589 at 43-51. If a party procedurally defaults on a Rule 50 motion, the district court may not issue judgment as a matter of law in the party's favor unless doing so is required to prevent manifest injustice. *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012). Therefore, the argument is waived.

*ii. Excessiveness*

*1. Degree of Reprehensibility*

First, the defendants argue that their "conduct was not reprehensible." ECF No. 599 at 8. "In this context, 'reprehensibility' is not a question of whether the conduct is acceptable or unacceptable; the jury's finding of liability has already settled that question." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996). Punitive damages "should reflect the enormity of [a defendant's] offense." *Gore*, 517 U.S. at 575. The degree of reprehensibility is "particularly important and useful because punitive damages are intended to punish, and the severity of punishment, as in the case of criminal punishments, should vary with the degree of reprehensibility of the conduct being punished." *Payne v. Jones*, 711 F.3d 85, 101 (2d Cir. 2013). In assessing reprehensibility, courts consider whether: "the harm was physical rather than economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the conduct involved

repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003).

The jury's verdict on liability shows the first factor was present in this case – that the defendants' conduct posed a risk of physical harm to Baltas. As for the second *State Farm* factor, it is already clear from the discussion above that there was sufficient evidence to find that the defendants' states of mind exceeded negligence. Deliberate indifference itself implies at least recklessness. *Farmer*, 511 U.S. at 839-40 ("[s]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."). Next, there was evidence that the violations were longstanding and ongoing. Over a period of months, Baltas raised the problems with lack of food to Robles daily, Mulligan two times a week, and Quiros at least twice, while other inmates testified to raising the nutrition issue with Quiros for "years." As to the cancellation of recreation, there was evidence that Robles heard this complaint daily and Mulligan heard it twice a week during their tours. Finally, there was evidence from which the jury could have inferred malice, such as Mulligan's comment that, "[i]t's our job to make you as uncomfortable and miserable as possible, so nothing's going to happen." ECF No. 588 at 110. There was thus evidence to find the defendants' conduct reprehensible.

*2. Ratio of Actual Harm to the Punitive Award*

The second *Gore* factor evaluates the ratio of the damages to the harm inflicted. *Gore*, 517 U.S. at 580. The defendants argue that "the punitive damages award is grossly excessive in relation to the complete absence of physical injuries sustained by the alleged violation" ECF No. 599 at 9. The defendants premise some of their argument on the ratio of punitive to compensatory damages.

While compensatory damages may provide a helpful ratio for calculations of punitive damages in some cases, "the reasonableness of such a relationship is no simple mathematical formula," and "[w]e have said that punitive damages may be awarded in a § 1983 case, even if the compensatory damages are only nominal." *Lee*, 101 F.3d at 811. "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582. "Since the use of a multiplier to assess punitive damages is not the best tool here, we must look to the punitive damage awards in other civil rights cases to find limits and proportions." *Lee*, 101 F.3d at 811.

*3. Civil Penalties for Comparable Conduct*

The defendants state that "this element has no bearing on this case," and so I will not address it. ECF No. 599 at 10; ECF No. 613 at 9-10.

*iii. Comparison with Punitive Damages Awards in Similar Cases*

"[E]ven where the punitive award is not beyond the outer constitutional limit marked out, however imprecisely, by the three *Gore* guideposts," it is necessary to "review punitive awards for excessiveness...[which] requires comparison with awards approved in similar cases...[and] determin[ing], as with compensatory awards, whether the punitive award is so high as to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries*, 121 F.3d 808, 816–17 (2d Cir. 1997) (internal quotation marks and citation omitted).

The defendants ask the "court [to] eliminate the punitive damages award here," because "there was no evidence in this trial that [the defendants] deliberately or willfully injured the plaintiff." ECF No. 599 at 13. As discussed above, I decline to vacate the punitive damages based on the sufficiency of the evidence. The defendants point to no factually similar cases in their motion. They instead point to cases involving excessive force and assault. ECF No. 599 at 10-13.

I find it difficult to compare a case where the defendant engaged in a one-time act of violence or excessive force with cases involving deprivations of life's necessities lasting for months.

In my own review, I searched within the Second Circuit and other federal courts for closer comparators, including cases where punitive damages were assessed against defendants found to be deliberately indifferent to plaintiffs' safety or serious medical needs. Each case can be factually distinguished from this one, but I find that these additional cases provide further insight into assessing the excessiveness issue here. *See Townsend v. Allen*, 2009 WL 347010 (W.D. Wis. Feb. 10, 2009) (remitting $295,000 award to $29,500 for plaintiff sleeping on an unsanitary mattress for two months); *Gevas v. Pork*, 2024 WL 730378 (N.D. Ill. Feb. 22, 2024) (upholding award of $35,000 and $25,000 in punitive damages (and no compensatory damages) against two defendants for denying plaintiff access to a wheelchair for six weeks and denying him a new mattress for seventeen months); *Blissett*, 66 F.3d at 537 (upholding punitive damages of $10,000 each where the plaintiff was confined for several days nude in a dark, feces-smeared observation cell without basic amenities); *Gevas v. Harrington*, 2014 WL 4627689, at *5 (S.D. Ill. Sept. 16, 2014) (upholding $10,000 punitive damage award for deliberate indifference of defendants to plaintiff's cell conditions where he languished in a cell without running water or sanitation for seven days); *Miranda-Ortiz v. Deming*, 2001 WL 604017, at *16 (S.D.N.Y. June 1, 2001) (upholding $10,000 punitive damage award against a correction officer for deliberate indifference to his medical needs because she did not get plaintiff medical attention and later informed a superintendent that no medical attention was necessary for the plaintiff despite plaintiff's claims to the contrary); *Reilly v. Grayson*, 157 F. Supp. 2d 762, 774 (E.D. Mich. 2001), *aff'd*, 310 F.3d 519 (6th Cir. 2002) (awarding punitive damage of $18,250 where correction officers were deliberately indifferent to plaintiff's health by failing to place him in a smoke-free housing unit despite knowledge of his

asthma); *Beckford v. Irvin*, 49 F.Supp.2d 170, 185-86 (W.D.N.Y. 1999) (upholding punitive damages award of $15,000 and $10,000 against defendant correctional officers for being deliberately indifferent to plaintiff's serious medical needs in taking away plaintiff's wheelchair); *Matthew KielBowick v. Charles Lewis*, 1999 WL 33591149 (E.D. Mo. Jan. 13, 1999) (jury award of $1,500 in punitive damages for defendant's deliberate indifference to plaintiff's serious medical needs after plaintiff's two front teeth were knocked out and defendant refused to obtain medical care for plaintiff's injury).

Considering inflation and the inherently fact-specific nature of the analysis, Baltas's award of $130,000 in punitive damages across three defendants appears reasonable. *See DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003) ("When considering the sizes of the awards in earlier cases, we must take into account inflation.") In *Blissett*, for example, in 1993 the jury awarded $10,000 against one defendant for a conditions of confinement claim; today, that would be equivalent to $23,668.[9] 66 F.3d at 534, 537. In *Townsend*, where the plaintiff slept on an unsanitary mattress for two months, the 2009 award of $29,500 would be $47,155 today. 2009 WL 347010 at *1. The jury in *Reilly* awarded an asthmatic plaintiff $18,250 in 2001 for the denial of a smoke-free cell, which is $34,604 today. 157 F.Supp.2d at 774.

Baltas spent approximately 130 days in Northern; in that time, he was deprived of nutritionally adequate food for all 130 of those days. And during a 71-day period, he was "usually" denied opportunities for recreation three times per week, at minimum. With recreation available only on weekdays, the 71-day period encompassed approximately 50 weekdays. If Baltas received recreation only twice per week during that period, he would have received approximately 20 recreation periods and been deprived of recreation on approximately 30 weekdays, meaning that

---

[9] *CPI Inflation Calculator*, U.S. Bureau of Labor Statistics (last visited Nov. 19, 2026), https://www.bls.gov/data/inflation_calculator.htm?utm=syndication

he was unable to engage in out-of-cell recreation on roughly 60% of the weekdays during that period. Moreover, when weekends are included, Baltas spent approximately 51 of the 71 days confined to his cell without recreation for 24 hours a day, representing nearly 72% of the entire period. On account of the severity and duration of the harms suffered by Baltas, I cannot conclude that the jury's award shocks the judicial conscience or falls outside the range of reasonable noneconomic damages awards.

## VII. Conclusion

For the reasons set forth above, I deny the defendants' post-trial motions.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

November 25, 2026